## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| **WELLS FARGO BANK, N.A., as Trustee for Morgan Stanley Capital I Inc., Commercial Mortgage Pass-through Certificates, Series 2006-IQ12,**<br><br>　　　　　　　　　**Plaintiff,**<br><br>v.<br><br>**LICHTER GATEWAY IV, LLC, CLAIRE LICHTER, individually and in her capacity as Executrix of the ESTATE OF ALFRED LICHTER, JOSEPH SCHWARTZ, SUZETTE SCHWARTZ, THE ALFRED LICHTER 2000 FAMILY TRUST, AND GATEWAY CONCOURSE ASSOCIATION, INC.,**<br><br>　　　　　　　　　**Defendants.** | Civ. No. 17-2036 (KM)(MAH)<br><br>**OPINION** |

**KEVIN MCNULTY, U.S.D.J.**:

The plaintiff, Wells Fargo Bank, N.A., as Trustee for Morgan Stanley Capital I Inc., Commercial Mortgage Pass-through Certificates, Series 2006-IQ12 ("Wells Fargo"), brings this action against defendants, Lichter Gateway IV, LLC ("Lichter Gateway"); Claire Lichter, individually and in her capacity as Executrix of the Estate of Alfred Lichter, Joseph Schwartz, Suzette Schwartz, the Alfred Lichter 2000 Family Trust (collectively, "Guarantor", with Lichter Gateway and Guarantor being referred to collectively as "Lichter"); and the Gateway Concourse Association, Inc. ("the Association").

This is essentially a commercial foreclosure, brought by Wells Fargo as mortgagee against Lichter Gateway as mortgagor, and other parties as

1

guarantors. Lichter Gateway is currently in default to the tune of nearly $57 million in principal that has come due at maturity.

Wells Fargo moved for the appointment of a receiver to manage the property during the pendency of this litigation. Its primary concern was waste. Most pertinently, Lichter Gateway had failed to make required payments to the Association for the repair and upkeep of common areas in the Gateway complex, and the Association had responded by placing liens on the property. That concern, however, has been allayed. State court litigation brought against Lichter Gateway by the Association was recently settled, and the Association has agreed to vacate its liens. Although Wells Fargo has other concerns, I do not find them sufficiently weighty to justify the drastic remedy of a receiver to manage the property *pendente lite*.

Wells Fargo has also moved for the appointment of a rent receiver. As to that request I have a different view. Lichter Gateway has collected rents pursuant to a revocable license from Wells Fargo. Under the terms of the loan documents, that license was automatically revoked as a result of Lichter's default. Under the circumstances, I find that appointment of a rent receiver during the pendency of this litigation is appropriate.

Finally, Lichter moves under Federal Rule of Civil Procedure 12(b)(6) to dismiss part of Count 6 of the complaint for failure to state a claim upon which relief can be granted. That motion is denied.

## I. Background[1]

Wells Fargo has succeeded to the position of mortgagee of the $61 million commercial mortgage loan at issue.[2] (Cplt. ¶¶ 21, 26-32) Lichter Gateway is the current owner of the mortgaged premises, Gateway IV, a commercial building located at 100 Mulberry Street in Newark, New Jersey. *Id.* ¶¶ 2-3. The Association maintains certain common areas in the complex, and assesses building owners for the cost of doing so. (*See id.* ¶¶ 47-49.)

### A. The Loan

On October 24, 2006, Heritage Gateway, LLC ("Heritage"), Marine One Associates III, LLC ("Marine"), Ridgewood 2000 Associates III, LLC ("Ridgewood"), JPG Real Estate III, LLC ("JPG"), and Ivy Gateway, LLC ("Ivy") executed a Promissory Note evidencing a $61 million loan made by LaSalle Bank National Association ("LaSalle") to Heritage, Marine, Ridgewood, JPG, and Ivy (collectively, the "original borrower"). *Id.* ¶ 10; ECF no. 1-2, Ex. A. The maturity date under the Note was November 1, 2016. *Id.* ¶ 15; ECF no. 1-2, Ex. B § 2.3.2.

---

[1]     Certain items cited repeatedly will be abbreviated as follows:

| | |
|---|---|
| Cplt. = | Complaint, ECF no. 1 |
| Pl. Br. = | Brief in Support of Plaintiff Wells Fargo's Motion for Appointment of a Receiver (ECF no. 6-17) |
| Def. Opp. = | Defendant Lichter's Opposition to Plaintiff Wells Fargo's Motion for Appointment of a Receiver (ECF no. 19) |
| Pl. Reply = | Reply Brief in Further Support of Plaintiff Wells Fargo's Motion for Appointment of a Receiver (ECF no. 23) |
| Def. Br.= | Brief in Support of Defendant Lichter's Motion to Dismiss, in part, Count Six of the Complaint (ECF no. 17-1) |
| Pl. Opp.= | Plaintiff Wells Fargo's Opposition to Defendant Lichter's Motion to Dismiss, in part, Count Six of the Complaint (ECF no. 18) |
| Def. Reply = | Reply Brief in Further Support of Defendant Lichter's Motion to Dismiss, in part, Count Six of the Complaint (ECF no. 21) |
| Def. Letter= | Letter from Defendant Lichter in response to the Court's text order (ECF no. 39) |
| Pl. Letter= | Letter from Plaintiff Wells Fargo in response to the Court's text order (ECF no. 40) |

[2]     Solely for purposes of the Rule 12(b)(6) motion to dismiss, the allegations of the Complaint are taken as true. *See* Section IV.A, *infra*.

On or around October 24, 2006, the original borrower entered into a loan agreement with LaSalle. *Id.* ¶ 11; ECF no. 1-3, Ex. B. The Note incorporates the terms of that agreement. *See* ECF no. 1-2, Ex. A.

A Mortgage and Security Agreement, dated October 25, 2006, was executed by the original borrower, as mortgagor, to LaSalle, as mortgagee. *Id.* ¶ 16; ECF no. 1-4, Ex. C. An Assignment of Leases and Rents, dated October 25, 2006, was also executed by the original borrower to LaSalle. *Id.* ¶ 18; ECF no. 1-5, Ex. D.

In December 2006, LaSalle assigned the loan and loan documents[3] to Wells Fargo. *Id.* ¶ 22. *See* ECF nos. 1-6, Ex. E; 1-7, Ex. F; 1-8, Ex. G.

### B. Assumption of Loan Documents by Newark 300, LLC

On or about June 12, 2009, Ivy transferred 24% of its initial 40% ownership interest in Gateway IV to Newark 300, LLC. *Id.* ¶ 24. Newark 300, LLC "agreed to become jointly and severally liable as tenants-in-common with [the] original borrower under the . . . loan documents." *Id. See* ECF no. 1-9, Ex. H.

### C. Assumption of Loan Documents by Lichter Gateway

On or about January 3, 2011, the original borrower and Newark 300, LLC transferred Gateway IV to defendant Lichter Gateway. *Id.* ¶ 26. Defendants Lichter Gateway, Alfred Lichter, Claire Lichter, Joseph Schwartz, Suzette Schwartz, and the Alfred Lichter 2000 Family Trust "assumed all obligations under the Loan Documents and released the original borrower [Newark 300, LLC], and Original Guarantor from certain obligations pursuant to the Loan Documents, subject to the provisions set forth in the Borrower Assumption Agreement." *Id.* Wells Fargo, Lichter Gateway, the original borrower, and Newark 300, LLC, "as well as Steven Greenberg, Jeffrey Greenberg, and Ivy . . . (collectively, the 'Original Guarantor')" executed the Borrower Assumption Agreement, dated January 3, 2011. *Id.* ¶ 27; ECF no. 1-10, Ex. I. In substance, Lichter Gateway stepped into the shoes of the borrower.

---

[3]     "Loan Documents" refers to the Note, Mortgage, and Assignment of Leases.

In connection with Lichter Gateway's assumption of the Note, Defendants Alfred Lichter, Claire Lichter, Joseph Schwartz, Suzette Schwartz, and the Alfred Lichter 2000 Family Trust, executed a Guaranty, dated January 3, 2011. *Id.* ¶ 27; ECF no. 1-11, Ex. J. In substance, those parties stepped into the shoes of the guarantor.

### D. Lichter Gateway's Failure to Pay by Maturity Date

Lichter Gateway failed to pay all amounts due to Wells Fargo under the loan documents on the maturity date of November 1, 2016. Cplt. ¶¶ 33-34. According to Wells Fargo, Lichter Gateway is in default of its obligations to Wells Fargo under the Note and Mortgage. *Id.*

On January 4, 2017, Wells Fargo sent the Lichter defendants a notice of maturity default letter, informing them of their default and demanding payment. *Id.* ¶ 35; ECF no. 1-14, Ex. M. As of March 28, 2017, the date of the filing of the Complaint, Lichter Gateway had failed to pay all sums due under the loan documents, including $56,959,629.12 in principal, and therefore was in default.[4] *Id.* ¶¶ 36-39.

### E. The Association's Filing of Liens against Gateway IV

Lichter Gateway is a party to the "Amended and Restated Grant and Agreement, by and among the Association, Third Newark Gateway Urban Renewal Association, Gateway Four Urban Renewal, L.P., Gateway South Urban Renewal Association, and the Prudential Insurance Company of America," dated December 21, 1999 (the "Concourse Agreement"). *Id.* ¶ 47. Under the Concourse Agreement, defendant Lichter Gateway is obligated to pay the Association for the Association's "costs for performing its duties to maintain and service certain of the concourses and walkways at or near" Gateway IV. *Id.* ¶¶ 48-49.

In December 2012, Lichter Gateway "voluntarily ceased payment" of those cost assessments, thereby defaulting under the Concourse Agreement.

---

[4]     Presumably the default continues; no party has brought to the Court's attention that it has been cured.

*Id.* ¶¶ 50-51. As a result of that default, the Association filed three liens against Gateway IV. *Id.* ¶ 52. The first lien was recorded in July 2013, the second in June 2015, and the third in March 2016. *Id.* The Association commenced an action to compel Lichter Gateway to pay the assessments in the Superior Court of New Jersey, Law Division, Essex County. *Gateway Concourse Association, Inc. v. Lichter Gateway IV LLC,* ESX-L-001075-16 (the "State Action").[5] *Id.* ¶ 53.

Wells Fargo asserts that, as a result of Lichter Gateway's unpaid assessments, the Association "has ceased maintaining the concourses and walkways" at or near Gateway IV. *Id.* ¶ 54. In particular, an escalator and revolving door which provide access to Gateway IV "are broken and remain unrepaired." *Id.* ¶ 55. Wells Fargo alleges that, "as a result of deteriorating conditions . . . a tenant at [Gateway IV] has declared an event of default against [Lichter Gateway] under the terms of its lease." *Id.* ¶ 56.

Wells Fargo says that neither Lichter Gateway nor the Association informed it of the default under the Concourse Agreement or the existence of the liens. *Id.* ¶ 57. Rather, from 2013 to 2016, Lichter Gateway submitted annual operating statements to Wells Fargo which indicated that Lichter Gateway had paid "association fees." *Id.* ¶ 58. It also provided budgets to Wells Fargo which included as budgeted costs the payment of the Association assessments. *Id.* Indeed, Lichter Gateway requested and obtained funds from Wells Fargo to pay those costs. *Id.* According to Wells Fargo, Lichter Gateway "failed or omitted to notify [Wells Fargo] that [it] was voluntarily withholding payment of the Concourse Assessments," from which Wells Fargo infers that it "either misappropriated, misapplied, converted, or failed to use such funds for the purpose of paying the Concourse Assessments." *Id.*

---

5    Lichter Gateway and the Association ultimately settled the State Action. *See* Section II, *infra.*

## II. Procedural History

On March 28, 2017, Wells Fargo filed this action. (Cplt., ECF no. 1) The Complaint asserts six causes of action against Lichter and the Association: (1) mortgage foreclosure; (2) possession; (3) security interest foreclosure; (4) rent receiver; (5) breach of promissory note; and (6) breach of guaranty. (*Id.* ¶¶ 69-88) Attached to the Complaint are thirteen exhibits. (ECF nos. 1-2 to 1-14).

On May 5, 2017, Wells Fargo filed the current motion for appointment of a receiver. (ECF no. 6) In support, it submitted a brief (Pl. Br.), and a declaration from Michael Nikula, a Servicing Officer of C-Ill Asset Management LLC, the Special Servicer for Wells Fargo, in support of its motion. (ECF no. 6-1). Fifteen exhibits were attached to the declaration. (ECF nos. 6-2 to 6-16).

On June 5, 2017, the Association filed an Answer to the Complaint. (ECF no. 14) On that same date, in lieu of an answer, Lichter filed a motion to dismiss part of Count Six of the Complaint. (Def. Br.)

On June 19, 2017, Wells Fargo filed a brief in opposition to the motion to dismiss. (Pl. Opp.) Also on that date, Lichter filed its brief in opposition to Wells Fargo's motion for appointment of a receiver. (Def. Opp.) In support of that brief, Lichter submitted a declaration from Abraham Schwartz, the manager at Lichter & Lichter, L.P., and a declaration from Steven Greenberg, the principal of Heritage Newark Management Company, the property management company for Gateway IV. (ECF nos. 19-1, 19-4) The declaration of Abraham Schwartz attached two exhibits, and the declaration of Steven Greenberg attached five exhibits. (ECF nos. 19-2 and 19-3; ECF nos. 19-5 to 19-9)

On June 26, 2017, Lichter filed a reply memorandum of law in further support of its motion to dismiss, in part, Count Six of the Complaint. (Def. Reply) On that same date, the Association submitted a letter in support of Wells Fargo's motion to appoint a receiver, and "in reply to the opposition . . . filed by Lichter." (ECF no. 22) Attached to the letter are the declaration of David L. Menzel, Esq., counsel for the Association, and exhibits related to the State Action. (ECF no. 22-1)

On that same date, Wells Fargo filed a reply brief in further support of its

motion for appointment of a receiver. (Pl. Reply) It also submitted a "reply declaration" from Mr. Nikula with an Exhibit (ECF nos. 23-1, 23-2), and a declaration from James Postell, its proposed receiver (ECF no. 23-3).

Two days later, on June 28, 2017, Lichter filed a letter requesting permission to respond to the Association's "untimely and reckless" filing.[6] (ECF no. 24 at 3) It argued that the Association's letter should be rejected by this Court pursuant to Local Civil Rule 7.1(d)(7).[7] (ECF no. 24 at 2) The next day, both the Association and Wells Fargo filed their respective responses. (ECF nos. 25, 26)

On October 19, 2017, I heard oral argument on the motions and reserved decision; among other things, I was awaiting news on the progress of the State Action between the Association and Lichter Gateway IV, which was imminently scheduled for trial. On October 25, 2017, the Association and Lichter Gateway IV reached a settlement in the State Action. (ECF no. 39 at 1)

Wells Fargo's position at oral argument and in its briefing heavily relied on the existence of the Association dispute and the alleged waste resulting from that dispute. I therefore entered a text order asking each party to submit a letter describing how the resolution of the State Action would bear on the pending application for a receiver. (ECF no. 35) Supplemental letters were filed. (ECF nos. 38 to 40) Lichter's submission attaches a copy of the settlement agreement as Exhibit A. (ECF no. 39, Ex. A) Wells Fargo's submission attaches a copy of March and October 2017 e-mails between Mr. Nikula and Nanette Jerlat of Heritage, which is Lichter Gateway's property management agent. (ECF no. 40, Ex. A)

---

6     Under Local Civil Rule 7.1(d)(6), "no sur-replies are permitted without permission of the Judge or Magistrate Judge to whom the case is assigned."
7     Local Rule 7.1(d)(7) states: "[t]he Court may reject any brief or other paper not filed within the time specified." Lichter pointed out that the date for responses to Wells Fargo's motion for appointment of a receiver was June 19, 2017; however, the Association filed its response on June 26, 2017. (ECF no. 24 at 1 to 2)

In Section III, *infra*, I address Wells Fargo's motion for appointment of a receiver, and in Section IV, *infra*, I address the motion to dismiss part of Count 6 of the complaint.

## III. Motion to Appoint Receiver

### A. Applicable Standard

Federal Rule of Civil Procedure 66 empowers a federal court to appoint a receiver in a pending litigation.[8] The remedy is a drastic one, and the power to appoint a receiver is one that should be exercised with great caution. "Such an appointment . . . should not be made lightly; it is appropriate only in the face of compelling circumstances and in the absence of a less drastic remedy." *Leone Indus. v. Associated Packaging, Inc.*, 795 F. Supp. 117, 120 (D.N.J. 1992). *See* 12 Wright, Miller, Kane & Marcus, Federal Practice and Procedure, § 2983 (2d ed.) ("The appointment of a receiver is considered to be an extraordinary remedy that should be employed with the utmost caution and granted only in cases of clear necessity to protect plaintiff's interests in the property.") (footnote omitted); *Maxwell v. Enter. Wall Paper Mfg. Co.*, 131 F.2d 400, 403 (3d Cir. 1942) (recognizing that "it has been judicially noted almost innumerable times that the appointment of a receiver is an extraordinary, a drastic ... remedy ... not to be resorted to if milder measures will give the plaintiff, whether creditor or shareholder, adequate protection for his rights.") (internal citations omitted).[9]

Generally, in federal diversity actions like this one, federal law governs the decision of whether a receiver should be appointed. *See* 12 Wright, Miller, Kane

---

[8]  It provides as follows:

> These rules govern an action in which the appointment of a receiver is sought or a receiver sues or is sued. But the practice in administering an estate by a receiver or a similar court-appointed officer must accord with the historical practice in federal courts or with a local rule. An action in which a receiver has been appointed may be dismissed only by court order.

[9]  "[T]he party seeking [a receivership] must show that he or she has some legally recognized right in that property that amounts to more than a mere claim against [the] defendant." 12 Wright, Miller, Kane & Marcus, *supra*, § 2983 (footnote omitted). Here, Wells Fargo claims an interest in Gateway IV as mortgagee, which is sufficient.

& Marcus, *supra*, § 2983 ("Whether a federal court should appoint a receiver in a diversity action appears to be a question properly determined on the basis of federal law."); 13–66 Moore's Federal Practice–Civil § 66.09 ("Federal law and federal practice govern the appointment of a federal equity receiver.... [T]o use federal law is not inconsistent with the *Erie* doctrine ... because the appointment of a receiver does not directly affect the outcome of the case. By definition, the appointment of a receiver is ancillary to the primary relief being sought, so the appointment of a receiver does not directly affect the outcome of a particular action."); *but see Mintzer v. Arthur L. Wright & Co., Inc.*, 263 F.2d 823, 825 (3d Cir.1959) (concluding that federal courts sitting in diversity should apply state law to the appointment of a receiver).

District courts in the Third Circuit have applied federal law to a motion to appoint a receiver. *See Fimbel v. Fimbel Door Corp.*, No. CV141915FLWDEA, 2016 WL 1379788, at *2 (D.N.J. Apr. 7, 2016) (identifying cases in the Third Circuit that have applied federal law when considering the appointment of a receiver, and applying federal law in its analysis); *but see New England Mutual Life Ins. Co. v. Troy Ventures, Ltd.*, Civ. No. 94-3299, 1994 WL 705411, at *8 (D.N.J. Dec. 14, 1994) (applying Pennsylvania state law standards).

The parties in this case both cite federal law, and have not identified any significant difference between state and federal standards.[10] Given the weight of the authority, and the parties' evident agreement, I will apply federal standards for the appointment of a receiver. *See* Section IV.B, *infra*.

Although all parties submitted affidavits and exhibits, no party sought an evidentiary hearing in connection with this motion. While the court may require live testimony in an appropriate case, an evidentiary hearing is not needed if "the record discloses sufficient facts to warrant appointment of a receiver." *Leone Indus.*, 795 F. Supp. at 120 n.6 (citation omitted). I think the parties' approach is sound, in that the essential facts may be gleaned from the

---

[10]    Lichter cites state cases in support of its contract-related arguments; however, it relies on federal law when discussing the factors that should be considered by this Court when deciding whether to appoint a receiver. (Def. Opp. at 19, 32 to 33)

documents; any disputes that would involve the credibility of witnesses are not essential to my decision. I therefore decide this motion on the papers, as supplemented by oral argument.

## B. Analysis of Motion to Appoint Receiver

The mortgage loan is in default. Wells Fargo seeks an order appointing a receiver who will 1) collect all rents and income, and 2) operate and manage the property. (Pl. Br. at 8, 13). As will become clear, I do not think that those two aspects of Wells Fargo's motion stand on the same footing.

When evaluating the appointment of a receiver in the context of a mortgage foreclosure, a district court has "'broad discretion in appointing a receiver... [I]t may consider a host of relevant factors ... [N]o one factor is dispositive.'" *Wells Fargo Bank, N.A. v. CCC Atl., LLC*, 905 F. Supp. 2d 604, 614 (D.N.J. 2012) (quoting *Canada Life Assurance Co. v. Alfred R. LaPeter*, 563 F.3d 837, 845 (9th Cir. 2009)). Courts have generally considered the following six factors: (1) whether "the property is inadequate security for the loan"; (2) whether "the mortgage contract contains a clause granting the mortgagee the right to a receiver"; (3) "the continued default of the mortgagor"; (4) "the probability that foreclosure will be delayed in the future"; (5) "the unstable financial status of the mortgagor"; and (6) "the misuse of project funds by the mortgagor." *Id.* (quoting *United States v. Berk & Berk*, 767 F.Supp. 593, 597 (D.N.J. 1991)) (footnote omitted). "The presence of a contractual stipulation to the appointment of a receiver 'is given considerable weight in the court's evaluation of whether a rent receiver should be appointed.'" *In re Inv'rs Warranty of Am., Inc. v. B.W.E. Dev., L.L.C.*, No. CIV.09-4490, 2010 WL 2557559, at *5 (D.N.J. June 23, 2010)(quoting *Barclays Bank, P.L .C. v. Davidson Ave. Assoc., Ltd.*, 644 A.2d 685, 687 (N.J. Super. Ct. App. Div. Jul. 8, 1994)).

The appointment of a managing receiver, as opposed to a mere receiver of rents, is a more drastic remedy that implicates additional concerns. When a moving party seeks a receiver who will manage and operate the mortgaged

11

property pending foreclosure, courts are particularly cautious in appointing a receiver, and therefore consider whether the evidence demonstrates "something more" than just "the doubtful financial standing" of the defendant and the "inadequacy of the security." *Wells Fargo Bank, N.A.*, 905 F. Supp. 2d at 614. Accordingly, additional factors may be considered, including

> (1) the danger of waste; (2) delays in foreclosure; (3) the defendant's fraudulent conduct; (4) imminent danger that property will be lost, concealed, injured, diminished in value, or squandered; (5) the inadequacy of the available legal remedies; (6) the probability that harm to plaintiff by denial of the appointment would be greater than the injury to the parties opposing appointment; and (7) the plaintiff's probable success in the action and the possibility of irreparable injury to his interests in the property.

*Id.* at 614–15 (internal quotation marks, brackets, and citation omitted)(quoting *Canada Life Assurance Co.*, 563 F.3d 837 at 845; *Chase Manhattan Bank, N.A. v. Turabo Shopping Ctr., Inc.*, 683 F.2d 25, 26–27 (1st Cir.1982)).[11]

Here, the parties did not address (5) the inadequacy of the available legal remedies, or (7) Wells Fargo's probable success in the action and the possibility of irreparable injury to its interests in Gateway IV. They did, however, address other relevant factors. I consider them in turn.

### 1. Mortgage Agreement

Wells Fargo stresses that it is entitled to such relief because under the mortgage agreement, Lichter "expressly consented to the appointment of a receiver" in the event of default, "which has indisputably occurred." (Pl. Br. at 9-10).

Particularly in regard to a managing receiver, as opposed to a rent receiver, Wells Fargo relies on Section 7.1(g) of the mortgage agreement, which

---

[11]    Lichter cites cases from other federal jurisdictions, which have applied different standards for appointment of a receiver. *See FirstMerit Bank, N.A. v. Myrter*, No. 2:15-cv-333, 2015 U.S. Dist. LEXIS 82642 (W.D. Pa. June 25, 2015); *Fidelity Bank v. Key Hotels of Brewton, LLC*, No. 15-0031-WS-M, 2015 U.S. Dist. LEXIS 48055 (S.D. Ala. Apr. 13, 2015); *Fed. Home Loan Mortg. Corp. v. Jerwin Realty Assoc.*, CV-92-4626 (CPS), 1992 U.S. Dist. LEXIS 19207 (E.D.N.Y. Dec. 14, 1992). The analyses and holdings from those cases are not binding on this Court. I will focus on the factors applied by courts in this District.

provides that in the event of default, as defined by the loan agreement,[12] Wells Fargo

> may . . . (g) apply for the appointment of a receiver, trustee, liquidator or conservator of the [Mortgaged Premises], without notice and without regard for the adequacy of the security for the [Loan] and without regard for the solvency of Borrower, any guarantor, indemnitor with respect to the Loan or of any [p]erson liable for the payment of the [Loan]. . .

(ECF No. 1-4, Ex. C, §7.1(g))

Lichter, as it must, acknowledges this provision, but urges that it falls short of "explicit consent" to the appointment of a receiver. Rather, it authorizes Wells Fargo to "*apply* for the appointment of a receiver." (Def. Opp. at 17, 33) (emphasis in original, quoting Mortgage Agreement §7.1(g), *supra*). I eschew Lichter's excessively literal approach, which would reduce this to an illusory promise (after all, anybody can *apply* for anything). I do accept, however, that it falls short of a full, self-executing consent to appointment of a receiver for any and all purposes upon default. Particularly as to the appointment of a receiver to operate and manage the property, it is relevant but not dispositive. Neither, however, is it Wells Fargo's only argument from the wording of the relevant agreements; additional provisions in the assignments of rents and leases strengthen its hand, at least as to a rent receiver.

Wells Fargo also points out that under the mortgage agreement and the Assignment of Leases, it possesses equitable title to the income and rents generated by Gateway IV, because Lichter's revocable license to collect the rents has been automatically terminated as a result of its default. *Id.* at 10 to 11; (ECF Nos. 6-4, Ex. C, at 4 to 5; 6-5, Ex. D, at 1 to 2)

In that regard, Wells Fargo relies on Section 1.2 of the mortgage agreement, entitled "ASSIGNMENT OF RENTS." Section 1.2 provides as follows:

> Borrower hereby absolutely and unconditionally assigns to Lender all of Borrower's right, title and interest in and to all current and

---

[12] Section 10.1(a) of the loan agreement defines "Event of Default." (ECF No. 6-3, Ex. B, at 67-69).

future Leases and Rents; it being intended by Borrower that this assignment constitutes a present, absolute assignment and not an assignment for additional security only. Nevertheless, subject to the terms of the Assignment of Leases and Section 7.l(h) of this Security Instrument, Lender grants to Borrower a revocable license to collect, receive, use and enjoy the Rents. Borrower shall hold the Rents, or a portion thereof sufficient to discharge all current sums due on the Debt, for use in the payment of such sums.

(ECF No. 1-4, Ex. C, §1.2)

Closely related is the Assignment of Leases, in which Lichter "absolutely and unconditionally" assigned the right to leases and rents of Gateway IV to Wells Fargo, and granted "[t]he right, at [Wells Fargo]'s option upon revocation of the license granted herein, to enter upon [Gateway IV] in person, by agent or by court-appointed receiver, to collect the Rents." (ECF No. 1-5, Ex. D, §1.1(c), (h)). Under Section 2.1 of that Assignment, Lichter does not possess title to the rents; it enjoys only a revocable *license* from Wells Fargo to "collect, receive, use and enjoy the Rents, as well as other sums due under the Lease Guaranties." (ECF No. 1-5, Ex. D, §2.1).

The Assignment of Leases explicitly spells out the consequences of default. Section 3.1 of that Assignment provides that "[u]pon the occurrence of an Event of Default, the license granted to Borrower in Section 2.1 of this Assignment shall automatically be revoked, and Lender shall immediately be entitled to possession of all Rents and sums due under any Lease Guaranties, whether or not Lender enters upon or takes control of the Property." (ECF No. 1-5, Ex. D, §3.1) Moreover, under that Section, Lichter also consents and agrees that Wells Fargo may enter onto the property, eject Lichter, and collect rents:

[Wells Fargo] may, at its option, without waiving such Event of Default, without regard to the adequacy of the security for the Debt, either in person or by agent, nominee or attorney, with or without bringing any action or proceeding, or by a receiver appointed by a court, dispossess Borrower and its agents and servants from the Property, without liability for trespass, damages or otherwise and exclude Borrower and its agents or servants

14

wholly therefrom, and take possession of the Property and all books, records and accounts relating thereto and have, hold, manage, lease and operate the Property on such terms and for such period of time as [Wells Fargo] may deem proper and either with or without taking possession of the Property in its own name, demand, sue for or otherwise collect and receive all Rents and sums due under all Lease Guaranties, including those past due and unpaid with full power to make from time to time all alterations, renovations, repairs or replacements thereto or thereof as [Wells Fargo] may deem proper . . .

*Id.*

Unlike the mortgage agreement, the assignments of rents and leases have rents and leases as their primary focus. As to the right to receive rents, the Assignment of Leases is far clearer than Section 7.1(g) of the mortgage agreement, *supra*, and it purports to be self-executing on default. According to Wells Fargo, the Assignment of Leases also authorizes it to enter onto the property without invoking legal process, and to manage and operate it. Wells Fargo, however, is not (or at least is not currently) exercising its claimed right to self-help under that Assignment. Understandably, it seeks the protection of a court order (as well as the insulation from liability afforded by a third-party manager). That being the case, however, Wells Fargo must take the bitter with the sweet; to invoke the powers of the Court and the protection of a Court order, it must submit to the Court's equitable discretion, which involves the weighing of factors other than the wording of the parties' agreements. The Court will not order relief merely because Wells Fargo might (at its own risk) have helped itself to the same.

As recognized in Section III.B, *supra*, a contractual stipulation to the appointment of a receiver "'is given considerable weight in the court's evaluation of whether a rent receiver should be appointed.'" *In re Inv'rs Warranty of Am., Inc.*, 2010 WL at *5 (quoting *Barclays*, 274 N.J. Super. at 520). However, "it is not the only factor to be examined. . .the Court also considers other equitable factors." *Id. See also Bank of America, N.A. v. B.R.M. Parkway Ctr., Inc.*, No. 12-CV-172 (ES), 2012 WL 12906570, at *4 (D.N.J. Dec.

19, 2012).[13] This factor therefore merits, and will receive, weight. As I must, however, I consider the other equitable factors.

### 2. Waste

In its initial submissions to the Court, Wells Fargo asserted that a managing receiver was required because Lichter had placed the mortgaged premises in jeopardy and committed waste. (Pl. Br. at 1, 11 to 13; Pl. Reply at 7 to 8) Its complaints centered on Lichter's alleged failure to pay required assessments to the Association for the repair and upkeep of common areas in the Gateway complex. This resulted in the Association's imposition of liens and bringing of a state court lawsuit against Lichter Gateway. And that, said Wells Fargo, detracted from the value and viability of the property.

Lichter was alleged to have (1) failed to make condominium assessments due to the Association since December 2012; (2) permitted three liens to be recorded by the Association against the premises, resulting in the commencement of litigation against Lichter by the Association; and (3) "failed to repair or cause to be repaired a broken escalator and revolving door"; thereby creating "waste to [Gateway IV] and [Lichter]'s default under a lease with at least one tenant at [Gateway IV]."[14] (Pl. Br. at 1, 11; Nikula Decl. ¶¶ 29, 32, and 33) This dispute between Lichter and the Association lay at the heart of this motion and occupied the bulk of oral argument.[15] In a real sense, the

---

[13]  *Barclays Bank, P.L.C. v. Davidson Ave. Assocs., Ltd.*, 274 N.J. Super. 519, 520 (App. Div. 1994), and *Tucker v. Nabo Constr. Corp.*, 108 N.J. Eq. 449 (Ch. 1931), cited by Lichter, are not to the contrary. Those cases state that a court should not rely solely on a contractual provision when appointing a receiver, but recognize the general principle that a court should give considerable weight to such a contractual provision.

[14]  The reference is to McCarter & English, LLP, a Gateway IV tenant, which served a letter notice of default, seemingly because of the deteriorating conditions in the common area. (*See* Cplt. ¶ 56; Def. Opp. at 10; Schwartz Decl. ¶ 10.) Lichter maintains that this was the only time a tenant issued a default letter, and that the escalators have now been repaired and are operable. (Def. Opp. at 10)(citing Schwartz Decl. ¶ 10)).

[15]  As I say, the dispute has been settled. For ease of reference, however, I summarize the parties' contentions.

Lichter responded to the allegations of waste as follows. (Def. Opp. at 22) While recognizing the "unresolved issues" in the common areas, Lichter says the responsible entity is the Association, which owns, controls, and has failed to maintain the

dispute between Lichter and the Association was the tail that wagged the dog of this motion practice between Lichter and Wells Fargo. That is, Wells Fargo's application for relief against Lichter was based, in large part, on the Association's grievance against Lichter. And the Association, for its part, initially supported Wells Fargo's request for a receiver.

At oral argument, the parties informed the Court that, in the State court litigation between Lichter Gateway and the Association, a trial date was imminent. On or close to that trial date in late October 2017, the matter was settled.

In the settlement agreement, Lichter Gateway agreed to make a $561,003.32 payment to the Association by November 1, 2017. (ECF no. 39,

---

common areas since before Lichter had even acquired the property. *Id.* at 9 to 13, 22 to 24, 28. It further vigorously asserts that Wells Fargo "has known for years that the Concourse Association has failed to make repairs to the common areas despite multiple requests and pleas by Lichter." *Id.* at 22. In support of its allegation, Lichter points to e-mails from November and December 2013 between representatives of Wells Fargo's servicer, Berkadia, and Abraham Schwartz, the manager at Lichter & Lichter, L.P. *Id.* at 14, 25; Schwartz Decl. ¶¶ 12-15; ECF 19-2, Ex. 1. According to Lichter, those e-mails demonstrate that "Wells Fargo was well aware that Lichter Gateway was in good faith withholding association payments in an attempt to leverage the Concourse Association to follow through on its obligations." *Id.* at 25. Therefore, this is not an emergency situation which warrants this Court's intervention by appointment of a receiver. *Id.* at 27.

In its reply brief, Wells Fargo asserts that the imposition of the concourse liens and strained relationships with tenants over common area maintenance jeopardize Wells Fargo's security and reduce the value of the building. Pl. Reply at 4, 8. The November –December 2013 emails cited by Lichter, says Wells Fargo, "predate a number of [Lichter's] misrepresentations to [Wells Fargo]." *Id.* at 9. Because of Lichter's misrepresentations in 2014 and thereafter, it was not until recently, Wells Fargo says, that it became aware "of the severity of the problems at [Gateway IV], the deterioration of the relationships between [Lichter Gateway], tenants, and the Concourse Association, and the jeopardy in which [Lichter Gateway] has placed [Gateway IV]." *Id.* at 10 (citing Nikula Reply Decl. ¶ 11).

The Association, by the way, disputes that it is the owner of the common areas. Rather, it says, pursuant to an Amended Grant and Agreement among the owners of the Gateway properties, there are reciprocal easements by and among the Gateway owners so that people can travel through the concourse. (ECF no. 22 at 2)(citing Tobia Cert.) Thus, in the Association's view, the owners of the buildings in the Gateway complex "actually own, subject to the reciprocal easements. . . their respective areas of the Concourse." *Id.* For present purposes, that would be "Lichter and the owner of Gateway III." *Id.*

Ex. A ¶ 2) That payment, which Lichter has made, "represent[ed] payment of all outstanding assessments, reserves, and legal fees due as of October 1, 2017." *Id.*; (Def. Letter 1). The Association, in turn, agreed to discharge the liens it placed on Gateway IV. (ECF no. 39, Ex. A ¶ 17) Furthermore,

> [t]he settlement agreement require[d] the Concourse Association to use the settlement funds primarily to replace or thoroughly modernize the escalators serving Gateway IV. It also provides for the Concourse Association and Lichter Gateway IV to work together to evaluate project proposals and achieve savings. In addition, the Concourse Association recognizes in the settlement agreement that there has been deferred maintenance in the concourse area and that the following additional repair/maintenance items are within the scope of its responsibility:
>
> a. Replacement of the stationary doors at the Mulberry Street exit for the Gateway III/Gateway IV Atrium;
>
> b. Replacement of the remaining, original Mulberry Street revolving door;
>
> c. Replacement of AC . . . ;
>
> d. Investigate and repair concourse roof leaks, repair damaged plaster and painting;
>
> e. Correct tinted glass panels installed in the Atrium after Hurricane Sandy by either replacing glass panels or applying a coating to achieve uniform color with original panels;
>
> f. Upgrade ceiling light fixtures between Gateway II and Mulberry
>
> Street;
>
> g. General cleaning, repair, painting and regular program of maintenance/repair of all areas of the Mulberry Street end of the concourse.[16]

(Def. Letter at 2 (footnotes omitted); *see also* ECF no. 39, Ex. A ¶¶ 4-13.)

Additionally, "any funds remaining after completion of the escalator replacement/modernization will be utilized for door replacement, and thereafter for the above listed, remaining repairs. Moreover, the Concourse Association

---

[16]    The Association adds that funds from the settlement "will be utilized primarily to replace or modernize escalators in the Gateway III/Gateway IV Atrium. If there are funds remaining, they will be applied to other specified repair/maintenance items." (ECF no. 38)

has agreed that such maintenance and repair 'shall have priority over any unnecessary or discretionary work within the concourse as a whole.'" (Def. Letter at 2) (quoting ECF no. 39, Ex. A ¶ 12).

Lichter now argues, and I agree, that the settlement of the State Action "weighs against the appointment of a receiver." (Def. Letter at 1). The claim of waste is largely moot, and the urgency to which it gave rise is no longer so pressing. Indeed, Lichter cautions the Court that "[t]he appointment of an outsider . . . receiver would now only stand to delay and deter such progress and renewed relations." (Def. Letter at 3). The Association, for its part, considers the matter closed and no longer supports the motion for a receiver. *See* ECF no. 38 ("Because [the Association] no longer has an interest in the litigation, it no longer takes any position with respect to the pending application and withdraws the support it previously offered.")[17]

Wells Fargo, however, remains distrustful. A receiver is still necessary, it says, to ensure that Lichter pays the assessments to the Association so that the contemplated repairs can be completed. (*See* Pl. Letter.) Still, the settlement is satisfactory to the Association, which believes that it resolves the issues with maintenance to the common areas. Wells Fargo's arguments about what the future may hold do not persuade me that a managing receiver should be appointed based on the "waste" factor. Should the fears of Wells Fargo materialize, the issue may of course be revisited.

### 3. Misuse of Project Funds/Fraudulent Conduct

According to Wells Fargo, Lichter's conduct with respect to the Association assessments went beyond mere nonpayment. Lichter also allegedly (1) failed to inform Wells Fargo that it had ceased paying the Assessments, and (2) submitted financial statements to Wells Fargo which misleadingly indicated otherwise. (Pl. Br. at 7 to 8; Pl. Reply at 6) According to the Nikula Declarations, Lichter included the Association fees as expenses in its budgets,

---

[17]     The Association also argues that it should be dismissed from the case. (ECF no. 38) Dismissal, if desired, should be sought formally, not in a letter. If there is consent, a consent order will suffice.

and requested funding of such expenses from its cash management accounts. (Pl. Br. at 7–8; Nikula Decl. ¶ 35; Pl. Reply at 6; Nikula Reply Decl. ¶ 10) Wells Fargo asserts that these actions amount to fraud, or at least misapplication of project funds. (Pl. Reply at 6–7) Lichter responds that Wells Fargo was aware that it was withholding the Association assessments. *See* Section III.B.2, *supra.* In light of the State Action settlement, this might be viewed as water under the bridge; to Wells Fargo, however, it is indicative of financial practices that require monitoring by a receiver. The concern is perhaps overblown, but to an extent, I agree. Where the property is concededly in default, a borrower permitted to remain in possession owes the lender a duty of care and candor.

More recently, Wells Fargo has claimed that Lichter Gateway is misusing other project funds and rents. (Pl. Letter at 1) Relying on an e-mail chain between Mr. Nikula and Ms. Jerlat, Wells Fargo contends that "upon information and belief," Lichter Gateway "has failed to provide all of the released funds" to its management company, Heritage, therefore "leaving a shortfall so that Heritage cannot cover all of the payments due to the various contractors, vendors, and operating expenses that the property incurs each month." *Id.* at 2 (citing Pl. Letter, Exh. A) Wells Fargo further maintains that because the settlement does not address that misuse of funds, Lichter can "continue to misrepresent" its use of project funds, and the only way to protect the property is through this Court's appointment of a receiver. *Id.*

The evidence submitted by Wells Fargo, however, does not require such a conclusion. The e-mail chain began on March 2, 2017 when Ms. Jerlat of Heritage, Lichter Gateway's property management agent, forwarded an estimate for replacement of a booster system to Mr. Nikula, a Servicing Officer of C-Ill Asset Management LLC, the Special Servicer for Wells Fargo. (Pl. Letter, Exh. A) The invoice cited "a total cost of $84,420, payable in installments, with 50% ($42,120) due at the time of order, and the remaining 50% due thereafter."[18]

---

[18]     A copy of the invoice was not provided. I rely on Wells Fargo's description of it, which Lichter Gateway does not seem to dispute.

(Pl. Letter at 2 n.3) About seven months later, on October 12, 2017, Ms. Jerlat sent Mr. Nikula another e-mail, which forwarded the same estimate and asked Mr. Nikula if he would be funding the replacement "today." (Pl. Letter, Exh. A) Mr. Nikula responded the same day that "[w]e included the upfront deposit of $42,120 in March and the remaining $42,120 last month. You received $316,763 last month which was the operating expenses of $235,961 per budget and the $42,120 for the remaining booster payment." (Pl. Letter, Exh. A) Ms. Jerlat answered: "Thanks I will check with Lichter- because they had the sweep only at 168,337.52[.] Must be an error on their part[.]"(Pl. Letter, Exh. A) To my mind, this exchange falls well short of establishing any sort of misrepresentation or fraud.

According to Wells Fargo, "[Lichter Gateway's] failure to provide all of the released funds to Heritage, leaving Heritage unable to pay the monthly expenses it incurs, contradicts [Lichter Gateway's] assertion that it is properly managing the property and calls into question the relationship between [Lichter Gateway] and Heritage." (Pl. Letter at 2) In addition to interpreting the e-mails as support for its position that a receiver is needed to manage Gateway IV, Wells Fargo also argues that the e-mails demonstrate that a receiver is needed to collect the rents and apply those rents to the appropriate operating expenses for Gateway IV because the appointment of a receiver is "[t]he only way to protect the property from [Lichter Gateway's] misuse of rents." *Id.*

This evidence is insufficient to persuade me that a receiver should be operating the building. Still, Lichter's revocable license to collect rents has terminated, and the threshold for appointment of a rent receiver is correspondingly lowered. I therefore give this evidence some weight in consideration of appointment of a rent receiver.

### 4. Unstable financial status, continued default, and adequacy of property as security

Wells Fargo points out that Gateway IV is an office building with multiple tenants; that the income generated by the building is critical to its value; and that its value serves as collateral for the loan. (Pl. Br. at 13) Based on the

21

Declaration of Mr. Nikula, it contends that better management would "stabilize the operations and thereby preserve the greatest amount of value for the collateral." *Id.* Specifically, Wells Fargo stresses that the building has only a 63% current occupancy rate. Annual rental revenues were $8,593,388.00 in the year 2016, down significantly from $9,732,660 in 2013. *Id.* at 6; Nikula Decl. ¶ 27. Meanwhile, as of March 28, 2017, the Note had an outstanding balance exceeding $56,959,629. *Id.*; Nikula Decl. ¶ 25. It follows, says Wells Fargo, that "the present realizable value of the Mortgaged Premises" is insufficient to secure repayment in full of the sums due to Wells Fargo. (Pl. Br. at 1; *see also* Pl. Reply at 5.)

Lichter responds that Mr. Nikula provided no adequate foundation for the assertions in his declaration. *Id.* at 31. Moreover, Lichter points out that the alleged decrease in rental revenues "represents a revenue decrease of less than twelve percent," which it does not regard as drastic. *Id.*

In reply, Wells Fargo submitted a second declaration of Mr. Nikula stating that "he is personally familiar with the Loan, Mortgage, Borrower, and Mortgaged Premises and competent to testify regarding its financial status." (Pl. Reply at 6 n.5) *See* Nikula Reply Decl., ECF no. 23-1. Wells Fargo adds that it "obtained an appraisal from Colliers International dated December 23, 2016 with an 'as-is' value for the property of $31 million, and an appraisal from CB Richard Ellis dated January 4, 2017 with an 'as-is' value for the property of $30 million." (Pl. Letter at 3) Given that the valuations "indicate[] a shortfall in excess of $25 million", Wells Fargo asserts that its security is in jeopardy. *Id.* In essence, it argues that considering the alleged waste, *see* Section III.B.2, *supra*, Lichter Gateway's continued default, and the inadequacy of the property as security, there is an "imminent danger that property will be lost, concealed, injured, diminished in value, or squandered." *Wells Fargo Bank,* 905 F. Supp. 2d at 614 (internal quotation marks omitted).

That the value of the property is inadequate to secure the loan is a common feature of foreclosure actions; without more, it does not necessarily

require appointment of a receiver. Over the years, Lichter of course possessed every economic incentive to locate high quality tenants and maximize the property's cash flow. The real question is whether the property would produce significantly more income in the hands of a third-party manager, justifying the cost and disruption of a managing receivership.

As to that issue, Wells Fargo's presentation is not specific. The occupancy rate of the building, it suggests, is too low. It does not, however, identify specific managerial failings to suggest that Lichter Gateway's management practices are to blame.

Nor does Wells Fargo state specifically what it would do differently. The proposed receiver, James Postell, has submitted a declaration (ECF no. 23-3) that establishes his credentials and experience. As to a plan or strategy, however, he says little beyond stating that he will "work diligently to stabilize and maintain the Mortgaged Premises." (*Id.* ¶ 14) For its own part, Wells Fargo offers conclusions, not specifics. *See* Pl. Br. 13 ("The appointment of a receiver...with an expertise in distressed properties such as the subject office building, would stabilize the operations and thereby preserve the greatest amount of value for the collateral securing the Loan."); Pl. Reply 11 ("Unless a receiver is appointed, there is a serious risk that existing management will cause loss of additional tenants and the further decline in value of [Gateway IV].") While appointment of a managing receiver might not do any harm, I am not persuaded that it would necessarily do any good, either. Under such circumstances, the appointment of a managing receiver would not be prudent. *See generally U.S. Bank Nat'l Ass'n v. Brookside St. Ives, LLC*, No. CV 12-05519, 2012 WL 12897101, at *2 (E.D. Pa. Dec. 11, 2012) (denying motion for a receiver and noting that "[p]laintiff has not identified any specific management failures by Defendants, nor ha[s] [it] articulated how a receiver would manage the property differently than Defendants have. . . Presently, it appears that appointing a receiver would only make it more difficult for the property to generate sufficient revenue to cover its expenses and debts...").

### 5. Probability that foreclosure will be delayed

In its reply brief, Wells Fargo offers the additional argument that this Court should consider a borrower's effort to delay a foreclosure. (Pl. Reply at 8) (citing *Cornerstone Realty Partners, Inc. v. Rabolli*, No. CV157393ESJAD, 2017 WL 1243142, at *4 (D.N.J. Mar. 17, 2017)). Lichter, it says, requested multiple extensions of time to respond to the motion for a receivership, and "rather than filing an answer to the Complaint, the Lichter Defendants filed a partial motion to dismiss a portion of only one claim, leaving all six existing counts unanswered, effectively delaying [Wells Fargo's] ability to pursue its claims." *Id.* Lichter also allegedly sought to delay the State Action. *Id.* at 8 to 9 (citing Menzel Decl. ¶¶ 2-5). Wells Fargo concludes that "such tactics suggest that this foreclosure action will likely be further delayed and warrant appoint of a Receiver." *Id.* at 9.

This case was filed on March 28, 2017; it is not brand new, but neither is it old. The State Action, however "delayed," has now been settled. The filing of a motion to dismiss is not a dilatory tactic per se. That is especially true under the practice of our District, which is ordinarily to require that discovery go forward while motions to dismiss are pending. Indeed, a Joint Discovery Plan (ECF no. 32) was filed by the parties on September 20, 2017, pursuant to the order of Magistrate Judge Michael A. Hammer. Judge Hammer has issued a pretrial scheduling order providing that fact discovery is to conclude by May 21, 2018 (ECF no. 33, ¶2)—not a punishing schedule, but a reasonably brisk one. Even assuming that Lichter *hoped* to delay the progress of the case with a partial motion to dismiss—and I make no such finding—that hope would have been a vain one.

Accordingly, the delay factor does not move me either way at this point in the case.

### 6. The probability that the harm to Wells Fargo by denial of the appointment would be greater than the injury to Lichter

Lichter contends that appointment of a receiver would do more harm to Lichter Gateway than good to Wells Fargo. (Def. Opp. at 32) According to

Lichter, Wells Fargo "likely faces no damages due to the experience, expertise, and effectiveness of the current property manager in place," while Lichter, on the other hand, would endure the "badge of dishonor" of a receivership. *Id.* That "badge of dishonor", Lichter says, would likely reduce Gateway IV's value, to the disadvantage of both Lichter and Wells Fargo. *Id.* at 3, 32.

Wells Fargo responds that there is no "legitimate concern" that a receiver would cause harm; rather, a receiver would "stabilize the property", "preserve the value", and "mend relationships with tenants and [the Association]." (Pl. Reply 2, 9, 12-13)

As I recognized in my consideration of the waste factor, given the recent settlement of the State Action, the appointment of a receiver does not hold out the same potential for good, and it might well cause harm. *See* Section III.B.2, *supra.* Neither party's argument, however, rises much above the level of speculation. I am therefore unmoved by the balance-of-harms factor.

### 7. Weighing of factors

As stated above, I have weighed the factors that seem most pertinent to the situation.

As to the appointment of a receiver to take over the management and operation of the Gateway IV building, I remain unconvinced by the current record. The mortgage agreement grants only the right to apply for the appointment of a receiver, subject to the court's equitable discretion; although the assignments of rents and leases contain broader self-help language, they relate primarily to rents and leases, and Wells Fargo in any event has not resorted to self-help, preferring the protection of a Court order. The central contention of waste on which the motion was based, arising from the withholding of Concourse assessments owed to the Association, has been resolved. The withholding of the Concourse assessments was seemingly conducted in a less-than-transparent manner, raising some concerns, but these and other allegations of misapplication of funds do not rise to the necessary level. The inadequacy of security, while a relevant factor, does not persuade, because there is no persuasive, factually-based showing that a

managing receiver has a plan for, *e.g.*, improving occupancy rates. I do not see persuasive evidence that this matter is being unduly delayed, and the claim of delay in the State Action is moot. Finally, although certain claims of harm have plausibility, the balance of harms does not really point one way or the other.

As to appointment of a rent receiver, however, the balance favors Wells Fargo. The underlying loan documents grant Lichter Gateway only a revocable license to collect income and rents, which is automatically terminated by default. Wells Fargo's entitlement, then, does not depend on waste as such. The withholding of Concourse assessments, it seems, was not presented to Wells Fargo in a forthright manner (although Lichter Gateway claims that Wells Fargo had reason to know); that raises some concerns about the candor owed by a borrower in possession of the collateral in a default situation. I do not find, however, that Wells Fargo has established fraud. As to the inadequacy of security and delay, the balance is no different, but these factors have less weight as to a rent receiver. As to the balance of harms, I see that appointment of a rent receiver only presents much less potential for disruption. Indeed, Lichter Gateway itself asserts that Wells Fargo "already exercises control of the cash flow payments and distributions from the rental income generated by Gateway IV" through a lockbox system. (Def. Opp. at 29-30). That raises a question as to why Wells Fargo, even if entitled to a rent receiver, wants one, but I will not second-guess its calculation of its interests.

A question remains as to the scope of the rent receiver's authority with respect to receipts and disbursements. That should be addressed by the parties in connection with the submission of a proposed order, preferably on consent. *See* Conclusion, *infra*.

## IV. Motion to Dismiss Count 6 in Part

In addition to the motion for appointment of a receiver, I have before me the Guarantor's[19] Rule 12(b)(6) motion to dismiss part of Count 6 of the

---

[19]     "Guarantor" is defined collectively to refer to the Alfred Lichter 2000 Family Trust, Claire Lichter, Joseph Schwartz, and Suzette Schwartz. (Cplt. ¶ 6). Although the

complaint for failure to state a claim. The Guarantor seeks to dismiss this claim of breach of guaranty "to the extent it is made pursuant to the 'voluntary lien' provision of Article I, Section 1.2(ii)C of the Guaranty (and, by incorporation, the corresponding provisions of the Loan Agreement, Article XI, Section 11.22 (v)(B)(iii))." (Def. Br. at 7) At issue is whether the Guarantor is at risk for full, or only partial, recourse liability. For the reasons stated herein, the motion to dismiss will be denied.

## A. Applicable Standard

### 1. Rule 12(b)(6) standard

Fed. R. Civ. P. 12(b)(6) provides for the dismissal of a complaint, in whole or in part, if it fails to state a claim upon which relief can be granted. The moving party bears the burden of showing that no claim has been stated. *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005). In deciding a motion to dismiss, a court must take all allegations in the complaint as true and view them in the light most favorable to the plaintiff. *See Warth v. Seldin*, 422 U.S. 490, 501 (1975); *Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts Inc.*, 140 F.3d 478, 483 (3d Cir. 1998); *see also Phillips v. County of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008) ("reasonable inferences" principle not undermined by later Supreme Court *Twombly* case, *infra*).

Fed. R. Civ. P. 8(a) does not require that a complaint contain detailed factual allegations. Nevertheless, "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief requires more than labels and conclusions, and formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Thus, the factual allegations must be sufficient to raise a plaintiff's right to relief above a speculative level, such that it is "plausible on its face." *See id.* at 570; *see also Umland v. PLANCO Fin. Serv., Inc.*, 542 F.3d 59, 64 (3d Cir. 2008). A claim has "facial plausibility when the plaintiff pleads factual content that allows the

---

motion is brought by the Lichter defendants generally, it is more natural to treat the Guarantor as the movant, and for purposes of this section of the Opinion I do so.

court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)(citing *Twombly*, 550 U.S. at 556). While "[t]he plausibility standard is not akin to a 'probability requirement' … it asks for more than a sheer possibility." *Iqbal*, 556 U.S. at 678 (2009).

The Court in considering a Rule 12(b)(6) motion is confined to the allegations of the complaint, with certain exceptions:

> "Although phrased in relatively strict terms, we have declined to interpret this rule narrowly. In deciding motions under Rule 12(b)(6), courts may consider 'document[s] integral to or explicitly relied upon in the complaint,' *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (emphasis in original), or any 'undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document,' *PBGC v. White Consol. Indus.*, 998 F.2d 1192, 1196 (3d Cir. 1993)."

*In re Asbestos Products Liability Litigation (No. VI)*, 822 F.3d 125, 134 n.7 (3d Cir. 2016). *See also Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014) ("However, an exception to the general rule is that a 'document integral to or explicitly relied upon in the complaint' may be considered 'without converting the motion to dismiss into one for summary judgment.'")(quoting *In re Burlington Coat Factory*, 114 F.3d at 1426); *Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993).

### 2. Consideration of extrinsic documents on 12(b)(6) motion

Both sides have attached a number of extrinsic documents to their submissions. Most seem to be relevant to the motion for appointment of a receiver. To some extent, however, they may also be intended for consideration in connection with the motion to dismiss. I therefore review the standards for consideration of extrinsic documents on a Rule 12(b)(6) motion.

The Court in considering a Rule 12(b)(6) motion is generally confined to the allegations of the complaint. That principle has some exceptions:

> "Although phrased in relatively strict terms, we have declined to interpret this rule narrowly. In deciding motions under Rule

> 12(b)(6), courts may consider "document[s] integral to or explicitly relied upon in the complaint," *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (emphasis in original), or any "undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document," *PBGC v. White Consol. Indus.*, 998 F.2d 1192, 1196 (3d Cir. 1993)."

*In re Asbestos Products Liability Litigation (No. VI)*, 822 F.3d 125, 134 n.7 (3d Cir. 2016). *See also Schmidt v. Skolas,* 770 F.3d 241, 249 (3d Cir. 2014) ("However, an exception to the general rule is that a 'document integral to or explicitly relied upon in the complaint' may be considered 'without converting the motion to dismiss into one for summary judgment.' ")(quoting *In re Burlington Coat Factory*, 114 F.3d at 1426); *Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.,* 998 F.2d 1192, 1196 (3d Cir. 1993). "The rationale underlying this exception is that the primary problem raised by looking to documents outside the complaint—lack of notice to the plaintiff—is dissipated '[w]here plaintiff has actual notice … and has relied upon these documents in framing the complaint.'" *In re Burlington*, 114 F.3d at 1426 (quoting *Watterson v. Page*, 987 F.2d 1, 3–4 (1st Cir. 1993)(quoting *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2nd Cir. 1991)). A court may also, without exceeding the bounds of Rule 12(b)(6), consider matters appropriate for judicial notice, such as the existence of a prior court ruling. *See S. Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Grp. Ltd.*, 181 F.3d 410, 426-27 (3d Cir. 1999); *see generally* Fed. R. Evid. 201.[20]

Wells Fargo attached copies of relevant loan documents to the Complaint as Exhibits A through M. These are obviously integral to the allegations, and may be considered on a motion to dismiss the complaint. The remaining exhibits were submitted in support of or in opposition to Wells Fargo's motion

---

[20]    Where extrinsic documents are not properly considered on a Rule 12(b)(6) motion, a district court has the option, upon proper notice, to convert the motion to one for summary judgment. *See* FED. R. CIV. P. 12(d). I do not opt to do so here.

to appoint a receiver. (*See* ECF nos. 6, 19, 22, 23.) They will not be considered on the motion to dismiss.

## B. Analysis of Rule 12(b)(b) Motion

### 1. Relevant allegations of the Complaint

The Complaint alleges that Section 11.22 of the Loan Agreement and Section 1.2 of the Guaranty address "Partial Recourse Triggers" and "Full Recourse Triggers." (Cplt. ¶¶ 42-44, 46). The Complaint describes "Partial Recourse Triggers" as follows:

> . . . Lender may enforce the liability and obligation of Borrower, by money judgment or otherwise, to the extent of any loss damage, cost, expense, liability, claim, or other obligations incurred by Lender (including attorneys' fees and costs reasonably incurred) arising out of or in connection with certain events[.]

It describes "Full Recourse Triggers" as encompassing the situation in which "the Loan is fully recourse to the Borrower in the event of certain events enumerated in the Loan Agreement." *Id.* ¶ 42. Those "certain events" are referred to as "Recourse Events."

The Complaint alleges the occurrence of specified Recourse Events, which trigger both partial and full recourse liability. (Cplt. ¶¶ 58-60). It also alleges that the same Recourse Events constitute defaults by the Borrower, Lichter Gateway, under the Loan Agreement. (*Id.* ¶¶ 2, 59; *see also id.* ¶¶ 42–62) (alleging "Borrower's and Guarantor's Recourse Liability").

Specifically, Wells Fargo alleges that during the years in which Lichter Gateway "voluntarily withheld payment of the Concourse Assessments," Lichter Gateway engaged in eight "Recourse Events." (*Id.* ¶ 58) Allegedly, Lichter Gateway

a. submitted to [Wells Fargo] annual operating statements reflecting that [it] incurred annual operating expenses by paying "association fees" in the amounts of $111,093 in 2013, $113,904 in 2014, $113,904 in 2015, and $116,196 in 2016;

b. failed or omitted to notify [Wells Fargo] that [it] was *voluntarily* withholding payment of the Concourse Assessments;

30

c. provided budgets to [Wells Fargo] showing the Concourse Assessments as budgeted co[s]ts and expenses associated with [Gateway IV] that [Lichter Gateway] intended to pay;

d. requested the release of funds from [Wells Fargo] to cover the budgeted costs of the Concourse Assessments;

e. obtained the funds from [Wells Fargo] for such budgeted costs;

f. either misappropriated, misapplied, converted, or failed to use such funds for the purpose of paying the Concourse Assessments;

g. *permitted the Concourse Liens to be filed* against [Gateway IV]; and

h. permitted waste of [Gateway IV] to occur by virtue of the deteriorating conditions, including the broken escalators and revolving doors, and damaged relationships with tenants.

(*Id.* ¶ 58 (emphasis added); *see also id.* ¶¶ 50-52 (alleging that Lichter Gateway "voluntarily ceased payment of certain Concourse Assessments," thereby causing the Association to file three liens against the property.)

As a result of those events, Lichter Gateway has allegedly defaulted under Section 11.22 of the Loan Agreement, and Guarantor has allegedly defaulted under the Guaranty. *Id.* ¶ 59. Wells Fargo claims that Lichter Gateway and the Guarantor "are liable for the *full amount* of *the Indebtedness*[21] as a result of:

a. the fraud, willful misconduct or intentional material misrepresentations in connection with the Recourse Events; and

b. [Lichter Gateway]'s *failure to obtain [Wells Fargo]'s prior consent to the voluntary Concourse Liens* encumbering [Gateway IV] and the Recourse Events."

*Id.* ¶ 60 (emphasis added). It also alleges that:

[Lichter Gateway] and Guarantor are liable for any loss, damage, cost, expense, liability, claim or other obligation in connection with:

---

21     "Indebtedness" refers to "all sums due under the Loan Documents." (Cplt. ¶ 37) "Loan Documents" refers to the "Original Loan Documents, together with the Newark Borrower Assumption Agreement, Borrower Assumption Agreement, Guaranty, Delaware UCC and County UCC." *Id.* ¶ 41.

a. waste of the Mortgaged Premises resulting from the Recourse Events; and

b. the misapplication, misappropriation or conversion of Rents associated with the Recourse Events.

*Id.* ¶ 61.

## 2. Relevant contractual provisions

Here are the contractual provisions cited as relevant to the issues of voluntary liens, full recourse liability, and partial recourse liability:

### i. Loan Agreement

Section 11.22 of the Loan Agreement defines "Partial Recourse Triggers."(Cplt. ¶ 43); (ECF no. 1-3, Compl. Ex. B, Art. XI, § 11.22 at 79-80). The Loan Agreement states, in part:

[t]he provisions of this Section shall not, however. . .

(g) constitute a waiver of the right of Lender to enforce the liability and obligation of Borrower, *by money judgment or otherwise, to the extent of any loss, damage, cost, expense, liability, claim or other obligation incurred by Lender (including attorneys' fees and costs reasonably incurred)* arising out of or in connection with the following:

(i) waste of the Property;

(ii) the breach of any representation, warranty, covenant or indemnification provision in the Environmental Indemnity or in the Mortgage concerning environmental laws, hazardous substances and asbestos and any indemnification of Lender with respect thereto in either document;

(iii) the removal or disposal of any portion of the Property after a Default or Event of Default; and

(iv) the misapplication, misappropriation or conversion by Borrower of (A) any insurance proceeds paid by reason of any loss, damage or destruction to the Property, (B) any Awards or other amounts received in connection with the Condemnation of all or a portion of the Property, or (C) any Rents or other funds of Borrower . . . .

(ECF no. 1-3, Compl. Ex. B, Art. XI, § 11.22 at 79-80)(emphasis added).

It then defines "Full Recourse Triggers", and states as follows:

> Notwithstanding anything to the contrary in this Agreement, the Note or any of the Loan Documents. . . (B) *the Debt shall be fully recourse to Borrower* in the event that: (i) there has been at any time fraud, willful misconduct or intentional material misrepresentation by Borrower or any Guarantor in connection with the Loan, (ii) the first full monthly payment of interest under the Note is not paid when due; (iii) *Borrower fails to obtain Lender's prior consent to any subordinate financing or other voluntary Lien encumbering the Property* . . . .

(Cplt. ¶ 44); (ECF no. 1-3, Compl. Ex. B, Art. XI, § 11.22 at 80)(emphasis added).

The Loan Agreement defines "Lien" as

> any mortgage, deed of trust, lien, pledge, hypothecation, assignment, security interest, or any other encumbrance, charge or transfer of, on or affecting the Property or any portion thereof or Borrower, or any interest therein, including, without limitation, any conditional sale or other title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, the filing of any financing statement, and mechanic's, materialmen's and other similar liens and encumbrances.

(ECF no. 1-3, Compl. Ex. B, Art. I, § 1.1 at 7).

### ii. Guaranty

Under Article I, Section 1.1 of the Guaranty, the Guarantor "'irrevocably and unconditionally guarantees to [Wells Fargo] and its successors and assigns the payment and performance of the *Guaranteed Obligations* as and when the same shall be due and payable. . .'" (Cplt. ¶ 45) (quoting ECF no. 1-11, Compl. Ex. J, Art. I, §1.1) (emphasis added). The Guarantor "irrevocably and unconditionally . . . agrees that it is liable for the *Guaranteed Obligations* as a primary obligor." *Id.* (emphasis added).

The definition of the term "Guaranteed Obligations" addresses "Partial Recourse Triggers" and "Full Recourse Triggers." (Cplt. ¶ 46)

"Partial Recourse Triggers" are defined thus:

33

the obligations or liabilities of Borrower to Lender *for any loss, damage, cost, expense, liability, claim or other obligation incurred by Lender (including attorneys' fees and costs reasonably incurred)* arising out of or in connection with the following:

    (a) waste of the Property;

    (b) the breach of any representation, warranty, covenant or indemnification provision in the Environmental Indemnity or in the Mortgage concerning environmental laws, hazardous substances and asbestos and any indemnification of Lender with respect thereto in either document;

    (c) the removal or disposal of any portion of the Property after a Default or Event of Default; or

    (d) the misapplication, misappropriation or conversion by Borrower of (A) any insurance proceeds paid by reason of any loss, damage or destruction to the Property, (B) any Awards or other amounts received in connection with the Condemnation of all or a portion of the Property, or (C) any Rents or other funds of Borrower.

(ECF no. 1-11, Compl. Ex. J, Art. I, §1.2)(emphasis added).

"Full Recourse Triggers" are defined thus:

Notwithstanding anything to the contrary in any of the Loan Documents. . . (ii) *Guarantor shall be liable for the full amount of the Debt in the event* that (A) there has been at any time fraud, willful misconduct or intentional material misrepresentation by Borrower or any Guarantor in connection with the Loan; (B) the first full monthly payment of interest on the Note is not paid when due; (C) *Borrower fails to obtain Lender's prior written consent to any subordinate financing or other voluntary lien encumbering the Property as may be required by the Loan Agreement*; (D) Borrower fails to obtain Lender's prior written consent to any assignment, transfer, or conveyance of the Property or any interest therein as required by the Loan Agreement or the Mortgage. . .

(ECF no. 1-11, Compl. Ex. J, Art. I, §1.2) (emphasis added); *see also* ECF no. 1-11, Compl. Ex. J, Art. 4, §4.4) (addressing "liens subordinate").)

### 3. Discussion

The Guarantor maintains that the Complaint fails to allege a claim for full recourse liability, because such a claim requires the borrower's placement

of a "voluntary lien" on the property. The third-party liens here it says, were placed by the Association, and were not "voluntary" from the point of view of Lichter Gateway or the Guarantor. (Def. Br. at 9) Moreover, it says, "Wells Fargo's Complaint has not alleged any facts indicating that Lichter Defendants have affirmatively applied for, filed, or given an encumbrance in connection with any form of 'subordinate financing' to the Concourse Association or any other entity." *Id.* at 6. Lichter therefore urges this Court to partially dismiss Count Six with prejudice. *Id.* at 1, 4. Wells Fargo responds (1) that it has adequately pled a claim for breach of Guaranty, and (2) that the voluntariness, or not, of the Concourse Association liens is an issue of fact that cannot be resolved on a motion to dismiss. (Pl. Opp. at 1-2, 6-9) The Guarantor's arguments, it says, are matters to be pled and proven in defense, not grounds for dismissal of the claim. *Id.* at 8.

I find that Count 6 adequately pleads a claim under Article I, Section 1.2(ii)(C) of the Guaranty. At this early stage in the litigation, it is premature to consider the precise scope of Guarantor liability, assuming there is any at all. The liens, moreover, have now been removed as part of the settlement of the State litigation, a fact outside the pleadings that may or may not bear on the applicability of this provision. Nor does it usefully streamline this litigation to engage in "what-ifs" in relation to one of the alternative sub-theories on which the Count 6 breach-of-guaranty claim might be based. It is true, as I have pointed out before, that there are "cases where contractual language unambiguously rules out a claim of breach, and a motion to dismiss may confidently be granted." *Blackberry Ltd. v. PCS Wireless LLC*, No. 15-1070 (KM), 2016 WL 1313161, at *4 (D.N.J. Apr. 4, 2016). This is not such a case. The meaning of "voluntary lien" and its application to the facts of this case pose questions of interpretation and fact. The Guaranty does not expressly define "voluntary lien" and it does not directly address the role of the borrower's fault in causing a third party to place liens (subsequently removed, according to the parties) on a mortgaged property. The meaning of "voluntary lien" in this

context is not so clear and unambiguous as to permit resolution as a matter of law on a motion to dismiss.

I will therefore deny the motion to dismiss Count 6 in part without prejudice to renewal of these contentions on summary judgment. *See Kaufman v. Provident Life and Cas. Ins. Co.,* 828 F. Supp. 275, 282 (D.N.J. 1992), *aff'd,* 993 F.2d 877 (3d Cir. 1993) (resolving issues of contract construction on summary judgment).

## V.    Conclusion

For the reasons set forth above, Wells Fargo's motion (ECF no. 6) to appoint a receiver is **GRANTED IN PART AND DENIED IN PART**. A receiver of rents will be appointed; a receiver for the operation and management of the building will not be appointed. Lichter's motion (ECF no. 17) to dismiss Count 6, in part, pursuant to Federal Rule of Civil Procedure 12(b)(6) is also **DENIED**. The Court will enter an order to that effect.

Because the partial grant of the motion was probably not anticipated, and because the dividing line between a rent receiver and a managing receiver is not clearly delineated in the current proposed order, Wells Fargo shall submit a revised proposed order focused on the appointment of a receiver of rents. The factual recitals in the current proposed order shall be omitted.

A consent order would of course be preferred. If that is not feasible, Wells Fargo shall have 7 days to submit its proposed order, and defendants shall have an additional 7 days to file any objections to the wording of that proposed order. Each party may support its submission with a letter memorandum not to exceed three pages, which shall not reargue the merits. In light of the history of briefing on these motions, the Court states explicitly that replies will not be entertained.

Date:  December 1, 2017

_KEVIN MCNULTY, U.S.D.J._