# EXHIBIT 1

Case 2:17-cv-02036-KM-MAH Document 1 Filed 03/28/17 Page 1 of 19 PageID: 1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

---

WELLS FARGO BANK, N.A., AS TRUSTEE FOR MORGAN STANLEY CAPITAL I INC., COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2006-IQ12,

Plaintiff,

-against-

LICHTER GATEWAY IV LLC, CLAIRE LICHTER, individually and in her capacity as Executrix of the ESTATE OF ALFRED LICHTER, JOSEPH SCHWARTZ, SUZETTE SCHWARTZ, THE ALFRED LICHTER 2000 FAMILY TRUST, and GATEWAY CONCOURSE ASSOCIATION, INC.,

Defendants.

---

Civil Action No. ______________

**COMPLAINT**

Plaintiff Wells Fargo Bank, N.A., as Trustee for Morgan Stanley Capital I Inc., Commercial Mortgage Pass-Through Certificates, Series 2006-IQ12 ("**Plaintiff**"), by and through its attorneys, Thompson & Knight LLP, alleges as follows:

**PARTIES**

1. Plaintiff Wells Fargo Bank, N.A. ("**Wells Fargo**") is the trustee of a REMIC Trust and real party in interest in this action. Wells Fargo is a national banking association with its main office in Sioux Falls, South Dakota. For diversity purposes, a national bank is a citizen of the state in which the bank's main office, as set forth in its articles of association, is located. Therefore, for purposes of 28 U.S.C. § 1332, Plaintiff is a citizen of South Dakota. For all purposes of the action described in this Complaint, Plaintiff is acting by and through the third-party special servicer C-III Asset Management LLC (f/k/a ARCap Servicing, Inc.), a Delaware

Case 2:17-cv-02036-KM-MAH Document 1-8 Filed 03/28/17 Page 2 of 19 PageID: 92

limited liability company, not individually but solely in its authorized capacity as special servicer pursuant to that certain Pooling and Servicing Agreement, dated December 1, 2006.

2. Upon information and belief, at all times herein, defendant Lichter Gateway IV LLC ("**Lichter Gateway**" or "**Borrower"**) was and is a Delaware limited liability company, with a business address at c/o Lichter & Lichter, L.P., 35 West 36th Street, Suite 6E, New York, New York 10018. An organizational chart showing the ownership of structure of defendant Lichter Gateway is included as Exhibit B of the Borrower Assumption Agreement (defined below) (Exhibit I hereto). Upon information and belief, none of the members of Lichter Gateway are citizens of the State of South Dakota.

3. Borrower is made a defendant in this action because it is the owner of record of the real property and improvements known as and located at 100 Mulberry Street, Newark, New Jersey 07102, also known as Block 151, Lot 121, as shown on the Official Tax Map of the City of Newark in the County of Essex, State of New Jersey (as more particularly described in the Mortgage (as defined below), the "**Mortgaged Premises**"), and it has assumed the obligations of the Note (as defined below) and the Mortgage being foreclosed upon in this action.

4. Upon information and belief, at all times herein, defendants Claire Lichter ("**Claire**"), Joseph Schwartz ("**Joseph**"), and Suzette Schwartz ("**Suzette**") are natural persons, each of whom reside in the State of New York.

5. Upon information and belief, at all times herein, defendant Claire Lichter, in her capacity as executrix of the Estate of Alfred Lichter (the "**Estate**"), was and is a natural person, who resides in the State of New York. The Estate is made a defendant in this action because decedent Alfred Lichter ("**Alfred**") is a signatory to the Guaranty (as defined below).

6. Upon information and belief, at all times herein, defendant The Alfred Lichter 2000 Family Trust ("**Lichter Trust**" and together with the Estate, Claire, Joseph, and Suzette, the "**Guarantor**" and together with Borrower, the "**Defendant**") is a trust organized under the laws of the state of New York having its principal place of business at c/o Lichter & Lichter, L.P., 35 West 36th Street, Suite 6E, New York, New York 10018. Upon information and belief, neither the trustee nor any beneficiary of the Lichter Trust is a citizen of the State of South Dakota.

7. Upon information and belief, at all times herein, defendant Gateway Concourse Association, Inc. ("**Concourse Association**") is a not-for-profit corporation organized under the laws of the State of New Jersey with its principal place of business in the State of New Jersey.

**JURISDICTION AND VENUE**

8. Jurisdiction exists in this Court pursuant to 28 U.S.C. § 1332 as there exists complete diversity between the parties and the amount in controversy exceeds the sum of $75,000.00 exclusive of interest and costs.

9. Venue is proper in the Newark Division of the District of New Jersey pursuant to 28 U.S.C. § 1391(a) because the Mortgaged Premises exists in Essex County, New Jersey, which is in the Newark Division.

**BACKGROUND**

**The Loan**

10. On or about October 24, 2006, Heritage Gateway, LLC ("**Heritage**"), Marine One Associates III, LLC ("**Marine**"), Ridgewood 2000 Associates III, LLC ("**Ridgewood**"), JPG Real Estate III, LLC ("**JPG**"), and Ivy Gateway, LLC ("**Ivy**" and together with Heritage, Marine, Ridgewood and JPG, collectively, the "**Original Borrower**") executed that certain

Case 2:17-cv-02036-KM-MAH Document 1 Filed 03/28/17 Page 4 of 19 PageID: 94

Promissory Note (the "**Note**") evidencing a loan made by LaSalle Bank National Association ("**Original Lender**") to Original Borrower in the principal amount of $61,000,000.00 (the "**Loan**"). A true and correct copy of the Note is attached hereto as Exhibit A.

11. On or about October 24, 2006, Original Borrower entered into that certain Loan Agreement (the "**Loan Agreement**"), with Original Lender. A true and correct copy of the Loan Agreement is attached hereto as Exhibit B.

12. The Note (which incorporates the terms of the Loan Agreement) provides for interest at a rate of 5.96% per annum (the "**Applicable Interest Rate**"), which is to be calculated on the basis of a 360 day year and paid for the actual number of days elapsed. *See* Exhibit B at §§ 2.2.1, 2.2.3.

13. The Note (which incorporates the terms of the Loan Agreement) provides for a late fee (the "**Late Fee**") to be paid by Borrower on any sum payable under the Note which is not received before the fifth (5th) calendar day after the date when due. The Late Fee of five percent (5%) is applied to the delinquent amount to defray the reasonable expenses incurred by Plaintiff in handling and processing the delinquent payment and to compensate Plaintiff for the loss of the use of the delinquent payment. *See* Exhibit B at § 2.3.3.

14. The Note (which incorporates the terms of the Loan Agreement) also provides for a default interest rate (the "**Default Rate**") that applies in the event of a default by Borrower. The Default Rate is five percent (5%) above the Applicable Interest Rate in effect at the time of the occurrence of the event of default. *See* Exhibit B at § 2.2.2.

15. The maturity date under the Note was on November 1, 2016 (the "**Maturity Date**"). *See* Exhibit B at § 2.3.2.

16. Repayment of the Note is secured by, among other things, that certain Mortgage and Security Agreement (the "**Mortgage**"), dated October 25, 2006, executed by Original Borrower, as mortgagor, to Original Lender, as mortgagee. The Mortgage, having been first duly acknowledged, was recorded on October 30, 2006 with the Essex County Register, New Jersey (the "**Clerk's Office**") at Book 11600, page 868 as Instrument No. 6158038. A true and correct copy of the Mortgage is attached hereto as Exhibit C.

17. The Mortgage is not a purchase money mortgage.

18. Repayment of the Note is further secured by, among other things, that certain Assignment of Leases and Rents (the "**Assignment of Leases**") dated as of October 25, 2006, executed by Original Borrower to Original Lender. The Assignment of Leases was recorded with the Clerk's Office on October 30, 2006 at Book 11600, page 888 in the Mortgage Book Index as Instrument No. 6158040. A true and correct copy of the Assignment of Leases is attached hereto as Exhibit D.

19. The Assignment of Leases constituted a present, absolute and executed assignment, subject to the conditional license given to Borrower to collect, hold and use the rents to the extent provided in the Mortgage. *See* Exhibit D.

20. The Note, Loan Agreement, Mortgage, Assignment of Leases, together with all other documents and agreements evidencing and/or securing the Loan are collectively referred to as the "**Original Loan Documents**."

**Transfer and Assignment of the Loan and Loan Documents to Plaintiff**

21. Pursuant to the below-described endorsements, assignments and/or transfer of the Original Loan Documents, Plaintiff is the current owner of the Original Loan Documents.

22. Original Lender assigned the Loan and the Original Loan Documents to Plaintiff. In connection with the assignment to Plaintiff, Original Lender executed and delivered to Plaintiff the following documents:

a. that certain Allonge executed by Original Lender to Plaintiff, a true and correct copy of which is attached hereto as Exhibit E.

b. that certain Assignment of Mortgage and Security Agreement, dated effective as of December 21, 2006, which was properly recorded with the Clerk's Office on May 30, 2007, at Book 12059, Page 1227 as Instrument No. 7070234, a true and correct copy of which is attached hereto as Exhibit F.

c. that certain Omnibus Assignment of Loan Documents, dated effective as of December 21, 2006, assigning to Plaintiff, among other things, the Guaranty, a true and correct copy of which is attached hereto as Exhibit G.

23. As of the date hereof, as a result of the transaction described above, evidenced by each of the written assignments, Plaintiff is the owner and holder of the Note, the Mortgage, the Assignment of Leases, and each and all of the other Original Loan Documents.

**Assumption of Original Loan Documents by Newark Borrower**

24. On or about June 12, 2009, Ivy transferred 24% of its initial 40% ownership interest in the Mortgaged Premises to Newark 300, LLC ("**Newark Borrower**") and Newark Borrower agreed to become jointly and severally liable as tenants-in-common with Original Borrower for the obligations of Original Borrower under the Original Loan Documents (the "**Newark Borrower Assumption**").

25. In connection with the Newark Borrower Assumption, Original Borrower, Original Guarantor and Newark Borrower executed and delivered to Plaintiff, among other things, that certain Assumption Agreement dated September 16, 2009, which was properly recorded with the Clerk's Office on October 2, 2009, at Book 12220, Page 4691 as Instrument

Case 2:17-cv-02036-KM-MAH Document 1 Filed 03/28/17 Page 7 of 19 PageID: 7

No. 9085615 (the "**Newark Borrower Assumption Agreement**"), a true and correct copy of which is attached hereto as Exhibit H.

**Assumption of Original Loan Documents by Borrower**

26. On or about January 3, 2011, the Original Borrower and Newark Borrower transferred the Mortgaged Premises to Borrower. Borrower and Guarantor assumed all obligations under the Loan Documents and released the Original Borrower, Newark Borrower, and Original Guarantor from certain obligations pursuant to the Loan Documents, subject to the provisions set forth in the Borrower Assumption Agreement (defined below) (the "**Borrower Assumption**").

27. In connection with the Borrower Assumption, Plaintiff, Borrower, Original Borrower, Newark Borrower, as well as Steven Greenberg, Jeffrey Greenberg, and Ivy Equities, L.L.C. (collectively, the "**Original Guarantor**") executed that certain Assumption and Release Agreement (the "**Borrower Assumption Agreement**"), dated January 3, 2011 and recorded with the Clerk's Office on January 10, 2011 at Book 12291, Page 5216, Instrument Number 11002811. A true and correct copy of the Borrower Assumption Agreement is attached hereto as Exhibit I.

28. In connection with the Borrower Assumption, Guarantor executed and delivered to Plaintiff that certain Guaranty (the "**Guaranty**"), dated January 3, 2011, by Guarantor for the benefit of Plaintiff, a true and correct copy of which attached hereto as Exhibit J.

29. Pursuant to Section 1.1 of the Mortgage, Borrower granted Plaintiff a security interest in, *inter alia*, all machinery, equipment, goods, inventory, fixtures, and other personal property located on the Mortgaged Premises (collectively, the "**Personal Property**"), as further security for repayment of the Note.

Case 2:17-cv-02036-KM-MAH Document 1 Filed 03/28/17 Page 8 of 19 PageID: 8

30. Such security interest in Original Borrower's Personal Property was perfected by:

a. that certain UCC-1 Financing Statement ("**Delaware UCC**"), filed with the Delaware Department of State on January 6, 2011 at Filing No. 20110358922 and continued by that certain UCC-3 continuation filed on September 15, 2015 at Filing No. 20154615836, true and correct copies of which are attached hereto as Exhibit K.

b. that certain UCC-1 Financing Statement ("**County UCC**"), recorded with the Clerk's Office on January 30, 2017 as Instrument Number 2017008503, a true and correct copy of which is attached hereto as Exhibit L.

31. The Original Loan Documents, together with the Newark Borrower Assumption Agreement, Borrower Assumption Agreement, Guaranty, Delaware UCC and County UCC are hereinafter referred to as the "**Loan Documents**."

32. Pursuant to the above-described assumption, release and/or transfer of the Loan Documents and Mortgaged Premises, Borrower and Guarantor are the current obligors and under the Loan Documents.

**Borrower's Default under the Loan Documents**

33. Borrower is in default of its obligations to Plaintiff under the Note and Mortgage based on, among other things, Borrower's failure to timely pay all amounts required by the Loan Documents on the Maturity Date (the "**Maturity Default**").

34. This failure constitutes an event of default as defined under the Loan Documents.

35. Accordingly, Plaintiff demanded payment of the Loan and informed the Borrower of their default in accordance with the terms of the Loan Documents by that certain Notice of Maturity Default and Demand for Payment letter sent to Borrower and Guarantor on January 4, 2017 (the "**Notice of Maturity Default**"), a true and correct copy of which is attached hereto as Exhibit M.

Case 2:17-cv-02036-KM-MAH Document 1 Filed 03/28/17 Page 9 of 19 PageID: 9

36. Borrower has failed to cure such defaults, despite demand for payment under the Notice of Maturity Default.

37. Plaintiff informed Borrower of the Maturity Default and demanded that Borrower pay all sums due under the Loan Documents (collectively, the "**Indebtedness**").

38. To date, Borrower has failed to pay the Indebtedness due under the Loan Documents, and Borrower remains in default.

39. There is now due, owing, and payable to Plaintiff the following Indebtedness under the Loan Documents: (i) $56,959,629.12 in principal; (ii) accrued and unpaid interest at the contract and default rates; (iii) late charges; (iv) attorneys' fees, costs and expenses associated with the default under the Loan Documents, including costs of this action; and (v) all other sums provided for under the Loan Documents.

40. Pursuant to the terms of the Mortgage, the mortgagee has the right to advance or pay taxes and other liens affecting the Mortgaged Premises that could be superior to the lien of the Mortgage, and which, when paid by the mortgagee, together with interest thereon, are to be added to the amounts due under the Mortgage. Plaintiff may be required to pay such liens during the pendency of this action and, if made, Plaintiff will demand that such payments be added to the Indebtedness due under the Loan Documents.

41. The New Jersey Fair Foreclosure Act, *N.J.S.A.* § 2A:50-53 *et seq.* (the "**Act**") does not apply to this proceeding because the Mortgage is not a "residential mortgage" as that term is defined in *N.J.S.A.* § 2A:50-55, as the Mortgaged Premises are strictly used for commercial, non-residential purposes.

**Borrower's and Guarantor's Recourse Liability**

42. The Loan Documents provide that the Loan shall be non-recourse to Borrower except that: (1) Lender may enforce the liability and obligation of Borrower, by money judgment or otherwise, to the extent of any loss damage, cost, expense, liability, claim, or other obligations incurred by Lender (including attorneys' fees and costs reasonably incurred) arising out of or in connection with certain events (the "**Partial Recourse Triggers**"); and (2) the Loan is fully recourse to the Borrower in the event of certain events enumerated in the Loan Agreement (the "**Full Recourse Triggers**").

43. Section 11.22 of the Loan Agreement (Exhibit B, pp. 79-80) defines the Partial Recourse Triggers to include, among other things, the following:

(i) "waste of the Property"; and

(ii) "the misapplication, misappropriation or conversion by Borrower of … any Rents or other funds of Borrower."

44. Section 11.22 of the Loan Agreement (Exhibit B, pp. 79-80) defines the Full Recourse Triggers to include, among other things, where:

(i) "there has been at any time fraud, willful misconduct, or intentional material misrepresentation by Borrower or any Guarantor in connection with the Loan;" and

(ii) "Borrower fails to obtain Lender's prior consent to any subordinate financing or other voluntary Lien encumbering the Property."

45. Pursuant to Section 1.1 of the Guaranty, Guarantor is liable for the Guaranteed Obligations (defined below) and "irrevocably and unconditionally guarantee[d] to [Plaintiff] the payment and performance of the Guaranteed Obligations as and when the same shall be due and payable, whether by lapse of time, by acceleration of maturity or otherwise."

46. Pursuant to Section 1.2 of the Guaranty, the term "**Guaranteed Obligations**" is defined to include the Partial Recourse Triggers and Full Recourse Triggers.

47. Upon information and belief, Borrower is a party to that certain Amended and Restated Grant and Agreement, by and among One Gateway Center Condominium Association, Inc., Third Newark Gateway Urban Renewal Association, Gateway Four Urban Renewal, L.P., Gateway South Urban Renewal Association, and The Prudential Insurance Company of America, dated as of December 21, 1999 and recorded with the Clerk's Office on December 27, 1999 at Deed Book 5664, Page 680 (as amended, modified, and assigned, the "**Concourse Agreement**").

48. Upon information and belief, pursuant to the Concourse Agreement, defendant Concourse Association is authorized to assess certain amounts against the Borrower (the "**Concourse Assessments**") in connection with the Concourse Association's costs for performing its duties to maintain and service certain of the concourses and walkways at or near the Mortgaged Premises.

49. Upon information and belief, the Borrower is obligated to pay the Concourse Assessments.

50. Upon information and belief, Borrower's failure to pay the Concourse Assessments is an Event of Default under the Concourse Agreement and permits the Concourse Association to file liens against the Mortgaged Premises.

51. Upon information and belief, in or about December 2012, Borrower voluntarily ceased payment of certain Concourse Assessments, resulting in an Event of Default under the Concourse Agreement.

52. Upon information and belief, as a result, the Concourse Association filed the following liens (the "**Concourse Liens**") against Borrower and the Mortgaged Premises:

a. Notice of Assessment Lien by Concourse Association against the Mortgaged Premises for a lien in the amount of $103,510.56, recorded on July 19, 2013 in the Clerk's Office at Book 12446, Page 6425 as Instrument No. 13064539.

b. Notice of Assessment Lien by Concourse Association against the Mortgaged Premises for a lien in the amount of $262,152.87, recorded on June 10, 2015 in the Clerk's Office at Book 12558, Page 7040 as Instrument No. 15044326.

c. Notice of Assessment Lien by Concourse Association against the Mortgaged Premises for a lien in the amount of $340,191.32, recorded on March 16, 2016 in the Clerk's Office as Instrument No. 2016023085.

53. Upon information and belief, the Concourse Association has commenced an action against Borrower in connection with the Concourse Liens that is currently pending in the Superior Court of New Jersey, Law Division, bearing Docket No. L-1075-16.

54. Upon information and belief, as a result of the unpaid Concourse Assessments and Concourse Liens, the Concourse Association has ceased maintaining the concourses and walkways at or near the Mortgaged Premises.

55. Specifically, an escalator and revolving door, which provide access to tenants of the Mortgaged Premises are broken and have remained unrepaired. Upon information and belief, access to one of the broken escalators is blocked off and marked with yellow caution tape.

56. Upon information and belief, as a result of deteriorating conditions in the concourses and walkways at or near the Mortgaged Premises, a tenant at the Mortgaged Premises has declared an event of default against the Borrower under the terms of its lease.

57. Neither the Borrower nor the Concourse Association provided notice to Plaintiff of Borrower's default under the Concourse Agreement, or of the existence of the Concourse Liens.

58. Throughout the years during which Borrower has voluntarily withheld payment of the Concourse Assessments, Borrower has (collectively, the "**Recourse Events**"):

a. submitted to Plaintiff annual operating statements reflecting that the Borrower incurred annual operating expenses by paying "association fees" in the amounts of $111,093 in 2013, $113,904 in 2014, $113,904 in 2015, and $116,196 in 2016;

b. failed or omitted to notify Plaintiff that Borrower was voluntarily withholding payment of the Concourse Assessments;

c. provided budgets to Plaintiff showing the Concourse Assessments as budgeted cots and expenses associated with the Mortgaged Premises that the Borrower intended to pay;

d. requested the release of funds from Plaintiff to cover the budgeted costs of the Concourse Assessments;

e. obtained the funds from Plaintiff for such budgeted costs;

f. either misappropriated, misapplied, converted, or failed to use such funds for the purpose of paying the Concourse Assessments;

g. permitted the Concourse Liens to be filed against the Mortgaged Premises; and

h. permitted waste of the Mortgaged Premises to occur by virtue of the deteriorating conditions, including the broken escalators and revolving doors, and damaged relationships with tenants.

59. As a result of the Recourse Events, Borrower has defaulted under Section 11.22 of the Loan Agreement and Guarantor has defaulted under the Guaranty.

60. Accordingly, Borrower and Guarantor are liable for the full amount of the Indebtedness as a result of:

a. the fraud, willful misconduct or intentional material misrepresentations in connection with the Recourse Events; and

b. Borrower's failure to obtain Plaintiff's prior consent to the voluntary Concourse Liens encumbering the Mortgaged Premises and the Recourse Events.

61. In addition, Borrower and Guarantor are liable for any loss, damage, cost, expense, liability, claim or other obligation in connection with:

a. waste of the Mortgaged Premises resulting from the Recourse Events; and

b. the misapplication, misappropriation or conversion of Rents associated with the Recourse Events.

62. Therefore, pursuant to the Loan Agreement and Guaranty, Borrower and Guarantor are liable to Plaintiff for full payment of all amounts due under the Note, as well as all other amounts due under the Loan Documents, including expenses and reasonable attorneys' fees incurred by Plaintiff in connection with the enforcement of the Guaranty and Loan Documents.

**The Defendants**

63. The Borrower is joined as a party defendant herein because it is an obligor and mortgagor under the Loan Documents, and to extinguish any interest that it has or may have in and to the Mortgaged Premises.

64. The Guarantor is joined as a party defendant herein because it is the signatory to the Guaranty, pursuant to which it guarantied certain obligations of the Borrower under the Loan Documents, and to extinguish any interest that the Guarantor had, has or may have in and to the Mortgaged Premises.

65. Concourse Association is joined as a party defendant herein by virtue of the Concourse Liens, each of which are second and subordinate to the Mortgage by virtue of their own terms, and to extinguish any and all interest Concourse Association may have or has in the Mortgaged Premises.

66. Any interest or lien which any defendant herein has, or may claim to have, in or upon the Mortgaged Premises, or any part thereof, is subject and subordinate to the lien of the Mortgage.

67. In order to protect the lien and security represented by the Mortgage during the pendency of this foreclosure action, Plaintiff may be compelled to pay insurance premiums,

taxes, assessments, water charges, sewer charges, attorneys' fees, repairs and other expenses or charges affecting the Mortgaged Premises. Plaintiff asks that any amount so paid and expended by it during the pendency of this foreclosure action be added, pursuant to the Mortgage, to its claim and be repaid to Plaintiff from the proceeds of the sale of the Mortgaged Premises, together with interest thereon from the date that such expenditures are made, and that same be added to the amounts due Plaintiff and secured by the Mortgage.

68. Plaintiff does not seek a Writ of Possession to evict any occupant protected by the New Jersey Anti-Eviction Act, N.J.S.A. 2A:18-61.1, *et seq.*

**FIRST COUNT**
**(Mortgage Foreclosure)**

69. Plaintiff incorporates herein by reference the paragraphs set forth above as if fully set forth herein.

70. Borrower is a party herein because it is an obligor and mortgagor under the Loan Documents, and in order to extinguish any interest that it has or may have in and to the Mortgaged Premises.

71. Any interest or lien which Defendants have, or may claim to have, in or upon the Mortgaged Premises, or any part thereof, is subject and subordinate to the lien of the Mortgage.

**WHEREFORE,** Plaintiff demands judgment as follows:

a. upon separate application, appointing a receiver of the rents, issues and profits of the Mortgaged Premises described in the Mortgage;

b. fixing the amount due under the Mortgage;

c. barring and foreclosing Defendants of all equity of redemption in and to the Mortgaged Premises;

d. directing that Plaintiff be paid the amount due as provided in the Mortgage, Note and Loan Documents set forth hereinabove, together with interest, costs, property search fees, and attorneys' fees;

e. adjudging that the Mortgaged Premises shall be sold according to law to satisfy the amount due to Plaintiff under the Mortgage;

f. directing that the Defendants vacate and surrender the Mortgaged Premises to a receiver of rents and profits, to be appointed by the Court; and

g. for such other and further relief as the Court may deem just and proper.

**SECOND COUNT**
**(Possession)**

72. Plaintiff incorporates herein by reference the paragraphs set forth above as if fully set forth herein.

73. By the terms of the Note and the Mortgage, Plaintiff is entitled to immediate possession of the Mortgaged Premises together with all improvements and appurtenances described in the Mortgage and in this Complaint.

74. The Defendants have deprived or may deprive Plaintiff of possession of the Mortgaged Premises.

**WHEREFORE,** Plaintiff demands judgment as follows:

a. for possession of the Mortgaged Premises in favor of Plaintiff or its assignee or any purchaser at the foreclosure sale;

b. for damages and *mesne* profits;

c. for costs; and

d. for such other and further relief as the Court may deem just and proper.

Case 2:17-cv-02036-KM-MAH Document 1 Filed 03/28/17 Page 19 of 19 PageID: 17

**THIRD COUNT**
**(Security Interest Foreclosure)**

75. Plaintiff incorporates herein by reference the paragraphs set forth above as if fully set forth herein.

76. The Mortgage grants a valid and enforceable security interest in the Personal Property located at the Mortgaged Premises.

77. Plaintiff's security interest in the Personal Property was duly perfected by the filing of the County UCC, the Delaware UCC, the Mortgage, and the assignments thereof.

78. Pursuant to the terms contained in the Loan Documents, Plaintiff elects to have the Personal Property located at the Mortgaged Premises sold by the sheriff together with the Mortgaged Premises at a single public sale.

79. No person or entity possesses an interest in the Personal Property superior to the security interest held by Plaintiff.

80. Defendants have deprived or may deprive Plaintiff of the possession of the Personal Property.

**WHEREFORE,** Plaintiff demands judgment as follows:

a. adjudging that the Personal Property be sold together with the Mortgaged Premises at a single public sale conducted by the sheriff to satisfy the amounts due Plaintiff;

b. barring and foreclosing the Defendants of all equity of redemption in and to the Personal Property; and

c. for such other and further relief as the Court may deem just and proper.

Case 2:17-cv-02036-KM-MAH Document 1 Filed 03/28/17 Page 18 of 19 PageID: 18

**FOURTH COUNT**
**(Rent Receiver)**

81. Plaintiff incorporates herein by reference the paragraphs set forth above as if fully set forth herein.

82. The Mortgage provides that Plaintiff, upon default by Borrower, shall be entitled to the appointment of a receiver without regard to the adequacy of security for the sums due or to become due under the Note and Mortgage.

83. Plaintiff is also entitled to collect rent, income and profits of the Mortgaged Premises by virtue of the Assignment of Leases.

84. The appointment of a rent receiver is necessary to protect and preserve the value of the Plaintiff's security and the Mortgaged Premises.

**WHEREFORE,** Plaintiff demands judgment as follows:

a. appointing a receiver for the rent, income and profits of the Mortgaged Premises;

b. directing all tenants in possession of the Mortgaged Premises to pay the rent receiver all rent, income and profits;

c. awarding Plaintiff its costs of suit and attorneys' fees; and

d. for such other and further relief as the Court may deem just and proper.

**FIFTH COUNT**
**(Breach of Promissory Note)**

85. Plaintiff incorporates herein by reference the paragraphs set forth above as if fully set forth herein.

86. Borrower is personally liable for all amounts due Plaintiff under the Note.

Case 2:17-cv-02036-KM-MAH Document 1 Filed 03/28/17 Page 19 of 19 PageID: 19

**WHEREFORE,** Plaintiff demands judgment as follows:

a. awarding Plaintiff all amounts due under the Note, with interest, advances, other charges, attorneys' fees and costs; and

b. granting such other and further relief as the Court may deem just and proper.

**SIXTH COUNT**
**(Breach of Guaranty)**

87. Plaintiff incorporates herein by reference the paragraphs set forth above as if fully set forth herein.

88. Guarantor is personally liable for any amounts due Plaintiff under the Guaranty.

**WHEREFORE,** Plaintiff demands judgment as follows:

a. awarding Plaintiff all amounts due under the Guaranty, with interest, advances, other charges, attorneys' fees and costs; and

b. granting such other and further relief as the Court may deem just and proper.

Respectfully submitted,

THOMPSON & KNIGHT LLP
*Attorneys for Plaintiff Wells Fargo Bank, N.A., as Trustee for Morgan Stanley Capital I Inc., Commercial Mortgage Pass-Through Certificates, Series 2006-IQ12*

By: s/ Vivian M. Arias
Vivian M. Arias
900 Third Avenue, 20th Floor
New York, New York 10022
Vivian.Arias@tklaw.com
(212) 751-3325

Dated: March 28, 2017

JS 44 (Rev. 07/16)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

WELLS FARGO BANK, N.A., AS TRUSTEE FOR MORGAN STANLEY CAPITAL I INC., COMMERCIAL MORTGAGE PASS-THUOUGH CERTIFICATES, SERIES 2006-IQ12,

(b) County of Residence of First Listed Plaintiff: Minnehaha, SD
*(EXCEPT IN U.S. PLAINTIFF CASES)*

(c) Attorneys *(Firm Name, Address, Email and Telephone Number)*
Thompson & Knight LLP, 900 Third Ave., 20th Fl, NY, NY 10022
(212) 751-3325, vivian.arias@tklaw.com

## DEFENDANTS

LICHTER GATEWAY IV LLC, CLAIRE LICHTER, individually and in her capacity as Executor of the Estate of Alfred Lichter, JOSEPH SCHWARTZ, SUZETTE SCHWARTZ, et al.,

County of Residence of First Listed Defendant: ESSEX, NEW JERSEY
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1 U.S. Government Plaintiff
- ☐ 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)* *(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☒ 2 | ☒ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

**CONTRACT**
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans)
- ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☐ 160 Stockholders' Suits
- ☐ 190 Other Contract
- ☐ 195 Contract Product Liability
- ☐ 196 Franchise

**REAL PROPERTY**
- ☐ 210 Land Condemnation
- ☒ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

**TORTS**

PERSONAL INJURY
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury
- ☐ 362 Personal Injury - Medical Malpractice

PERSONAL INJURY
- ☐ 365 Personal Injury - Product Liability
- ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

**CIVIL RIGHTS**
- ☐ 440 Other Civil Rights
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/ Accommodations
- ☐ 445 Amer. w/Disabilities - Employment
- ☐ 446 Amer. w/Disabilities - Other
- ☐ 448 Education

**PRISONER PETITIONS**

Habeas Corpus:
- ☐ 463 Alien Detainee
- ☐ 510 Motions to Vacate Sentence
- ☐ 530 General
- ☐ 535 Death Penalty

Other:
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition
- ☐ 560 Civil Detainee - Conditions of Confinement

**FORFEITURE/PENALTY**
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 690 Other

**LABOR**
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Management Relations
- ☐ 740 Railway Labor Act
- ☐ 751 Family and Medical Leave Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Employee Retirement Income Security Act

**IMMIGRATION**
- ☐ 462 Naturalization Application
- ☐ 465 Other Immigration Actions

**BANKRUPTCY**
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

**PROPERTY RIGHTS**
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

**SOCIAL SECURITY**
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
- ☐ 375 False Claims Act
- ☐ 376 Qui Tam (31 USC 3729(a))
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 490 Cable/Sat TV
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 890 Other Statutory Actions
- ☐ 891 Agricultural Acts
- ☐ 893 Environmental Matters
- ☐ 895 Freedom of Information Act
- ☐ 896 Arbitration
- ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision
- ☐ 950 Constitutionality of State Statutes

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation - Transfer
- ☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. 1332

Brief description of cause:
Mortgage foreclosure, for foreclosure of security interest, breach of promissory note and guaranty

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes ☒ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):* JUDGE ______ DOCKET NUMBER ______

DATE: 03/28/2017

SIGNATURE OF ATTORNEY OF RECORD: Vivian M. Arias

FOR OFFICE USE ONLY

RECEIPT # ______ AMOUNT ______ APPLYING IFP ______ JUDGE ______ MAG. JUDGE ______

JS 44 Reverse (Rev. 07/16)

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

I.(a) **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

(b) **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

(c) **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

II. **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

III. **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

IV. **Nature of Suit.** Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerk(s) in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

V. **Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statue.

VI. **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service

VII. **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

VIII. **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

# EXHIBIT A

**SECURITIZATION**

PROMISSORY NOTE

$61,000,000

Newark, New Jersey
October 24, 2006

FOR VALUE RECEIVED, HERITAGE GATEWAY, LLC, MARINE ONE ASSOCIATES III, LLC, RIDGEWOOD 2000 ASSOCIATES III, LLC, JPG REAL ESTATE III, LLC, each a Delaware limited liability company having its principal place of business at 123 Prospect Street, Ridgewood, New Jersey 07451, and IVY GATEWAY, LLC, a Delaware limited liability company, having its principal place of business at 1 Paragon Drive, Suite 125, Montvale, New Jersey 07645, together as tenants-in-common and as maker (collectively, the "**Borrower**"), hereby unconditionally promise to pay to the order of LASALLE BANK NATIONAL ASSOCIATION, as lender, having an address at 135 South LaSalle Street, Suite 3410, Chicago, Illinois 60603 ("**Lender**"), or at such other place as the holder hereof may from time to time designate in writing, the principal sum of SIXTY-ONE MILLION AND NO/100 DOLLARS ($61,000,000), in lawful money of the United States of America, with interest thereon to be computed from the date of this Note at the Applicable Interest Rate, and to be paid in accordance with the terms of this Note and that certain Loan Agreement dated the date hereof between Borrower and Lender (as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, the "**Loan Agreement**"). All capitalized terms not defined herein shall have the respective meanings set forth in the Loan Agreement.

ARTICLE 1 - PAYMENT TERMS

Borrower agrees to pay the principal sum of this Note and interest on the unpaid principal sum of this Note from time to time outstanding at the rates and at the times specified in Article II of the Loan Agreement and the outstanding balance of the principal sum of this Note and all accrued and unpaid interest thereon shall be due and payable on the Maturity Date.

ARTICLE 2 - DEFAULT AND ACCELERATION

Subject to any grace or cure periods contained in the Loan Agreement, the Debt shall without notice become immediately due and payable at the option of Lender if any payment required in this Note is not paid on or prior to the date when due or if not paid on the Maturity Date or on the happening of any other Event of Default.

ARTICLE 3 - LOAN DOCUMENTS

This Note is secured by the Mortgage and the other Loan Documents. All of the terms, covenants and conditions contained in the Loan Agreement, the Mortgage and the other Loan Documents are hereby made part of this Note to the same extent and with the same force as if they were fully set forth herein. In the event of a conflict or inconsistency between the terms of this Note and the Loan Agreement, the terms and provisions of the Loan Agreement shall govern.

Case 2:17-cv-02036-KM-MAH Document 1-2 Filed 03/28/17 Page 93 of 7 PageID: 24

ARTICLE 4 - SAVINGS CLAUSE

Notwithstanding anything to the contrary, (a) all agreements and communications between Borrower and Lender are hereby and shall automatically be limited so that, after taking into account all amounts deemed interest, the interest contracted for, charged or received by Lender shall never exceed the maximum lawful rate or amount, (b) in calculating whether any interest exceeds the lawful maximum, all such interest shall be amortized, prorated, allocated and spread over the full amount and term of all principal indebtedness of Borrower to Lender, and (c) if through any contingency or event, Lender receives or is deemed to receive interest in excess of the lawful maximum, any such excess shall be deemed to have been applied toward payment of the principal of any and all then outstanding indebtedness of Borrower to Lender, or if there is no such indebtedness, shall immediately be returned to Borrower.

ARTICLE 5 - NO ORAL CHANGE

This Note may not be modified, amended, waived, extended, changed, discharged or terminated orally or by any act or failure to act on the part of Borrower or Lender, but only by an agreement in writing signed by the party against whom enforcement of any modification, amendment, waiver, extension, change, discharge or termination is sought.

ARTICLE 6 - WAIVERS

Borrower and all others who may become liable for the payment of all or any part of the Debt do hereby severally waive presentment and demand for payment, notice of dishonor, notice of intention to accelerate, notice of acceleration, protest and notice of protest and non-payment and all other notices of any kind. No release of any security for the Debt or extension of time for payment of this Note or any installment hereof, and no alteration, amendment or waiver of any provision of this Note, the Loan Agreement or the other Loan Documents made by agreement between Lender or any other Person shall release, modify, amend, waive, extend, change, discharge, terminate or affect the liability of Borrower or any other Person who may become liable for the payment of all or any part of the Debt under this Note, the Loan Agreement or the other Loan Documents. No notice to or demand on Borrower shall be deemed to be a waiver of the obligation of Borrower or of the right of Lender to take further action without further notice or demand as provided for in this Note, the Loan Agreement or the other Loan Documents. If Borrower is a partnership or limited liability company, the agreements herein contained shall remain in force and be applicable, notwithstanding any changes in the individuals comprising the partnership or limited liability company, and the term "Borrower," as used herein, shall include any alternate or successor partnership or limited liability company, but any predecessor partnership or limited liability company and their partners or members shall not thereby be released from any liability. If Borrower is a corporation, the agreements contained herein shall remain in full force and be applicable notwithstanding any changes in the shareholders comprising, or the officers and directors relating to, the corporation, and the term "Borrower," as used herein, shall include any alternative or successor corporation, but any predecessor corporation shall not be relieved of liability hereunder. (Nothing in the foregoing sentence shall be construed as a consent to, or a waiver of, any prohibition or restriction on transfers of interests in such partnership, limited liability company or corporation, which may be set forth in the Loan Agreement, the Mortgage or any other Loan Document.)

ARTICLE 7 - TRANSFER

Upon the transfer of this Note, Lender may deliver all the collateral mortgaged, granted, pledged or assigned pursuant to the Loan Documents, or any part thereof, to the transferee who shall thereupon become vested with all the rights herein or under applicable law given to Lender with respect thereto, and Lender shall thereafter forever be relieved and fully discharged from any liability or responsibility in the matter; but Lender shall retain all rights and obligations hereby given to it with respect to any liabilities and the collateral not so transferred. Lender shall deliver to Borrower notice of such transfer in accordance with Section 11.6 of the Loan Agreement.

ARTICLE 8 - EXCULPATION

The provisions of Section 11.22 of the Loan Agreement are hereby incorporated by reference into this Note to the same extent and with the same force as if fully set forth herein.

ARTICLE 9 - GOVERNING LAW

**(A) THIS NOTE WAS NEGOTIATED IN THE STATE OF NEW JERSEY, AND MADE BY BORROWER AND ACCEPTED BY LENDER IN THE STATE OF NEW JERSEY, AND THE PROCEEDS OF THIS NOTE WERE DISBURSED FROM THE STATE OF NEW JERSEY, WHICH STATE THE PARTIES AGREE HAS A SUBSTANTIAL RELATIONSHIP TO THE PARTIES AND TO THE UNDERLYING TRANSACTION EMBODIED HEREBY, AND IN ALL RESPECTS, INCLUDING, WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THIS NOTE AND THE OBLIGATIONS ARISING HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW JERSEY APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE (WITHOUT REGARD TO PRINCIPLES OF CONFLICT LAWS) AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA. TO THE FULLEST EXTENT PERMITTED BY LAW, BORROWER HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS NOTE AND THIS NOTE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW JERSEY.**

**(B) ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST LENDER OR BORROWER ARISING OUT OF OR RELATING TO THIS NOTE MAY AT LENDER'S OPTION BE INSTITUTED IN ANY FEDERAL OR STATE COURT IN THE STATE OF NEW JERSEY AND BORROWER WAIVES ANY OBJECTIONS WHICH IT MAY NOW OR HEREAFTER HAVE BASED ON VENUE AND/OR FORUM NON CONVENIENS OF ANY SUCH SUIT, ACTION OR PROCEEDING, AND BORROWER HEREBY IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING. BORROWER DOES HEREBY DESIGNATE AND APPOINT:**

**as Agent for Heritage Gateway, LLC, Marine One Associates III, LLC, Ridgewood 2000 Associates III, LLC, and JPG Real Estate III, LLC:**

Jeffrey Greenberg
Heritage Management Company, LLC
P.O. Box 627
123 Prospect Street
Ridgewood, New Jersey 07451

**as Agent for Ivy Gateway, LLC:**

Anthony P. DiTommaso, Jr.
Ivy Equities, L.L.C.
1 Paragon Drive
Montvale, NJ 07645

**AS ITS AUTHORIZED AGENT TO ACCEPT AND ACKNOWLEDGE ON ITS BEHALF SERVICE OF ANY AND ALL PROCESS WHICH MAY BE SERVED IN ANY SUCH SUIT, ACTION OR PROCEEDING IN ANY FEDERAL OR STATE COURT IN NEW JERSEY AND AGREES THAT SERVICE OF PROCESS UPON SAID AGENT AT SAID ADDRESS AND WRITTEN NOTICE OF SAID SERVICE MAILED OR DELIVERED TO BORROWER IN THE MANNER PROVIDED HEREIN SHALL BE DEEMED IN EVERY RESPECT EFFECTIVE SERVICE OF PROCESS UPON BORROWER IN ANY SUCH SUIT, ACTION OR PROCEEDING IN THE STATE OF NEW JERSEY. BORROWER (I) SHALL GIVE PROMPT NOTICE TO LENDER OF ANY CHANGED ADDRESS OF ITS AUTHORIZED AGENT HEREUNDER, (II) MAY AT ANY TIME AND FROM TIME TO TIME DESIGNATE A SUBSTITUTE AUTHORIZED AGENT WITH AN OFFICE IN NEW JERSEY (WHICH SUBSTITUTE AGENT AND OFFICE SHALL BE DESIGNATED AS THE PERSON AND ADDRESS FOR SERVICE OF PROCESS), AND (III) SHALL PROMPTLY DESIGNATE SUCH A SUBSTITUTE IF ITS AUTHORIZED AGENT CEASES TO HAVE AN OFFICE IN NEW JERSEY OR IS DISSOLVED WITHOUT LEAVING A SUCCESSOR.**

ARTICLE 10 - NOTICES

All notices or other written communications hereunder shall be delivered in accordance with Section 11.6 of the Loan Agreement.

[NO FURTHER TEXT ON THIS PAGE]

IN WITNESS WHEREOF, Borrower has duly executed this Note as of the day and year first above written.

BORROWER:

HERITAGE GATEWAY, LLC, a Delaware limited liability company

By: ______________________________
Name: Steven Greenberg
Title: Manager

MARINE ONE ASSOCIATES III, LLC, a Delaware limited liability company

By: ______________________________
Name: Jeffrey Greenberg
Title: Manager

RIDGEWOOD 2000 ASSOCIATES III, LLC, a Delaware limited liability company

By: ______________________________
Name: Steven Greenberg
Title: Manager

JPG REAL ESTATE III, LLC, a Delaware limited liability company

By: ______________________________
Name: Jeffrey Greenberg
Title: Manager

IVY GATEWAY, LLC, a Delaware limited liability company

By: ______________________________
Name: Anthony P. DiTommaso, Jr.
Title: Manager

IN WITNESS WHEREOF, Borrower has duly executed this Note as of the day and year first above written.

BORROWER:

HERITAGE GATEWAY, LLC, a Delaware limited liability company

By: ____________________________
Name: Steven Greenberg
Title: Manager

MARINE ONE ASSOCIATES III, LLC, a Delaware limited liability company

By: ____________________________
Name: Jeffrey Greenberg
Title: Manager

RIDGEWOOD 2000 ASSOCIATES III, LLC, a Delaware limited liability company

By: ____________________________
Name: Steven Greenberg
Title: Manager

JPG REAL ESTATE III, LLC, a Delaware limited liability company

By: ____________________________
Name: Jeffrey Greenberg
Title: Manager

IVY GATEWAY, LLC, a Delaware limited liability company

By: ____________________________
Name: Anthony P. DiTommaso, Jr.
Title: Manager

# EXHIBIT B

# LOAN AGREEMENT

Dated as of October 24, 2006

Between

**HERITAGE GATEWAY, LLC, MARINE ONE ASSOCIATES III, LLC, RIDGEWOOD 2000 ASSOCIATES III, LLC, JPG REAL ESTATE III, LLC** and **IVY GATEWAY, LLC,**
as Borrower

And

**LASALLE BANK NATIONAL ASSOCIATION**
as Lender

# TABLE OF CONTENTS


| | | | Page |
|---|---|---|---|
| ARTICLE I. | DEFINITIONS; PRINCIPLES OF CONSTRUCTION | | 1 |
| Section 1.1 | Definitions | | 1 |
| Section 1.2 | Principles of Construction | | 13 |
| ARTICLE II. | THE LOAN | | 13 |
| Section 2.1 | The Loan | | 13 |
| | 2.1.1 | Agreement to Lend and Borrow | 13 |
| | 2.1.2 | Single Disbursement to Borrower | 13 |
| | 2.1.3 | The Note | 13 |
| | 2.1.4 | Use of Proceeds | 14 |
| Section 2.2 | Interest Rate | | 14 |
| | 2.2.1 | Initial Interest Rate | 14 |
| | 2.2.2 | Default Rate | 14 |
| | 2.2.3 | Interest Calculation | 14 |
| | 2.2.4 | Usury Savings | 14 |
| Section 2.3 | Loan Payments | | 15 |
| | 2.3.1 | Payment Before Maturity Date | 15 |
| | 2.3.2 | Payment on Maturity Date | 15 |
| | 2.3.3 | Late Payment Charge | 15 |
| Section 2.4 | Prepayments | | 16 |
| | 2.4.1 | Voluntary Prepayments | 16 |
| | 2.4.2 | Mandatory Prepayments | 16 |
| | 2.4.3 | Prepayments After Default | 16 |
| | 2.4.4 | Prepayment Upon Partition | 16 |
| Section 2.5 | Defeasance | | 17 |
| | 2.5.1 | Conditions to Defeasance | 17 |
| | 2.5.2 | Defeasance Collateral Account | 18 |
| | 2.5.3 | Successor Borrower | 18 |
| ARTICLE III. | REPRESENTATIONS AND WARRANTIES | | 19 |
| Section 3.1 | Borrower Representations | | 19 |
| | 3.1.1 | Organization | 19 |
| | 3.1.2 | Proceedings | 20 |
| | 3.1.3 | No Conflicts | 20 |
| | 3.1.4 | Litigation | 20 |
| | 3.1.5 | Agreements | 20 |
| | 3.1.6 | Consents | 20 |
| | 3.1.7 | Title | 20 |

**TABLE OF CONTENTS**
(continued)

**Page**

3.1.8 No Plan Assets ..... 21
3.1.9 Compliance ..... 21
3.1.10 Financial Information ..... 21
3.1.11 Condemnation ..... 22
3.1.12 Utilities and Public Access ..... 22
3.1.13 Separate Lots ..... 22
3.1.14 Assessments ..... 22
3.1.15 Enforceability ..... 22
3.1.16 Assignment of Leases ..... 22
3.1.17 Insurance ..... 22
3.1.18 Licenses ..... 22
3.1.19 Flood Zone ..... 22
3.1.20 Physical Condition ..... 22
3.1.21 Boundaries ..... 23
3.1.22 Leases ..... 23
3.1.23 Filing and Recording Taxes ..... 23
3.1.24 Single Purpose ..... 23
3.1.25 Tax Filings ..... 27
3.1.26 Solvency ..... 27
3.1.27 Federal Reserve Regulations ..... 27
3.1.28 Organizational Chart ..... 27
3.1.29 Bank Holding Company ..... 27
3.1.30 No Other Debt ..... 28
3.1.31 Investment Company Act ..... 28
3.1.32 Access/Utilities ..... 28
3.1.33 No Bankruptcy Filing ..... 28
3.1.34 Full and Accurate Disclosure ..... 28
3.1.35 Foreign Person ..... 28
3.1.36 Fraudulent Transfer ..... 28
3.1.37 No Change in Facts or Circumstances; Disclosure ..... 28
3.1.38 Management Agreement ..... 29
3.1.39 Perfection of Accounts ..... 29
3.1.40 OFAC Lists ..... 29
3.1.41 Operating Agreements ..... 30

Section 3.2 Survival of Representations ..... 30

ARTICLE IV. BORROWER COVENANTS ..... 30

Section 4.1 Borrower Affirmative Covenants ..... 30

4.1.1 Existence; Compliance with Legal Requirements ..... 30
4.1.2 Taxes and Other Charges ..... 31
4.1.3 Litigation ..... 31
4.1.4 Access to Property ..... 31
4.1.5 Further Assurances; Supplemental Mortgage Affidavits ..... 31

0000479



NEWY1\8035685.7

Case 2:17-cv-02036-KM-MAH Document 1-3 Filed 03/28/17 Page 5 of 115 PageID: 953

# TABLE OF CONTENTS
(continued)


| | | Page |
|---|---|---|
| 4.1.6 | Financial Reporting | 32 |
| 4.1.7 | Title to the Property | 33 |
| 4.1.8 | Estoppel Statement | 33 |
| 4.1.9 | Leases | 34 |
| 4.1.10 | Alterations | 35 |
| 4.1.11 | Material Agreements | 35 |
| 4.1.12 | Performance by Borrower | 35 |
| 4.1.13 | Costs of Enforcement/Remedying Defaults | 35 |
| 4.1.14 | Business and Operations | 36 |
| 4.1.15 | Loan Fees | 36 |
| 4.1.16 | Tenancy-in-Common | 36 |
| Section 4.2 | Borrower Negative Covenants | 37 |
| 4.2.1 | Due on Sale and Encumbrance; Transfers of Interests | 37 |
| 4.2.2 | Liens | 38 |
| 4.2.3 | Dissolution | 38 |
| 4.2.4 | Change in Business | 38 |
| 4.2.5 | Debt Cancellation | 38 |
| 4.2.6 | Affiliate Transactions | 38 |
| 4.2.7 | Zoning | 38 |
| 4.2.8 | Assets | 38 |
| 4.2.9 | No Joint Assessment | 38 |
| 4.2.10 | Principal Place of Business | 39 |
| 4.2.11 | ERISA | 39 |
| 4.2.12 | Material Agreements | 39 |
| 4.2.13 | Tenancy-in-Common | 39 |
| 4.2.14 | Operating Agreements | 40 |
| ARTICLE V. | INSURANCE, CASUALTY AND CONDEMNATION | 40 |
| Section 5.1 | Insurance | 40 |
| 5.1.1 | Insurance Policies | 40 |
| 5.1.2 | Insurance Company | 43 |
| Section 5.2 | Casualty and Condemnation | 43 |
| 5.2.1 | Casualty | 43 |
| 5.2.2 | Condemnation | 44 |
| 5.2.3 | Casualty Proceeds | 44 |
| Section 5.3 | Delivery of Net Proceeds | 44 |
| 5.3.1 | Minor Casualty or Condemnation | 44 |
| 5.3.2 | Major Casualty or Condemnation | 45 |
| ARTICLE VI. | RESERVE FUNDS | 48 |




NEWY1\8035685.7

## TABLE OF CONTENTS
(continued)

| | | Page |
|---|---|---|
| Section 6.1 | Intentionally Omitted | 48 |
| Section 6.2 | Tax Funds | 48 |
| 6.2.1 | Deposits of Tax Funds | 48 |
| 6.2.2 | Release of Tax Funds | 48 |
| Section 6.3 | Insurance Funds | 49 |
| 6.3.1 | Deposits of Insurance Funds | 49 |
| 6.3.2 | Release of Insurance Funds | 49 |
| Section 6.4 | Capital Expenditure Funds | 49 |
| 6.4.1 | Deposits of Capital Expenditure Funds | 49 |
| 6.4.2 | Release of Capital Expenditure Funds | 50 |
| Section 6.5 | McCarter Lease Rollover Funds | 51 |
| 6.5.1 | Deposits of McCarter Lease Rollover Funds | 51 |
| 6.5.2 | Release of McCarter Lease Rollover Funds | 51 |
| 6.5.3 | Short-Term Lease of McCarter Space | 53 |
| Section 6.6 | Prudential Lease Rollover Funds | 53 |
| 6.6.1 | Deposits of Prudential Lease Rollover Funds | 53 |
| 6.6.2 | Release of Prudential Lease Rollover Funds | 53 |
| Section 6.7 | Lease Termination Rollover Funds | 55 |
| 6.7.1 | Deposits of Rollover Funds | 55 |
| 6.7.2 | Release of Lease Termination Rollover Funds | 55 |
| Section 6.8 | Provisions Regarding Reserve Funds | 56 |
| 6.8.1 | Event of Default | 56 |
| 6.8.2 | Interest on Reserve Funds | 56 |
| Section 6.9 | Security Interest in Reserve Funds | 57 |
| 6.9.1 | Grant of Security Interest | 57 |
| 6.9.2 | Prohibition Against Further Encumbrance | 57 |
| Section 6.10 | Letters of Credit | 57 |
| 6.10.1 | Delivery of Letters of Credit | 57 |
| Section 6.11 | Provisions Regarding Letters of Credit | 58 |
| 6.11.1 | Security for Debt | 58 |
| 6.11.2 | Additional Rights of Lender | 58 |
| Section 6.12 | Master Lease Reserve Funds. | 58 |
| ARTICLE VII. | PROPERTY MANAGEMENT | 59 |
| Section 7.1 | The Management Agreement | 59 |



NEWYI\8035685.7

**TABLE OF CONTENTS**
(continued)

**Page**

Section 7.2 Prohibition Against Termination or Modification .......... 59
Section 7.3 Replacement of Manager .......... 60

ARTICLE VIII. PERMITTED TRANSFERS .......... 60

Section 8.1 Restrictions on Transfer .......... 60
Section 8.2 Permitted Transfers .......... 60

8.2.1 Certain Transfers .......... 60
8.2.2 Mezzanine Financing .......... 61

ARTICLE IX. SALE AND SECURITIZATION OF MORTGAGE .......... 62

Section 9.1 Sale of Mortgage and Securitization .......... 62
Section 9.2 Securitization Indemnification .......... 65

ARTICLE X. DEFAULTS .......... 67

Section 10.1 Event of Default .......... 67
Section 10.2 Remedies .......... 69
Section 10.3 Right to Cure Defaults .......... 70
Section 10.4 Remedies Cumulative .......... 70

ARTICLE XI. MISCELLANEOUS .......... 71

Section 11.1 Successors and Assigns .......... 71
Section 11.2 Lender's Discretion .......... 71
Section 11.3 Governing Law .......... 71
Section 11.4 Modification, Waiver in Writing .......... 72
Section 11.5 Delay Not a Waiver .......... 73
Section 11.6 Notices .......... 73
Section 11.7 Trial by Jury .......... 74
Section 11.8 Headings .......... 75
Section 11.9 Severability .......... 75
Section 11.10 Preferences .......... 75
Section 11.11 Waiver of Notice .......... 75
Section 11.12 Remedies of Borrower .......... 75
Section 11.13 Expenses; Indemnity .......... 76
Section 11.14 Schedules Incorporated .......... 77
Section 11.15 Offsets, Counterclaims and Defenses .......... 77
Section 11.16 No Joint Venture or Partnership; No Third Party Beneficiaries .......... 77
Section 11.17 Publicity .......... 77
Section 11.18 Waiver of Marshalling of Assets .......... 77
Section 11.19 Waiver of Offsets/Defenses/Counterclaims .......... 78
Section 11.20 Conflict; Construction of Documents; Reliance .......... 78
Section 11.21 Brokers and Financial Advisors .......... 78
Section 11.22 Exculpation .......... 79



NEWY1\8035685.7

Case 2:17-cv-02036-KM-MAH Document 1-3 Filed 03/28/17 Page 8 of 115 PageID: 956

**TABLE OF CONTENTS**
(continued)

**Page**


| | | |
|---|---|---|
| Section 11.23 | Prior Agreements | 80 |
| Section 11.24 | Servicer | 80 |
| Section 11.25 | Joint and Several Liability | 81 |
| Section 11.26 | Creation of Security Interest | 81 |
| Section 11.27 | Assignments and Participations | 81 |
| Section 11.28 | Set-Off | 82 |
| Section 11.29 | Counterparts | 82 |




NEWY1\8035685.7

000000483

Case 2:17-cv-02036-KM-MAH Document 1-3 Filed 03/28/17 Page 9 of 115 PageID: 937

# TABLE OF CONTENTS

## SCHEDULES


| | | |
|---|---|---|
| Schedule I | – | Rent Roll |
| Schedule II | – | Intentionally Omitted |
| Schedule III | – | Organizational Chart |
| Schedule IV | – | Form of Subordination, Non-Disturbance and Attornment Agreement |
| Schedule V | – | Operating Agreements |


000000484

# LOAN AGREEMENT

THIS LOAN AGREEMENT, dated as of October 24, 2006 (as amended, restated, replaced, supplemented or otherwise modified from time to time, this "Agreement"), between LASALLE BANK NATIONAL ASSOCIATION, a national banking association having an address at 135 South LaSalle Street, Suite 3410, Chicago, Illinois 60603 ("Lender"), and HERITAGE GATEWAY, LLC, MARINE ONE ASSOCIATES III, LLC, RIDGEWOOD 2000 ASSOCIATES III, LLC, JPG REAL ESTATE III, LLC, each a Delaware limited liability company, having an address at 123 Prospect Street, Ridgewood, New Jersey 07451, and IVY GATEWAY, LLC, a Delaware limited liability company, having an address at 1 Paragon Drive, Suite 125, Montvale, New Jersey 07645, together as tenants-in-common (collectively, "Borrower").

All capitalized terms used herein shall have the respective meanings set forth in Article I hereof.

## W I T N E S S E T H:

WHEREAS, Borrower desires to obtain the Loan from Lender; and

WHEREAS, Lender is willing to make the Loan to Borrower, subject to and in accordance with the conditions and terms of this Agreement and the other Loan Documents.

NOW, THEREFORE, in consideration of the covenants set forth in this Agreement, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree, represent and warrant as follows:

## ARTICLE I.

## DEFINITIONS; PRINCIPLES OF CONSTRUCTION

**Section 1.1 Definitions.**

For all purposes of this Agreement, except as otherwise expressly provided:

"**Affiliate**" shall mean, as to any Person, any other Person that, directly or indirectly, owns more than fifty percent (50%) of, is in control of, is controlled by or is under common ownership or control with such Person or is a director or officer of such Person or of an Affiliate of such Person. As used in this definition, the term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management, policies or activities of a Person, whether through ownership of voting securities, by contract or otherwise.

"**Agent**" shall mean LaSalle Bank National Association and any successor Eligible Institution thereto.

"**ALTA**" shall mean American Land Title Association, or any successor thereto.

"**Alteration Threshold**" shall mean $1,000,000.

"**Annual Budget**" shall mean the operating and capital budget for the Property setting forth Borrower's good faith estimate of Gross Revenue, Operating Expenses, and Capital Expenditures for the applicable Fiscal Year.

"**Anti-Money Laundering Laws**" shall have the meaning set forth in Section 3.1.40.

"**Applicable Interest Rate**" shall mean a rate per annum equal to Five and 96/100 percent (5.96%).

"**Assignment of Leases**" shall mean that certain first priority Assignment of Leases and Rents, dated as of the date hereof, from Borrower, as assignor, to Lender, as assignee, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Assignment of Management Agreement**" shall mean that certain Assignment of Management Agreement and Subordination of Management Fees, dated as of the date hereof, among Borrower, Manager and Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Assumption Fees**" shall have the meaning set forth in Section 8.1.

"**Award**" shall mean any compensation paid by any Governmental Authority in connection with a Condemnation in respect of all or any part of the Property.

"**Bankruptcy Action**" shall have the meaning set forth in Section 4.1.16.

"**Bankruptcy Code**" shall mean Title 11 of the United States Code entitled "Bankruptcy", as amended from time to time, and any successor statute or statutes and all rules and regulations from time to time promulgated thereunder, and any comparable foreign laws relating to bankruptcy, insolvency or creditors' rights.

000000486

"**Basic Carrying Costs**" shall mean the sum of the following costs associated with the Property for the relevant Fiscal Year or payment period: (i) Taxes and (ii) Insurance Premiums.

"**Borrower**" shall mean, collectively, Heritage Gateway, LLC, Marine One Associates III, LLC, Ridgewood 2000 Associates III, LLC, JPG Real Estate III, LLC and Ivy Gateway, LLC, together with their permitted successors and permitted assigns.

"**Business Day**" shall mean any day other than a Saturday, a Sunday or a legal holiday on which national banks are not open for general business in (i) the State of New York, (ii) the state where the corporate trust office of the Trustee is located, or (iii) the state where the servicing offices of the Servicer are located.

"**Capital Expenditures**" for any period shall mean amounts expended for replacements and alterations to the Property and required to be capitalized according to GAAP.

"**Capital Expenditure Funds**" shall have the meaning set forth in Section 6.4.1.

"**Capital Expenditures Work**" shall mean any labor performed or materials installed in connection with any Capital Expenditure.

"**Cash Management Agreement**" shall mean that certain Cash Management Agreement of even date herewith among Lender, Borrower, the borrowers of the LaSalle Mezzanine Financing, Manager and Agent, or any replacement cash management agreement.

"**Casualty**" shall mean the occurrence of any casualty, damage or injury, by fire or otherwise, to the Property or any part thereof.

"**Casualty Consultant**" shall have the meaning set forth in Section 5.3.2(c).

"**Casualty Retainage**" shall have the meaning set forth in Section 5.3.2(d).

"**Closing Date**" shall mean the date of funding the Loan.

"**Code**" shall mean the Internal Revenue Code of 1986, as amended, and as it may be further amended from time to time, any successor statutes thereto, and applicable U.S. Department of Treasury regulations issued pursuant thereto in temporary or final form.

"**Condemnation**" shall mean a temporary or permanent taking by any Governmental Authority as the result or in lieu or in anticipation of the exercise of the right of condemnation or eminent domain, of all or any part of the Property, or any interest therein or right accruing thereto, including any right of access thereto or any change of grade affecting the Property or any part thereof.

"**Debt**" shall mean the outstanding principal amount of the Loan together with all interest accrued and unpaid thereon and all other sums (including the Yield Maintenance Premium) due to Lender in respect of the Loan under the Note, this Agreement, the Mortgage, the Environmental Indemnity or any other Loan Document.

"**Debt Service**" shall mean, with respect to any particular period of time, scheduled principal and interest payments under the Note.

"**Debt Service Coverage Ratio**" shall mean the ratio of (i) Underwritable Cash Flow for the twelve (12) calendar month period immediately preceding the date of calculation to (ii) the projected Debt Service that would be due for the twelve (12) calendar month period immediately following such calculation assuming interest at the Applicable Interest Rate and a thirty (30) year amortization term plus debt service on the LaSalle Mezzanine Financing assuming the interest rate applicable thereto and a thirty (30) year amortization term.

"**Default**" shall mean the occurrence of any event hereunder or under any other Loan Document which, but for the giving of notice or passage of time, or both, would be an Event of Default.

"**Default Rate**" shall mean, with respect to the Loan, a rate per annum equal to the lesser of (i) the maximum rate permitted by applicable law, or (ii) five percent (5%) above the Applicable Interest Rate.

"**Defeasance Collateral**" shall mean U.S. Obligations, which provide payments (i) on or prior to, but as close as possible to, the Business Day immediately preceding all Monthly Payment Dates and other scheduled payment dates, if any, under the Note after the Defeasance Date and up to and including the Maturity Date, and (ii) in amounts equal to or greater than the Scheduled Defeasance Payments relating to such Monthly Payment Dates and other scheduled payment dates.

"**Defeasance Collateral Account**" shall have the meaning set forth in Section 2.5.2.

"**Defeasance Date**" shall have the meaning set forth in Section 2.5.1(a)(i).

"**Defeasance Event**" shall have the meaning set forth in Section 2.5.1(a).

"**Disclosure Document**" shall have the meaning set forth in Section 9.2(a).

"**Eligible Account**" shall mean a separate and identifiable account from all other funds held by the holding institution that is either (i) an account or accounts maintained with a federal or state-chartered depository institution or trust company which complies with the definition of Eligible Institution or (ii) a segregated trust account or accounts maintained with a federal or state chartered depository institution or trust company acting in its fiduciary capacity which, in the case of a state chartered depository institution or trust company is subject to regulations substantially similar to 12 C.F.R. §9.10(b), having in either case a combined capital and surplus of at least $50,000,000 and subject to supervision or examination by federal and state authority. An Eligible Account will not be evidenced by a certificate of deposit, passbook or other instrument.

"**Eligible Institution**" shall mean a depository institution or trust company insured by the Federal Deposit Insurance Corporation the short term unsecured debt obligations or commercial paper of which are rated at least A-1 by S&P, P-1 by Moody's and F-1+ by Fitch in the case of accounts in which funds are held for thirty (30) days or less or, in the case of Letters of Credit or accounts in which funds are held for more than thirty (30) days, the long term unsecured debt obligations of which are rated at least "AA" by Fitch and S&P and "Aa2" by Moody's.

"**Environmental Indemnity**" shall mean that certain Environmental Indemnity Agreement dated as of the date hereof executed by Borrower and Guarantors in connection with the Loan for the benefit of Lender.

"**Equipment**" shall have the meaning set forth in the granting clause of the Mortgage.

"**ERISA**" shall have the meaning set forth in Section 3.1.8.

"**Event of Default**" shall have the meaning set forth in Section 10.1.

"**Exchange Act**" shall have the meaning set forth in Section 9.2(a).

"**Exchange Act Filing**" shall have the meaning set forth in Section 9.1(c).

"**Fiscal Year**" shall mean each twelve month period commencing on January 1 and ending on December 31 during each year of the term of the Loan.

"**Fitch**" shall mean Fitch, Inc.

"**GAAP**" shall mean generally accepted accounting principles set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board (or agencies with similar functions of comparable stature and authority within the accounting profession), or in such other statements by such entity as may be in general use by significant segments of the U.S. accounting profession.

"**Governmental Authority**" shall mean any court, board, agency, commission, office or authority of any nature whatsoever or any governmental unit (federal, state, county, district, municipal, city or otherwise) whether now or hereafter in existence.

"**Gross Revenue**" shall mean all revenue, derived from the ownership and operation of the Property from whatever source, including, but not limited to, Rents, but excluding sales, use and occupancy or other taxes on receipts required to be accounted for by Borrower to any Governmental Authority, non-recurring revenues as reasonably determined by Lender, proceeds from the sale or refinancing of the Property, security deposits (except to the extent reasonably determined by Lender to be properly utilized to offset a loss of Rent), refunds and uncollectible accounts, proceeds of casualty insurance and Awards (other than business interruption or other loss of income insurance related to business interruption or loss of income for the period in question), and any disbursements to Borrower from the Reserve Funds or any other fund established by the Loan Documents.

000000489

"**Guarantor(s)**" shall mean, collectively, Steven Greenberg, Jeffrey Greenberg and Ivy Equities, LLC, and, individually, any of such individuals or entities.

"**Guaranty**" shall mean that certain Guaranty of even date herewith from Guarantors for the benefit of Lender.

"**Improvements**" shall have the meaning set forth in the granting clause of the Mortgage.

"**Indebtedness**" shall mean, for any Person, without duplication: (i) all indebtedness of such Person for borrowed money, for amounts drawn under a letter of credit, or for the deferred purchase price of property for which such Person or its assets is liable, (ii) all unfunded amounts under a loan agreement, letter of credit, or other credit facility for which such Person would be liable if such amounts were advanced thereunder, (iii) all amounts required to be paid by such Person as a guaranteed payment to partners or a preferred or special dividend, including any mandatory redemption of shares or interests, (iv) all indebtedness guaranteed by such Person, directly or indirectly, (v) all obligations under leases that constitute capital leases for which such Person is liable, and (vi) all obligations of such Person under interest rate swaps, caps, floors, collars and other interest hedge agreements, in each case whether such Person is liable contingently or otherwise, as obligor, guarantor or otherwise, or in respect of which obligations such Person otherwise assures a creditor against loss.

Case 2:17-cv-02036-KM-MAH Document 1-3 Filed 03/28/17 Page 15 of 125 PageID: 48

"**Indemnified Liabilities**" shall have the meaning set forth in Section 11.13(b).

"**Independent Director**" shall have the meaning set forth in Section 3.1.24(p).

"**Insolvency Opinion**" shall mean that certain bankruptcy nonconsolidation opinion letter dated the date hereof delivered by Edwards & Angell in connection with the Loan.

"**Insurance Funds**" shall have the meaning set forth in Section 6.3.1.

"**Insurance Premiums**" shall have the meaning set forth in Section 5.1.1(b).

"**LaSalle**" shall have the meaning set forth in Section 9.2(b).

"**LaSalle Group**" shall have the meaning set forth in Section 9.2(b).

"**LaSalle Mezzanine Financing**" shall mean the financing provided by LaSalle pursuant to that certain Mezzanine Loan Agreement, of even date herewith, between LaSalle and certain owners of equity interests in Borrower.

"**Lease**" shall mean any lease, sublease or subsublease, letting, license, concession or other agreement (whether written or oral and whether now or hereafter in effect) pursuant to which any Person is granted a possessory interest in, or right to use or occupy all or any portion of any space in the Property, and every modification, amendment or other agreement relating to such lease, sublease, subsublease, or other agreement entered into in connection with such lease, sublease, subsublease, or other agreement and every guarantee of the performance and observance of the covenants, conditions and agreements to be performed and observed by the other party thereto.

"**Lease Termination Fee**" shall have the meaning set forth in Section 6.7.1.

"**Lease Termination Rollover Funds**" shall have the meaning set forth in Section 6.7.1.

"**Legal Requirements**" shall mean all federal, state, county, municipal and other governmental statutes, laws, rules, orders, regulations, ordinances, judgments, decrees and injunctions of Governmental Authorities affecting Borrower or the Property or any part thereof or the construction, use, alteration or operation thereof, or any part thereof, whether now or hereafter enacted and in force, including, without limitation, the Americans with Disabilities Act of 1990, and all permits, licenses and authorizations and regulations relating thereto, and all covenants, agreements, restrictions and encumbrances contained in any instruments, either of record or known to Borrower, at any time in force affecting the Property or any part thereof, including, without limitation, any which may (i) require repairs, modifications or alterations in or to the Property or any part thereof, or (ii) in any way limit the use and enjoyment thereof.

"**Lender**" shall mean LaSalle Bank National Association, a national banking association, together with its successors and assigns.

"**Letter of Credit**" shall mean an irrevocable, unconditional, transferable, clean sight draft letter of credit acceptable to Lender and the Rating Agencies (either an evergreen letter of

Case 2:17-cv-02036-KM-MAH Document 1-3 Filed 03/28/17 Page 19 of 115 PageID: 44

credit or one which does not expire until at least thirty (30) Business Days after the Maturity Date) in favor of Lender and entitling Lender to draw thereon in New York, New York, issued by a domestic Eligible Institution or the U.S. agency or branch of a foreign Eligible Institution. If at any time the bank issuing any such Letter of Credit shall cease to be an Eligible Institution, Lender shall have the right immediately to draw down the same in full and hold the proceeds of such draw in accordance with the applicable provisions hereof.

"**Liabilities**" shall have the meaning set forth in Section 9.2(b).

"**Lien**" shall mean any mortgage, deed of trust, lien, pledge, hypothecation, assignment, security interest, or any other encumbrance, charge or transfer of, on or affecting the Property or any portion thereof or Borrower, or any interest therein, including, without limitation, any conditional sale or other title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, the filing of any financing statement, and mechanic's, materialmen's and other similar liens and encumbrances.

"**Loan**" shall mean the loan in the original principal amount of Sixty One Million and No/100 Dollars ($61,000,000) made by Lender to Borrower pursuant to this Agreement.

"**Loan Documents**" shall mean, collectively, this Agreement, the Note, the Mortgage, the Assignment of Leases, the Cash Management Agreement, the Environmental Indemnity, the Guaranty, the Assignment of Management Agreement and any other document pertaining to the Property as well as all other documents now or hereafter executed and/or delivered in connection with the Loan, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Major Lease**" shall mean any Lease (i) covering more than 16,000 square feet at the Property or (ii) made with a Tenant that is a Tenant under another Lease at the Property or that is an Affiliate of any other Tenant under a Lease at the Property, if the Leases together cover more than 16,000 square feet.

"**Management Agreement**" shall mean, collectively, the management contracts entered into by and between Borrower and G4 Operating Company, LLC, pursuant to which G4 Operating Company, LLC, is to provide management and other services with respect to the Property and the management and administrative services agreement between G4 Operating Company, LLC, and Heritage Management Company, L.L.C., pursuant to which Heritage Management Company, L.L.C. is to provide day-to-day management services with respect to the Property.

"**Manager**" shall mean, collectively, G4 Operating Company, LLC and Heritage Management Company, L.L.C. or any other manager approved in accordance with the terms and conditions of the Loan Documents.

"**Material Agreements**" means each contract and agreement relating to the ownership, management, development, use, operation, leasing, maintenance, repair or improvement of the Property, other than the Management Agreement and the Leases, under which there is an obligation of Borrower to pay more than $100,000 per annum.

000000491

Case 2:17-cv-02036-KM-MAH Document 1-3 Filed 03/28/17 Page 19 of 125 PageID: 45

"**Maturity Date**" shall mean November 1, 2016 or such other date on which the final payment of principal of the Note becomes due and payable as therein or herein provided, whether at such stated maturity date, by declaration of acceleration, or otherwise.

"**Maximum Legal Rate**" shall mean the maximum nonusurious interest rate, if any, that at any time or from time to time may be contracted for, taken, reserved, charged or received on the indebtedness evidenced by the Note and as provided for herein or the other Loan Documents, under the laws of such state or states whose laws are held by any court of competent jurisdiction to govern the interest rate provisions of the Loan.

"**McCarter Lease Rollover Funds**" shall have the meaning set forth in Section 6.5.1.

"**McCarter Replacement Tenant Space**" shall have the meaning set forth in Section 6.5.2.

"**McCarter Short Term Commencement Date**" shall have the meaning set forth in Section 6.5.3.

"**McCarter Space**" shall have the meaning set forth in Section 6.5.1.

"**Minimum Disbursement Amount**" shall mean Twenty-Five Thousand and No/100 Dollars ($25,000).

"**Monthly Debt Service Payment Amount**" shall mean a constant monthly payment of $364,158.58.

"**Monthly Payment Date**" shall mean the first (1st) day of every calendar month occurring during the term of the Loan.

"**Moody's**" shall mean Moody's Investors Service, Inc.

"**Mortgage**" shall mean that certain first priority Mortgage, Assignment of Leases and Rents and Security Agreement, dated the date hereof, executed and delivered by Borrower as security for the Loan and encumbering the Property, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Net Proceeds**" shall mean: (i) the net amount of all insurance proceeds payable as a result of a Casualty to the Property, after deduction of reasonable costs and expenses (including, but not limited to, reasonable attorneys' fees), if any, in collecting such insurance proceeds, or (ii) the net amount of the Award, after deduction of reasonable costs and expenses (including, but not limited to, reasonable attorneys' fees), if any, in collecting such Award.

"**Net Proceeds Deficiency**" shall have the meaning set forth in Section 5.3.2(f).

"**Note**" shall have the meaning set forth in Section 2.1.3.

"**Notice**" shall have the meaning set forth in Section 11.6.

"**OFAC List**" shall have the meaning set forth in Section 3.1.40.

"**OFAC Rules**" shall have the meaning set forth in Section 3.1.40.

"**Officer's Certificate**" shall mean a certificate delivered to Lender by Borrower which is signed by an authorized senior officer of Borrower.

"**Operating Agreements**" shall mean those agreements or instruments of record more specifically described on Schedule V attached hereto and made a part hereof, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"**Operating Expenses**" shall mean all costs and expenses relating to the operation, maintenance and management of the Property, including, without limitation, utilities, repairs and maintenance, insurance, property taxes and assessments, advertising expenses, payroll and related taxes, equipment lease payments, a management fee equal to the greater of 3% of annual rents or the actual management fee and $0.20 per rentable square foot of the Improvements per annum with respect to capital costs, but excluding actual Capital Expenditures, depreciation, amortization, and deposits required to be made to the Reserve Funds; provided, however such costs and expenses shall be subject to adjustment by Lender to normalize such costs and expenses.

"**Other Charges**" shall mean all ground rents, maintenance charges, impositions other than Taxes, and any other charges, including, without limitation, vault charges and license fees for the use of vaults, chutes and similar areas adjoining the Property, now or hereafter levied or assessed or imposed against the Property or any part thereof.

"**Otherwise Rated Insurer**" shall have the meaning set forth in Section 5.1.2.

"**Patriot Act**" shall mean the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Public Law 107-56).

"**Permitted Encumbrances**" shall mean, collectively, (i) the Liens and security interests created by the Loan Documents, (ii) all Liens, encumbrances and other matters disclosed in the Title Insurance Policy, (iii) Liens, if any, for Taxes imposed by any Governmental Authority not yet due or delinquent, and (iv) such other title and survey exceptions as Lender has approved or may approve in writing in Lender's sole discretion.

"**Permitted Investments**" shall have the meaning set forth in the Cash Management Agreement.

"**Permitted Prepayment Date**" shall mean August 1, 2016.

"**Person**" shall mean any individual, corporation, partnership, limited liability company, joint venture, estate, trust, unincorporated association, any other entity, any federal, state, county or municipal government or any bureau, department or agency thereof and any fiduciary acting in such capacity on behalf of any of the foregoing.

"**Plan Assets Regulation**" shall have the meaning set forth in Section 3.1.8.

"**Policies**" shall have the meaning set forth in Section 5.1.1(b).

"**Prepayment Date**" shall mean the date on which the Loan is prepaid in accordance with the terms hereof.

"**Prescribed Laws**" shall mean, collectively, (a) the Patriot Act, (b) Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001, and relating to Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism, (c) the International Emergency Economic Power Act, 50 U.S.C. §1701 et seq. and (d) all other Legal Requirements relating to money laundering or terrorism.

"**Prohibited Person**" shall have the meaning set forth in Section 3.1.40.

"**Property**" shall mean the parcel of real property, the Improvements thereon and all personal property owned by Borrower and encumbered by the Mortgage, together with all rights pertaining to such property and Improvements, all as more particularly described in the Granting Clauses of the Mortgage.

"**Prudential Lease Rollover Funds**" shall have the meaning set forth in Section 6.6.1.

"**Prudential Replacement Tenant Space**" shall have the meaning set forth in Section 6.6.2.

"**Prudential Space**" shall have the meaning set forth in Section 6.6.1.

"**Rating Agencies**" shall mean, prior to the final Securitization of the Loan, each of S&P, Moody's and Fitch, or any other nationally recognized statistical rating agency which has been designated by Lender and, after the final Securitization of the Loan, shall mean any of the foregoing that has rated any of the Securities.

"**Rating Agency Confirmation**" shall mean a written affirmation from each of the Rating Agencies that the credit rating of the Securities by such Rating Agency immediately prior to the occurrence of the event with respect to which such Rating Agency Confirmation is sought will not be qualified, downgraded or withdrawn as a result of the occurrence of such event, which affirmation may be granted or withheld in such Rating Agency's sole and absolute discretion.

"**Registration Statement**" shall have the meaning set forth in Section 9.2(b).

"**Regulation AB**" shall mean the Regulation AB set forth in the Securities and Exchange Act (17 C.F.R. § 229.1100 et seq), as such Regulation may be amended from time to time.

"**Release Date**" shall mean the earlier to occur of (i) the third anniversary of the Closing Date and (ii) the date that is two (2) years from the "startup day" (within the meaning of Section 860G(a)(9) of the Code) of the REMIC Trust established in connection with the last Securitization involving any portion of this Loan.

000000494

"**REMIC Trust**" shall mean a "real estate mortgage investment conduit" within the meaning of Section 860D of the Code that holds the Note.

"**Rent Deficiency**" shall have the meaning set forth in Section 6.7.2.

"**Rents**" shall mean all rents, moneys payable as damages or in lieu of rent, revenues, deposits (including, without limitation, security, utility and other deposits), accounts, cash, issues, profits, charges for services rendered, and other consideration of whatever form or nature received by or paid to or for the account of or benefit of Borrower or its agents or employees from any and all sources arising from or attributable to the Property.

"**Replacement Lease**" shall have the meaning set forth in Section 6.7.2.

"**Reserve Funds**" shall mean, collectively, the Capital Expenditure Funds, the Insurance Funds, the Tax Funds, the McCarter Lease Rollover Funds and the Prudential Lease Rollover Funds.

"**Restoration**" shall have the meaning set forth in Section 5.2.1.

"**Restoration Threshold**" shall mean $1,000,000.

"**S&P**" shall mean Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc.

"**Scheduled Defeasance Payments**" shall mean scheduled payments of interest and principal under the Note for all Monthly Payment Dates occurring after the Defeasance Date and up to and including the Maturity Date (including the outstanding principal balance on the Note as of the Maturity Date), and all payments required after the Defeasance Date, if any, under the Loan Documents for servicing fees and other similar charges.

"**Secondary Market Transaction**" shall have the meaning set forth in Section 9.1(a).

"**Securities**" shall have the meaning set forth in Section 9.1(a).

"**Securities Act**" shall have the meaning set forth in Section 9.2(a).

"**Securitization**" shall have the meaning set forth in Section 9.1(a).

"**Security Agreement**" shall mean a security agreement in form and substance that would be satisfactory to a prudent lender pursuant to which Borrower grants Lender a perfected, first priority security interest in the Defeasance Collateral Account and the Defeasance Collateral.

"**Servicer**" shall have the meaning set forth in Section 11.24.

"**Servicing Agreement**" shall have the meaning set forth in Section 11.24.

000000495

"**Significant Obligor**" shall mean a "significant obligor" as defined in Item 1101(k) of Regulation AB.

"**SPC Party**" shall have the meaning set forth in Section 3.1.24(o).

"**State**" shall mean the State or Commonwealth in which the Property or any part thereof is located.

"**Successor Borrower**" shall have the meaning set forth in Section 2.5.3.

"**Survey**" shall mean a survey of the Property prepared by a surveyor licensed in the State and satisfactory to Lender and the company or companies issuing the Title Insurance Policy, and containing a certification of such surveyor satisfactory to Lender.

"**Tax Funds**" shall have the meaning set forth in Section 6.2.1.

"**Taxes**" shall mean all real estate and personal property taxes, assessments, water rates or sewer rents, now or hereafter levied or assessed or imposed against the Property or part thereof, together with all interest and penalties thereon.

"**Tenant**" shall mean any Person obligated by contract or otherwise to pay monies (including a percentage of gross income, revenue or profits) under any Lease now or hereafter affecting all or any part of the Property.

"**Termination Space**" shall have the meaning set forth in Section 6.7.1.

"**TIC Agreement**" shall mean that certain Agreement of Cotenancy, of even date herewith, by and among the entities comprising Borrower.

"**Title Insurance Policy**" shall mean an ALTA mortgagee title insurance policy in the form acceptable to Lender issued with respect to the Property and insuring the lien of the Mortgage.

"**Trustee**" shall mean any trustee holding the Loan in a Securitization.

"**UCC**" or "**Uniform Commercial Code**" shall mean the Uniform Commercial Code as in effect in the State.

"**Underwritable Cash Flow**" shall mean the excess of Gross Revenue over Operating Expenses. Lender's calculation of Underwritable Cash Flow (including determination of items that do not qualify as Gross Revenue or Operating Expenses) shall be reasonably calculated by Lender based upon Lender's determination of Rating Agency criteria and shall be final absent manifest error.

"**Underwriter Group**" shall have the meaning set forth in Section 9.2(b).

"**Updated Information**" shall have the meaning set forth in Section 9.1(b)(i).

000000496

"**U.S. Obligations**" shall mean direct full faith and credit obligations of the United States of America that are not subject to prepayment, call or early redemption.

"**Yield Maintenance Premium**" shall mean an amount equal to the greater of: (i) one percent (1%) of the principal amount of the Loan being prepaid or (ii) the present value as of the Prepayment Date of the Calculated Payments from the Prepayment Date through the Maturity Date determined by discounting such payments at the Discount Rate. As used in this definition, the term "Prepayment Date" shall mean the date on which prepayment is made. As used in this definition, the term "Calculated Payments" shall mean the monthly payments of interest only which would be due based on the principal amount of the Loan being prepaid on the Prepayment Date and assuming an interest rate per annum equal to the difference (if such difference is greater than zero) between (y) the Applicable Interest Rate and (z) the Yield Maintenance Treasury Rate. As used in this definition, the term "Discount Rate" shall mean the rate which, when compounded monthly, is equivalent to the Yield Maintenance Treasury Rate, when compounded semi-annually. As used in this definition, the term "Yield Maintenance Treasury Rate" shall mean the yield calculated by Lender by the linear interpolation of the yields, as reported in the Federal Reserve Statistical Release H.15-Selected Interest Rates under the heading U.S. Government Securities/Treasury Constant Maturities for the week ending prior to the Prepayment Date, of U.S. Treasury Constant Maturities with maturity dates (one longer or one shorter) most nearly approximating the Maturity Date. In the event that Release H.15 is no longer published, Lender shall select a comparable publication to determine the Yield Maintenance Treasury Rate. In no event, however, shall Lender be required to reinvest any prepayment proceeds in U.S. Treasury obligations or otherwise.

**Section 1.2 Principles of Construction**. All references to sections and schedules are to sections and schedules in or to this Agreement unless otherwise specified. Unless otherwise specified, the words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement. Unless otherwise specified, all meanings attributed to defined terms herein shall be equally applicable to both the singular and plural forms of the terms so defined.

## ARTICLE II.

## THE LOAN

**Section 2.1 The Loan**.

**2.1.1 Agreement to Lend and Borrow**. Subject to and upon the terms and conditions set forth herein, Lender shall make the Loan to Borrower and Borrower shall accept the Loan from Lender on the Closing Date.

**2.1.2 Single Disbursement to Borrower**. Borrower shall receive only one borrowing hereunder in respect of the Loan and any amount borrowed and repaid hereunder in respect of the Loan may not be reborrowed.

**2.1.3 The Note**. The Loan shall be evidenced by that certain Promissory Note of even date herewith, in the stated principal amount of Sixty One Million and No/100 Dollars

($61,000,000) executed by Borrower and payable to the order of Lender in evidence of the Loan (as the same may hereafter be amended, supplemented, restated, increased, extended or consolidated from time to time, the "Note") and shall be repaid in accordance with the terms of this Agreement and the Note.

**2.1.4 Use of Proceeds**. Borrower shall use proceeds of the Loan to (i) pay and discharge any existing loans relating to the Property, (ii) pay all past due Basic Carrying Costs, if any, in respect of the Property, (iii) deposit the Reserve Funds, (iv) pay costs and expenses incurred in connection with the closing of the Loan, as approved by Lender, (v) fund any working capital requirements of the Property, as approved by Lender and (vi) retain the balance, if any.

**Section 2.2 Interest Rate**.

**2.2.1 Initial Interest Rate**. Except as herein provided with respect to interest accruing at the Default Rate, interest on the principal balance of the Loan outstanding from time to time shall accrue from the Closing Date up to the Maturity Date at the Applicable Interest Rate.

**2.2.2 Default Rate**. In the event that, and for so long as, any Event of Default shall have occurred and be continuing, the outstanding principal balance of the Loan and, to the extent permitted by law, overdue interest in respect of the Loan, shall accrue interest at the Default Rate, calculated from the date of such Event of Default.

**2.2.3 Interest Calculation**. Interest on the outstanding principal balance of the Loan shall be calculated by multiplying (a) the actual number of days elapsed in the period for which the calculation is being made by (b) a daily rate based on a three hundred sixty (360) day year (that is, the Applicable Interest Rate or the Default Rate, as then applicable, expressed as an annual rate divided by 360) by (c) the outstanding principal balance. The accrual period for calculating interest due on each Monthly Payment Date shall be the calendar month immediately prior to such Monthly Payment Date.

**2.2.4 Usury Savings**. This Agreement and the other Loan Documents are subject to the express condition that at no time shall Borrower be required to pay interest on the principal balance of the Loan at a rate which could subject Lender to either civil or criminal liability as a result of being in excess of the Maximum Legal Rate. If by the terms of this Agreement or the other Loan Documents, Borrower is at any time required or obligated to pay interest on the principal balance due hereunder at a rate in excess of the Maximum Legal Rate, the Applicable Interest Rate or the Default Rate, as the case may be, shall be deemed to be immediately reduced to the Maximum Legal Rate and all previous payments in excess of the Maximum Legal Rate shall be deemed to have been payments in reduction of principal and not on account of the interest due hereunder. All sums paid or agreed to be paid to Lender for the use, forbearance, or detention of the sums due under the Loan, shall, to the extent permitted by applicable law, be amortized, prorated, allocated, and spread throughout the full stated term of the Loan until payment in full so that the rate or amount of interest on account of the Loan does not exceed the Maximum Legal Rate from time to time in effect and applicable to the Loan for so long as the Loan is outstanding.

000000498

**Section 2.3 Loan Payments.**

**2.3.1 Payment Before Maturity Date.** Borrower shall make a payment to Lender of interest only on the Closing Date for the period from the Closing Date through the last day of the month in which the Closing Date occurs (unless the Closing Date is the first day of a calendar month, in which case no such separate payment of interest shall be due). Borrower shall make payments of interest only on the outstanding principal amount of the Loan from time to time on the Monthly Payment Date occurring in December, 2006 and on each Monthly Payment Date thereafter to and including November, 2011. Thereafter, Borrower shall make a payment to Lender of principal and interest in the amount of the Monthly Debt Service Payment Amount on the Monthly Payment Date occurring in December, 2011 and on each Monthly Payment Date thereafter to and including the Maturity Date. Each payment shall be applied first to accrued and unpaid interest and the balance to principal. The Monthly Debt Service Payment Amount required hereunder is based upon a thirty (30) year amortization schedule.

**2.3.2 Payment on Maturity Date.** Borrower shall pay to Lender on the Maturity Date the outstanding principal balance of the Loan, all accrued and unpaid interest and all other amounts due hereunder and under the Note, the Mortgage and the other Loan Documents.

**2.3.3 Late Payment Charge.** If any principal, interest or any other sum due under the Loan Documents, other than the payment of principal due on the Maturity Date, is not paid by Borrower within five (5) days of the date on which it is due, Borrower shall pay to Lender upon demand an amount equal to the lesser of five percent (5%) of such unpaid sum or the maximum amount permitted by applicable law in order to defray the expense incurred by Lender in handling and processing such delinquent payment and to compensate Lender for the loss of the use of such delinquent payment. Any such amount shall be secured by the Mortgage and the other Loan Documents.

000000499

(a) **Method and Place of Payment.**

(b) Except as otherwise specifically provided herein, all payments and prepayments under this Agreement and the Note shall be made to Lender not later than 1:00 P.M., New York City time, on the date when due and shall be made in lawful money of the United States of America in immediately available funds at Lender's office, and any funds received by Lender after such time shall, for all purposes hereof, be deemed to have been paid on the next succeeding Business Day.

(c) Whenever any payment to be made hereunder or under any other Loan Document shall be stated to be due on a day which is not a Business Day, the due date thereof shall be the following Business Day.

(d) All payments required to be made by Borrower hereunder or under the Note or the other Loan Documents shall be made irrespective of, and without deduction for, any setoff, claim or counterclaim and shall be made irrespective of any defense thereto.

Case 2:17-cv-02036-KM-MAH Document 1-3 Filed 03/28/17 Page 25 of 125 PageID: 55

**Section 2.4 Prepayments.**

2.4.1 **Voluntary Prepayments**. Except as otherwise provided herein, Borrower shall not have the right to prepay the Loan in whole or in part. On and after the Permitted Prepayment Date, Borrower may, provided no Event of Default has occurred, at its option and upon thirty (30) days prior notice to Lender (which notice may be given prior to the Permitted Prepayment Date, provided that the prepayment itself occurs on or after the Permitted Prepayment Date), prepay the Debt in whole but not in part on any date without payment of the Yield Maintenance Premium. Any prepayment received by Lender on a date other than a Monthly Payment Date shall include interest which would have accrued thereon to the next Monthly Payment Date and such amounts (i.e., principal and interest prepaid by Borrower) shall be held by Lender as collateral security for the Loan in an interest bearing account at an Eligible Institution, with interest accruing on such amounts to the benefit of Borrower; such amounts prepaid shall be applied to the Loan on the next Monthly Payment Date. Any partial prepayment shall be applied to the last payments of principal due under the Loan.

2.4.2 **Mandatory Prepayments**. On each date on which Lender actually receives a distribution of Net Proceeds, and if Lender does not make such Net Proceeds available to Borrower for a Restoration, Borrower shall, at Lender's option, prepay the outstanding principal balance of the Note in an amount equal to one hundred percent (100%) of such Net Proceeds together with interest that would have accrued on such amounts through the next Monthly Payment Date. No Yield Maintenance Premium shall be due in connection with any prepayment made pursuant to this Section 2.4.2. Any prepayment received by Lender pursuant to this Section 2.4.2 on a date other than a Monthly Payment Date shall be held by Lender as collateral security for the Loan in an interest bearing account, with such interest accruing to the benefit of Borrower, and shall be applied by Lender on the next Monthly Payment Date.

2.4.3 **Prepayments After Default**. If after an Event of Default, payment of all or any part of the principal of the Loan is tendered by Borrower, a purchaser at foreclosure or any other Person, such tender shall be deemed an attempt to circumvent the prohibition against prepayment set forth in Section 2.4.1 and Borrower, such purchaser at foreclosure or other Person shall pay the Yield Maintenance Premium, in addition to the outstanding principal balance, all accrued and unpaid interest and other amounts payable under the Loan Documents.

2.4.4 **Prepayment Upon Partition**. If the Debt or any portion shall be prepaid on account of a partition action brought by any tenant-in-common of the Property, then, in addition and not in limitation of any other rights or remedies Lender may have under this Agreement and the other Loan Documents, Borrower shall pay to Lender an amount equal to the Yield Maintenance Premium with respect to the prepaid amount. Nothing contained in this Section 2.4.4 shall be construed as an authorization to Borrower to bring any partition action or as a waiver of the covenants contained herein prohibiting Borrower from bringing any such action.

Case 2:17-cv-02036-KM-MAH Document 1-3 Filed 03/28/17 Page 29 of 115 PageID: 54

**Section 2.5 <u>Defeasance</u>.**

**2.5.1 <u>Conditions to Defeasance.</u>**

(a) Provided no Event of Default shall have occurred and remain uncured, Borrower shall have the right at any time after the Release Date and prior to the Permitted Prepayment Date to voluntarily defease the entire Loan and obtain a release of the lien of the Mortgage by providing Lender with the Defeasance Collateral (hereinafter, a "<u>Defeasance Event</u>"), subject to the satisfaction of the following conditions precedent:

(i) Borrower shall provide Lender not less than thirty (30) days notice (or such shorter period of time as permitted by Lender in its sole discretion) specifying a date (the "<u>Defeasance Date</u>") on which the Defeasance Event is to occur;

(ii) Borrower shall pay to Lender (A) all payments of principal and interest due on the Loan to and including the Defeasance Date and (B) all other sums then due under the Note, this Agreement, the Mortgage and the other Loan Documents;

(iii) Borrower shall deposit the Defeasance Collateral into the Defeasance Collateral Account and otherwise comply with the provisions of Sections 2.5.2 and 2.5.3 hereof;

(iv) Borrower shall execute and deliver to Lender a Security Agreement in respect of the Defeasance Collateral Account and the Defeasance Collateral;

(v) Borrower shall deliver to Lender an opinion of counsel for Borrower that is standard in commercial lending transactions and subject only to customary qualifications, assumptions and exceptions opining, among other things, that (A) Lender has a legal and valid perfected first priority security interest in the Defeasance Collateral Account and the Defeasance Collateral, (B) if a Securitization has occurred, the REMIC Trust formed pursuant to such Securitization will not fail to maintain its status as a "real estate mortgage investment conduit" within the meaning of Section 860D of the Code as a result of a Defeasance Event pursuant to this Section 2.5, (C) the Defeasance Event will not result in a deemed exchange for purposes of the Code and will not adversely affect the status of the Note as indebtedness for federal income tax purposes, (D) delivery of the Defeasance Collateral and the grant of a security interest therein to Lender shall not constitute an avoidable preference under Section 547 of the Bankruptcy Code or applicable state law and (E) a non-consolidation opinion with respect to the Successor Borrower, if any;

(vi) Borrower shall deliver to Lender a Rating Agency Confirmation as to the Defeasance Event;

(vii) Borrower shall deliver an Officer's Certificate certifying that the requirements set forth in this Section 2.5 have been satisfied;

(viii) Borrower shall deliver a certificate of a "big four" or other nationally recognized public accounting firm reasonably acceptable to Lender certifying that the

Case 2:17-cv-02036-KM-MAH Document 1-3 Filed 03/28/17 Page 29 of 125 PageID: 55

Defeasance Collateral will generate monthly amounts equal to or greater than the Scheduled Defeasance Payments;

(ix) Borrower shall deliver such other certificates, opinions, documents and instruments as Lender may reasonably request; and

(x) Borrower shall pay all costs and expenses of Lender incurred in connection with the Defeasance Event, including Lender's reasonable attorneys' fees and expenses and Rating Agency fees and expenses.

(b) If Borrower has elected to defease the Note and the requirements of this Section 2.5 have been satisfied, the Property shall be released from the lien of the Mortgage and the Defeasance Collateral pledged pursuant to the Security Agreement shall be the sole source of collateral securing the Note. In connection with the release of the Lien, Borrower shall submit to Lender, not less than thirty (30) days prior to the Defeasance Date (or such shorter time as is acceptable to Lender in its sole discretion), a release of Lien (and related Loan Documents) for execution by Lender. Such release shall be in a form appropriate in the jurisdiction in which the Property is located. In addition, Borrower shall provide all other documentation Lender reasonably requires to be delivered by Borrower in connection with such release, together with an Officer's Certificate certifying that such documentation (i) is in compliance with all Legal Requirements, and (ii) will effect such release in accordance with the terms of this Agreement. Borrower shall pay all costs, taxes and expenses associated with the release of the lien of the Mortgage, including Lender's reasonable attorneys' fees. Except as set forth in this Section 2.5, no repayment, prepayment or defeasance of all or any portion of the Note shall cause, give rise to a right to require, or otherwise result in, the release of the lien of the Mortgage on the Property.

**2.5.2 Defeasance Collateral Account**. On or before the date on which Borrower delivers the Defeasance Collateral, Borrower shall open at any Eligible Institution the defeasance collateral account (the "Defeasance Collateral Account") which shall at all times be an Eligible Account. The Defeasance Collateral Account shall contain only (i) Defeasance Collateral, and (ii) cash from interest and principal paid on the Defeasance Collateral. All cash from interest and principal payments paid on the Defeasance Collateral shall be paid over to Lender on each Monthly Payment Date and applied first to accrued and unpaid interest and then to principal. Any cash from interest and principal paid on the Defeasance Collateral not needed to pay the Scheduled Defeasance Payments shall be paid to Borrower. Borrower shall cause the Eligible Institution at which the Defeasance Collateral is deposited to enter an agreement with Borrower and Lender, satisfactory to Lender in its sole discretion, pursuant to which such Eligible Institution shall agree to hold and distribute the Defeasance Collateral in accordance with this Agreement. The Borrower or Successor Borrower, as applicable, shall be the owner of the Defeasance Collateral Account and shall report all income accrued on Defeasance Collateral for federal, state and local income tax purposes in its income tax return. Borrower shall prepay all cost and expenses associated with opening and maintaining the Defeasance Collateral Account. Lender shall not in any way be liable by reason of any insufficiency in the Defeasance Collateral Account.

**2.5.3 Successor Borrower**. In connection with a Defeasance Event under this Section 2.5, Borrower shall, if required by the Rating Agencies or if Borrower elects to do so,

establish or designate a successor entity (the "Successor Borrower") which shall be a single purpose bankruptcy remote entity and which shall be approved by the Rating Agencies. Any such Successor Borrower may, at Borrower's option, be an Affiliate of Borrower unless the Rating Agencies shall require otherwise. Borrower shall transfer and assign all obligations, rights and duties under and to the Note, together with the Defeasance Collateral, to such Successor Borrower. Such Successor Borrower shall assume the obligations under the Note and the Security Agreement and Borrower shall be relieved of its obligations under such documents. Borrower shall pay a minimum of $1,000 to any such Successor Borrower as consideration for assuming the obligations under the Note and the Security Agreement. Borrower shall pay all costs and expenses incurred by Lender, including Lender's attorney's fees and expenses, incurred in connection therewith.

## ARTICLE III.

## REPRESENTATIONS AND WARRANTIES

**Section 3.1 Borrower Representations.**

Borrower represents and warrants that:

**3.1.1 Organization.**

(a) Each of Borrower, each tenant-in-common comprising Borrower and each SPC Party is duly organized, validly existing and in good standing with full power and authority to own its assets and conduct its business, and is duly qualified in all jurisdictions in which the ownership or lease of its property or the conduct of its business requires such qualification, except where the failure to be so qualified would not have a material adverse effect on its ability to perform its obligations hereunder, and Borrower has taken all necessary action to authorize the execution, delivery and performance of this Agreement and the other Loan Documents by it, and has the power and authority to execute, deliver and perform under this Agreement, the other Loan Documents and all the transactions contemplated hereby.

(b) Borrower's exact legal name is correctly set forth in the first paragraph of this Agreement. Borrower is an organization of the type specified in the first paragraph of this Agreement. Borrower is incorporated or organized under the laws of the state specified in the first paragraph of this Agreement. Borrower's principal place of business and chief executive office, and the place where Borrower keeps its books and records, including recorded data of any kind or nature, regardless of the medium of recording, including software, writings, plans, specifications and schematics, has been for the preceding four (4) months (or, if less than four (4) months, the entire period of the existence of Borrower) and will continue to be the address of Borrower set forth in the first paragraph of this Agreement (unless Borrower notifies Lender in writing at least thirty (30) days prior to the date of such change). The organizational identification number, if any, assigned by the state of their incorporation or organization and the federal tax identification numbers of the entities comprising Borrower are as set forth below:

Case 2:17-cv-02036-KM-MAH Document 1-3 Filed 03/28/17 Page 29 of 125 PageID: 57

| Borrower | Organizational ID No. | Tax ID No. |
|---|---|---|
| Heritage Gateway, LLC | 4194417 | 35-2274915 |
| Marine One Associates III, LLC | 4219402 | 87-0782073 |
| Ridgewood 2000 Associates III, LLC | 4219410 | 87-0782079 |
| JPG Real Estate III, LLC | 4219408 | 87-0782082 |
| Ivy Gateway, LLC | 4222940 | 20-5617604 |

**3.1.2** **Proceedings**. This Agreement and the other Loan Documents have been duly authorized, executed and delivered by Borrower and constitute a legal, valid and binding obligation of Borrower, enforceable against Borrower in accordance with their respective terms, except as such enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally, and by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

**3.1.3** **No Conflicts**. The execution and delivery of this Agreement and the other Loan Documents by Borrower and the performance of its obligations hereunder and thereunder will not conflict with any provision of any law or regulation to which Borrower is subject, or conflict with, result in a breach of, or constitute a default under, any of the terms, conditions or provisions of any of Borrower's organizational documents or any agreement or instrument to which Borrower is a party or by which it is bound, or any order or decree applicable to Borrower, or result in the creation or imposition of any lien on any of Borrower's assets or property (other than pursuant to the Loan Documents).

**3.1.4** **Litigation**. There is no action, suit, proceeding or investigation pending or, to Borrower's knowledge, threatened against Borrower in any court or by or before any other Governmental Authority which would materially and adversely affect the ability of Borrower to carry out the transactions contemplated by this Agreement.

**3.1.5** **Agreements**. Borrower is not in default with respect to any order or decree of any court or any order, regulation or demand of any Governmental Authority, which default might have consequences that would materially and adversely affect the condition (financial or other) or operations of Borrower or its properties or might have consequences that would adversely affect its performance hereunder.

**3.1.6** **Consents**. No consent, approval, authorization or order of any court or Governmental Authority is required for the execution, delivery and performance by Borrower of, or compliance by Borrower with, this Agreement or the consummation of the transactions contemplated hereby, other than those which have been obtained by Borrower.

**3.1.7** **Title**. Borrower has good, marketable and insurable fee simple title to the real property comprising part of the Property and good title to the balance of the Property owned by it, free and clear of all Liens whatsoever except the Permitted Encumbrances. The Mortgage, when properly recorded in the appropriate records, together with any Uniform Commercial Code

Case 2:17-cv-02036-KM-MAH Document 1-3 Filed 03/28/17 Page 30 of 115 PageID: 58

financing statements required to be filed in connection therewith, will create (i) a valid, first priority, perfected lien on the Property, subject only to Permitted Encumbrances and (ii) perfected security interests in and to all personalty (including the Leases), all in accordance with the terms thereof, in each case subject only to any Permitted Encumbrances. There are no mechanics', materialman's or other similar liens or claims which have been filed for work, labor or materials affecting the Property which are or may be liens prior to, or equal or coordinate with, the lien of the Mortgage. None of the Permitted Encumbrances, individually or in the aggregate, materially interfere with the benefits of the security intended to be provided by the Mortgage and this Agreement, materially and adversely affect the value of the Property, impair the use or operations of the Property or impair Borrower's ability to pay its obligations in a timely manner.

**3.1.8** **No Plan Assets**. As of the date hereof and throughout the term of the Loan (a) Borrower is not and will not be an "employee benefit plan," as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), whether or not subject to Title I of ERISA, or a "plan" as defined in Section 4975 of the Code, (b) none of the assets of Borrower constitutes or will constitute "plan assets" of one or more such plans within the meaning of U.S. Department of Labor Regulation 29 C.F.R. Section 2510.3-101 (the "Plan Assets Regulation"), and (c) transactions by or with Borrower are not and will not be subject to any state statute regulating investments of, or fiduciary obligations with respect to, governmental plans, as defined in Section 3(32) of ERISA.

**3.1.9** **Compliance**. To the best of Borrower's knowledge, after due inquiry, Borrower and the Property and the use thereof comply in all material respects with all applicable Legal Requirements, including, without limitation, building and zoning ordinances and codes and Prescribed Laws. Borrower is not in default or violation of any order, writ, injunction, decree or demand of any Governmental Authority, the violation of which might materially adversely affect the condition (financial or otherwise) or business of Borrower. Borrower has not committed any act which may give any Governmental Authority the right to cause Borrower to forfeit the Property or any part thereof or any monies paid in performance of Borrower's obligations under any of the Loan Documents.

**3.1.10** **Financial Information**. All financial data, including, without limitation, the statements of cash flow and income and operating expense, that have been delivered to Lender in respect of the Property (i) are true, complete and correct in all material respects, (ii) accurately represent the financial condition of the Property as of the date of such reports, and (iii) have been prepared in accordance with GAAP throughout the periods covered, except as disclosed therein. Borrower does not have any contingent liabilities, liabilities for taxes, unusual forward or long-term commitments or unrealized or anticipated losses from any unfavorable commitments that are known to Borrower and reasonably likely to have a materially adverse effect on the Property or the operation thereof, except as referred to or reflected in said financial statements. Since the date of the financial statements, there has been no material adverse change in the financial condition, operations or business of Borrower or the Property from that set forth in said financial statements.

**3.1.11 Condemnation**. To the best of Borrower's knowledge, after due inquiry, no Condemnation or other proceeding has been commenced or is contemplated with respect to all or any portion of the Property or for the relocation of roadways providing access to the Property.

**3.1.12 Utilities and Public Access**. To the best of Borrower's knowledge, after due inquiry, the Property has rights of access to public ways and is served by water, sewer, sanitary sewer and storm drain facilities adequate to service the Property for its intended uses.

**3.1.13 Separate Lots**. The Property is comprised of one (1) or more parcels which constitute separate tax lots and do not constitute a portion of any other tax lot not a part of the Property.

**3.1.14 Assessments**. To the best of Borrower's knowledge, after due inquiry, there are no pending or proposed special or other assessments for public improvements or otherwise affecting the Property, nor are there any contemplated improvements to the Property that may result in such special or other assessments.

**3.1.15 Enforceability**. The Loan Documents are not subject to any right of rescission, set off, counterclaim or defense by Borrower, including the defense of usury, nor would the operation of any of the terms of the Loan Documents, or the exercise of any right thereunder, render the Loan Documents unenforceable, and Borrower has not asserted any right of rescission, set off, counterclaim or defense with respect thereto.

**3.1.16 Assignment of Leases**. The Assignment of Leases creates a valid assignment of, or a valid security interest in, certain rights under the Leases, subject only to a license granted to Borrower to exercise certain rights and to perform certain obligations of the lessor under the Leases, including the right to operate the Property. No Person other than Lender has any interest in or assignment of the Leases or any portion of the Rents due and payable or to become due and payable thereunder.

**3.1.17 Insurance**. Borrower has obtained and has delivered to Lender original or certified copies of all of the Policies, with all premiums prepaid thereunder, reflecting the insurance coverages, amounts and other requirements set forth in this Agreement. No claims have been made under any of the Policies, and no Person, including Borrower, has done, by act or omission, anything which would impair the coverage of any of the Policies.

**3.1.18 Licenses**. To the best of Borrower's knowledge, after due inquiry, all permits and approvals, including without limitation, certificates of occupancy required by any Governmental Authority for the use, occupancy and operation of the Property in the manner in which the Property is currently being used, occupied and operated have been obtained and are in full force and effect.

**3.1.19 Flood Zone**. None of the Improvements on the Property is located in an area identified by the Federal Emergency Management Agency as a special flood hazard area.

**3.1.20 Physical Condition**. To the best of Borrower's knowledge, after due inquiry, the Property, including, without limitation, all buildings, improvements, parking facilities,

sidewalks, storm drainage systems, roofs, plumbing systems, HVAC systems, fire protection systems, electrical systems, equipment, elevators, exterior sidings and doors, landscaping, irrigation systems and all structural components, are in good condition, order and repair in all material respects; there exists no structural or other material defects or damages in the Property, whether latent or otherwise, and Borrower has not received notice from any insurance company or bonding company of any defects or inadequacies in the Property, or any part thereof, which would adversely affect the insurability of the same or cause the imposition of extraordinary premiums or charges thereon or of any termination or threatened termination of any policy of insurance or bond.

**3.1.21 <u>Boundaries</u>**. Except as may be set forth on the Survey, all of the improvements which were included in determining the appraised value of the Property lie wholly within the boundaries and building restriction lines of the Property, and no improvements on adjoining properties encroach upon the Property, and no easements or other encumbrances affecting the Property encroach upon any of the Improvements so as to affect the value or marketability of the Property, except those which are insured against by the Title Insurance Policy.

**3.1.22 <u>Leases</u>**. With respect to the Leases: (a) the rent roll attached hereto as <u>Schedule I</u> is true, complete and correct and the Property is not subject to any Leases other than the Leases described in <u>Schedule I</u>, (b) the Leases identified on <u>Schedule I</u> are in full force and effect and there are no defaults thereunder by either party, (c) the copies of the Leases delivered to Lender are true and complete, and there are no oral agreements with respect thereto, (d) no Rent (including security deposits) has been paid more than one (1) month in advance of its due date, (e) all work to be performed by Borrower under each Lease has been performed as required and has been accepted by the applicable Tenant, (f) any payments, free rent, partial rent, rebate of rent or other payments, credits, allowances or abatements required to be given by Borrower to any Tenant have already been received by such Tenant and (g) all security deposits are being held in accordance with Legal Requirements.

**3.1.23 <u>Filing and Recording Taxes</u>**. All transfer taxes, deed stamps, intangible taxes or other amounts in the nature of transfer taxes required to be paid under applicable Legal Requirements in connection with the transfer of the Property to Borrower have been paid or are being paid simultaneously herewith. All mortgage, mortgage recording, stamp, intangible or other similar tax required to be paid under applicable Legal Requirements in connection with the execution, delivery, recordation, filing, registration, perfection or enforcement of any of the Loan Documents, including, without limitation, the Mortgage, have been paid or are being paid simultaneously herewith. All taxes and governmental assessments due and owing in respect of the Property have been paid, or an escrow of funds in an amount sufficient to cover such payments has been established hereunder or are insured against by the Title Insurance Policy.

**3.1.24 <u>Single Purpose</u>**. Borrower hereby represents and warrants to, and covenants with, Lender that as of the date hereof and until such time as the Debt shall be paid in full:

(a) Each entity comprising Borrower does not own and will not own any asset or property other than (i) the Property, and (ii) incidental personal property necessary for the ownership or operation of the Property.

(b) Each entity comprising Borrower will not engage in any business other than the ownership, management and operation of the Property and each entity comprising Borrower will conduct and operate its business as presently conducted and operated.

(c) Each entity comprising Borrower will not enter into any contract or agreement with any of its Affiliates, any constituent party of any entity comprising Borrower or any Affiliate of any constituent party, except upon terms and conditions that are intrinsically fair and substantially similar to those that would be available on an arm's-length basis with third parties other than any such party.

(d) Each entity comprising Borrower has not incurred and will not incur any Indebtedness other than (i) the Debt and (ii) unsecured trade payables and operational debt not evidenced by a note and in an aggregate amount not exceeding $1,220,000 for all entities comprising Borrower at any one time provided that any Indebtedness incurred pursuant to subclause (ii) shall be (x) not more than sixty (60) days past due and (y) incurred in the ordinary course of business. No Indebtedness other than the Debt may be secured (subordinate or pari passu) by the Property.

(e) Each entity comprising Borrower has not made and will not make any loans or advances to any third party (including any Affiliate or constituent party), and shall not acquire obligations or securities of its Affiliates.

(f) Each entity comprising Borrower is and will remain solvent and each entity comprising Borrower will pay its debts and liabilities (including, as applicable, shared personnel and overhead expenses) from its assets as the same shall become due.

(g) Each entity comprising Borrower has done or caused to be done and will do all things necessary to observe organizational formalities and preserve its existence, and each entity comprising Borrower will not amend, modify or otherwise change, nor will any entity comprising Borrower permit any constituent party to amend, modify or otherwise change, the partnership certificate, partnership agreement, articles of incorporation and bylaws, operating agreement, trust or other organizational documents of such entity or such constituent party without the prior consent of Lender in any manner that (i) violates the single purpose covenants set forth in this Section 3.1.24, or (ii) amends, modifies or otherwise changes any provision thereof that by its terms cannot be modified at any time when the Loan is outstanding or by its terms cannot be modified without Lender's consent.

(h) Each entity comprising Borrower will maintain all of its books, records, financial statements and bank accounts separate from those of its Affiliates and any constituent party. The assets of each entity comprising Borrower will not be listed as assets on the financial statement of any other Person; provided, however, that such entity's assets may be included in a consolidated financial statement of its Affiliates provided that (i) appropriate notation shall be made on such consolidated financial statements to indicate the separateness of such entity and such Affiliates and to indicate that such entity's assets and credit are not available to satisfy the debts and other obligations of such Affiliates or any other Person and (ii) such assets shall be listed on such entity's own separate balance sheet. Each entity comprising Borrower will file its own tax returns (to the extent that such entity is required to file any such tax returns) and will not

Case 2:17-cv-02036-KM-MAH Document 1-3 Filed 03/28/17 Page 33 of 125 PageID: 82

file a consolidated federal income tax return with any other Person. Each entity comprising Borrower shall maintain its books, records, resolutions and agreements as official records.

(i) Each entity comprising Borrower will be, and at all times will hold itself out to the public as, a legal entity separate and distinct from any other entity (including any Affiliate of such entity or any constituent party of such entity), shall correct any known misunderstanding regarding its status as a separate entity, shall conduct business in its own name, shall not identify itself or any of its Affiliates as a division or part of the other and shall maintain and utilize separate stationery, invoices and checks bearing its own name.

(j) Each entity comprising Borrower will maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations.

(k) Neither any entity comprising Borrower nor any constituent party will seek or effect the liquidation, dissolution, winding up, liquidation, consolidation or merger, in whole or in part, of any entity comprising Borrower.

(l) Each entity comprising Borrower will not commingle the funds and other assets of such entity with those of any Affiliate or constituent party or any other Person, and will hold all of its assets in its own name.

(m) Each entity comprising Borrower has maintained and will maintain its assets in such a manner that it will not be costly or difficult to segregate, ascertain or identify its individual assets from those of any Affiliate or constituent party or any other Person.

(n) Each entity comprising Borrower will not guarantee or become obligated for the debts of any other Person and does not and will not hold itself out to be responsible for or have its credit available to satisfy the debts or obligations of any other Person.

(o) If any entity comprising Borrower is a limited partnership or a limited liability company (other than a single member limited liability company), each general partner or managing member (each, an "<u>SPC Party</u>") shall be a corporation whose sole asset is its interest in such entity and each such SPC Party will at all times comply, and will cause such entity to comply, with each of the representations, warranties, and covenants contained in this Section 3.1.24 as if such representation, warranty or covenant was made directly by such SPC Party. Upon the withdrawal or the disassociation of an SPC Party from any entity comprising Borrower, such entity shall immediately appoint a new SPC Party whose articles of incorporation are substantially similar to those of such SPC Party and deliver a new non-consolidation opinion to the Rating Agency or Rating Agencies, as applicable, with respect to the new SPC Party and its equity owners. If any entity comprising Borrower is a single member limited liability company, such entity shall have at least one springing member, which, upon the dissolution of such sole member or the withdrawal or the disassociation of the sole member from such entity, shall immediately become the sole member of such entity.

(p) Each entity comprising Borrower shall at all times cause there to be at least one duly appointed member of the board of directors (each, an "<u>Independent Director</u>") of

Case 2:17-cv-02036-KM-MAH Document 1-3 Filed 03/28/17 Page 39 of 125 PageID: 83

each SPC Party and such entity satisfactory to Lender who shall not have been at the time of such individual's appointment or at any time while serving as a director of such SPC Party and such entity, and may not have been at any time during the preceding five years, (i) a stockholder, director (other than as an Independent Director), officer, employee, partner, attorney or counsel of such SPC Party, such entity or any Affiliate of either of them, (ii) a customer, supplier or other Person who derives any of its purchases or revenues from its activities with such SPC Party, such entity or any Affiliate of either of them, (iii) a Person or other entity controlling or under common control with any such stockholder, partner, customer, supplier or other Person, or (iv) a member of the immediate family of any such stockholder, director, officer, employee, partner, customer, supplier or other Person. As used in this paragraph, the term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management, policies or activities of a Person, whether through ownership of voting securities, by contract or otherwise. A natural person who otherwise satisfies the foregoing shall not be disqualified from serving as an Independent Director of any entity comprising Borrower or an SPC Party if such individual is at the time of initial appointment, or at any time while serving as a Independent Director of such entity or such SPC Party, an Independent Director of a special purpose entity that is an Affiliate of such entity or such SPC Party (other than any mezzanine borrower) if such individual is an independent director provided by a nationally-recognized company that provides professional independent directors. As used in this paragraph, a "special purpose entity" is an entity, whose organizational documents contain restrictions on its activities and impose requirements intended to preserve its separateness that are substantially similar to those of each entity comprising Borrower or such SPC Party, as applicable, and provide, inter alia, that it (A) is organized for a limited purpose, (B) has restrictions on its ability to incur indebtedness, dissolve, liquidate, consolidate, merge and/or sell assets, (C) may not file voluntarily a bankruptcy petition without the consent of the Independent Director and (D) shall conduct itself in accordance with certain "separateness covenants", including, but not limited to, the maintenance of its books, records, bank accounts and assets separate from those of any other person or entity.

(q) Each entity comprising Borrower shall not cause or permit the board of directors of any SPC Party and such entity to take any action which, under the terms of any certificate of incorporation, by-laws or any voting trust agreement with respect to any common stock or under any organizational document of such entity or SPC Party, requires a vote of the board of directors of each SPC Party and such entity unless at the time of such action there shall be at least one member who is an Independent Director.

(r) Each entity comprising Borrower shall conduct its business so that the assumptions made with respect to such entity in the Insolvency Opinion shall be true and correct in all respects. In connection with the foregoing, each entity comprising Borrower hereby covenants and agrees that it will comply with or cause the compliance with (i) all of the facts and assumptions (whether regarding such entity or any other Person) set forth in the Insolvency Opinion, (ii) all the representations, warranties and covenants in this Section 3.1.24, and (iii) all the organizational documents of such entity and any SPC Party.

(s) Each entity comprising Borrower will not permit any Affiliate or constituent party independent access to its bank accounts.

Case 2:17-cv-02036-KM-MAH Document 1-3 Filed 03/28/17 Page 36 of 125 PageID: 64

(t) Each entity comprising Borrower shall pay the salaries of its own employees (if any) from its own funds and maintain a sufficient number of employees (if any) in light of its contemplated business operations.

(u) Each entity comprising Borrower shall compensate each of its consultants and agents from its funds for services provided to it and pay from its own assets all obligations of any kind incurred.

**3.1.25** Tax Filings. To the extent required, Borrower has filed (or has obtained effective extensions for filing) all federal, state and local tax returns required to be filed and has paid or made adequate provision for the payment of all federal, state and local taxes, charges and assessments payable by Borrower. Borrower believes that its tax returns (if any) properly reflect the income and taxes of Borrower for the periods covered thereby, subject only to reasonable adjustments required by the Internal Revenue Service or other applicable tax authority upon audit.

**3.1.26** Solvency. Borrower (a) has not entered into the transaction or any Loan Document with the actual intent to hinder, delay, or defraud any creditor and (b) has received reasonably equivalent value in exchange for its obligations under the Loan Documents. Giving effect to the Loan, the fair saleable value of Borrower's assets exceeds and will, immediately following the making of the Loan, exceed Borrower's total liabilities, including, without limitation, subordinated, unliquidated, disputed and contingent liabilities. The fair saleable value of Borrower's assets is, and immediately following the making of the Loan will be, greater than Borrower's probable liabilities, including the maximum amount of its contingent liabilities on its debts as such debts become absolute and matured. Borrower's assets do not, and immediately following the making of the Loan will not, constitute unreasonably small capital to carry out its business as conducted or as proposed to be conducted. Borrower does not intend to incur, and does not believe that it will incur, Indebtedness and liabilities (including contingent liabilities and other commitments) beyond its ability to pay such Indebtedness and liabilities as they mature (taking into account the timing and amounts of cash to be received by Borrower and the amounts to be payable on or in respect of obligations of Borrower).

**3.1.27** Federal Reserve Regulations. No part of the proceeds of the Loan will be used for the purpose of purchasing or acquiring any "margin stock" within the meaning of Regulation U of the Board of Governors of the Federal Reserve System or for any other purpose which would be inconsistent with such Regulation U or any other Regulations of such Board of Governors, or for any purposes prohibited by Legal Requirements or by the terms and conditions of this Agreement or the other Loan Documents.

**3.1.28** Organizational Chart. The organizational chart attached as Schedule III hereto, relating to Borrower and certain Affiliates and other parties, is true, complete and correct on and as of the date hereof.

**3.1.29** Bank Holding Company. Borrower is not a "bank holding company" or a direct or indirect subsidiary of a "bank holding company" as defined in the Bank Holding Company Act of 1956, as amended, and Regulation Y thereunder of the Board of Governors of the Federal Reserve System.

**3.1.30 No Other Debt**. Borrower has not borrowed or received debt financing (other than permitted pursuant to this Agreement) that has not been heretofore repaid in full.

**3.1.31 Investment Company Act**. Borrower is not (1) an "investment company" or a company "controlled" by an "investment company," within the meaning of the Investment Company Act of 1940, as amended; or (2) subject to any other federal or state law or regulation which purports to restrict or regulate its ability to borrow money.

**3.1.32 Access/Utilities**. All public utilities necessary to the continued use and enjoyment of the Property as presently used and enjoyed are located in the public right-of-way abutting the Property. All roads necessary for the full utilization of the Property for its current purpose have been completed and dedicated to public use and accepted by all governmental authorities or are the subject of access easements for the benefit of the Property.

**3.1.33 No Bankruptcy Filing**. Borrower is not contemplating either the filing of a petition by it under any state or federal bankruptcy or insolvency laws or the liquidation of its assets or property, and Borrower does not have any knowledge of any Person contemplating the filing of any such petition against it.

**3.1.34 Full and Accurate Disclosure**. To the best of Borrower's knowledge, no information contained in this Agreement, the other Loan Documents, or any written statement furnished by or on behalf of Borrower pursuant to the terms of this Agreement contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements contained herein or therein not misleading in light of the circumstances under which they were made. There is no fact or circumstance presently known to Borrower which has not been disclosed to Lender and which materially adversely affects, or is reasonably likely to materially adversely affect, the Property, Borrower or its business, operations or condition (financial or otherwise).

**3.1.35 Foreign Person**. Borrower is not a "foreign person" within the meaning of Section 1445(f)(3) of the Code.

**3.1.36 Fraudulent Transfer**. Borrower (a) has not entered into the Loan or any Loan Document with the actual intent to hinder, delay, or defraud any creditor and (b) has received reasonably equivalent value in exchange for its obligations under the Loan Documents. The assets of Borrower do not, and immediately following the execution and delivery of the Loan Documents will not, constitute unreasonably small capital to carry out its business as conducted or as proposed to be conducted. Borrower does not intend to, and does not believe that it will, incur debts and liabilities (including contingent liabilities and other commitments) beyond its ability to pay such debts as they mature (taking into account the timing and amounts reasonably expected to be payable on or in respect of its obligations).

**3.1.37 No Change in Facts or Circumstances; Disclosure**. To the best of Borrower's knowledge, there has been no material adverse change in any condition, fact, circumstance or event that would make the financial statements, rent rolls, reports, certificates or other documents submitted in connection with the Loan inaccurate, incomplete or otherwise misleading in any

material respect or that otherwise materially and adversely affects the business operations or the financial condition of Borrower or the Property.

**3.1.38** **<u>Management Agreement</u>**. All of the representations and warranties with respect to the Management Agreement set forth in Article VII of this Agreement are true and correct in all respects.

**3.1.39** **<u>Perfection of Accounts</u>**. Borrower hereby represents and warrants to Lender that:

(a) This Agreement, together with the other Loan Documents, create a valid and continuing security interest (as defined in the Uniform Commercial Code) in the Accounts (as defined in the Cash Management Agreement) in favor of Lender, which security interest is prior to all other Liens, other than Permitted Encumbrances, and is enforceable as such against creditors of and purchasers from Borrower. Other than in connection with the Loan Documents and except for Permitted Encumbrances, Borrower has not sold or otherwise conveyed the Accounts;

(b) The Accounts constitute "deposit accounts" or "securities accounts" within the meaning of the Uniform Commercial Code, as set forth in the Cash Management Agreement;

(c) Pursuant and subject to the terms hereof, Agent has agreed to comply with all instructions originated by Lender, without further consent by Borrower, directing disposition of the Accounts and all sums at any time held, deposited or invested therein, together with any interest or other earnings thereon, and all proceeds thereof (including proceeds of sales and other dispositions), whether accounts, general intangibles, chattel paper, deposit accounts, instruments, documents or securities; and

(d) The Accounts are not in the name of any Person other than Borrower, as pledgor, or Lender, as pledgee. Borrower has not consented to Agent's complying with instructions with respect to the Accounts from any Person other than Lender.

**3.1.40** **<u>OFAC Lists</u>**. Lender hereby notifies Borrower that pursuant to the requirements of the Patriot Act, and Lender's policies and practices, Lender is required to obtain, verify and record certain information and documentation that identifies Borrower, which information includes the name and address of Borrower and such other information that will allow Lender to identify Borrower in accordance with the Patriot Act. Borrower represents and covenants that Borrower is not and will not become a person (individually, a "<u>Prohibited Person</u>" and collectively, "<u>Prohibited Persons</u>") listed on the Specially Designated Nationals and Blocked Persons List maintained by the Office of Foreign Asset Control, U.S. Department of the Treasury (the "<u>OFAC List</u>") or otherwise subject to any other prohibitions or restriction imposed by laws, rules, regulations or executive orders, including Executive Order No. 13224, administered by OFAC (collectively the "<u>OFAC Rules</u>"). Borrower represents and covenants that Borrower also (a) is not and will not become owned or controlled by a Prohibited Person, (b) is not acting and will not act for or on behalf of a Prohibited Person, (c) is not otherwise associated with and will not become associated with a Prohibited Person, (d) is not providing and will not provide any

Case 2:17-cv-02036-KM-MAH Document 1-3 Filed 03/28/17 Page 39 of 125 PageID: 87

material, financial or technological support for or financial or other service to or in support of acts of terrorism or a Prohibited Person. Borrower will not transfer any interest in Borrower to or enter into a Lease with a Prohibited Person. Borrower shall immediately notify Lender if Borrower has knowledge that any Guarantor or any member or beneficial owner of Borrower or any Guarantor is or becomes a Prohibited Person or (i) is indicted on or (ii) arraigned and held over on charges involving money laundering or predicate crimes to money laundering. Borrower will not enter into any Lease or any other transaction or undertake any activities related to the Loan in violation of the federal Bank Secrecy Act, as amended, 31 U.S.C. §5311, et seq. or any federal or state laws, rules, regulations or executive orders, including, but not limited to, 18 U.S.C. §§1956, 1957 and 1960, prohibiting money laundering and terrorist financing (collectively "Anti-Money Laundering Laws"). Borrower shall (A) not use or permit the use of any proceeds of the Loan in any way that will violate either the OFAC Rules or Anti-Money Laundering Laws, (B) comply and cause all of its subsidiaries to comply with applicable OFAC Rules and Anti-Money Laundering Laws, (C) provide information as Lender may require from time to time to permit Lender to satisfy its obligations under the OFAC Rules and/or the Anti-Money Laundering Laws and (D) not engage in or conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the foregoing. Borrower shall immediately notify Lender if any Tenant becomes a Prohibited Person or (1) is convicted of, (2) pleads nolo contendere to, (3) is indicted on, or (4) is arraigned and held over on charges involving money laundering or predicate crimes to money laundering.

**3.1.41 Operating Agreements.** To the best of Borrower's knowledge, after due inquiry, the Operating Agreements are in full force and effect and neither Borrower nor any other party to any Operating Agreement is in default thereunder, and, to the best of Borrower's knowledge, there are no conditions which, with the passage of time or the giving of notice, or both, would constitute a default thereunder. Except as set forth on Schedule V, the Operating Agreements have not been modified, amended or supplemented.

**Section 3.2 Survival of Representations.**

The representations and warranties set forth in Section 3.1 shall survive, and any covenants contained in Section 3.1 shall continue, for so long as any amount remains payable to Lender under this Agreement or any of the other Loan Documents.

## ARTICLE IV.

## BORROWER COVENANTS

**Section 4.1 Borrower Affirmative Covenants.**

Borrower hereby covenants and agrees with Lender that:

**4.1.1 Existence; Compliance with Legal Requirements.** Borrower shall do or cause to be done all things necessary to preserve, renew and keep in full force and effect its existence, rights, licenses, permits and franchises and comply with all Legal Requirements applicable to it and the Property, including, without limitation, Prescribed Laws.

**4.1.2** **Taxes and Other Charges**. Borrower shall pay all Taxes and Other Charges now or hereafter levied or assessed or imposed against the Property or any part thereof as the same become due and payable; provided, however, Borrower's obligation to directly pay Taxes shall be suspended for so long as Borrower complies with the terms and provisions of Section 6.2 hereof. Borrower shall furnish to Lender receipts for the payment of the Taxes and the Other Charges prior to the date the same shall become delinquent; provided, however, that Borrower is not required to furnish such receipts for payment of Taxes in the event that such Taxes have been paid by Lender pursuant to Section 6.2 hereof. Borrower shall not permit or suffer and shall promptly discharge or post a bond for any lien or charge against the Property. After prior notice to Lender, Borrower, at its own expense, may contest by appropriate legal proceeding, conducted in good faith and with due diligence, the amount or validity of any Taxes or Other Charges, provided that (i) no Default or Event of Default has occurred and remains uncured; (ii) such proceeding shall be permitted under and be conducted in accordance with all applicable statutes, laws and ordinances; (iii) neither the Property nor any part thereof or interest therein will be in danger of being sold, forfeited, terminated, canceled or lost; (iv) Borrower shall promptly upon final determination thereof pay the amount of any such Taxes or Other Charges, together with all costs, interest and penalties which may be payable in connection therewith; (v) such proceeding shall suspend the collection of Taxes or Other Charges from the Property; and (vi) Borrower shall deposit with Lender cash, or other security as may be approved by Lender, in an amount equal to one hundred twenty-five percent (125%) of the contested amount, to insure the payment of any such Taxes or Other Charges, together with all interest and penalties thereon. Lender may pay over any such cash or other security held by Lender to the claimant entitled thereto upon any final, non-appealable administrative or judicial determination establishing the entitlement of such claimant.

**4.1.3** **Litigation**. Borrower shall give prompt notice to Lender of any litigation or governmental proceedings pending or threatened against Borrower which might materially adversely affect the Property or Borrower's ability to perform its obligations hereunder or under the other Loan Documents.

**4.1.4** **Access to Property**. Borrower shall permit agents, representatives and employees of Lender to inspect the Property or any part thereof at reasonable hours upon reasonable advance notice.

**4.1.5** **Further Assurances; Supplemental Mortgage Affidavits**. Borrower shall, at Borrower's sole cost and expense:

(a) execute and deliver to Lender such documents, instruments, certificates, assignments and other writings, and do such other acts necessary or desirable, to evidence, preserve and/or protect the collateral at any time securing or intended to secure the obligations of Borrower under the Loan Documents, as Lender may reasonably require; and

(b) do and execute all and such further lawful and reasonable acts, conveyances and assurances for the better and more effective carrying out of the intents and purposes of this Agreement and the other Loan Documents, as Lender shall reasonably require from time to time.

### 4.1.6 Financial Reporting.

(a) Borrower shall keep and maintain or will cause to be kept and maintained proper and accurate books and records, in accordance with GAAP, reflecting the financial affairs of Borrower. Lender shall have the right from time to time, once during any twelve-month period or at any time following an Event of Default, during normal business hours upon reasonable notice to Borrower, to examine such books and records at the office of Borrower or other Person maintaining such books and records and to make such copies or extracts thereof as Lender shall desire.

(b) Borrower shall furnish Lender annually, within ninety (90) days following the end of each Fiscal Year, a complete copy of annual financial statements of Borrower, audited by an independent certified public accountant acceptable to Lender prepared in accordance with GAAP covering the Property, including statements of income and expense and cash flow and a balance sheet. Borrower's financial statements shall set forth gross revenue and operating expenses for the Property and shall be accompanied by a certificate executed by the chief financial officer of Borrower stating that such annual financial statements present fairly the financial condition and the results of operations of Borrower and the Property. Together with Borrower's annual financial statements, Borrower shall furnish to Lender an Officer's Certificate certifying as of the date thereof whether to the best of Borrower's knowledge there exists an event or circumstance which constitutes a Default or Event of Default by Borrower under the Loan Documents and if such Default or Event of Default exists, the nature thereof, the period of time it has existed and the action then being taken to remedy the same.

(c) Borrower will furnish Lender on or before the forty-fifth (45th) day after the end of each fiscal quarter (based on Borrower's Fiscal Year), the following items, accompanied by a certificate from the chief financial officer of Borrower, certifying that such items are true, correct, accurate and complete and fairly present the financial condition and results of the operations of Borrower and the Property in accordance with GAAP as applicable:

(i) quarterly and year-to-date statements of income and expense and cash flow prepared for such quarter with respect to the Property, with a balance sheet for such quarter for Borrower;

(ii) a calculation reflecting the Debt Service Coverage Ratio as of the last day of such quarter, for such quarter and the last four quarters;

(iii) a comparison of the budgeted income and expenses and the actual income and expenses for such quarter and year to date for the Property, together with a detailed explanation of any variances of more than five percent (5%) between budgeted and actual amounts for such period and year to date; and

(iv) a current rent roll for the Property.

(d) Borrower will furnish Lender on or before the thirty-fifth (35th) day after the end of each calendar month, the following items, accompanied by a certificate from the chief financial officer of Borrower, certifying that such items are true, correct, accurate, and complete

and fairly present the financial condition and results of the operations of Borrower and the Property in a manner consistent with GAAP, as applicable:

(i) until the later of (A) the first anniversary of this Agreement and (B) the date of a Securitization, monthly and year-to-date statements of income and expense and cash flow prepared for such month with respect to the Property;

(ii) until the later of (A) the first anniversary of this Agreement and (B) the date of a Securitization, a comparison of the budgeted income and expenses and the actual income and expenses for such month and year to date for the Property, together with a detailed explanation of any variances of more than five percent (5%) between budgeted and actual amounts for such period and year to date;

(iii) until the later of (A) the first anniversary of this Agreement and (B) the date of a Securitization, a current rent roll for the Property; and

(iv) any notice received from a Tenant threatening non-payment of Rent or other default, alleging or acknowledging a default by landlord, requesting a termination of a Lease or a material modification of any Lease or notifying Borrower of the exercise or non-exercise of any option provided for in such Tenant's Lease, or any other similar material correspondence received by Borrower from Tenants during the subject month.

(e) Borrower shall submit the Annual Budget to Lender not later than thirty (30) days prior to the commencement of each Fiscal Year. During any Cash Management Period (as defined in the Cash Management Agreement), such Annual Budget shall be subject to review and approval by Lender.

(f) Borrower shall furnish to Lender, within ten (10) Business Days after request (or as soon thereafter as may be reasonably possible), such further detailed information with respect to the operation of the Property and the financial affairs of Borrower as may be reasonably requested by Lender, including, without limitation, a comparison of the budgeted income and expenses and the actual income and expenses for a quarter and year to date for the Property, together with a detailed explanation of any variances of more than the greater of five percent (5%) or $50,000 between budgeted and actual amounts for such period and year to date.

**4.1.7 <u>Title to the Property</u>**. Borrower will warrant and defend the validity and priority of the Liens of the Mortgage and the Assignment of Leases on the Property against the claims of all Persons whomsoever, subject only to Permitted Encumbrances.

**4.1.8 <u>Estoppel Statement</u>**.

(a) After request by Lender, Borrower shall within ten (10) Business Days furnish Lender with a statement, duly acknowledged and certified, stating (i) the unpaid principal amount of the Note, (ii) the Applicable Interest Rate of the Note, (iii) the date installments of interest and/or principal were last paid, (iv) any offsets or defenses to the payment of the Debt, if any, and (v) that this Agreement and the other Loan Documents have not been modified or if modified, giving particulars of such modification.

(b) After request by Borrower, Lender shall within ten (10) Business Days furnish Borrower with a statement, duly acknowledged and certified, stating (i) the unpaid principal amount of the Note, (ii) the Applicable Interest Rate of the Note, (iii) the date installments of interest and/or principal were last paid and (iv) whether or not Lender has sent any notice of default under the Loan Documents which remains uncured in the opinion of Lender.

(c) Borrower shall deliver to Lender, upon request, an estoppel certificate from each Tenant under any Lease (provided that Borrower shall only be required to use commercially reasonable efforts to obtain an estoppel certificate from any Tenant not required to provide an estoppel certificate under its Lease); provided that such certificate may be in the form required under such Lease; provided, further, that Borrower shall not be required to deliver such certificates more frequently than two (2) times in any calendar year.

**4.1.9 Leases.**

(a) All Leases and all renewals of Leases executed after the date hereof shall (i) provide for rental rates comparable to existing local market rates for similar properties, (ii) be on commercially reasonable terms, (iii) provide that such Lease is subordinate to the Mortgage and that the lessee will attorn to Lender and any purchaser at a foreclosure sale and (iv) not contain any terms which would materially adversely affect Lender's rights under the Loan Documents. All Major Leases and all renewals, amendments and modifications thereof executed after the date hereof shall be subject to Lender's prior approval, which approval shall not be unreasonably withheld. Lender shall execute and deliver a Subordination Non-Disturbance and Attornment Agreement in the form annexed as Schedule IV to Tenants under current and future Major Leases approved by Lender promptly upon request with such commercially reasonable changes as may be requested by Tenants, from time to time, and which are reasonably acceptable to Lender.

(b) Borrower (i) shall observe and perform the obligations imposed upon the lessor under the Leases in a commercially reasonable manner; (ii) shall enforce the terms, covenants and conditions contained in the Leases upon the part of the lessee thereunder to be observed or performed in a commercially reasonable manner; provided, however, Borrower shall not terminate or accept a surrender of a Major Lease without Lender's prior approval, which approval shall not be unreasonably withheld; (iii) shall not collect any of the Rents more than one (1) month in advance (other than security deposits); (iv) shall not execute any assignment of lessor's interest in the Leases or the Rents (except as contemplated by the Loan Documents); (v) shall not alter, modify or change any Major Lease so as to change the amount of or payment date for rent, change the expiration date, grant any option for additional space or term, materially reduce the obligations of the lessee or increase the obligations of lessor; and (vi) shall hold all security deposits under all Leases in accordance with Legal Requirements. Upon request, Borrower shall furnish Lender with executed copies of all Leases.

(c) With respect to any item for which Lender's approval is required pursuant to this Section 4.1.9, if Borrower shall submit to Lender, at the address specified by lender in accordance with this Agreement, (i) all such items as are reasonably required for Lender's review, which shall include, in the case of a new Major Lease, a draft of the proposed Major

Case 2:17-cv-02036-KM-MAH Document 1-3 Filed 03/28/17 Page 49 of 115 PageID: 72

Lease in substantially final form together with an abstract of the major economic terms thereof, accompanied by (ii) a letter, requesting Lender's approval and stating at the top in bold face, 12 point, solid capitals: "**IMMEDIATE RESPONSE REQUIRED. FAILURE TO RESPOND WITHIN TEN (10) BUSINESS DAYS WILL BE DEEMED APPROVAL PURSUANT TO THE LOAN AGREEMENT**," then, if Lender shall fail to reply to Borrower's request within ten (10) Business Days after Lender's receipt thereof, Lender shall be deemed to have approved said item.

**4.1.10 Alterations**. Lender's prior approval shall be required in connection with any alterations to any Improvements (except tenant improvements under any Lease approved by Lender or under any Lease for which approval was not required by Lender under this Agreement) (a) that may have a material adverse effect on Borrower's financial condition, the value of the Property or the ongoing revenues and expenses of the Property or (b) the cost of which (including any related alteration, improvement or replacement) is reasonably anticipated to exceed the Alteration Threshold, which approval may be granted or withheld in Lender's sole discretion. If the total unpaid amounts incurred and to be incurred with respect to such alterations to the Improvements shall at any time exceed the Alteration Threshold, Borrower shall promptly deliver to Lender as security for the payment of such amounts and as additional security for Borrower's obligations under the Loan Documents any of the following: (i) cash, (ii) Letters of Credit, (iii) U.S. Obligations, (iv) other securities acceptable to Lender, provided that Lender shall have received a Rating Agency Confirmation as to the form and issuer of same, or (v) a completion bond, provided that Lender shall have received a Rating Agency Confirmation as to the form and issuer of same. Such security shall be in an amount equal to the excess of the total unpaid amounts incurred and to be incurred with respect to such alterations to the Improvements (other than such amounts to be paid or reimbursed by Tenants under the Leases) over the Alteration Threshold.

**4.1.11 Material Agreements**. Borrower shall (a) promptly perform and/or observe all of the material covenants and agreements required to be performed and observed by it under each Material Agreement to which it is a party, and do all things reasonably necessary to preserve and to keep unimpaired its rights thereunder, (b) promptly notify Lender in writing of the giving of any notice of any default by any party under any Material Agreement of which it is aware and (c) promptly enforce the performance and observance of all of the material covenants and agreements required to be performed and/or observed by the other party under each Material Agreement to which it is a party in a commercially reasonable manner.

**4.1.12 Performance by Borrower**. Borrower shall in a timely manner observe, perform and fulfill each and every covenant, term and provision of each Loan Document executed and delivered by Borrower, and shall not enter into or otherwise suffer or permit any amendment, waiver, supplement, termination or other modification of any Loan Document executed and delivered by Borrower without the prior consent of Lender.

**4.1.13 Costs of Enforcement/Remedying Defaults**. In the event (a) that the Mortgage is foreclosed in whole or in part or the Note or any other Loan Document is put into the hands of an attorney for collection, suit, action or foreclosure, (b) of the foreclosure of any Lien or mortgage prior to or subsequent to the Mortgage in which proceeding Lender is made a party,

Case 2:17-cv-02036-KM-MAH Document 1-3 Filed 03/28/17 Page 49 of 125 PageID: 79

(c) of the bankruptcy, insolvency, rehabilitation or other similar proceeding in respect of Borrower or any Guarantor or an assignment by Borrower or any Guarantor for the benefit of its creditors, or (d) Lender shall remedy or attempt to remedy any Event of Default hereunder, Borrower shall be chargeable with and agrees to pay all costs incurred by Lender as a result thereof, including costs of collection and defense (including reasonable attorneys', experts', consultants' and witnesses' fees and disbursements) in connection therewith and in connection with any appellate proceeding or post-judgment action involved therein, which shall be due and payable on demand, together with interest thereon from the date incurred by Lender at the Default Rate, and together with all required service or use taxes.

**4.1.14** **<u>Business and Operations</u>**. Borrower will continue to engage in the businesses currently conducted by it as and to the extent the same are necessary for the ownership and leasing of the Property. Borrower will qualify to do business and will remain in good standing under the laws of each jurisdiction as and to the extent the same are required for the ownership and leasing of the related Property. Borrower shall at all times cause the Property to be maintained as an office building.

**4.1.15** **<u>Loan Fees</u>**. Borrower shall pay all fees and costs (including, without limitation, all origination and commitment fees) required of Borrower pursuant to the terms of that certain Mortgage Loan Application between Heritage Gateway, LLC, and Lender dated August 28, 2006.

**4.1.16** **<u>Tenancy-in-Common</u>**.

(a) Borrower and each tenant-in-common comprising Borrower shall comply in all material respects with the terms and provisions of the TIC Agreement. Borrower and each tenant-in-common comprising Borrower declares that Lender is intended as, and shall be, a third-party beneficiary of the TIC Agreement.

(b) Borrower and each tenant-in-common comprising Borrower shall give Lender prompt (and in all events within ten (10) days) written notice of any default by any party under the TIC Agreement or the receipt of any notice of such a default. Borrower and each tenant-in-common comprising Borrower will promptly (and in all events within five (5) days) furnish to Lender an exact copy of any notice, communication, or other instrument or document received or given by Borrower or any of the tenants-in-common comprising Borrower which may concern or affect the estate or interest of Borrower or any such tenant-in-common in or to the Property or under the TIC Agreement.

(c) Borrower and each tenant-in-common comprising Borrower covenants and agrees that its rights under the TIC Agreement are and shall at all times be subject and subordinate to the lien and rights of Lender under this Agreement, the Mortgage and the other Loan Documents. Borrower and each tenant-in-common comprising Borrower waives any lien or other rights under the TIC Agreement regarding the Property until such time, if any, as the Debt has been paid in full. Without limitation to the foregoing, Borrower and each of the tenants-in-common comprising Borrower agrees that it shall not (i) demand or sue for any payment, or commence any legal proceeding to enforce any right, under the TIC Agreement, (ii) vote or take any action in respect of any Bankruptcy Action (as defined below) without Lender's

prior written consent (said consent, except when an Event of Default shall have occurred and be continuing, not to be unreasonably withheld or delayed) unless and until the Debt shall have been paid in full, or (iii) accept or obtain any lien, pledge or security interest as security for its rights under the TIC Agreement except as provided in the TIC Agreement.

(d) Borrower and each tenant-in-common comprising Borrower agrees that upon any distribution of the assets or readjustment of the indebtedness of any tenant-in-common comprising Borrower, whether by reason of liquidation, composition, bankruptcy, arrangement, receivership, assignment for the benefit of creditors or any other action or proceeding involving the readjustment of all or any of the Debt, or the application of the assets of any tenant-in-common comprising Borrower to the payment or liquidation thereof (each of the foregoing being referred to herein as a "Bankruptcy Action"), Lender shall be entitled to receive payment in full of any and all Debt prior to the payment of all or any part of any amount payable under the TIC Agreement, and in order to enable Lender to enforce Lender's rights hereunder in any such action or proceeding, Lender is hereby irrevocably authorized and empowered in its discretion (in Lender's name or in the name of any of the tenants-in-common comprising Borrower) to make and to present for and on behalf of any such tenant-in-common such proofs of claim against any other tenant-common on account of the TIC Agreement as Lender may deem expedient or proper and to receive and collect any and all distributions or other payments or disbursements made with respect to the TIC Agreement in whatever form the same may be paid or issued and to apply the same to the Debt. Borrower and each tenant-in-common comprising Borrower further agrees to execute and deliver to Lender such assignments or other instruments as may be required by Lender in order to enable Lender to enforce any and all claims, and to collect any and all payments or disbursements which may be made, on account of the TIC Agreement.

(e) Without limitation to the rights provided to Lender in this Section 4.1.16, Borrower and each tenant-in-common comprising Borrower irrevocably grants Lender the right (in Lender's name or in the name of such tenant-in-common) to exercise any and all rights of such tenant-in-common in any Bankruptcy Action to make elections with respect to the TIC Agreement including, without limitation, elections with respect to any proposed plan of reorganization. Borrower and each tenant-in-common comprising Borrower hereby further agrees to consent to any motion made by or on behalf of Lender in any Bankruptcy Action for relief against any stay or injunction therein against collection of the Debt, including, but not limited to, any motion made by or on behalf of Lender therein to lift such stay or injunction for the purposes of foreclosing the Mortgage.

(f) Borrower and each tenant-in-common comprising Borrower agrees that any payments or proceeds received by any such tenant-in-common in contravention of the terms and provisions of this Section 4.1.16 will be held in trust for Lender and promptly delivered to Lender.

**Section 4.2 Borrower Negative Covenants.**

Borrower covenants and agrees with Lender that:

**4.2.1 Due on Sale and Encumbrance; Transfers of Interests.** Except as permitted by Article VIII, neither Borrower nor any other Person having a direct or indirect ownership or

Case 2:17-cv-02036-KM-MAH Document 1-3 Filed 03/28/17 Page 49 of 125 PageID: 75

beneficial interest in Borrower shall sell, convey, mortgage, grant, bargain, encumber, pledge, assign or transfer any interest, direct or indirect, in the Borrower, the Property or any part thereof, whether voluntarily or involuntarily, in violation of the covenants and conditions set forth in the Mortgage and this Agreement.

**4.2.2** **Liens**. Borrower shall not create, incur, assume or suffer to exist any Lien on any portion of the Property except for Permitted Encumbrances.

**4.2.3** **Dissolution**. Borrower shall not (i) engage in any dissolution, liquidation or consolidation or merger with or into any other business entity, (ii) engage in any business activity not related to the ownership and operation of the Property, (iii) transfer, lease or sell, in one transaction or any combination of transactions, all or substantially all of the property or assets of Borrower except to the extent expressly permitted by the Loan Documents, or (iv) cause, permit or suffer any SPC Party to (A) dissolve, wind up or liquidate or take any action, or omit to take an action, as a result of which such SPC Party would be dissolved, wound up or liquidated in whole or in part, or (B) amend, modify, waive or terminate the certificate of incorporation or bylaws of such SPC Party, in each case without obtaining the prior consent of Lender.

**4.2.4** **Change in Business**. Borrower shall not enter into any line of business other than the ownership and operation of the Property.

**4.2.5** **Debt Cancellation**. Borrower shall not cancel or otherwise forgive or release any claim or debt (other than termination of Leases in accordance herewith) owed to Borrower by any Person, except for adequate consideration and in the ordinary course of Borrower's business.

**4.2.6** **Affiliate Transactions**. Borrower shall not enter into, or be a party to, any transaction with an Affiliate of Borrower or any of the partners of Borrower except in the ordinary course of business and on terms which are fully disclosed to Lender in advance and are no less favorable to Borrower or such Affiliate than would be obtained in a comparable arm's length transaction with an unrelated third party or as otherwise permitted under this Agreement.

**4.2.7** **Zoning**. Borrower shall not initiate or consent to any zoning reclassification of any portion of the Property or seek any variance under any existing zoning ordinance or use or permit the use of any portion of the Property in any manner that could result in such use becoming a non-conforming use under any zoning ordinance or any other applicable land use law, rule or regulation, without the prior consent of Lender.

**4.2.8** **Assets**. Borrower shall not purchase or own any property other than the Property and any property necessary or incidental for the operation of the Property.

**4.2.9** **No Joint Assessment**. Borrower shall not suffer, permit or initiate the joint assessment of the Property (i) with any other real property constituting a tax lot separate from the Property, and (ii) with any portion of the Property which may be deemed to constitute personal property, or any other procedure whereby the lien of any taxes which may be levied against such personal property shall be assessed or levied or charged to the Property.

Case 2:17-cv-02036-KM-MAH Document 1-3 Filed 03/28/17 Page 48 of 115 PageID: 76

**4.2.10 Principal Place of Business**. Borrower shall not change its principal place of business from the address set forth on the first page of this Agreement without first giving Lender thirty (30) days prior notice.

**4.2.11 ERISA**.

(a) Borrower shall not engage in any transaction which would cause any obligation, or action taken or to be taken, hereunder (or the exercise by Lender of any of its rights under the Note, this Agreement or the other Loan Documents) to be a non-exempt (under a statutory or administrative class exemption) prohibited transaction under the ERISA or Section 4975 of the Code.

(b) Borrower shall deliver to Lender such certifications or other evidence from time to time throughout the term of the Loan, as requested by Lender in its sole discretion, that (A) Borrower is not an "employee benefit plan" as defined in Section 3(3) of ERISA, which is subject to Title I of ERISA, or a "plan" within the meaning of Section 4975 of the Code; (B) Borrower is not subject to any state statute regulating investments of, or fiduciary obligations with respect to, governmental plans as defined in Section 3(32) of ERISA; and (C) one or more of the following circumstances is true:

(i) Equity interests in Borrower are publicly offered securities, within the meaning of the Plan Assets Regulation;

(ii) Less than twenty-five percent (25%) of each outstanding class of equity interests in Borrower is held by "benefit plan investors" within the meaning of the Plan Assets Regulation; or

(iii) Borrower qualifies as an "operating company" or a "real estate operating company" within the meaning of the Plan Assets Regulation.

**4.2.12 Material Agreements**. Borrower shall not, without Lender's prior written consent: (a) enter into, surrender or terminate any Material Agreement to which it is a party (unless the other party thereto is in material default and the termination of such agreement would be commercially reasonable), (b) increase or consent to the increase of the amount of any charges under any Material Agreement to which it is a party, except as provided therein or on an arm's-length basis and commercially reasonable terms; or (c) otherwise modify, change, supplement, alter or amend, or waive or release any of its rights and remedies under any Material Agreement to which it is a party in any material respect, except on an arm's-length basis and commercially reasonable terms.

**4.2.13 Tenancy-in-Common**. Neither Borrower nor any of the tenants-in-common comprising Borrower shall bring any action for partition, or other action of a similar nature, with respect to the Property. Neither Borrower nor any of the tenants-in-common comprising Borrower shall take any action or omit to take any action, in their capacity as tenants-in-common, the effect of which will impair or tend to impair the rights and security granted to Lender under this Agreement, the Mortgage or the other Loan Documents. Neither Borrower nor

any of the tenants-in-common comprising Borrower shall amend the TIC Agreement without the prior written consent of Lender.

**4.2.14 Operating Agreements**. Borrower agrees that without the prior consent of Lender, Borrower will not execute modifications to the Operating Agreements if such modifications will have a material adverse effect on the use, operation or value (including the Underwritable Cash Flow) of the Property, taken as a whole, or the ability of Borrower to pay its obligations in respect of the Loan.

## ARTICLE V.

## INSURANCE, CASUALTY AND CONDEMNATION

**Section 5.1 Insurance**.

**5.1.1 Insurance Policies**.

(a) Borrower shall obtain and maintain, or cause to be maintained, insurance for Borrower and the Property providing at least the following coverages:

(i) comprehensive all risk insurance on the Improvements and the personal property at the Property, including contingent liability from Operation of Building Laws, Demolition Costs and Increased Cost of Construction Endorsements, in each case (A) in an amount equal to one hundred percent (100%) of the "Full Replacement Cost," which for purposes of this Agreement shall mean actual replacement value (exclusive of costs of excavations, foundations, underground utilities and footings) with a waiver of depreciation, but the amount shall in no event be less than the outstanding principal balance of the Loan; (B) containing an agreed amount endorsement with respect to the Improvements and personal property at the Property waiving all co-insurance provisions; (C) providing for no deductible in excess of Twenty-Five Thousand and No/100 Dollars ($25,000) for all such insurance coverage; and (D) containing an "Ordinance or Law Coverage" or "Enforcement" endorsement if any of the Improvements or the use of the Property shall at any time constitute legal non-conforming structures or uses. In addition, Borrower shall obtain: (x) war risk and acts of terrorism coverage in form and substance and in amounts satisfactory to Lender; (y) if any portion of the Improvements is currently or at any time in the future located in a federally designated "special flood hazard area," flood hazard insurance in an amount equal to the lesser of (1) the outstanding principal balance of the Note or (2) the maximum amount of such insurance available under the National Flood Insurance Act of 1968, the Flood Disaster Protection Act of 1973 or the National Flood Insurance Reform Act of 1994, as each may be amended or such greater amount as Lender shall require; and (z) earthquake insurance in amounts and in form and substance satisfactory to Lender in the event the Property is located in an area with a high degree of seismic activity, provided that the insurance pursuant to clauses (y) and (z) hereof shall be on terms consistent with the comprehensive all risk insurance policy required under this subsection (i).

(ii) commercial general liability insurance against claims for personal injury, bodily injury, death or property damage occurring upon, in or about the Property, such insurance (A) to be on the so-called "occurrence" form with a combined limit, excluding

Case 2:17-cv-02036-KM-MAH Document 1-3 Filed 03/28/17 Page 50 of 115 PageID: 78

umbrella coverage, of not less than Two Million and No/100 Dollars ($2,000,000); (B) to continue at not less than the aforesaid limit until required to be changed by Lender by reason of changed economic conditions making such protection inadequate; and (C) to cover at least the following hazards: (1) premises and operations; (2) products and completed operations on an "if any" basis; (3) independent contractors; (4) blanket contractual liability for all legal contracts; and (5) contractual liability covering the indemnities contained in Article 9 of the Mortgage to the extent the same is available;

(iii) business income insurance (A) with loss payable to Lender; (B) covering all risks required to be covered by the insurance provided for in subsection (i) above; (C) containing an extended period of indemnity endorsement which provides that after the physical loss to the Improvements and related personal property has been repaired, the continued loss of income will be insured until such income either returns to the same level it was at prior to the loss, or the expiration of twenty-four (24) months from the date that the Property is repaired or replaced and operations are resumed, whichever first occurs, and notwithstanding that the policy may expire prior to the end of such period; and (D) in an amount equal to one hundred percent (100%) of the projected gross income from the Property for a period of twenty-four (24) months from the date that the Property is repaired or replaced and operations are resumed. The amount of such business income insurance shall be determined prior to the date hereof and at least once each year thereafter based on Borrower's reasonable estimate of the gross income from the Property for the succeeding twenty-four (24) month period. All proceeds payable to Lender pursuant to this subsection shall be held by Lender and shall be applied to the obligations secured by the Loan Documents from time to time due and payable hereunder and under the Note; provided, however, that nothing herein contained shall be deemed to relieve Borrower of its obligations to pay the obligations secured by the Loan Documents on the respective dates of payment provided for in the Note and the other Loan Documents except to the extent such amounts are actually paid out of the proceeds of such business income insurance;

(iv) at all times during which structural construction, repairs or alterations are being made with respect to the Improvements, and only if the Property coverage form does not otherwise apply, (A) owner's contingent or protective liability insurance covering claims not covered by or under the terms or provisions of the above mentioned commercial general liability insurance policy; and (B) the insurance provided for in subsection (i) above written in a so-called builder's risk completed value form (1) on a non-reporting basis, (2) against all risks insured against pursuant to subsection (i) above, (3) including permission to occupy the Property, and (4) with an agreed amount endorsement waiving co-insurance provisions;

(v) workers' compensation, subject to the statutory limits of the state in which the Property is located;

(vi) comprehensive boiler and machinery insurance, if applicable, in amounts as shall be reasonably required by Lender on terms consistent with the commercial property insurance policy required under subsection (i) above;

(vii) umbrella liability insurance in addition to primary coverage in an amount not less than Fifty Million and No/100 Dollars ($50,000,000) per occurrence on terms

consistent with the commercial general liability insurance policy required under subsection (ii) above and (viii) below;

(viii) if applicable, motor vehicle liability coverage for all owned and non-owned vehicles, including rented and leased vehicles containing minimum limits per occurrence, exclusive of umbrella coverage, of One Million and No/100 Dollars ($1,000,000);

(ix) if applicable, so-called "dramshop" insurance or other liability insurance required in connection with the sale of alcoholic beverages;

(x) insurance against employee dishonesty in an amount not less than one (1) month of gross revenue from the Property and with a deductible not greater than Twenty-Five Thousand and No/100 Dollars ($25,000); and

(xi) upon sixty (60) days' notice, such other reasonable insurance and in such reasonable amounts as Lender from time to time may reasonably request against such other insurable hazards which at the time are commonly insured against for property similar to the Property located in or around the region in which the Property is located.

(b) All insurance provided for in Section 5.1.1(a) shall be obtained under valid and enforceable policies (collectively, the "Policies" or, in the singular, the "Policy") and, to the extent not specified above, shall be subject to the approval of Lender as to deductibles, loss payees and insureds. Not less than ten (10) days prior to the expiration dates of the Policies theretofore furnished to Lender, certificates of insurance evidencing the Policies accompanied by evidence satisfactory to Lender of payment of the premiums then due thereunder (the "Insurance Premiums"), shall be delivered by Borrower to Lender.

(c) Any blanket insurance Policy shall specifically allocate to the Property the amount of coverage from time to time required hereunder and shall otherwise provide the same protection as would a separate Policy insuring only the Property in compliance with the provisions of Section 5.1.1(a).

(d) All Policies of insurance provided for or contemplated by Section 5.1.1(a), except for the Policy referenced in Section 5.1.1(a)(v), shall name Borrower as the insured and Lender and its successors and/or assigns as the additional insured, as its interests may appear, and in the case of property damage, boiler and machinery, flood, earthquake and terrorism insurance, shall contain a so-called New York standard non-contributing mortgagee clause in favor of Lender providing that the loss thereunder shall be payable to Lender.

(e) All Policies of insurance provided for in Section 5.1.1(a), except for the Policies referenced in Section 5.1.1(a)(v) and (a)(viii) shall contain clauses or endorsements to the effect that:

(i) no act or negligence of Borrower, or anyone acting for Borrower, or of any Tenant or other occupant, or failure to comply with the provisions of any Policy, which might otherwise result in a forfeiture of the insurance or any part thereof, shall in any way affect the validity or enforceability of the insurance insofar as Lender is concerned;

(ii) the Policy shall not be canceled without at least thirty (30) days' written notice to Lender and any other party named therein as an additional insured and, if obtainable by Borrower using commercially reasonable efforts, shall not be materially changed (other than to increase the coverage provided thereby) without such a thirty (30) day notice; and

(iii) Lender shall not be liable for any Insurance Premiums thereon or subject to any assessments thereunder.

(f) If at any time Lender is not in receipt of written evidence that all insurance required hereunder is in full force and effect, Lender shall have the right, without notice to Borrower, to take such action as Lender reasonably deems necessary to protect its interest in the Property, including, without limitation, the obtaining of such insurance coverage as Lender in its sole discretion deems appropriate and all premiums incurred by Lender in connection with such action or in obtaining such insurance and keeping it in effect shall be paid by Borrower to Lender upon demand and until paid shall be secured by the Mortgage and shall bear interest at the Default Rate.

(g) In the event of foreclosure of the Mortgage or other transfer of title to the Property in extinguishment in whole or in part of the Debt, all right, title and interest of Borrower in and to the Policies that are not blanket Policies then in force concerning the Property and all proceeds payable thereunder shall thereupon vest in the purchaser at such foreclosure or Lender or other transferee in the event of such other transfer of title.

**5.1.2** <u>**Insurance Company**</u>. The Policies shall be issued by financially sound and responsible insurance companies authorized to do business in the state in which the Property is located and having a claims paying ability rating of "A:VIII" or better by A.M. Best and "A" or better by S&P. Notwithstanding the foregoing, Borrower shall be permitted to maintain the Policies with insurance companies which do not meet the foregoing requirements (an "<u>Otherwise Rated Insurer</u>"), provided Borrower obtains a "cut-through" endorsement (that is, an endorsement which permits recovery against the provider of such endorsement) with respect to any Otherwise Rated Insurer from an insurance company which meets the claims paying ability ratings required above. Moreover, if Borrower desires to maintain insurance required hereunder from an insurance company which does not meet the claims paying ability ratings set forth herein but the parent of such insurance company, which owns at least fifty-one percent (51%) of such insurance company, maintains such ratings, Borrower may use such insurance companies if approved by the Rating Agencies (such approval may be conditioned on items required by the Rating Agencies including a requirement that the parent guarantee the obligations of such insurance company).

**Section 5.2** <u>**Casualty and Condemnation**</u>.

**5.2.1** <u>**Casualty**</u>. If the Property shall sustain a Casualty, Borrower shall give prompt notice of such Casualty to Lender and shall promptly commence and diligently prosecute to completion the repair and restoration of the Property as nearly as possible to the condition the Property was in immediately prior to such Casualty (a "<u>Restoration</u>") and otherwise in accordance with Section 5.3, it being understood, however, that Borrower shall not be obligated to restore the Property to the precise condition of the Property prior to such Casualty provided

Case 2:17-cv-02036-KM-MAH Document 1-3 Filed 03/28/17 Page 53 of 125 PageID: 81

the Property is restored, to the extent practicable, to be of at least equal value and of substantially the same character as prior to the Casualty. Borrower shall pay all costs of such Restoration whether or not such costs are covered by insurance. Lender may, but shall not be obligated to, make proof of loss if not made promptly by Borrower. In the event of a Casualty where the loss does not exceed the Restoration Threshold, Borrower may settle and adjust such claim; provided that (a) no Event of Default has occurred and is continuing and (b) such adjustment is carried out in a commercially reasonable and timely manner. In the event of a Casualty where the loss exceeds the Restoration Threshold or if an Event of Default then exists, Borrower may settle and adjust such claim only with the consent of Lender (which consent shall not be unreasonably withheld or delayed) and Lender shall have the opportunity to participate, at Borrower's cost, in any such adjustments. Notwithstanding any Casualty, Borrower shall continue to pay the Debt at the time and in the manner provided for its payment in the Note and in this Agreement.

**5.2.2** **Condemnation**. Borrower shall give Lender prompt notice of any actual or threatened Condemnation by any Governmental Authority of all or any part of the Property and shall deliver to Lender a copy of any and all papers served in connection with such proceedings. Provided no Event of Default has occurred and is continuing, in the event of a Condemnation where the amount of the taking does not exceed the Restoration Threshold, Borrower may settle and compromise such Condemnation; provided that the same is effected in a commercially reasonable and timely manner. In the event of a Condemnation where the amount of the taking exceeds the Restoration Threshold or if an Event of Default then exists, Borrower may settle and compromise the Condemnation only with the consent of Lender (which consent shall not be unreasonably withheld or delayed) and Lender shall have the opportunity to participate, at Borrower's cost, in any litigation and settlement discussions in respect thereof and Borrower shall from time to time deliver to Lender all instruments requested by Lender to permit such participation. Borrower shall, at its expense, diligently prosecute any such proceedings, and shall consult with Lender, its attorneys and experts, and cooperate with them in the carrying on or defense of any such proceedings. Notwithstanding any Condemnation, Borrower shall continue to pay the Debt at the time and in the manner provided for its payment in the Note and in this Agreement. Lender shall not be limited to the interest paid on the Award by any Governmental Authority but shall be entitled to receive out of the Award interest at the rate or rates provided herein or in the Note. If the Property or any portion thereof is taken by any Governmental Authority, Borrower shall promptly commence and diligently prosecute the Restoration of the Property and otherwise comply with the provisions of Section 5.3. If the Property is sold, through foreclosure or otherwise, prior to the receipt by Lender of the Award, Lender shall have the right, whether or not a deficiency judgment on the Note shall have been sought, recovered or denied, to receive the Award, or a portion thereof sufficient to pay the Debt.

**5.2.3** **Casualty Proceeds**. Payments on account of the business interruption insurance specified in Section 5.1.1(a)(iii) above with respect to any Casualty or Condemnation shall be deposited directly into the Deposit Account (as defined in the Cash Management Agreement).

**Section 5.3** **Delivery of Net Proceeds**.

**5.3.1** **Minor Casualty or Condemnation**. If a Casualty or Condemnation has occurred to the Property and the Net Proceeds shall be less than the Restoration Threshold and the costs of

Case 2:17-cv-02036-KM-MAH Document 1-3 Filed 03/28/17 Page 54 of 115 PageID: 82

completing the Restoration shall be less than the Restoration Threshold, and provided no Event of Default shall have occurred and remain uncured, the Net Proceeds will be disbursed by Lender to Borrower. Promptly after receipt of the Net Proceeds, Borrower shall commence and satisfactorily complete with due diligence the Restoration in accordance with the terms of this Agreement. If any Net Proceeds are received by Borrower and may be retained by Borrower pursuant to the terms hereof, such Net Proceeds shall, until completion of the Restoration, be held in trust for Lender and shall be segregated from other funds of Borrower to be used to pay for the cost of Restoration in accordance with the terms hereof.

**5.3.2 Major Casualty or Condemnation.**

(a) If a Casualty or Condemnation has occurred to the Property and the costs of completing the Restoration is equal to or greater than the Restoration Threshold, Lender shall make the Net Proceeds available for the Restoration, provided that each of the following conditions are met:

(i) no Event of Default shall have occurred and be continuing;

(ii) (A) in the event the Net Proceeds are insurance proceeds, less than twenty-five percent (25%) of the total floor area of the Improvements at the Property has been damaged, destroyed or rendered unusable as a result of such Casualty or (B) in the event the Net Proceeds are an Award, less than ten percent (10%) of the land constituting the Property is taken, and such land is located along the perimeter or periphery of the Property, and no portion of the Improvements is the subject of the Condemnation;

(iii) Leases requiring payment of annual rent equal to eighty percent (80%) of the Gross Revenue received by Borrower during the twelve (12) month period immediately preceding the Casualty or Condemnation and all Major Leases shall remain in full force and effect during and after the completion of the Restoration without abatement of rent beyond the time required for Restoration, notwithstanding the occurrence of such Casualty or Condemnation.

(iv) Borrower shall commence the Restoration as soon as reasonably practicable and shall diligently pursue the same to satisfactory completion;

(v) Lender shall be reasonably satisfied that any operating deficits and all payments of principal and interest under the Note will be paid during the period required for Restoration from (A) the Net Proceeds (including proceeds of any business interruption insurance), or (B) other funds of Borrower;

(vi) Lender shall be satisfied that the Restoration will be completed on or before the earliest to occur of (A) the date six (6) months prior to the Maturity Date, (B) the earliest date required for such completion under the terms of any Major Lease, (C) such time as may be required under applicable Legal Requirements in order to repair and restore the Property to the condition it was in immediately prior to such Casualty or to as nearly as possible the condition it was in immediately prior to such Condemnation, as applicable or (D) the expiration of the insurance coverage referred to in Section 5.1.1(a)(iii);

Case 2:17-cv-02036-KM-MAH Document 1-3 Filed 03/28/17 Page 55 of 125 PageID: 85

(vii) the Property and the use thereof after the Restoration will be in compliance with and permitted under all applicable Legal Requirements;

(viii) the Restoration shall be done and completed by Borrower in an expeditious and diligent fashion and in compliance with all applicable Legal Requirements; and

(ix) such Casualty or Condemnation, as applicable, does not result in the loss of access to the Property or the related Improvements.

(b) The Net Proceeds shall be paid directly to Lender and held by Lender in an interest-bearing account and, until disbursed in accordance with the provisions of this Section 5.3.2, shall constitute additional security for the Debt. The Net Proceeds shall be disbursed by Lender to, or as directed by, Borrower from time to time during the course of the Restoration, upon receipt of evidence satisfactory to Lender that (A) all requirements set forth in Section 5.3.2(a) have been satisfied, (B) all materials installed and work and labor performed (except to the extent that they are to be paid for out of the requested disbursement) in connection with the Restoration have been paid for in full, and (C) there exist no notices of pendency, stop orders, mechanic's or materialman's liens or notices of intention to file same, or any other liens or encumbrances of any nature whatsoever on the Property arising out of the Restoration which have not either been fully bonded to the satisfaction of Lender and discharged of record or in the alternative fully insured to the satisfaction of Lender by the title company issuing the Title Insurance Policy.

(c) All plans and specifications required in connection with the Restoration shall be subject to prior approval of Lender and an independent architect selected by Lender (the "Casualty Consultant"); provided that Lender and Casualty Consultant shall furnish all approvals or objections in a timely manner so as not to delay Borrower's implementation of the Restoration. The plans and specifications shall require that the Restoration be completed in a first-class workmanlike manner at least equivalent to the quality and character of the original work in the Improvements (provided, however, that in the case of a partial Condemnation, the Restoration shall be done to the extent reasonable practicable after taking into account the consequences of such partial Condemnation), so that upon completion thereof, the Property shall be at least equal in value and general utility to the Property prior to the damage or destruction; it being understood, however, that Borrower shall not be obligated to restore the Property to the precise condition of the Property prior to such Casualty provided the Property is restored, to the extent practicable, to be of at least equal value and of substantially the same character as prior to the Casualty. Borrower shall restore all Improvements such that when they are fully restored and/or repaired, such Improvements and their contemplated use fully comply with all applicable material Legal Requirements. The identity of the contractors, subcontractors and materialmen engaged in the Restoration, as well as the contracts under which they have been engaged, shall be subject to approval of Lender and the Casualty Consultant. All costs and expenses incurred by Lender in connection with recovering, holding and advancing the Net Proceeds for the Restoration including, without limitation, reasonable attorneys' fees and disbursements and the Casualty Consultant's fees and disbursements, shall be paid by Borrower.

(d) In no event shall Lender be obligated to make disbursements of the Net Proceeds in excess of an amount equal to the costs actually incurred from time to time for work

Case 2:17-cv-02036-KM-MAH Document 1-3 Filed 03/28/17 Page 56 of 125 PageID: 84

in place as part of the Restoration, as certified by the Casualty Consultant, less the Casualty Retainage. The term "Casualty Retainage" shall mean, as to each contractor, subcontractor or materialman engaged in the Restoration, an amount equal to ten percent (10%) of the costs actually incurred for work in place as part of the Restoration, as certified by the Casualty Consultant, until the Restoration has been completed. The Casualty Retainage shall in no event, and notwithstanding anything to the contrary set forth above in this Section 5.3.2(d), be less than the amount actually held back by Borrower from contractors, subcontractors and materialmen engaged in the Restoration. The Casualty Retainage shall not be released until the Casualty Consultant certifies to Lender that the Restoration has been completed in accordance with the provisions of this Section 5.3.2(d) and that all approvals necessary for the re-occupancy and use of the Property have been obtained from all appropriate Governmental Authorities, and Lender receives evidence satisfactory to Lender that the costs of the Restoration have been paid in full or will be paid in full out of the Casualty Retainage; provided, however, that Lender will release the portion of the Casualty Retainage being held with respect to any contractor, subcontractor or materialman engaged in the Restoration as of the date upon which the Casualty Consultant certifies to Lender that the contractor, subcontractor or materialman has satisfactorily completed all work and has supplied all materials in accordance with the provisions of the contractor's, subcontractor's or materialman's contract, the contractor, subcontractor or materialman delivers the lien waivers and evidence of payment in full of all sums due to the contractor, subcontractor or materialman as may be reasonably requested by Lender or by the title company issuing the Title Insurance Policy, and Lender receives an endorsement to the Title Insurance Policy insuring the continued priority of the lien of the Mortgage and evidence of payment of any premium payable for such endorsement. If required by Lender, the release of any such portion of the Casualty Retainage shall be approved by the surety company, if any, which has issued a payment or performance bond with respect to the contractor, subcontractor or materialman.

(e) Lender shall not be obligated to make disbursements of the Net Proceeds more frequently than once every calendar month.

(f) If at any time the Net Proceeds or the undisbursed balance thereof shall not, in the opinion of Lender in consultation with the Casualty Consultant, be sufficient to pay in full the balance of the costs which are estimated by the Casualty Consultant to be incurred in connection with the completion of the Restoration, Borrower shall deposit the deficiency (the "Net Proceeds Deficiency") with Lender before any further disbursement of the Net Proceeds shall be made. The Net Proceeds Deficiency deposited with Lender shall be held by Lender and shall be disbursed for costs actually incurred in connection with the Restoration on the same conditions applicable to the disbursement of the Net Proceeds, and until so disbursed pursuant to this Section 5.3.2 shall constitute additional security for the Debt.

(g) The excess, if any, of the Net Proceeds and the remaining balance, if any, of the Net Proceeds Deficiency deposited with Lender after the Casualty Consultant certifies to Lender that the Restoration has been completed in accordance with the provisions of this Section 5.3.2, and the receipt by Lender of evidence satisfactory to Lender that all costs incurred in connection with the Restoration have been paid in full, shall be remitted by Lender to Borrower, provided no Event of Default shall have occurred and shall be continuing under any of the Loan Documents; provided, however, the amount of such excess returned to Borrower in the

Case 2:17-cv-02036-KM-MAH Document 1-3 Filed 03/28/17 Page 59 of 125 PageID: 85

case of a Condemnation shall not exceed the amount of Net Proceeds Deficiency deposited by Borrower with the balance being applied to the Debt in the manner provided for in Section 5.3.2(h).

(h) All Net Proceeds not required (i) to be made available for the Restoration or (ii) to be returned to Borrower as excess Net Proceeds pursuant to Section 5.3.2(g) may be retained and applied by Lender toward the payment of the Debt, whether or not then due and payable, in such order, priority and proportions as Lender in its sole discretion shall deem proper, which application shall be deemed to be a payment made in accordance with Section 2.4.2, or, at the discretion of Lender, the same may be paid, either in whole or in part, to Borrower for such purposes as Lender shall designate.

## ARTICLE VI.

## RESERVE FUNDS

**Section 6.1** **Intentionally Omitted**.

**Section 6.2** **Tax Funds**.

**6.2.1** **Deposits of Tax Funds**. On the Closing Date, Borrower shall deposit with Agent the amount of $112,809.90 and, pursuant to the Cash Management Agreement, there shall be deposited, or Borrower shall deposit if the Cash Management Agreement has been replaced by a springing Cash Management Agreement in accordance with its terms, on each Monthly Payment Date an amount equal to one-twelfth of the Taxes that Lender estimates will be payable during the next ensuing twelve (12) months in order to accumulate sufficient funds to pay all such Taxes at least ten (10) days prior to their respective due dates. Amounts deposited pursuant to this Section 6.2.1 are referred to herein as the "Tax Funds." If at any time Lender reasonably determines that the Tax Funds will not be sufficient to pay the Taxes, Lender shall notify Borrower of such determination and the monthly deposits for Taxes shall be increased by the amount that Lender estimates is sufficient to make up the deficiency at least ten (10) days prior to the respective due dates for the Taxes; provided that if Borrower receives notice of any deficiency after the date that is ten (10) days prior to the date that Taxes are due, Borrower will deposit such amount within three (3) Business Days after its receipt of such notice.

**6.2.2** **Release of Tax Funds**. Lender shall apply the Tax Funds to payments of Taxes. In making any payment relating to Taxes, Lender may do so according to any bill, statement or estimate procured from the appropriate public office (with respect to Taxes) without inquiry into the accuracy of such bill, statement or estimate or into the validity of any tax, assessment, sale, forfeiture, tax lien or title or claim thereof. If the amount of the Tax Funds shall exceed the amounts due for Taxes, Lender shall, in its sole discretion, return any excess to Borrower or credit such excess against future payments to be made to the Tax Funds. Any Tax Funds remaining after the Debt has been paid in full shall be returned to Borrower.

Case 2:17-cv-02036-KM-MAH Document 1-3 Filed 03/28/17 Page 58 of 125 PageID: 86

**Section 6.3 Insurance Funds.**

**6.3.1 Deposits of Insurance Funds.** On the Closing Date, Borrower shall deposit with Agent the amount of $15,748.40 and, pursuant to the Cash Management Agreement, there shall be deposited, or Borrower shall deposit if the Cash Management Agreement has been replaced by a springing Cash Management Agreement in accordance with its terms, on each Monthly Payment Date an amount equal to one-twelfth of the Insurance Premiums that Lender estimates will be payable for the renewal of the coverage afforded by the Policies upon the expiration thereof in order to accumulate sufficient funds to pay all such Insurance Premiums at least thirty (30) days prior to the expiration of the Policies. Amounts deposited pursuant to this Section 6.3.1 are referred to herein as the "Insurance Funds." If at any time Lender reasonably determines that the Insurance Funds will not be sufficient to pay the Insurance Premiums, Lender shall notify Borrower of such determination and the monthly deposits for Insurance Premiums shall be increased by the amount that Lender estimates is sufficient to make up the deficiency at least thirty (30) days prior to expiration of the Policies.

**6.3.2 Release of Insurance Funds.** Lender shall apply the Insurance Funds to payment of Insurance Premiums. In making any payment relating to Insurance Premiums, Lender may do so according to any bill, statement or estimate procured from the insurer or its agent, without inquiry into the accuracy of such bill, statement or estimate. If the amount of the Insurance Funds shall exceed the amounts due for Insurance Premiums, Lender shall, in its sole discretion, return any excess to Borrower or credit such excess against future payments to be made to the Insurance Funds. Any Insurance Funds remaining after the Debt has been paid in full shall be returned to Borrower.

**Section 6.4 Capital Expenditure Funds.**

**6.4.1 Deposits of Capital Expenditure Funds.** Pursuant to the Cash Management Agreement, there shall be deposited, or Borrower shall deposit if the Cash Management Agreement has been replaced by a springing Cash Management Agreement in accordance with its terms, on each Monthly Payment Date an amount equal to $5,262.33 for annual Capital Expenditures approved by Lender, which approval shall not be unreasonably withheld or delayed. Amounts deposited pursuant to this Section 6.4.1 are referred to herein as the "Capital Expenditure Funds." At any time when the balance of the Capital Expenditure Funds held by Lender equals or exceeds $327,135, provided that no Default or Event of Default shall have occurred and be continuing, no further deposits to the Capital Expenditure Funds shall be required; provided, however, that Borrower shall resume monthly deposits to the Capital Expenditure Funds as hereinabove provided at such time, if any, that the balance of the Capital Expenditure Funds is less than $327,135, or upon the occurrence of any Default or Event of Default. Lender may reassess its estimate of the amount necessary for capital expenditures from time to time and, and may require Borrower to increase the monthly deposits required pursuant to this Section 6.4.1 upon thirty (30) days notice to Borrower if Lender determines in its reasonable discretion that an increase is necessary to maintain proper operation of the Property.

Case 2:17-cv-02036-KM-MAH Document 1-3 Filed 03/28/17 Page 59 of 125 PageID: 87

**6.4.2 Release of Capital Expenditure Funds.**

(a) Lender shall direct Agent to disburse Capital Expenditure Funds only for Capital Expenditures.

(b) Lender shall direct Agent to disburse to Borrower the Capital Expenditure Funds upon satisfaction by Borrower of each of the following conditions: (i) Borrower shall submit a request for payment to Lender at least ten (10) days prior to the date on which Borrower requests such payment be made and specifies the Capital Expenditures to be paid, (ii) on the date such request is received by Lender and on the date such payment is to be made, no Event of Default shall exist and remain uncured, (iii) Lender shall have received a certificate from Borrower (A) stating that the items to be funded by the requested disbursement are Capital Expenditures, (B) stating that all Capital Expenditures at the Property to be funded by the requested disbursement have been completed in a good and workmanlike manner and in accordance with all applicable Legal Requirements, such certificate to be accompanied by a copy of any license, permit or other approval required by any Governmental Authority in connection with the Capital Expenditures, (C) identifying each Person that supplied materials or labor in connection with the Capital Expenditures to be funded by the requested disbursement, and (D) stating that each such Person has been paid in full or will be paid in full upon such disbursement, such certificate to be accompanied by lien waivers or other evidence of payment satisfactory to Lender, (iv) at Lender's option, a title search for the Property indicating that the Property is free from all Liens, claims and other encumbrances not previously approved by Lender, and (v) at Lender's option, if the cost of any individual Capital Expenditure exceeds $100,000, Lender shall have received a report satisfactory to Lender in its reasonable discretion from an architect or engineer approved by Lender in respect of such architect or engineer's inspection of the required repairs, and (vi) Lender shall have received such other evidence as Lender shall reasonably request that the Capital Expenditures at the Property to be funded by the requested disbursement have been completed and are paid for or will be paid upon such disbursement to Borrower. Lender shall not be required to disburse Capital Expenditure Funds more frequently than once each calendar month, unless such requested disbursement is in an amount greater than the Minimum Disbursement Amount (or a lesser amount if the total amount of Capital Expenditure Funds is less than the Minimum Disbursement Amount, in which case only one disbursement of the amount remaining in the account shall be made).

(c) Nothing in this Section 6.4.2 shall (i) make Lender responsible for making or completing the Capital Expenditures Work; (ii) require Lender to expend funds in addition to the Capital Expenditure Funds to complete any Capital Expenditures Work; (iii) obligate Lender to proceed with the Capital Expenditures Work; or (iv) obligate Lender to demand from Borrower additional sums to complete any Capital Expenditures Work.

(d) Borrower shall permit Lender and Lender's agents and representatives (including, without limitation, Lender's engineer, architect, or inspector) or third parties to enter onto the Property during normal business hours (subject to the rights of Tenants under their Leases) to inspect the progress of any Capital Expenditures Work and all materials being used in connection therewith and to examine all plans and shop drawings relating to such Capital Expenditures Work. Borrower shall cause all contractors and subcontractors to cooperate with

Lender or Lender's representatives or such other Persons described above in connection with inspections described in this Section 6.4.2(d).

(e) If a disbursement will exceed $100,000, Lender may require an inspection of the Property at Borrower's expense prior to making a disbursement of Capital Expenditure Funds in order to verify completion of the Capital Expenditures Work for which reimbursement is sought. Lender may require that such inspection be conducted by an appropriate independent qualified professional selected by Lender and may require a certificate of completion by an independent qualified professional architect acceptable to Lender prior to the disbursement of Capital Expenditure Funds. Borrower shall pay the expense of the inspection as required hereunder, whether such inspection is conducted by Lender or by an independent qualified professional architect.

(f) In addition to any insurance required under the Loan Documents, Borrower shall provide or cause to be provided workmen's compensation insurance, builder's risk, and public liability insurance and other insurance to the extent required under applicable law in connection with Capital Expenditures Work. All such policies shall be in form and amount reasonably satisfactory to Lender.

**Section 6.5 McCarter Lease Rollover Funds.**

**6.5.1 Deposits of McCarter Lease Rollover Funds**. On the Closing Date, Borrower shall deposit with Agent the amount of $2,168,000 to be held as a reserve with respect to the portion of the Property leased to McCarter & English on the Closing Date (the "McCarter Space") and, pursuant to the Cash Management Agreement, until such time as the balance of such reserve equals $4,000,000, there shall be deposited on each Monthly Payment Date to be added to such reserve an amount equal to the lesser of (x) $122,133.33 or (y) the amount available for such purpose under the provisions of the Cash Management Agreement. Amounts deposited pursuant to this Section 6.5.1 are referred to herein as the "McCarter Lease Rollover Funds." In the event that the balance of the McCarter Lease Rollover Funds has not reached $4,000,000 by February 1, 2008, Borrower shall deposit with Agent by February 5, 2008 such amount as is required to bring such balance to $4,000,000.

**6.5.2 Release of McCarter Lease Rollover Funds**. Lender shall direct Agent to disburse to Borrower the McCarter Lease Rollover Funds, and no further deposits to the McCarter Lease Rollover Funds shall be required, upon satisfaction by Borrower of each of the following conditions: (i) on the date such request is received by Lender and on the date such payment is to be made, no Event of Default shall exist and remain uncured and (ii) Lender shall have received evidence reasonably satisfactory to Lender that McCarter & English has renewed its Lease of the entire McCarter Space, for a term of at least ten (10) years, at an annual rent of not less than $28.00 per square foot assuming a 1998 base year for reimbursements and otherwise on commercially reasonable and customary terms and conditions. Alternatively, in the event that McCarter & English does not renew its Lease on the terms described in the preceding sentence, but a replacement tenant or tenants reasonably acceptable to Lender leases all of the McCarter Space under a Lease or Leases each of which provides a term of at least ten (10) years and an annual rent of not less than $28.00 per square foot assuming a 1998 base year for reimbursements and is otherwise on commercially reasonable and customary terms and

Case 2:17-cv-02036-KM-MAH Document 1-3 Filed 03/28/17 Page 61 of 115 PageID: 89

conditions (each portion of the McCarter Space so leased being hereinafter referred to as a "McCarter Replacement Tenant Space"), Lender shall direct Agent to disburse to Borrower, for tenant improvement costs and leasing commissions that may be incurred with respect to any McCarter Replacement Tenant Space, an amount not to exceed the fraction of the McCarter Lease Rollover Funds equal to the square footage ratio of such McCarter Replacement Tenant Space to the McCarter Space. Required future deposits to the McCarter Lease Rollover Funds shall be reduced in the same ratio. Lender shall direct such disbursement upon satisfaction by Borrower of each of the following conditions with respect to such McCarter Replacement Tenant Space: (i) Borrower shall submit a request for payment to Lender at least ten (10) days prior to the date on which Borrower requests such payment be made and specifies the tenant improvement costs and leasing commissions to be paid, (ii) on the date such request is received by Lender and on the date such payment is to be made, no Event of Default shall exist and remain uncured, (iii) Lender shall have reviewed and approved the Lease in respect of which Borrower is obligated to pay or reimburse certain tenant improvement costs and leasing commissions, (iv) Lender shall have received and approved a budget for tenant improvement costs and a schedule of leasing commissions payments and the requested disbursement will be used to pay all or a portion of such costs and payments, (v) Lender shall have received a certificate from Borrower (A) stating that all tenant improvements at the Property to be funded by the requested disbursement have been completed in good and workmanlike manner and in accordance with all applicable federal, state and local laws, rules and regulations, such certificate to be accompanied by a copy of any license, permit or other approval by any Governmental Authority required in connection with the Capital Expenditures, (B) identifying each Person that supplied materials or labor in connection with the tenant improvements to be funded by the requested disbursement, and (C) stating that each such Person has been paid in full or will be paid in full upon such disbursement, such certificate to be accompanied by lien waivers or other evidence of payment satisfactory to Lender, (vi) at Lender's option, a title search for the Property indicating that the Property is free from all Liens, claims and other encumbrances not previously approved by Lender and (vii) Lender shall have received such other evidence as Lender shall reasonably request that the tenant improvements at the Property to be funded by the requested disbursement have been completed and are paid for or will be paid upon such disbursement to Borrower. Additionally, to the extent that (x) the fraction of McCarter Lease Rollover Funds equal to the square footage ratio of any McCarter Replacement Tenant Space to the McCarter Space exceeds (y) the amount disbursed for tenant improvement costs and leasing commissions in accordance with the preceding two sentences, Lender shall direct Agent to disburse such excess to Borrower upon receipt by Lender of reasonably satisfactory evidence, which may include a tenant estoppel and such other items as Lender may reasonably request, that (i) the tenant of the space in question is in occupancy, conducting business and paying full contractual rent without any right of offset, abatement or credit and (ii) all tenant improvement costs and leasing commissions for which disbursements were previously made have been paid. Lender shall not be required to disburse McCarter Lease Rollover Funds more frequently than once each calendar month, unless such requested disbursement is in an amount greater than the Minimum Disbursement Amount (or a lesser amount if the total amount of McCarter Lease Rollover Funds is less than the Minimum Disbursement Amount, in which case only one disbursement of the amount remaining in the account shall be made).

**6.5.3** **Short-Term Lease of McCarter Space**. In the event that either McCarter & English renews its Lease for a term of at least five (5) years, or a replacement tenant or tenants leases the entire McCarter Space for a term of at least five (5) years, in either case on terms which, but for the duration of the applicable Lease, would entitle Borrower to a disbursement of the McCarter Lease Rollover Funds pursuant to Section 6.5.2, Lender shall direct Agent to disburse to Borrower the McCarter Lease Rollover Funds, and further deposits to the McCarter Lease Rollover Funds shall be temporarily suspended, notwithstanding the failure of the applicable Lease to satisfy the ten-year term requirement of Section 6.5.2; provided that deposits shall thereafter be made to the McCarter Lease Rollover Funds as follows. Pursuant to the Cash Management Agreement, until such time as the balance of the McCarter Lease Rollover Funds equals $4,000,000, there shall be deposited on each Monthly Payment Date, commencing on the commencement date of the renewal term of the Lease to McCarter & English or to a replacement tenant (the "McCarter Short Term Commencement Date"), to be added to the McCarter Lease Rollover Funds, an amount equal to the lesser of (x) $4,000,000 divided by the number of Monthly Payment Dates occurring between the McCarter Short-Term Commencement Date and February 1, 2013, inclusive, (y) or the amount available for such purpose under the provisions of the Cash Management Agreement. In the event that the balance of the McCarter Lease Rollover Funds has not reached $4,000,000 by February 1, 2013, Borrower shall deposit with Agent by February 5, 2013 such amount as is required to bring such balance to $4,000,000.

**Section 6.6** **Prudential Lease Rollover Funds**.

**6.6.1** **Deposits of Prudential Lease Rollover Funds**. Pursuant to the Cash Management Agreement, except as hereinafter provided in this Section 6.6.1, there shall be deposited, or Borrower shall deposit if the Cash Management Agreement has been replaced by a springing Cash Management Agreement in accordance with its terms, with Agent on each Monthly Payment Date, commencing on January 1, 2014, the sum of $175,833.33 to be held as a reserve with respect to the portion of the Property leased to The Prudential Insurance Company of America on the Closing Date (the "Prudential Space") until such time as the balance of such reserve equals $2,110,000. Amounts deposited pursuant to this Section 6.6.1 are referred to herein as the "Prudential Lease Rollover Funds." In the event that the balance of the Prudential Lease Rollover Funds has not reached $2,110,000 by December 1, 2014, Borrower shall deposit with Agent by December 5, 2014 such amount as is required to bring such balance to $2,110,000. The foregoing deposits of Prudential Lease Rollover Funds shall not be required in the event that Borrower furnishes to Lender, before January 1, 2014, an appraisal reasonably satisfactory to Lender by an appraiser acceptable to the Rating Agencies which demonstrates that the outstanding amount of the Loan is less than 65% of the value of the Property.

**6.6.2** **Release of Prudential Lease Rollover Funds**. Lender shall direct Agent to disburse to Borrower the Prudential Lease Rollover Funds, and no further deposits to the Prudential Lease Rollover Funds shall be required, upon satisfaction by Borrower of each of the following conditions: (i) on the date such request is received by Lender and on the date such payment is to be made, no Event of Default shall exist and remain uncured and (ii) Lender shall have received evidence reasonably satisfactory to Lender that The Prudential Insurance Company of America has renewed its Lease of the entire Prudential Space, for a term of at least five (5) years, at an annual rent of not less than $25.00 per square foot and otherwise on

Case 2:17-cv-02036-KM-MAH Document 1-3 Filed 03/28/17 Page 63 of 125 PageID: 91

commercially reasonable and customary terms and conditions. Alternatively, in the event that The Prudential Insurance Company of America does not renew its Lease on the terms described in the preceding sentence, but either (x) a replacement tenant or tenants reasonably acceptable to Lender leases all of the Prudential Space or (y) existing subtenants of the Prudential Space reasonably acceptable to Lender lease all or any portion of the Prudential Space, in either case for a term of at least five (5) years, at an annual rent of not less than $25.00 per square foot and otherwise on commercially reasonable and customary terms and conditions (each portion of the Prudential Space leased as described in either clause (x) or (y) being hereinafter referred to as a "Prudential Replacement Tenant Space"), Lender shall direct Agent to disburse to Borrower, for tenant improvement costs and leasing commissions that may be incurred with respect to any Prudential Replacement Tenant Space, an amount not to exceed the fraction of the Prudential Lease Rollover Funds equal to the square footage ratio of such Prudential Replacement Tenant Space to the Prudential Space. Required future deposits to the Prudential Lease Rollover Funds shall be reduced in the same ratio. Lender shall direct such disbursement upon satisfaction by Borrower of each of the following conditions with respect to such Prudential Replacement Tenant Space: (i) Borrower shall submit a request for payment to Lender at least ten (10) days prior to the date on which Borrower requests such payment be made and specifies the tenant improvement costs and leasing commissions to be paid, (ii) on the date such request is received by Lender and on the date such payment is to be made, no Event of Default shall exist and remain uncured, (iii) Lender shall have reviewed and approved the Lease in respect of which Borrower is obligated to pay or reimburse certain tenant improvement costs and leasing commissions, which Lease shall demise at least 22,000 square feet, (iv) Lender shall have received and approved a budget for tenant improvement costs and a schedule of leasing commissions payments and the requested disbursement will be used to pay all or a portion of such costs and payments, (v) Lender shall have received a certificate from Borrower (A) stating that all tenant improvements at the Property to be funded by the requested disbursement have been completed in good and workmanlike manner and in accordance with all applicable federal, state and local laws, rules and regulations, such certificate to be accompanied by a copy of any license, permit or other approval by any Governmental Authority required in connection with the Capital Expenditures, (B) identifying each Person that supplied materials or labor in connection with the tenant improvements to be funded by the requested disbursement, and (C) stating that each such Person has been paid in full or will be paid in full upon such disbursement, such certificate to be accompanied by lien waivers or other evidence of payment satisfactory to Lender, (vi) at Lender's option, a title search for the Property indicating that the Property is free from all Liens, claims and other encumbrances not previously approved by Lender and (vii) Lender shall have received such other evidence as Lender shall reasonably request that the tenant improvements at the Property to be funded by the requested disbursement have been completed and are paid for or will be paid upon such disbursement to Borrower. Additionally, to the extent that (x) the fraction of Prudential Lease Rollover Funds equal to the square footage ratio of any Prudential Replacement Tenant Space to the Prudential Space exceeds (y) the amount disbursed for tenant improvement costs and leasing commissions in accordance with the preceding two sentences, Lender shall direct Agent to disburse such excess to Borrower upon receipt by Lender of reasonably satisfactory evidence, which may include a tenant estoppel and such other items as Lender may reasonably request, that (i) the tenant of the space in question is in occupancy, conducting business and paying full contractual rent without any right of offset, abatement or credit and (ii) all tenant improvement costs and leasing commissions for which

disbursements were previously made have been paid. Lender shall not be required to disburse Prudential Lease Rollover Funds more frequently than once each calendar month, unless such requested disbursement is in an amount greater than the Minimum Disbursement Amount (or a lesser amount if the total amount of Prudential Lease Rollover Funds is less than the Minimum Disbursement Amount, in which case only one disbursement of the amount remaining in the account shall be made).

**Section 6.7** **Lease Termination Rollover Funds**.

**6.7.1** **Deposits of Rollover Funds**. In the event that Borrower receives a fee, payment or other compensation from any Tenant relating to or in exchange for the termination of such Tenant's Lease (a "Lease Termination Fee") Borrower shall immediately deposit such Lease Termination Fee with Lender, to be utilized for tenant improvements and leasing commissions that may be incurred with respect to the space relating to such Lease Termination Fee (a "Termination Space") and, in the event that there is a Rent Deficiency with respect to the Termination Space from and after the date that the Lease for the Termination Space was terminated, in replacement of Rent. Amounts deposited pursuant to this Section 6.7.1 are referred to herein as the "Lease Termination Rollover Funds".

**6.7.2** **Release of Lease Termination Rollover Funds**.

(a) Lender shall direct Agent to disburse to Borrower the Lease Termination Rollover Funds upon satisfaction by Borrower of each of the following conditions: (i) Borrower shall submit a request for payment to Lender at least ten (10) days prior to the date on which Borrower requests such payment be made and (A) specifies the tenant improvement costs and leasing commissions to be paid for the Termination Space or (B) specifies the amount by which the rent expected to be obtained by Borrower for the Termination Space during the next succeeding calendar month pursuant to the Lease or Leases for such Termination Space (a "Replacement Lease") is less than the amount of monthly rent received from the previous Tenant leasing the Termination Space pursuant to its Lease prior to such termination (the "Rent Deficiency"), (ii) on the date such request is received by Lender and on the date such payment is to be made, no Event of Default shall exist and remain uncured, (iii) Lender shall have reviewed and, to the extent required hereby, approved the Replacement Lease in respect of which Borrower is obligated to pay or reimburse certain tenant improvement costs and leasing commissions, (iv) with respect to any Lease Termination Rollover Funds to be released by Lender for tenant improvements or leasing commissions pursuant to a Replacement Lease, Lender shall have received a budget for tenant improvement costs and a schedule of leasing commission payments and the requested disbursement will be used to pay all or a portion of such costs and payments, (v) with respect to any Lease Termination Rollover Funds to be released by Lender for tenant improvements or leasing commissions pursuant to a Replacement Lease, Lender shall have received a certificate from Borrower (A) stating that all tenant improvements at the Property to be funded by the requested disbursement have been completed in good and workmanlike manner and in accordance with all applicable federal, state and local laws, rules and regulations, such certificate to be accompanied by a copy of any license, permit or other approval by any Governmental Authority required in connection with the tenant improvements to be funded by the requested disbursement, (B) identifying each Person that supplied materials or

labor in connection with the tenant improvements to be funded by the requested disbursement, and (C) stating that each such Person has been paid in full or will be paid in full upon such disbursement, such certificate to be accompanied by lien waivers or other evidence of payment satisfactory to Lender, (vi) with respect to any Lease Termination Rollover Funds to be released by Lender for tenant improvements or leasing commissions pursuant to a Replacement Lease, at Lender's option, a title search for the Property indicating that the Property is free from all Liens, claims and other encumbrances not previously approved by Lender and (vii) with respect to any Lease Termination Rollover Funds to be released by Lender for tenant improvements or leasing commissions pursuant to a Replacement Lease, Lender shall have received such other evidence as Lender shall reasonably request that the tenant improvements at the Property to be funded by the requested disbursement have been completed and are paid for or will be paid upon such disbursement to Borrower. Lender shall not be required to disburse Lease Termination Rollover Funds more frequently than once each calendar month, unless such requested disbursement is in an amount greater than the Minimum Disbursement Amount (or a lesser amount if the total amount of Lease Termination Rollover Funds is less than the Minimum Disbursement Amount, in which case only one disbursement of the amount remaining in the account shall be made). All Rent Deficiency disbursements made by Lender shall be deposited into the Clearing Account as if such sums were received by Borrower as Rent during the calendar month after such request is made by Borrower.

(b) Notwithstanding the foregoing, upon receipt by Lender of evidence that, with respect to any new Replacement Lease with a term of at least five (5) years, all tenant improvements required to be completed by Borrower pursuant to the Replacement Lease, if any, have been completed and all leasing commissions required to be paid by Borrower with respect to the Replacement Lease, if any, have been paid or will be paid in full upon such disbursement, and provided no Event of Default then exists, Lender shall direct Agent to disburse to Borrower the Lease Termination Rollover Funds on deposit with respect to such Termination Space provided that the rent to be obtained by Borrower for such Termination Space during the next succeeding sixty (60) calendar months pursuant to the respective Replacement Lease is equal to or greater than the sum of the monthly rent last received from the previous Tenant in such Termination Space pursuant to its Lease multiplied by sixty (60).

**Section 6.8 <u>Provisions Regarding Reserve Funds</u>.**

**6.8.1 <u>Event of Default</u>.** Upon the occurrence of an Event of Default, Lender, at its option, may withdraw the Reserve Funds and apply the Reserve Funds to the items for which the Reserve Funds were established or to payment of the Debt in such order, proportion and priority as Lender may determine in its sole discretion; provided that Lender shall apply available Tax Funds and Insurance Funds to the payment of Taxes and Insurance Premiums, respectively. Lender's right to withdraw and apply the Reserve Funds shall be in addition to all other rights and remedies provided to Lender under the Loan Documents.

**6.8.2 <u>Interest on Reserve Funds</u>.** Borrower shall receive interest on the Reserve Funds as and to the extent provided in the Cash Management Agreement. In the event that the Cash Management Agreement is replaced by a springing Cash Management Agreement in accordance with its terms, then, except during a Cash Management Period, the Capital

Expenditure Funds, the McCarter Lease Rollover Funds and the Prudential Lease Rollover Funds shall bear interest for the benefit of Borrower at the rate of interest which is the lower of (i) the amount paid from time to time by Lender on commercial money market accounts; or (ii) the return on such investments to be made with the funds as are permitted by the Servicer and the Rating Agencies, and all such interest shall be added to and become part of the applicable Reserve Fund. Borrower shall report on its federal, state and local income tax returns all interest or income accrued on the Reserve Funds.

**Section 6.9 Security Interest in Reserve Funds.**

**6.9.1 Grant of Security Interest.** Borrower shall be the owner of the Reserve Funds. Borrower hereby pledges, assigns and grants a security interest to Lender, as security for payment of the Debt and the performance of all other terms, conditions and covenants of the Loan Documents on Borrower's part to be paid and performed, in all of Borrower's right, title and interest in and to the Reserve Funds. The Reserve Funds shall be under the sole dominion and control of Lender.

**6.9.2 Prohibition Against Further Encumbrance.** Borrower shall not, without the prior consent of Lender, further pledge, assign or grant any security interest in the Reserve Funds or permit any lien or encumbrance to attach thereto, or any levy to be made thereon, or any UCC-1 Financing Statements, except those naming Lender as the secured party, to be filed with respect thereto.

**Section 6.10 Letters of Credit.**

**6.10.1 Delivery of Letters of Credit.**

(a) In lieu of making the payments to any of the Capital Expenditure Funds, the McCarter Lease Rollover Funds or the Prudential Lease Rollover Funds, Borrower may deliver to Lender a Letter of Credit in accordance with the provisions of this Section 6.10. Additionally, Borrower may deliver to Lender a Letter of Credit in accordance with the provisions of this Section 6.10 in lieu of deposits previously made to such Reserve Funds. The aggregate amount of any Letter of Credit and cash on deposit with respect to the Capital Expenditure Funds, McCarter Lease Rollover Funds and Prudential Lease Rollover Funds shall at all times be at least equal to the aggregate amount which Borrower is required to have on deposit in such Reserve Fund pursuant to this Agreement. At no time shall the aggregate amount of all Letters of Credit, plus the aggregate rentals payable under all Leases to Affiliates of any entity comprising Borrower, exceed ten percent (10%) of the outstanding principal amount of the Loan.

(b) Borrower shall give Lender no less than thirty (30) days notice of Borrower's election to deliver a Letter of Credit and Borrower shall pay to Lender all of Lender's reasonable out-of-pocket costs and expenses in connection therewith. Borrower shall not be entitled to draw from any such Letter of Credit. Upon ten (10) days notice to Lender, Borrower may replace a Letter of Credit with a cash deposit to the applicable Reserve Fund. Prior to the return of a Letter of Credit, Borrower shall deposit an amount equal to the amount

that would have accumulated in the applicable Reserve Fund and not been disbursed in accordance with this Agreement if such Letter of Credit had not been delivered.

**Section 6.11 Provisions Regarding Letters of Credit.**

**6.11.1 Security for Debt.** Each Letter of Credit delivered under this Agreement shall be additional security for the payment of the Debt. Upon the occurrence of an Event of Default, Lender shall have the right, at its option, to draw on any Letter of Credit and to apply all or any part thereof to the payment of the items for which such Letter of Credit was established or to apply each such Letter of Credit to payment of the Debt in such order, proportion or priority as Lender may determine. Any such application to the Debt shall be subject to the Yield Maintenance Premium. On the Maturity Date, any such Letter of Credit may be applied to reduce the Debt.

**6.11.2 Additional Rights of Lender.** In addition to any other right Lender may have to draw upon a Letter of Credit pursuant to the terms and conditions of this Agreement, Lender shall have the additional rights to draw in full any Letter of Credit: (a) with respect to any evergreen Letter of Credit, if Lender has received a notice from the issuing bank that the Letter of Credit will not be renewed and a substitute Letter of Credit is not provided at least thirty (30) days prior to the date on which the outstanding Letter of Credit is scheduled to expire; (b) with respect to any Letter of Credit with a stated expiration date, if Lender has not received a notice from the issuing bank that it has renewed the Letter of Credit at least thirty (30) days prior to the date on which such Letter of Credit is scheduled to expire and a substitute Letter of Credit is not provided at least thirty (30) days prior to the date on which the outstanding Letter of Credit is scheduled to expire; (c) upon receipt of notice from the issuing bank that the Letter of Credit will be terminated (except if the termination of such Letter of Credit is permitted pursuant to the terms and conditions of this Agreement or a substitute Letter of Credit is provided); or (d) if Lender has received notice that the bank issuing the Letter of Credit shall cease to be an Eligible Institution. Notwithstanding anything to the contrary contained in the above, Lender is not obligated to draw any Letter of Credit upon the happening of an event specified in (a), (b), (c) or (d) above and shall not be liable for any losses sustained by Borrower due to the insolvency of the bank issuing the Letter of Credit if Lender has not drawn the Letter of Credit.

**Section 6.12 Master Lease Reserve Funds.**

On the date hereof, Borrower shall deposit with Lender the sum of $615,169 as additional security for the Loan. The provisions of this Agreement governing Reserve Funds, including the pledge thereof, shall apply to such monies. Such funds shall bear interest for the benefit of Borrower. At such time, if any, as Lender shall have received satisfactory evidence that United Healthcare has executed a Lease, substantially in the form of the draft lease currently being negotiated by Borrower and United Healthcare, for the portion of the Property now leased to G4 Operating Company, LLC, with a term of at least five (5) years and a rent of at least $27.25 per square foot, provided that no Event of Default shall have occurred and be continuing, Lender shall return $360,598 of such deposit to Borrower. At such time as Lender shall have received a tenant estoppel from United Healthcare confirming that United Healthcare is in occupancy, open for business and paying full contractual rent under the aforesaid Lease, provided that no Event of Default shall have occurred and be continuing, Lender shall return the balance of the aforesaid

Case 2:17-cv-02036-KM-MAH Document 1-3 Filed 03/28/17 Page 68 of 115 PageID: 96

deposit to Borrower. Additionally, in the event that instead of executing a Lease to United Healthcare, Borrower enters into one or more Leases for the portion of the Property now leased to G4 Operating Company, LLC, in each case with a Tenant reasonably acceptable to Lender, for a term of at least five (5) years and with a rent of at least $27.25 per square foot, then, at such time as Lender shall have received a tenant estoppel from any such Tenant confirming that said Tenant is in occupancy, open for business and paying full contractual rent under the aforesaid Lease, provided that no Event of Default shall have occurred and be continuing, Lender shall return to Borrower a portion of the deposit made pursuant to this Section 6.12 proportional to the square footage leased to said Tenant.

## ARTICLE VII.

## PROPERTY MANAGEMENT

**Section 7.1 The Management Agreement.**

Borrower shall cause Manager to manage the Property in accordance with the Management Agreement. Borrower shall (i) diligently perform and observe all of the terms, covenants and conditions of the Management Agreement on the part of Borrower to be performed and observed, (ii) promptly notify Lender of any notice to Borrower of any default by Borrower in the performance or observance of any of the terms, covenants or conditions of the Management Agreement on the part of Borrower to be performed and observed, and (iii) promptly deliver to Lender a copy of each financial statement, business plan, capital expenditures plan, report and estimate received by it under the Management Agreement. If Borrower shall default beyond applicable notice and cure periods in the performance or observance of any material term, covenant or condition of the Management Agreement on the part of Borrower to be performed or observed, then, without limiting Lender's other rights or remedies under this Agreement or the other Loan Documents, and without waiving or releasing Borrower from any of its obligations hereunder or under the Management Agreement, Lender shall have the right, but shall be under no obligation, to pay any sums and to perform any act as may be appropriate to cause all the material terms, covenants and conditions of the Management Agreement on the part of Borrower to be performed or observed.

**Section 7.2 Prohibition Against Termination or Modification.**

Borrower shall not surrender, terminate, cancel, modify, renew or extend the Management Agreement, or enter into any other agreement relating to the management or operation of the Property with Manager or any other Person, or consent to the assignment by the Manager of its interest under the Management Agreement, in each case without the express consent of Lender, which consent shall not be unreasonably withheld; provided, however, with respect to a new manager such consent may be conditioned upon Borrower delivering a Rating Agency Confirmation as to such new manager and management agreement and, if such new manager is an Affiliate of Borrower, upon delivery of a non-consolidation opinion acceptable to the Rating Agencies. If at any time Lender consents to the appointment of a new manager, such new manager and Borrower shall, as a condition of Lender's consent, execute a subordination of management agreement in the form then used by Lender. Lender consents to the replacement of Manager by either Heritage Management Company, LLC, or any of its Affiliates or Ivy Realty

Services, LLC, or any of its Affiliates, subject to receipt of a subordination of management agreement in the form then used by Lender.

**Section 7.3 Replacement of Manager.**

Lender shall have the right to require Borrower to replace the Manager with a Person, which is not an Affiliate of Borrower, chosen by Borrower and approved by Lender upon the occurrence of any one or more of the following events: (i) at any time following the occurrence of an Event of Default or (ii) if Manager shall be in default under the Management Agreement beyond any applicable notice and cure period or if at any time the Manager has engaged in gross negligence, fraud or willful misconduct.

## ARTICLE VIII.

## PERMITTED TRANSFERS

**Section 8.1 Restrictions on Transfer.**

For purposes of this Article VIII, references to "Borrower" shall be construed as references to each tenant-in-common comprising Borrower. Except as otherwise provided herein, Borrower shall not make a transfer of its interest in the Property to any other party without Lender's consent, which may be withheld in Lender's sole discretion, and the payment to Lender of an assumption fee equal to one percent (1%) of the outstanding principal balance of the Loan ("Assumption Fees") as well as Lender's reasonable out-of-pocket costs associated with the assumption. For purposes of this Agreement and the Mortgage, a transfer of an interest in the Property shall include, without limitation: (i) an installment sales agreement wherein Borrower agrees to sell the Property or any interest therein or any part thereof for a price to be paid in installments; (ii) an agreement by Borrower leasing all or a substantial part of the Property for other than actual occupancy by a space tenant thereunder or a sale, assignment or other transfer of, or the grant of a mortgage in, Borrower's right, title and interest in and to any Leases or any Rents (other than the Loan Documents); or (iii) a sale, encumbrance, pledge, hypothecation or transfer of any direct and/or indirect ownership interests (including beneficial interests) in Borrower, except in connection with the LaSalle Mezzanine Financing.

**Section 8.2 Permitted Transfers.**

**8.2.1 Certain Transfers.** Provided that no Event of Default shall have occurred and be continuing, the following shall not be deemed to be a transfer for the purpose of this Section: (a) transfers of interests in Borrower for estate planning purposes to immediate family members (which shall be limited to a spouse, parent, sibling, child and grandchild) of the transferor or to trusts or entities created for the benefit of such immediate family members provided that (i) if the transferor is a Guarantor, such Guarantor still controls such transferred interest and such Guarantor shall not be released from any guaranty or indemnity agreement by virtue of such permitted transfer, (ii) Borrower shall provide Lender with thirty (30) days' prior written notice of any such permitted transfer, (iii) Borrower shall reimburse Lender for all reasonable out-of-pocket costs and expenses, including reasonable attorney fees incurred by Lender in connection with such permitted transfer, (iv) there has been no change in control or management rights of

Borrower as a result of such transfer, including but not limited to any sale, encumbrance, pledge, hypothecation, or transfer of any general partner or managing member interest in Borrower, (v) such transfer has no effect on the continuing status of Borrower as a validly existing entity in good standing or on Borrower's compliance with Section 3.1.24, and (vi) Borrower shall furnish Lender with copies of any documentation executed in connection with such permitted transfer promptly after execution thereof; (b) transfers of direct and/or indirect interests in Borrower by operation of law or upon death by devise or descent, provided that the condition set forth in clause (a)(v) above is satisfied; (c) transfers of direct and/or indirect interests in Borrower to a Guarantor; (d) a sale, encumbrance, pledge, hypothecation, or transfer of (i) less than forty-nine percent (49%) in the aggregate (which may be pursuant to one or more transactions during the term of the Loan) of the direct and/or indirect ownership interests (including beneficial interests) in Borrower; provided that the conditions set forth in clauses (a)(ii) through (a)(vi) above are satisfied as to each such transfer; (e) transfers to Affiliates of Heritage Management Company, LLC or Ivy Realty Fund I, L.P., provided that (i) the transferee is not the subject of a bankruptcy or similar insolvency proceeding or a criminal conviction, and is not in material default under any loan, (ii) the transferee is not a Prohibited Person and the investment by such transferee does not result in a violation of the Prescribed Laws, and (iii) Lender receives reasonably satisfactory evidence that there has been no material adverse financial change in the condition of whichever of Heritage Management Company, LLC or Ivy Realty Fund I, L.P. is an Affiliate of the transferee; (f) transfers of direct or indirect ownership interests in Ivy Realty Fund I, L.P., provided that (i) Anthony DiTommaso, Jr., and/or Russell Warren, Jr., collectively continue to control Ivy Realty Fund I, L.P., (ii) the transferee is not be the subject of a bankruptcy or similar insolvency proceeding or a criminal conviction, and is not in material default under any loan, and (iii) the transferee is not a Prohibited Person and the investment by such transferee does not result in a violation of the Prescribed Laws; and (g) a transfer of the entire Property to the holder of any mezzanine loan permitted hereunder.

**8.2.2 Mezzanine Financing**. Lender consents to the existence of the LaSalle Mezzanine Financing. Additionally, notwithstanding the provisions of Section 8.1, Lender shall not unreasonably withhold its consent to subsequent mezzanine financing relating to the Property provided that the following conditions are satisfied: (i) the LaSalle Mezzanine Financing shall have been fully paid and satisfied; (ii) no Event of Default shall have occurred; (iii) no indebtedness other than the Loan shall encumber the Property; (iv) Borrower makes a written request to Lender for permission to obtain such mezzanine debt at least forty-five (45) days prior to any anticipated closing date and the anticipated closing date is at least one (1) year prior to the Maturity Date; (v) Borrower shall not have any liability or obligations under the loan documents relating to the mezzanine debt; (vi) prior to the closing of such financing, Lender has the opportunity to review and approve (such approval not to be unreasonably withheld, conditioned or delayed) the mezzanine debt and to review and approve (such approval not to be unreasonably withheld, conditioned or delayed) the final loan documents relating to the mezzanine debt and such loan documents shall provide that all payments due under the mezzanine debt must be fully subordinate to payment due under this Agreement and the other Loan Documents and that the mezzanine debt be paid out of excess cash flow payments to the owners of Borrower only after periodic payments of principal and interest and all other payments on the Loan have been made as required under the Loan Documents and further providing that the mezzanine debt lender cannot file an involuntary bankruptcy with respect to its loan while the Loan is outstanding;

(vii) prior to the closing of such financing, a customary intercreditor agreement approved by the Rating Agencies and Lender shall be entered into by the mezzanine debt lender and Lender acknowledging, among other items, the subordination of the mezzanine debt; (viii) Lender has determined that the mezzanine debt shall not result in a lien against the Property and that the mezzanine debt shall be secured solely by pledges of interests in Borrower; (ix) no memorandum or other evidence of the mezzanine debt or said pledges shall be filed in the real estate records relating to any Property; (x) the minimum debt service coverage ratio for the Loan and the mezzanine debt on a combined basis, based upon the amounts of such loans outstanding as of the date of closing of the mezzanine financing, upon the interest rates applicable to such loans and upon a thirty-year amortization schedule for each loan, shall not be less than 0.94 to 1; and the minimum debt service coverage ratio for the Loan and the mezzanine debt on a combined basis, based upon the amounts of such loans outstanding as of the date of closing of the mezzanine financing and upon an annual loan constant of 10.09%, shall not be less 0.70 to 1; (xi) the aggregate sum of the Loan and the mezzanine debt cannot at the time of the closing of the mezzanine debt exceed an amount equal to ninety percent (90%) of the fair market value of the Property based upon a then current appraisal acceptable to LaSalle and obtained at Borrower's expense as measured against the original unamortized principal amount of the Loan and the proposed outstanding amount of the mezzanine financing; (xii) if a Securitization has occurred, Borrower delivers to Lender an opinion of counsel reasonably acceptable to Lender and the Rating Agencies concluding that the mezzanine debt transaction to be engaged in (a) will not constitute a "prohibited transaction," within the meaning of Section 860F(a)(2) of the Code with respect to the Note and (b) will not cause Lender to fail to qualify as a real estate mortgage investment conduit within the meaning of Code Section 860D; (xiii) Borrower delivers at the request of Lender a Rating Agency Confirmation; (xiv) the maturity date for the mezzanine debt occurs on or after the Maturity Date; (xv) Lender shall be provided with notice of and an opportunity to cure any default under the mezzanine debt, but Lender shall have no obligation to cure any such default; (xvi) Borrower delivers to Lender such opinions of counsel as Lender shall reasonably require and pay all costs and expenses, including reasonably attorneys fees, incurred by Lender in confirming that the foregoing conditions are satisfied and processing Borrower's request for mezzanine financing approval. All financial ratios required to be calculated pursuant to this Section 8.2.2 shall be calculated by Lender or the Servicer in its reasonable discretion.

## ARTICLE IX.

## SALE AND SECURITIZATION OF MORTGAGE

**Section 9.1 Sale of Mortgage and Securitization.**

(a) Lender shall have the right (i) to sell or otherwise transfer the Loan or any portion thereof as a whole loan, (ii) to sell participation interests in the Loan or (iii) to securitize the Loan or any portion thereof in a single asset securitization or a pooled loan securitization. (Each transaction referred to in clauses (i), (ii) and (iii) shall hereinafter be referred to collectively as a "Secondary Market Transaction" and each transaction referred to in clause (iii) shall hereinafter be referred to as a "Securitization." Any certificates, notes or other securities issued in connection with a Securitization are hereinafter referred to as "Securities.")

Case 2:17-cv-02036-KM-MAH Document 1-3 Filed 03/28/17 Page 72 of 115 PageID: 100

(b) If requested by Lender, Borrower shall assist Lender in satisfying the market standards to which Lender customarily adheres or which may be reasonably required in the marketplace or by the Rating Agencies in connection with any Secondary Market Transactions, including, without limitation, to:

(i) (A) provide updated financial and other information with respect to the Property, the business operated at the Property, Borrower and the Manager, (B) provide updated budgets relating to the Property and (C) provide updated appraisals, market studies, environmental reviews (Phase I's and, if appropriate, Phase II's), property condition reports and other due diligence investigations of the Property (the "Updated Information"), together, if customary, with appropriate verification of the Updated Information through letters of auditors or opinions of counsel reasonably acceptable to Lender and acceptable to the Rating Agencies;

(ii) provide opinions of counsel, which may be relied upon by Lender, the Rating Agencies and their respective counsel, agents and representatives, as to non-consolidation, fraudulent conveyance, and true sale or any other opinion customary in Secondary Market Transactions or required by the Rating Agencies with respect to the Property and Borrower and Affiliates, which counsel and opinions shall be reasonably satisfactory to Lender and satisfactory to the Rating Agencies;

(iii) provide updated, as of the closing date of the Secondary Market Transaction, representations and warranties made in the Loan Documents and such additional representations and warranties as the Rating Agencies may require; and

(iv) execute amendments to the Loan Documents and Borrower's organizational documents reasonably requested by Lender; provided, however, that Borrower shall not be required to modify or amend any Loan Document if such modification or amendment would (A) change the interest rate, the stated maturity or the amortization of principal as set forth herein or in the Note, or (B) modify or amend any other material economic term of the Loan.

(c) If, at the time one or more Disclosure Documents are being prepared for a Securitization as to which Regulation AB of the Securities Act is applicable and Lender expects that Borrower alone or Borrower and one or more Affiliates of Borrower collectively, or the Property alone or the Property and related properties (within the meaning of Regulation AB) collectively, will be a Significant Obligor, Borrower shall furnish to Lender upon request (i) the selected financial data or, if applicable, net operating income, required under Item 1112(b)(1) of Regulation AB, if Lender expects that the principal amount of the Loan together with any related loans (within the meaning of Regulation AB) as of the cut-off date for such Securitization may, or if the principal amount of the Loan together with any related loans (within the meaning of Regulation AB) as of the cut-off date for such Securitization does, equal or exceed ten percent (10%) (but less than twenty percent (20%)) of the aggregate principal amount of all mortgage loans included or expected to be included, as applicable, in the Securitization or (ii) the financial statements required under Item 1112(b)(2) of Regulation AB, if Lender expects that the principal amount of the Loan together with any related loans (within the meaning of Regulation AB) as of the cut-off date for such Securitization may, or if the principal amount of the Loan together with any related loans (within the meaning of Regulation AB) as of the cut-of date for such

Securitization does, equal or exceed twenty percent (20%) of the aggregate principal amount of all mortgage loans included or expected to be included, as applicable, in the Securitization. Such financial data or financial statement shall be furnished to Lender (A) within ten (10) Business Days after notice from Lender in connection with the preparation of Disclosure Documents for the Securitization, (B) not later than thirty (30) days after the end of each fiscal quarter of Borrower and (C) not later than seventy-five (75) days after the end of each fiscal year of Borrower; provided, however, that Borrower shall not be obligated to furnish financial data or financial statements pursuant to clauses (B) or (C) of this sentence with respect to any period for which a filing pursuant to the Exchange Act in connection with or relating to the Securitization (an "Exchange Act Filing") is not required. If required by Lender, Borrower shall furnish to Lender, to the extent available to Borrower by the exercise of commercially reasonable efforts, financial data and/or financial statements for any tenant of the Property and any related properties if, in connection with a Securitization, Lender expects there to be, with respect to such tenant or group of affiliated tenants, a concentration within all of the mortgage loans included or expected to be included, as applicable, in the Securitization such that such tenant or group of affiliated tenants would constitute a Significant Obligor.

(d) All financial data and financial statements provided by Borrower pursuant to Section 9.1(c) shall be prepared in accordance with GAAP, and shall meet the requirements of Regulation AB and other applicable Legal Requirements. All financial statements relating to a Fiscal Year shall be audited by the independent accountants in accordance with generally accepted auditing standards, Regulation AB, and all other applicable Legal Requirements shall be accompanied by the manually executed report of the independent accountants thereon, which report shall meet the requirements of Regulation AB and all other applicable Legal Requirements, and shall be further accompanied by a manually executed written consent of the independent accountants, in form and substance reasonably acceptable to Lender, to the inclusion of such financial statements in any Disclosure Document and any Exchange Act Filing and to the use of the name of such independent accountants and the reference to such independent accountants as "experts" in any Disclosure Document and Exchange Act Filing, all of which shall be provided at the same time as the related financial statements are required to be provided. All other financial data and financial statements shall be certified by the chief financial officer of Borrower, which certification shall state that such financial statements meet the requirements of the first sentence of this paragraph.

(e) In the event Lender determines, in connection with a Securitization, that the financial data and financial statements required in order to comply with Regulation AB or any amendment, modification or replacement thereto or Legal Requirements are other than as provided herein, then notwithstanding the provisions of this Section, Lender may request, and Borrower shall promptly provide, such other financial statements as may be necessary for such compliance.

(f) If requested by Lender, Borrower shall provide Lender, promptly upon request, with any other or additional financial statements, or financial, statistical or operating information, as shall be required pursuant to Regulation AB or other Legal Requirements in connection with any Disclosure Document or any Exchange Act Filing or as shall otherwise be reasonably requested by Lender to meet disclosure, rating agency or marketing requirements.

**Section 9.2 Securitization Indemnification.**

(a) Borrower understands that information provided to Lender by Borrower and its agents, counsel and representatives may be included in disclosure documents in connection with the Securitization, including, without limitation, an offering circular, a prospectus, prospectus supplement, private placement memorandum or other offering document (each, an "Disclosure Document") and may also be included in filings with the Securities and Exchange Commission pursuant to the Securities Act of 1933, as amended (the "Securities Act"), or the Securities and Exchange Act of 1934, as amended (the "Exchange Act"), and may be made available to investors or prospective investors in the Securities, the Rating Agencies, and service providers relating to the Securitization.

(b) Borrower shall provide in connection with each of (i) a preliminary and a final private placement memorandum or (ii) a preliminary and final prospectus or prospectus supplement, as applicable, an agreement (A) certifying that Borrower has examined such Disclosure Documents specified by Lender and that each such Disclosure Document, as it relates to Borrower, Borrower Affiliates, the Property, Manager and all other aspects of the Loan, does not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, (B) indemnifying Lender (and for purposes of this Section 9.2, Lender hereunder shall include its officers and directors), the Affiliate of LaSalle Bank National Association ("LaSalle") that has filed the registration statement relating to the Securitization (the "Registration Statement"), each of its directors, each of its officers who have signed the Registration Statement and each Person that controls the Affiliate within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act (collectively, the "LaSalle Group"), and LaSalle, and any other placement agent or underwriter with respect to the Securitization, each of their respective directors and each Person who controls LaSalle or any other placement agent or underwriter within the meaning of Section 15 of the Securities Act and Section 20 of the Exchange Act (collectively, the "Underwriter Group") for any losses, claims, damages or liabilities (collectively, the "Liabilities") to which Lender, the LaSalle Group or the Underwriter Group may become subject insofar as the Liabilities arise out of or are based upon any untrue statement or alleged untrue statement of any material fact contained in such sections or arise out of or are based upon the omission or alleged omission to state therein a material fact required to be stated in such sections or necessary in order to make the statements in such sections, in light of the circumstances under which they were made, not misleading and (C) agreeing to reimburse Lender, the LaSalle Group and/or the Underwriter Group for any legal or other expenses reasonably incurred by Lender, the LaSalle Group and the Underwriter Group in connection with investigating or defending the Liabilities; provided, however, that Borrower will be liable in any such case under clauses (B) or (C) above only to the extent that any such loss, claim, damage or liability arises out of or is based upon any such untrue statement or omission made therein in reliance upon and in conformity with information furnished to Lender by or on behalf of Borrower in connection with the preparation of the Disclosure Document or in connection with the underwriting or closing of the Loan, including, without limitation, financial statements of Borrower and operating statements and rent rolls with respect to the Property. This indemnity agreement will be in addition to any liability which Borrower may otherwise have.

Case 2:17-cv-02036-KM-MAH Document 1-3 Filed 03/28/17 Page 75 of 115 PageID: 103

(c) In connection with Exchange Act Filings, Borrower shall (i) indemnify Lender, the LaSalle Group and the Underwriter Group for Liabilities to which Lender, the LaSalle Group or the Underwriter Group may become subject insofar as the Liabilities arise out of or are based upon the omission or alleged omission to state in the Disclosure Document a material fact required to be stated in the Disclosure Document in order to make the statements in the Disclosure Document, in light of the circumstances under which they were made, not misleading and (ii) reimburse Lender, the LaSalle Group or the Underwriter Group for any legal or other expenses reasonably incurred by Lender, the LaSalle Group or the Underwriter Group in connection with defending or investigating the Liabilities; provided, however, that Borrower will be liable under this subsection (c) only to the extent that any such loss, claim, damage or liability arises out of or is based upon any omission therefrom in reliance upon and in conformity with information furnished to Lender by or on behalf of Borrower in connection with the preparation of the Disclosure Document or in connection with the underwriting or closing of the Loan, including, without limitation, financial statements of Borrower and operating statements and rent rolls with respect to the Property.

(d) Promptly after receipt by an indemnified party under this Section 9.2 of notice of the commencement of any action, such indemnified party will, if a claim in respect thereof is to be made against the indemnifying party under this Section 9.2, notify the indemnifying party in writing of the commencement thereof, but the omission to so notify the indemnifying party will not relieve the indemnifying party from any liability which the indemnifying party may have to any indemnified party hereunder except to the extent that failure to notify causes prejudice to the indemnifying party. In the event that any action is brought against any indemnified party, and it notifies the indemnifying party of the commencement thereof, the indemnifying party will be entitled, jointly with any other indemnifying party, to participate therein and, to the extent that it (or they) may elect by written notice delivered to the indemnified party promptly after receiving the aforesaid notice from such indemnified party, to assume the defense thereof with counsel satisfactory to such indemnified party. After notice from the indemnifying party to such indemnified party under this Section 9.2, such indemnified party shall pay for any legal or other expenses subsequently incurred by such indemnified party in connection with the defense thereof other than reasonable costs of investigation; provided, however, if the defendants in any such action include both the indemnified party and the indemnifying party and the indemnified party shall have reasonably concluded that there are any legal defenses available to it and/or other indemnified parties that are different from or additional to those available to the indemnifying party, the indemnified party or parties shall have the right to select separate counsel to assert such legal defenses and to otherwise participate in the defense of such action on behalf of such indemnified party at the cost of the indemnifying party. The indemnifying party shall not be liable for the expenses of more than one separate counsel unless an indemnified party shall have reasonably concluded that there may be legal defenses available to it that are different from or additional to those available to another indemnified party.

(e) In order to provide for just and equitable contribution in circumstances in which the indemnity agreement provided for in Section 9.2(b) or (c) is for any reason held to be unenforceable as to an indemnified party in respect of any losses, claims, damages or liabilities (or action in respect thereof) referred to therein which would otherwise be indemnifiable under Section 9.2(b) or (c), the indemnifying party shall contribute to the amount paid or payable by

Case 2:17-cv-02036-KM-MAH Document 1-3 Filed 03/28/17 Page 76 of 113 PageID: 104

the indemnified party as a result of such losses, claims, damages or liabilities (or action in respect thereof); provided, however, that no Person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any Person who was not guilty of such fraudulent misrepresentation. In determining the amount of contribution to which the respective parties are entitled, the following factors shall be considered: (i) LaSalle's and Borrower's relative knowledge and access to information concerning the matter with respect to which the claim was asserted; (ii) the opportunity to correct and prevent any statement or omission; and (iii) any other equitable considerations appropriate in the circumstances. Lender and Borrower hereby agree that it would not be equitable if the amount of such contribution were determined by pro rata or per capita allocation.

(f) The liabilities and obligations of both Borrower and Lender under this Section 9.2 shall survive the termination of this Agreement and the satisfaction and discharge of the Debt.

## ARTICLE X.

## DEFAULTS

**Section 10.1 Event of Default.**

(a) Each of the following events shall constitute an event of default hereunder (an "Event of Default"):

(i) if (A) any monthly installment of principal and/or interest due under the Note is not paid within five (5) days of the date when due or the payment due on the Maturity Date is not paid when due or (B) any other portion of the Debt is not paid when due and such non-payment continues for five (5) days following notice to Borrower that the same is due and payable;

(ii) if any of the Taxes or Other Charges are not paid when due, except as provided in Section 4.1.2;

(iii) if the Policies are not kept in full force and effect;

(iv) if Borrower breaches or permits or suffers a breach of Article VIII hereof;

(v) if any representation or warranty made by Borrower herein or in any other Loan Document, or in any report, certificate, financial statement or other instrument, agreement or document furnished to Lender shall have been false or misleading in any material respect as of the date the representation or warranty was made;

(vi) if Borrower, any SPC Party or any Guarantor shall make an assignment for the benefit of creditors;

(vii) if a receiver, liquidator or trustee shall be appointed for Borrower, any SPC Party or any Guarantor or if Borrower, any SPC Party or any Guarantor shall be adjudicated a bankrupt or insolvent, or if any petition for bankruptcy, reorganization or arrangement pursuant to federal bankruptcy law, or any similar federal or state law, shall be filed by or against, consented to, or acquiesced in by, Borrower, any SPC Party or any Guarantor, or if any proceeding for the dissolution or liquidation of Borrower, any SPC Party or any Guarantor shall be instituted; provided, however, if such appointment, adjudication, petition or proceeding was involuntary and not consented to by Borrower, any SPC Party or any Guarantor, upon the same not being discharged, stayed or dismissed within thirty (30) days;

(viii) if Borrower attempts to assign its rights under this Agreement or any of the other Loan Documents or any interest herein or therein in contravention of the Loan Documents;

(ix) if any of the assumptions contained in the Insolvency Opinion, or in any other non-consolidation opinion delivered to Lender in connection with the Loan, or in any other non-consolidation opinion delivered subsequent to the closing of the Loan, is or shall become untrue in any material respect;

(x) if Borrower breaches any representation, warranty or covenant contained in Section 3.1.24 hereof;

(xi) if Borrower fails to comply with the covenants as to Prescribed Laws set forth in Section 4.1.1;

(xii) if Borrower breaches any of the negative covenants contained in Section 4.2.12;

(xiii) if any of the tenants-in-common comprising Borrower shall be in default beyond any applicable notice or cure period under the TIC Agreement;

(xiv) if any of the tenants-in-common comprising Borrower shall bring a partition action or other action of a similar nature with respect to the Property;

(xv) if any Guarantor breaches in any material respect any covenant, warranty or representation contained in the Guaranty;

(xvi) if Borrower shall continue to be in Default under any of the other terms, covenants or conditions of this Agreement not specified in subsections (i) to (xiv) above, for ten (10) days after notice to Borrower from Lender, in the case of any Default which can be cured by the payment of a sum of money, or for thirty (30) days after notice from Lender in the case of any other Default; provided, however, that if such non-monetary Default is susceptible of cure but cannot reasonably be cured within such 30 day period and provided further that Borrower shall have commenced to cure such Default within such 30 day period and thereafter diligently and expeditiously proceeds to cure the same, such 30 day period shall be extended for such time as is reasonably necessary for Borrower in the exercise of due diligence to cure such Default, such additional period not to exceed sixty (60) days; or

(xvii) if there shall be default under any of the other Loan Documents beyond any applicable cure periods contained in such Loan Documents, whether as to Borrower or the Property, or if any other such event shall occur or condition shall exist, if the effect of such event or condition is to accelerate the maturity of any portion of the Debt or to permit Lender to accelerate the maturity of all or any portion of the Debt.

(b) Upon the occurrence of an Event of Default (other than an Event of Default described in clauses (vi), (vii) or (viii) above) and at any time thereafter Lender may, in addition to any other rights or remedies available to it pursuant to this Agreement and the other Loan Documents or at law or in equity, take such action, without notice or demand, that Lender deems advisable to protect and enforce its rights against Borrower and in and to the Property, including, without limitation, declaring the Debt to be immediately due and payable, and Lender may enforce or avail itself of any or all rights or remedies provided in the Loan Documents against Borrower and the Property, including, without limitation, all rights or remedies available at law or in equity; and upon any Event of Default described in clauses (vi), (vii) or (viii) above, the Debt and all other obligations of Borrower hereunder and under the other Loan Documents shall immediately and automatically become due and payable, without notice or demand, and Borrower hereby expressly waives any such notice or demand, anything contained herein or in any other Loan Document to the contrary notwithstanding.

**Section 10.2** **Remedies**.

(a) Upon the occurrence of an Event of Default, all or any one or more of the rights, powers, privileges and other remedies available to Lender against Borrower under this Agreement or any of the other Loan Documents executed and delivered by, or applicable to, Borrower or at law or in equity may be exercised by Lender at any time and from time to time, whether or not all or any of the Debt shall be declared due and payable, and whether or not Lender shall have commenced any foreclosure proceeding or other action for the enforcement of its rights and remedies under any of the Loan Documents with respect to the Property. Any such actions taken by Lender shall be cumulative and concurrent and may be pursued independently, singly, successively, together or otherwise, at such time and in such order as Lender may determine in its sole discretion, to the fullest extent permitted by law, without impairing or otherwise affecting the other rights and remedies of Lender permitted by law, equity or contract or as set forth herein or in the other Loan Documents. Without limiting the generality of the foregoing, if an Event of Default is continuing, (i) Lender is not subject to any "one action" or "election of remedies" law or rule, and (ii) all liens and other rights, remedies or privileges provided to Lender shall remain in full force and effect until Lender has exhausted all of its remedies against the Property and the Mortgage has been foreclosed, sold and/or otherwise realized upon in satisfaction of the Debt or the Debt has been paid in full.

(b) Lender shall have the right from time to time to partially foreclose the Mortgage in any manner and for any amounts secured by the Mortgage then due and payable as determined by Lender in its sole discretion including, without limitation, the following circumstances: (i) in the event Borrower defaults beyond any applicable grace period in the payment of one or more scheduled payments of principal and interest, Lender may foreclose the Mortgage to recover such delinquent payments, or (ii) in the event Lender elects to accelerate

Case 2:17-cv-02036-KM-MAH Document 1-3 Filed 03/28/17 Page 79 of 115 PageID: 107

less than the entire outstanding principal balance of the Loan, Lender may foreclose the Mortgage to recover so much of the principal balance of the Loan as Lender may accelerate and such other sums secured by the Mortgage as Lender may elect. Notwithstanding one or more partial foreclosures, the Property shall remain subject to the Mortgage to secure payment of sums secured by the Mortgage and not previously recovered.

(c) Any amounts recovered from the Property or any other collateral for the Loan after an Event of Default may be applied by Lender toward the payment of any interest and/or principal of the Loan and/or any other amounts due under the Loan Documents in such order, priority and proportions as Lender in its sole discretion shall determine.

**Section 10.3** **<u>Right to Cure Defaults</u>**.

Lender may, but without any obligation to do so and without notice to or demand on Borrower and without releasing Borrower from any obligation hereunder or being deemed to have cured any Event of Default hereunder, make, do or perform any obligation of Borrower hereunder in such manner and to such extent as Lender may deem necessary. Lender is authorized to enter upon the Property for such purposes, or appear in, defend, or bring any action or proceeding to protect its interest in the Property for such purposes, and the cost and expense thereof (including reasonable attorneys' fees to the extent permitted by law), with interest as provided in this Section 10.3, shall constitute a portion of the Debt and shall be due and payable to Lender upon demand. All such costs and expenses incurred by Lender in remedying such Event of Default or such failed payment or act or in appearing in, defending, or bringing any action or proceeding shall bear interest at the Default Rate, for the period after such cost or expense was incurred into the date of payment to Lender. All such costs and expenses incurred by Lender together with interest thereon calculated at the Default Rate shall be deemed to constitute a portion of the Debt and be secured by the liens, claims and security interests provided to Lender under the Loan Documents and shall be immediately due and payable upon demand by Lender therefore.

**Section 10.4** **<u>Remedies Cumulative</u>**.

The rights, powers and remedies of Lender under this Agreement shall be cumulative and not exclusive of any other right, power or remedy which Lender may have against Borrower pursuant to this Agreement or the other Loan Documents, or existing at law or in equity or otherwise. Lender's rights, powers and remedies may be pursued singly, concurrently or otherwise, at such time and in such order as Lender may determine in Lender's sole discretion. No delay or omission to exercise any remedy, right or power accruing upon an Event of Default shall impair any such remedy, right or power or shall be construed as a waiver thereof, but any such remedy, right or power may be exercised from time to time and as often as may be deemed expedient. A waiver of one Default or Event of Default with respect to Borrower shall not be construed to be a waiver of any subsequent Default or Event of Default by Borrower or to impair any remedy, right or power consequent thereon.

# ARTICLE XI.

# MISCELLANEOUS

**Section 11.1 Successors and Assigns.**

All covenants, promises and agreements in this Agreement, by or on behalf of Borrower, shall inure to the benefit of the legal representatives, successors and assigns of Lender.

**Section 11.2 Lender's Discretion.**

Whenever pursuant to this Agreement Lender exercises any right given to it to approve or disapprove, or any arrangement or term is to be satisfactory to Lender, the decision of Lender to approve or disapprove or to decide whether arrangements or terms are satisfactory or not satisfactory shall (except as is otherwise specifically herein provided) be in the sole discretion of Lender and shall be final and conclusive. Prior to a Securitization, whenever pursuant to this Agreement the Rating Agencies are given any right to approve or disapprove, or any arrangement or term is to be satisfactory to the Rating Agencies, the decision of Lender to approve or disapprove or to decide whether arrangements or terms are satisfactory or not satisfactory, based upon Lender's determination of Rating Agency criteria, shall be substituted therefore.

**Section 11.3 Governing Law.**

(a) **IN ALL RESPECTS, INCLUDING, WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THIS AGREEMENT, THE NOTE AND THE OTHER LOAN DOCUMENTS AND THE OBLIGATIONS ARISING HEREUNDER AND THEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW JERSEY APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE (WITHOUT REGARD TO PRINCIPLES OF CONFLICT OF LAWS) AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA, INCLUDING AT ALL TIMES THE PROVISIONS FOR THE CREATION, PERFECTION, AND ENFORCEMENT OF THE LIEN AND SECURITY INTEREST CREATED PURSUANT HERETO AND PURSUANT TO THE OTHER LOAN DOCUMENTS (OTHER THAN WITH RESPECT TO LIENS AND SECURITY INTERESTS IN PROPERTY WHOSE PERFECTION AND PRIORITY IS COVERED BY ARTICLE 9 OF THE UCC (INCLUDING, WITHOUT LIMITATION, THE ACCOUNTS) WHICH SHALL BE GOVERNED BY THE LAW OF THE JURISDICTION APPLICABLE THERETO IN ACCORDANCE WITH SECTIONS 9-301 THROUGH 9-307 OF THE UCC AS IN EFFECT IN THE STATE OF NEW JERSEY).**

(b) **ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST LENDER OR BORROWER ARISING OUT OF OR RELATING TO THIS AGREEMENT MAY AT LENDER'S OPTION BE INSTITUTED IN ANY FEDERAL OR STATE COURT IN THE STATE OF NEW JERSEY, COUNTY OF ESSEX. BORROWER HEREBY IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY**

SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING. BORROWER DOES HEREBY DESIGNATE AND APPOINT:

AS AGENT FOR HERITAGE GATEWAY, LLC, MARINE ONE ASSOCIATES III, LLC, RIDGEWOOD 2000 ASSOCIATES III, LLC AND JPG REAL ESTATE III, LLC:

JEFFREY GREENBERG
123 PROSPECT STREET
RIDGEWOOD, NEW JERSEY 07451

AS AGENT FOR IVY GATEWAY, LLC:

ANTHONY DITOMMASO
C/O IVY EQUITIES, LLC
1 PARAGON DRIVE, SUITE 125
MONTVALE, NEW JERSEY 07645

AS ITS AUTHORIZED AGENT TO ACCEPT AND ACKNOWLEDGE ON ITS BEHALF SERVICE OF ANY AND ALL PROCESS WHICH MAY BE SERVED IN ANY SUCH SUIT, ACTION OR PROCEEDING IN ANY FEDERAL OR STATE COURT IN NEW JERSEY, AND AGREES THAT SERVICE OF PROCESS UPON SAID AGENT AT SAID ADDRESS AND WRITTEN NOTICE OF SAID SERVICE MAILED OR DELIVERED TO BORROWER IN THE MANNER PROVIDED HEREIN SHALL BE DEEMED IN EVERY RESPECT EFFECTIVE SERVICE OF PROCESS UPON BORROWER, IN ANY SUCH SUIT, ACTION OR PROCEEDING IN THE STATE OF NEW JERSEY. BORROWER (I) SHALL GIVE PROMPT NOTICE TO LENDER OF ANY CHANGED ADDRESS OF ITS AUTHORIZED AGENT HEREUNDER, (II) MAY AT ANY TIME AND FROM TIME TO TIME DESIGNATE A SUBSTITUTE AUTHORIZED AGENT WITH AN OFFICE IN NEW JERSEY (WHICH SUBSTITUTE AGENT AND OFFICE SHALL BE DESIGNATED AS THE PERSON AND ADDRESS FOR SERVICE OF PROCESS), AND (III) SHALL PROMPTLY DESIGNATE SUCH A SUBSTITUTE IF ITS AUTHORIZED AGENT CEASES TO HAVE AN OFFICE IN NEW JERSEY OR IS DISSOLVED WITHOUT LEAVING A SUCCESSOR.

**Section 11.4 Modification, Waiver in Writing.**

No modification, amendment, extension, discharge, termination or waiver of any provision of this Agreement or of any other Loan Document, nor consent to any departure by Borrower therefrom, shall in any event be effective unless the same shall be in a writing signed by the party against whom enforcement is sought, and then such waiver or consent shall be effective only in the specific instance, and for the purpose, for which given. Except as otherwise expressly provided herein, no notice to, or demand on Borrower, shall entitle Borrower to any other or future notice or demand in the same, similar or other circumstances.

Case 2:17-cv-02036-KM-MAH Document 1-3 Filed 03/28/17 Page 82 of 115 PageID: 110

**Section 11.5 Delay Not a Waiver.**

Neither any failure nor any delay on the part of Lender in insisting upon strict performance of any term, condition, covenant or agreement, or exercising any right, power, remedy or privilege hereunder, or under any other Loan Document, shall operate as or constitute a waiver thereof, nor shall a single or partial exercise thereof preclude any other future exercise, or the exercise of any other right, power, remedy or privilege. In particular, and not by way of limitation, by accepting payment after the due date of any amount payable under this Agreement or any other Loan Document, Lender shall not be deemed to have waived any right either to require prompt payment when due of all other amounts due under this Agreement or the other Loan Documents, or to declare a default for failure to effect prompt payment of any such other amount. Lender shall have the right to waive or reduce any time periods that Lender is entitled to under the Loan Documents in its sole and absolute discretion.

**Section 11.6 Notices.**

All notices, demands, requests, consents, approvals or other communications (any of the foregoing, a "Notice") required, permitted, or desired to be given hereunder shall be in writing sent by telefax (with answer back acknowledged) or by registered or certified mail, postage prepaid, return receipt requested, or delivered by hand or reputable overnight courier addressed to the party to be so notified at its address hereinafter set forth, or to such other address as such party may hereafter specify in accordance with the provisions of this Section 11.6. Any Notice shall be deemed to have been received: (a) three (3) days after the date such Notice is mailed, (b) on the date of sending by telefax if sent during business hours on a Business Day (otherwise on the next Business Day), (c) on the date of delivery by hand if delivered during business hours on a Business Day (otherwise on the next Business Day), and (d) on the next Business Day if sent by an overnight commercial courier, in each case addressed to the parties as follows:

| | |
|---|---|
| If to Lender: | LaSalle Bank National Association<br>135 S. LaSalle Street, Suite 3410<br>Chicago, Illinois 60603<br>Attn.: Servicing Department,<br>Real Estate Capital Markets<br>Facsimile No. (312) 904-0900<br>Re: Gateway IV |
| With a copy to: | LaSalle Bank National Association<br>135 South LaSalle Street, Suite 3410<br>Chicago, Illinois 60603<br>Attn: Nathan Stearns, Esq.<br>Real Estate Capital Markets<br>Facsimile No. (312) 904-0900<br>Re: Gateway IV |

Case 2:17-cv-02036-KM-MAH Document 1-3 Filed 03/28/17 Page 83 of 115 PageID: 111

| | |
|---|---|
| With a copy to: | DLA Piper US LLP<br>1251 Avenue of the Americas<br>New York, New York 10020-1104<br>Attn.: Willard S. Moore, Esq.<br>Facsimile No. (212) 335-4501 |
| If to Borrower: | Heritage Gateway, LLC, Marine One Associates III, LLC, Ridgewood 2000 Associates III, LLC, JPG Real Estate III, LLC and Ivy Gateway, LLC<br>123 Prospect Street<br>Ridgewood, New Jersey 07451<br>Attn.: Jeffrey Greenberg |
| With a copy to: | Anthony DiTommaso<br>c/o Ivy Equities, LLC<br>1 Paragon Drive, Suite 125<br>Montvale, New Jersey 07645 |
| With a copy to: | Sokol, Behot & Fiorenzo<br>433 Hackensack Avenue<br>Hackensack, New Jersey 07601<br>Attn.: Jeffrey A. Zenn, Esq.<br>Facsimile No.: (201) 488-6541 |
| With a copy to: | Morrison Cohen LLP<br>909 Third Avenue<br>New York, New York 10022<br>Attn.: Andrew Bank, Esq. |

**Section 11.7 Trial by Jury.**

**BORROWER AND LENDER EACH HEREBY AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THE LOAN DOCUMENTS, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY BORROWER AND LENDER, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. EACH PARTY IS HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER.**

Case 2:17-cv-02036-KM-MAH Document 1-3 Filed 03/28/17 Page 84 of 115 PageID: 112

**Section 11.8** **Headings**.

The Article and/or Section headings and the Table of Contents in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose.

**Section 11.9** **Severability**.

Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

**Section 11.10** **Preferences**.

Lender shall have the continuing and exclusive right to apply or reverse and reapply any and all payments by Borrower to any portion of the obligations of Borrower hereunder. To the extent Borrower makes a payment or payments to Lender, which payment or proceeds or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, receiver or any other party under any bankruptcy law, state or federal law, common law or equitable cause, then, to the extent of such payment or proceeds received, the obligations hereunder or part thereof intended to be satisfied shall be revived and continue in full force and effect, as if such payment or proceeds had not been received by Lender.

**Section 11.11** **Waiver of Notice**.

Borrower shall not be entitled to any notices of any nature whatsoever from Lender except with respect to matters for which this Agreement or the other Loan Documents specifically and expressly provide for the giving of notice by Lender to Borrower and except with respect to matters for which Borrower is not, pursuant to applicable Legal Requirements, permitted to waive the giving of notice. Borrower hereby expressly waives the right to receive any notice from Lender with respect to any matter for which this Agreement or the other Loan Documents do not specifically and expressly provide for the giving of notice by Lender to Borrower.

**Section 11.12** **Remedies of Borrower**.

In the event that a claim or adjudication is made that Lender or its agents have acted unreasonably or unreasonably delayed acting in any case where, by law or under this Agreement or the other Loan Documents, Lender or such agent, as the case may be, has an obligation to act reasonably or promptly, neither Lender nor its agents shall be liable for any monetary damages, and Borrower's sole remedy shall be limited to commencing an action seeking injunctive relief or declaratory judgment. Any action or proceeding to determine whether Lender has acted reasonably shall be determined by an action seeking declaratory judgment.

**Section 11.13 <u>Expenses; Indemnity</u>.**

(a) Borrower shall pay or, if Borrower fails to pay, reimburse Lender upon receipt of notice from Lender, for all reasonable costs and expenses (including reasonable attorneys' fees and disbursements) incurred by Lender in connection with (i) Borrower's ongoing performance of and compliance with Borrower's agreements and covenants contained in this Agreement and the other Loan Documents on its part to be performed or complied with after the Closing Date, including, without limitation, confirming compliance with environmental and insurance requirements; (ii) Lender's ongoing performance of and compliance with all agreements and covenants contained in this Agreement and the other Loan Documents on its part to be performed or complied with after the Closing Date; (iii) the negotiation, preparation, execution, delivery and administration of any consents, amendments, waivers or other modifications to this Agreement and the other Loan Documents and any other documents or matters requested by Borrower; (iv) the filing and recording fees and expenses, title insurance and reasonable fees and expenses of counsel for providing to Lender all required legal opinions, and other similar expenses incurred, in creating and perfecting the Liens in favor of Lender pursuant to this Agreement and the other Loan Documents; (v) enforcing or preserving any rights, in response to third party claims or the prosecuting or defending of any action or proceeding or other litigation, in each case against, under or affecting Borrower, this Agreement, the other Loan Documents, the Property, or any other security given for the Loan; and (vi) enforcing any obligations of or collecting any payments due from Borrower under this Agreement, the other Loan Documents or with respect to the Property or in connection with any refinancing or restructuring of the credit arrangements provided under this Agreement in the nature of a "work out" or of any insolvency or bankruptcy proceedings; provided, however, that Borrower shall not be liable for the payment of any such costs and expenses to the extent the same arise by reason of the gross negligence, illegal acts, fraud or willful misconduct of Lender. Any costs due and payable to Lender may be paid to Lender pursuant to the Cash Management Agreement.

(b) Borrower shall indemnify, defend and hold harmless Lender from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, claims, costs, expenses and disbursements of any kind or nature whatsoever (including, without limitation, the reasonable fees and disbursements of counsel for Lender in connection with any investigative, administrative or judicial proceeding commenced or threatened, whether or not Lender shall be designated a party thereto), that may be imposed on, incurred by, or asserted against Lender in any manner relating to or arising out of (i) any breach by Borrower of its obligations under, or any material misrepresentation by Borrower contained in, this Agreement or the other Loan Documents, or (ii) the use or intended use of the proceeds of the Loan (collectively, the "<u>Indemnified Liabilities</u>"); provided, however, that Borrower shall not have any obligation to Lender hereunder to the extent that such Indemnified Liabilities arise from the gross negligence, illegal acts, fraud or willful misconduct of Lender. To the extent that the undertaking to indemnify, defend and hold harmless set forth in the preceding sentence may be unenforceable because it violates any law or public policy, Borrower shall pay the maximum portion that it is permitted to pay and satisfy under applicable law to the payment and satisfaction of all Indemnified Liabilities incurred by Lender.

**Section 11.14 Schedules Incorporated.**

The Schedules annexed hereto are hereby incorporated herein as a part of this Agreement with the same effect as if set forth in the body hereof.

**Section 11.15 Offsets, Counterclaims and Defenses.**

Any assignee of Lender's interest in and to this Agreement and the other Loan Documents shall take the same free and clear of all offsets, counterclaims or defenses which are unrelated to such documents which Borrower may otherwise have against any assignor of such documents, and no such unrelated counterclaim or defense shall be interposed or asserted by Borrower in any action or proceeding brought by any such assignee upon such documents and any such right to interpose or assert any such unrelated offset, counterclaim or defense in any such action or proceeding is hereby expressly waived by Borrower.

**Section 11.16 No Joint Venture or Partnership; No Third Party Beneficiaries.**

(a) Borrower and Lender intend that the relationships created hereunder and under the other Loan Documents be solely that of borrower and lender. Nothing herein or therein is intended to create a joint venture, partnership, tenancy in common, or joint tenancy relationship between Borrower and Lender nor to grant Lender any interest in the Property other than that of mortgagee, beneficiary or lender.

(b) This Agreement and the other Loan Documents are solely for the benefit of Lender and nothing contained in this Agreement or the other Loan Documents shall be deemed to confer upon anyone other than Lender any right to insist upon or to enforce the performance or observance of any of the obligations contained herein or therein. All conditions to the obligations of Lender to make the Loan hereunder are imposed solely and exclusively for the benefit of Lender and no other Person shall have standing to require satisfaction of such conditions in accordance with their terms or be entitled to assume that Lender will refuse to make the Loan in the absence of strict compliance with any or all thereof and no other Person shall under any circumstances be deemed to be a beneficiary of such conditions, any or all of which may be freely waived in whole or in part by Lender if, in Lender's sole discretion, Lender deems it advisable or desirable to do so.

**Section 11.17 Publicity.**

All news releases, publicity or advertising by Borrower or its Affiliates through any media intended to reach the general public which refers to the Loan Documents or the financing evidenced by the Loan Documents, to Lender or to any of its Affiliates shall be subject to the prior approval of Lender.

**Section 11.18 Waiver of Marshalling of Assets.**

To the fullest extent permitted by law, Borrower, for itself and its successors and assigns, waives all rights to a marshalling of the assets of Borrower, Borrower's partners and others with interests in Borrower, and of the Property, and shall not assert any right under any laws

Case 2:17-cv-02036-KM-MAH Document 1-3 Filed 03/28/17 Page 87 of 115 PageID: 115

pertaining to the marshalling of assets, the sale in inverse order of alienation, homestead exemption, the administration of estates of decedents, or any other matters whatsoever to defeat, reduce or affect the right of Lender under the Loan Documents to a sale of the Property for the collection of the Debt without any prior or different resort for collection or of the right of Lender to the payment of the Debt out of the net proceeds of the Property in preference to every other claimant whatsoever.

**Section 11.19** **Waiver of Offsets/Defenses/Counterclaims**.

Borrower hereby waives the right to assert a counterclaim, other than a compulsory counterclaim, in any action or proceeding brought against it by Lender or its agents or otherwise to offset any obligations to make the payments required by the Loan Documents. No failure by Lender to perform any of its obligations hereunder shall be a valid defense to, or result in any offset against, any payments which Borrower is obligated to make under any of the Loan Documents.

**Section 11.20** **Conflict; Construction of Documents; Reliance**.

In the event of any conflict between the provisions of this Agreement and any of the other Loan Documents, the provisions of this Agreement shall control. The parties hereto acknowledge that they were represented by competent counsel in connection with the negotiation, drafting and execution of the Loan Documents and that such Loan Documents shall not be subject to the principle of construing their meaning against the party which drafted same. Borrower acknowledges that, with respect to the Loan, Borrower shall rely solely on its own judgment and advisors in entering into the Loan without relying in any manner on any statements, representations or recommendations of Lender or any parent, subsidiary or Affiliate of Lender. Lender shall not be subject to any limitation whatsoever in the exercise of any rights or remedies available to it under any of the Loan Documents or any other agreements or instruments which govern the Loan by virtue of the ownership by it or any parent, subsidiary or Affiliate of Lender of any equity interest any of them may acquire in Borrower, and Borrower hereby irrevocably waives the right to raise any defense or take any action on the basis of the foregoing with respect to Lender's exercise of any such rights or remedies. Borrower acknowledges that Lender engages in the business of real estate financings and other real estate transactions and investments which may be viewed as adverse to or competitive with the business of Borrower or its Affiliates.

**Section 11.21** **Brokers and Financial Advisors**.

Borrower hereby represents that it has dealt with no financial advisors, brokers, underwriters, placement agents, agents or finders other than Holliday Fenoglio Fowler, L.P., in connection with the transactions contemplated by this Agreement. Borrower shall indemnify, defend and hold Lender harmless from and against any and all claims, liabilities, costs and expenses of any kind (including Lender's attorneys' fees and expenses) in any way relating to or arising from a claim by any Person that such Person acted on behalf of Borrower or Lender in connection with the transactions contemplated herein. The provisions of this Section 11.21 shall survive the expiration and termination of this Agreement and the payment of the Debt.

Case 2:17-cv-02036-KM-MAH Document 1-3 Filed 03/28/17 Page 88 of 115 PageID: 116

**Section 11.22 Exculpation.**

Subject to the qualifications below, Lender shall not enforce the liability and obligation of Borrower to perform and observe the obligations contained in the Note, this Agreement, the Mortgage or the other Loan Documents by any action or proceeding wherein a money judgment shall be sought against Borrower, except that Lender may bring a foreclosure action, an action for specific performance or any other appropriate action or proceeding to enable Lender to enforce and realize upon its interest under the Note, this Agreement, the Mortgage and the other Loan Documents, or in the Property, the Rents, or any other collateral given to Lender pursuant to the Loan Documents; provided, however, that, except as specifically provided herein, any judgment in any such action or proceeding shall be enforceable against Borrower only to the extent of Borrower's interest in the Property, in the Rents and in any other collateral given to Lender, and Lender, by accepting the Note, this Agreement, the Mortgage and the other Loan Documents, agrees that it shall not sue for, seek or demand any deficiency judgment against Borrower in any such action or proceeding under or by reason of or under or in connection with the Note, this Agreement, the Mortgage or the other Loan Documents. The provisions of this Section shall not, however, (a) constitute a waiver, release or impairment of any obligation evidenced or secured by any of the Loan Documents; (b) impair the right of Lender to name Borrower as a party defendant in any action or suit for foreclosure and sale under the Mortgage; (c) affect the validity or enforceability of any guaranty made in connection with the Loan or any of the rights and remedies of Lender thereunder; (d) impair the right of Lender to obtain the appointment of a receiver; (e) impair the enforcement of the Assignment of Leases; (f) constitute a prohibition against Lender to seek a deficiency judgment against Borrower in order to fully realize the security granted by the Mortgage or to commence any other appropriate action or proceeding in order for Lender to exercise its remedies against the Property; or (g) constitute a waiver of the right of Lender to enforce the liability and obligation of Borrower, by money judgment or otherwise, to the extent of any loss, damage, cost, expense, liability, claim or other obligation incurred by Lender (including attorneys' fees and costs reasonably incurred) arising out of or in connection with the following:

(i) waste of the Property;

(ii) the breach of any representation, warranty, covenant or indemnification provision in the Environmental Indemnity or in the Mortgage concerning environmental laws, hazardous substances and asbestos and any indemnification of Lender with respect thereto in either document;

(iii) the removal or disposal of any portion of the Property after a Default or Event of Default; and

(iv) the misapplication, misappropriation or conversion by Borrower of (A) any insurance proceeds paid by reason of any loss, damage or destruction to the Property, (B) any Awards or other amounts received in connection with the Condemnation of all or a portion of the Property, or (C) any Rents or other funds of Borrower; and

Case 2:17-cv-02036-KM-MAH Document 1-3 Filed 03/28/17 Page 89 of 113 PageID: 117

(v) the bringing by Borrower or any of the tenants-in-common comprising Borrower of any action for partition, or other action of a similar nature, with respect to the Property.

Notwithstanding anything to the contrary in this Agreement, the Note or any of the Loan Documents, (A) Lender shall not be deemed to have waived any right which Lender may have under Section 506(a), 506(b), 1111(b) or any other provisions of the Bankruptcy Code to file a claim for the full amount of the Debt or to require that all collateral shall continue to secure all of the Debt owing to Lender in accordance with the Loan Documents, and (B) the Debt shall be fully recourse to Borrower in the event that: (i) there has been at any time fraud, willful misconduct or intentional material misrepresentation by Borrower or any Guarantor in connection with the Loan, (ii) the first full monthly payment of interest under the Note is not paid when due; (iii) Borrower fails to obtain Lender's prior consent to any subordinate financing or other voluntary Lien encumbering the Property; (iv) Borrower fails to obtain Lender's prior consent to any assignment, transfer, or conveyance of the Property or any interest therein as required by the Mortgage or this Agreement; (v) Borrower files a voluntary petition under the Bankruptcy Code or any other Federal or state bankruptcy or insolvency law; (vi) an Affiliate, officer, director, or representative which controls, directly or indirectly, Borrower files, or joins in the filing of, an involuntary petition against Borrower under the Bankruptcy Code or any other Federal or state bankruptcy or insolvency law, or solicits or causes to be solicited petitioning creditors for any involuntary petition against Borrower from any Person; (vii) Borrower files an answer consenting to or otherwise acquiescing in or joining in any involuntary petition filed against it by any other Person, under the Bankruptcy Code or any other Federal or state bankruptcy or insolvency law, or solicits or causes to be solicited petitioning creditors for any involuntary petition from any Person; (viii) any Affiliate, officer, director, or representative which controls Borrower consents to or colludes with respect to or joins in an application for the appointment of a custodian, receiver, trustee, or examiner for Borrower or any portion of the Property; or (ix) Borrower makes an assignment for the benefit of creditors, or admits, in writing or in any legal proceeding, its insolvency or inability to pay its debts as they become due.

0000000564

**Section 11.23 Prior Agreements.**

This Agreement and the other Loan Documents contain the entire agreement of the parties hereto and thereto in respect of the transactions contemplated hereby and thereby, and all prior agreements among or between such parties, whether oral or written, including, without limitation, the Mortgage Loan Application dated August 28, 2006 between Borrower and Lender, are superseded by the terms of this Agreement and the other Loan Documents.

**Section 11.24 Servicer.**

(a) At the option of Lender, the Loan may be serviced by a servicer (the "Servicer") selected by Lender and Lender may delegate all or any portion of its responsibilities under this Agreement and the other Loan Documents to the Servicer pursuant to a servicing agreement (the "Servicing Agreement") between Lender and Servicer. LaSalle shall not make an initial transfer of servicing rights for the Loan to Wachovia Securities, provided that this covenant shall not apply to successor holders of the Loan or to subsequent transfers of servicing rights. Borrower shall not be responsible for payment of the monthly servicing fee due to the

Servicer under the Servicing Agreement. Servicer shall, however, be entitled to reimbursement of costs and expenses as and to the same extent (but without duplication) as Lender is entitled thereto under the applicable provisions of this Agreement and the other Loan Documents.

(b) Upon notice thereof from Lender, Servicer shall have the right to exercise all rights of Lender and enforce all obligations of Borrower pursuant to the provisions of this Agreement, the Note and the other Loan Documents.

(c) Provided Borrower shall have been given notice of Servicer's address by Lender, Borrower shall deliver to Servicer duplicate originals of all notices and other instruments which Borrower may or shall be required to deliver to Lender pursuant to this Agreement, the Note and the other Loan Documents (and no delivery of such notices or other instruments by Borrower shall be of any force or effect unless delivered to Lender and Servicer as provided above).

**Section 11.25** **Joint and Several Liability**.

If more than one Person has executed this Agreement as "Borrower," the representations, covenants, warranties and obligations of all such Persons hereunder shall be joint and several.

**Section 11.26** **Creation of Security Interest**.

Notwithstanding any other provision set forth in this Agreement, the Note, the Mortgage or any of the other Loan Documents, Lender may at any time create a security interest in all or any portion of its rights under this Agreement, the Note, the Mortgage and any other Loan Document (including, without limitation, the advances owing to it) in favor of any Federal Reserve Bank in accordance with Regulation A of the Board of Governors of the Federal Reserve System.

**Section 11.27** **Assignments and Participations**.

(a) The Lender may assign to one or more Persons all or a portion of its rights and obligations under this Agreement.

(b) Upon such execution and delivery, from and after the effective date specified in such Assignment and Acceptance, the assignee thereunder shall be a party hereto and have the rights and obligations of Lender hereunder.

(c) Lender may sell participations to one or more Persons in or to all or a portion of its rights and obligations under this Agreement; provided, however, that (i) Lender's obligations under this Agreement shall remain unchanged, (ii) Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, (ii) Lender shall remain the holder of any Note for all purposes of this Agreement and (iv) Borrower shall continue to deal solely and directly with Lender in connection with Lender's rights and obligations under and in respect of this Agreement and the other Loan Documents.

(d) Lender may, in connection with any assignment or participation or proposed assignment or participation pursuant to this Section 11.27, disclose to the assignee or participant or proposed assignee or participant, as the case may be, any information relating to Borrower or any of its Affiliates or to any aspect of the Loan that has been furnished to the Lender by or on behalf of the Borrower or any of its Affiliates.

**Section 11.28 Set-Off.**

In addition to any rights and remedies of Lender provided by this Agreement and by law, the Lender shall have the right, upon five (5) days prior written notice to Borrower, upon any amount becoming due and payable by Borrower hereunder (whether at the stated maturity, by acceleration or otherwise) to set-off and appropriate and apply against such amount any and all deposits (general or special, time or demand, provisional or final), in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by Lender or any Affiliate thereof to or for the credit or the account of Borrower. Lender agrees promptly to notify Borrower after any such set-off and application made by Lender; provided that the failure to give such notice shall not affect the validity of such set-off and application.

**Section 11.29 Counterparts.**

This Agreement and each of the other Loan Documents may be executed in any number of counterparts, each of which shall be an original and all of which together shall constitute one and the same instrument.

[NO FURTHER TEXT ON THIS PAGE]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their duly authorized representatives, all as of the day and year first above written.

LENDER:

LASALLE BANK NATIONAL ASSOCIATION

By:______________________________
Name:
Title:

BORROWER:

HERITAGE GATEWAY, LLC

By: ______________________________
Steven Greenberg
Manager

MARINE ONE ASSOCIATES III, LLC

By: ______________________________
Jeffrey Greenberg
Manager

RIDGEWOOD 2000 ASSOCIATES III, LLC

By: ______________________________
Steven Greenberg
Manager

JPG REAL ESTATE III, LLC

By: ______________________________
Jeffrey Greenberg
Manager

IVY GATEWAY, LLC

By: ______________________________
Anthony P. DiTommaso, Jr.
Manager

Case 2:17-cv-02036-KM-MAH Document 1-3 Filed 03/28/17 Page 93 of 115 PageID: 121

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their duly authorized representatives, all as of the day and year first above written.

LENDER:

LASALLE BANK NATIONAL ASSOCIATION

By:____________________________
Name:
Title:

BORROWER:

HERITAGE GATEWAY, LLC

By: ____________________________
Steven Greenberg
Manager

MARINE ONE ASSOCIATES III, LLC

By: ____________________________
Jeffrey Greenberg
Manager

RIDGEWOOD 2000 ASSOCIATES III, LLC

By: ____________________________
Steven Greenberg
Manager

JPG REAL ESTATE III, LLC

By: ____________________________
Jeffrey Greenberg
Manager

IVY GATEWAY, LLC

By: ____________________________
Anthony P. DiTommaso, Jr.
Manager

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their duly authorized representatives, all as of the day and year first above written.

LENDER:

LASALLE BANK NATIONAL ASSOCIATION

By: Kevin Connolly
Name: Kevin Connolly
Title: Senior Associate

BORROWER:

HERITAGE GATEWAY, LLC

By: ______________________________
Steven Greenberg
Manager

MARINE ONE ASSOCIATES III, LLC

By: ______________________________
Jeffrey Greenberg
Manager

RIDGEWOOD 2000 ASSOCIATES III, LLC

By: ______________________________
Steven Greenberg
Manager

JPG REAL ESTATE III, LLC

By: ______________________________
Jeffrey Greenberg
Manager

IVY GATEWAY, LLC

By: ______________________________
Anthony P. DiTommaso, Jr.
Manager

Case 2:17-cv-02036-KM-MAH Document 1-3 Filed 03/28/17 Page 95 of 113 PageID: 123

**SCHEDULE I**

# RENT ROLL

X0-G)
2006
ubtal
hole:

Date: 8/13/06
Time: 11:15 am
Ref#: ABI
Page: 1

**Presentation Rent Roll & Current Term Tenant Summary**
**As of Nov-2006 for 327,135 Square Feet**

| | Tenant Name<br>Type & Suite Number<br>Lease Dates & Term | Floor<br>SqFt<br>Bldg Share | Rate & Amount<br>per Year<br>per Month | Changes<br>on | Changes<br>to | CPI & Current<br>Porters' Wage<br>Miscellaneous | Months<br>to<br>Abate | Port<br>to<br>Abate | Description of<br>Operating Expense<br>Reimbursements | Improvmnts<br>Rate<br>Amount | Commssns<br>Rate<br>Amount | Assumption about subsequent<br>terms for this tenant |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | McCarter & English (L<br>Office, Suite: B050<br>Sep-1998 to Feb-2008<br>114 Months | 2,820<br>0.77% | $10.87<br>$26,660<br>$0.89<br>$2,241 | - | - | - | - | - | Full Service: Pays no expense reimbursement. | - | - | Option<br>See assumption:<br>$13 Gross Storage |
| 2 | Management Office<br>Office, Suite: 0300<br>Expires Oct-2031 | 2,022<br>0.62% | $0.00<br>$0<br>$0.00<br>$0 | - | - | - | - | - | Gross: Pays the increases over a base year ending Dec-2006; ($32,768.00) | - | - | Market<br>See assumption:<br>$28 BY (Floors 1-9) |
| 3 | Prudential<br>Office, Suite: B003<br>Sep-1998 to Dec-2014<br>196 Months | 2,418<br>0.74% | $11.75<br>$28,412<br>$0.98<br>$2,368 | - | - | - | - | - | Full Service: Pays no expense reimbursement. | - | - | Market<br>See assumption:<br>$26 BY (Floors 1-9) |
| 4 | McCarter & English (L<br>Office, Suite: B054<br>Sep-1998 to Feb-2008<br>114 Months | 1,341<br>0.41% | $16.58<br>$22,234<br>$1.38<br>$1,853 | - | - | - | - | - | Full Service: Pays no expense reimbursement. | - | - | Option<br>See assumption:<br>$13 Gross Storage |
| 5 | Franks Franks MTM<br>Retail, Suite: Lobby 1<br>Jul-2006 to Dec-2006<br>6 Months | 1,088<br>0.33% | $6.61<br>$7,200<br>$0.56<br>$600 | - | - | - | - | - | See method: Franks /Margarita's $50/Mo | - | - | ReAbsorb<br>See assumption:<br>MTM Lobby N/A |
| 6 | Gourmet Lunchbox MTM<br>Retail, Suite: Lobby 2<br>Jul-2006 to Dec-2006<br>6 Months | 2,666<br>0.81% | $5.40<br>$14,400<br>$0.45<br>$1,200 | - | - | - | - | - | See method: Lunchbox $100/Mo | - | - | ReAbsorb<br>See assumption:<br>MTM Lobby N/A |
| 7 | Margarita's Kitchen<br>Retail, Suite: Lobby 3<br>Jul-2006 to Dec-2006<br>6 Months | 1,361<br>0.42% | $5.29<br>$7,200<br>$0.44<br>$600 | - | - | - | - | - | See method: Franks /Margarita's $50/Mo | - | - | ReAbsorb<br>See assumption:<br>MTM Lobby N/A |
| 8 | Potential Retail Leas<br>Retail, Suite: Lobby 1<br>Jan-2008 to Dec-2017<br>120 Months | 5,115<br>1.56% | $40.00<br>$204,640<br>$3.33<br>$17,053 | Jan-2009<br>Jan-2010<br>Jan-2011<br>Jan-2012<br>Jan-2013<br>Jan-2014<br>Jan-2015<br>Jan-2016<br>Jan-2017 | $41.20<br>$42.44<br>$43.71<br>$45.02<br>$46.37<br>$47.76<br>$49.19<br>$50.67<br>$52.19 | - | - | - | Net: Pays a full pro-rata share of all reimbursable expenses. | $10.00<br><br>$51,150 | $27.51<br>6.00%<br>$140,768 | Market<br>See assumption:<br>Lobby Retail $40 w/BY Tax |

0000000417

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 9 | McCarter & English (1<br>Office, Suite: 00051<br>Sep-1998 to Feb-2008<br>114 Months | 932<br>0.28% | $24.21<br>$22,564<br>$2.02<br>$1,880 | Jan-2008 | $28.84 | - | - | - See method, McCarter '98 BY (Ste 0051) | - | - | Option<br>See assumption:<br>$28 BY (Floors 1-9) |
| 10 | McCarter & English (1<br>Office, Suite: 0100<br>Sep-1998 to Feb-2008<br>114 Months | 10,571<br>3.23% | $24.21<br>$255,924<br>$2.02<br>$21,327 | Jan-2008 | $28.84 | - | - | - See method: McCarter '98 BY (Ste 100) | - | - | Option<br>See assumption:<br>$28 BY (Floors 1-9) |
| 11 | Prudential<br>Office, Suite: 0100-09<br>Feb-1988 to Dec-2014<br>323 Months | 138,252<br>42.26% | $23.00<br>$3,179,796<br>$1.92<br>$264,983 | Jan-2010 | $25.50 | - | - | - See method: Prudential '98 Base Year | - | - | Market<br>See assumption:<br>$28 BY (Floors 1-9) |
| 12 | United HealthCare (PE<br>Office, Suite: 0400<br>Jan-2007 to Dec-2013<br>84 Months | 22,575<br>6.90% | $27.25<br>$615,169<br>$2.27<br>$51,264 | Jul-2010 | $30.25 | - | - | - See method: Base Year | $30.00<br>$877,250 | - | Market<br>See assumption:<br>$28 BY (Floors 1-9) |
| 13 | Speculative Tenant<br>Office, Suite: 0300<br>Aug-2007 to Jul-2014<br>84 Months | 6,970<br>2.13% | $28.00<br>$195,160<br>$2.33<br>$16,263 | Feb-2011 | $[illegible] | - | [illegible] | - See method: Base Year | $25.75<br>$179,478 | $12.30<br>6.00%<br>$85,350 | Market<br>See assumption:<br>$28 BY (Floors 1-9) |
| 14 | Jacobs Rosenberg<br>Office, Suite: 0385<br>Aug-2004 to Jul-2009<br>60 Months | 2,560<br>0.78% | $26.75<br>$68,213<br>$2.23<br>$5,684 | Aug-2006<br>Aug-2007<br>Aug-2008 | $27.75<br>$28.75<br>$29.75 | - | - | - See method: Jacobs 2005 Base Year | - | - | Market<br>See assumption:<br>$28 BY (Floors 1-9) |
| 15 | McCarter & English (1<br>Office, Suite: 1000<br>Sep-1998 to Feb-2008<br>114 Months | 21,978<br>6.72% | $32.00<br>$700,296<br>$2.67<br>$58,608 | - | - | - | - | - See method: McCarter ($4.30 & $2.20 BY) 10 | - | - | Option<br>See assumption:<br>$32 BY (Floors 10-15) |
| 16 | McCarter & English (1<br>Office, Suite: 1100-15<br>Sep-1998 to Feb-2008<br>114 Months | 109,890<br>33.59% | $32.00<br>$3,516,480<br>$2.67<br>$293,040 | - | - | - | - | - See method: McCarter ($4.30 & $2.20 BY) 11 | - | - | Option<br>See assumption:<br>$32 BY (Floors 10-15) |
| | Total Occupied SqFt<br>Total Available SqFt | 332,251<br>(5,116) | | | | | | | | | |

Software: ARGUS Ver. 12.0.4 (Build: 12000-G)
File: FOUR GATEWAY - Argus - 8-10-2006
Property Type: Office/Industrial
Portfolio:

Date: 8/15/06
Time: 11:19 am
Ref#: ABI
Page: 1

Schedule Of Prospective Cash Flow
In Inflated Dollars for the Fiscal Year Beginning 11/1/2006

| For the Years Ending | Year 1 Oct-2007 | Year 2 Oct-2008 | Year 3 Oct-2009 | Year 4 Oct-2010 | Year 5 Oct-2011 | Year 6 Oct-2012 | Year 7 Oct-2013 | Year 8 Oct-2014 | Year 9 Oct-2015 | Year 10 Oct-2016 | Year 11 Oct-2017 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Potential Gross Revenue** | | | | | | | | | | | |
| Base Rental Revenue | $8,550,718 | $8,537,190 | $8,437,828 | $8,765,740 | $8,880,658 | $8,906,259 | $9,174,568 | $9,559,013 | $11,826,576 | $12,277,764 | $12,441,268 |
| Absorption & Turnover Vacancy | (157,493) | | (15,093) | | | | | (208,672) | (1,023,338) | (9,554) | (9,554) |
| Scheduled Base Rental Revenue | 8,393,225 | 8,537,190 | 8,422,738 | 8,765,740 | 8,880,658 | 8,906,259 | 9,174,568 | 9,350,341 | 10,803,238 | 12,268,210 | 12,431,714 |
| Expense Reimbursement Revenue | 1,317,956 | 1,216,919 | 1,190,602 | 1,294,821 | 1,411,459 | 1,543,786 | 1,688,467 | 1,778,336 | 1,159,265 | 1,182,623 | 1,341,465 |
| License Agreements | 16,750 | 16,750 | 16,750 | 16,750 | 16,750 | 16,750 | 16,750 | 16,750 | 16,750 | 16,750 | 16,750 |
| Direct Billed Tenant Charges | 366,491 | 377,466 | 388,810 | 400,474 | 412,489 | 424,863 | 437,609 | 450,737 | 464,260 | 478,187 | 492,533 |
| Submeter Electric Reimb | 430,500 | 443,415 | 456,717 | 470,419 | 484,532 | 499,067 | 514,040 | 529,461 | 545,345 | 561,705 | 578,556 |
| Total Potential Gross Revenue | 10,524,962 | 10,591,780 | 10,476,009 | 10,948,204 | 11,215,888 | 11,390,724 | 11,831,432 | 12,125,625 | 12,985,878 | 14,507,675 | 14,861,018 |
| General Vacancy | (18,538) | (28,532) | (15,420) | (32,105) | (34,045) | (34,750) | (141,456) | (42,573) | (190,353) | (394,264) | (403,928) |
| Collection Loss | (14,317) | (17,887) | (18,646) | (19,578) | (20,486) | (20,890) | (56,836) | (75,960) | (122,615) | (145,077) | (148,610) |
| Effective Gross Revenue | 10,492,107 | 10,545,341 | 10,441,938 | 10,896,521 | 11,161,357 | 11,334,984 | 11,633,140 | 12,007,092 | 12,673,910 | 13,968,334 | 14,308,480 |
| **Operating Expenses** | | | | | | | | | | | |
| Payroll - Building Staff | 153,750 | 158,363 | 163,113 | 168,007 | 173,047 | 178,238 | 183,586 | 189,093 | 194,766 | 200,609 | 206,627 |
| Employee Benefits | 25,865 | 26,744 | 27,547 | 28,373 | 29,224 | 30,101 | 31,004 | 31,934 | 32,892 | 33,878 | 34,895 |
| Service Contracts | 1,230,005 | 1,266,900 | 1,304,907 | 1,344,054 | 1,384,376 | 1,425,907 | 1,468,684 | 1,512,745 | 1,558,127 | 1,604,871 | 1,653,017 |
| Cleaning Contract | 328,000 | 337,840 | 347,975 | 358,414 | 369,167 | 380,242 | 391,649 | 403,399 | 415,501 | 427,966 | 440,805 |
| Repairs & Maintenance | 265,956 | 273,934 | 282,152 | 290,617 | 299,336 | 308,316 | 317,565 | 327,092 | 336,905 | 347,012 | 357,422 |
| Operating Expense | 4,674 | 4,814 | 4,959 | 5,107 | 5,261 | 5,418 | 5,581 | 5,748 | 5,921 | 6,099 | 6,281 |
| Administrative | 41,000 | 42,230 | 43,497 | 44,802 | 46,146 | 47,530 | 48,956 | 50,425 | 51,938 | 53,496 | 55,101 |
| Management Fee | 314,763 | 316,360 | 313,258 | 326,896 | 334,841 | 340,050 | 348,994 | 360,213 | 380,277 | 419,050 | 429,254 |
| Professional Fees | 20,500 | 21,115 | 21,748 | 22,401 | 23,073 | 23,765 | 24,478 | 25,212 | 25,969 | 26,748 | 27,550 |
| Insurance | 106,092 | 109,274 | 112,553 | 115,929 | 119,407 | 122,989 | 126,679 | 130,479 | 134,394 | 138,425 | 142,578 |
| *Common Area Electric* | 358,085 | 368,827 | 379,892 | 391,289 | 403,028 | 415,118 | 427,572 | 440,399 | 453,611 | 467,219 | 481,236 |
| Oil Gas & Water | 148,625 | 153,084 | 157,676 | 162,407 | 167,279 | 172,297 | 177,466 | 182,790 | 188,274 | 193,922 | 199,740 |
| Real Estate Taxes | 1,114,584 | 1,148,021 | 1,182,462 | 1,217,936 | 1,254,474 | 1,292,108 | 1,330,872 | 1,370,798 | 1,411,922 | 1,454,278 | 1,497,906 |
| Direct Billed Tenant Expense | 258,250 | 265,937 | 271,856 | 280,011 | 288,412 | 297,064 | 305,976 | 315,156 | 324,610 | 334,348 | 344,379 |
| Submeter electric | 430,500 | 443,415 | 456,717 | 470,419 | 484,532 | 499,067 | 514,040 | 529,461 | 545,345 | 561,705 | 578,556 |
| Total Operating Expenses | 4,798,744 | 4,934,858 | 5,070,312 | 5,226,662 | 5,361,603 | 5,538,210 | 5,703,102 | 5,874,943 | 6,060,452 | 6,269,628 | 6,455,349 |
| Net Operating Income | 5,693,363 | 5,610,483 | 5,371,626 | 5,669,859 | 5,779,754 | 5,796,774 | 5,930,038 | 6,132,149 | 6,615,458 | 7,698,706 | 7,853,131 |
| **Debt Service** | | | | | | | | | | | |
| Interest Payments | 3,600,000 | 3,600,000 | 3,600,000 | 3,600,000 | 3,600,000 | 3,600,000 | 3,600,000 | 3,600,000 | 3,600,000 | 3,600,000 | |
| Total Debt Service | 3,600,000 | 3,600,000 | 3,600,000 | 3,600,000 | 3,600,000 | 3,600,000 | 3,600,000 | 3,600,000 | 3,600,000 | 3,600,000 | |
| **Leasing & Capital Costs** | | | | | | | | | | | |
| Tenant Improvements | 856,728 | 51,160 | 43,538 | | | | | 584,792 | 2,867,851 | | 53,547 |
| Leasing Commissions | 86,358 | 1,173,257 | 39,747 | | | | 1,129,545 | 549,517 | 2,694,859 | | 60,317 |
| Capital Reserves | 33,531 | 34,537 | 35,573 | 36,641 | 37,740 | 38,872 | 40,038 | 41,239 | 42,478 | 43,751 | 45,063 |
| Total Leasing & Capital Costs | 976,617 | 1,258,954 | 118,858 | 36,641 | 37,740 | 38,872 | 1,169,583 | 1,175,548 | 5,605,188 | 43,751 | 148,927 |
| Cash Flow After Debt Service But Before Taxes | $1,116,746 | $751,529 | $1,652,768 | $2,033,218 | $2,142,014 | $2,157,902 | $1,160,455 | $1,356,601 | ($2,589,728) | $4,054,955 | $7,704,204 |

SEP. 12. 2006 6:32PM ABN NO. 7652 P. 5

Software: ARGUS Ver. 12.0.4 (Build: 12000-G)
File: FOUR GATEWAY - Argus - 8-10-2006
Property Type: Office/Industrial
Portfolio:

Date: 8/15/06
Time: 11:17 am
Ref#: ABI
Page: 1

Tenant Rent Roll
As of Nov-2006
Projected Tenant Revenues and Costs for the Year Ending Oct-2007

| Tenant Name | Suite | Lease Type | Lease Status | Tenant Size | Lease Start Date | Lease Expiration Date | Potential Gross Revenue | Net Cash Flow |
|---|---|---|---|---|---|---|---|---|
| Franks Franks MTM | Lobby 1 | Retail | Contract | 1,089 | 7/06 | 12/06 | 1,200 | 1,200 |
| Gourmet Lunchbox MTM | Lobby 2 | Retail | Contract | 2,666 | 7/06 | 12/06 | 2,400 | 2,400 |
| Jacobs Rosenberg | 305 | Office | Contract | 2,550 | 8/04 | 7/09 | 71,400 | 71,400 |
| Management Office | 300 | Office | Contract | 2,022 | 11/06 | 10/31 | 694 | 694 |
| Margarita's Kitchen MTM | Lobby 3 | Retail | Contract | 1,361 | 7/06 | 12/06 | 1,200 | 1,200 |
| McCarter & English (1) | 51 | Office | Contract | 932 | 9/98 | 2/08 | 25,706 | 25,706 |
| McCarter & English (1) | 51 | Option | Speculativ | | 3/08 | 2/13 | | |
| McCarter & English (1) | 51 | Option | Speculativ | | 3/13 | 2/18 | | |
| McCarter & English (1) | 100 | Office | Contract | 10,571 | 9/98 | 2/08 | 291,538 | 291,538 |
| McCarter & English (1) | 100 | Option | Speculativ | | 3/08 | 2/13 | | |
| McCarter & English (1) | 100 | Option | Speculativ | | 3/13 | 2/18 | | |
| McCarter & English (10) | 1,000 | Office | Contract | 21,978 | 9/98 | 2/08 | 836,732 | 836,732 |
| McCarter & English (10) | 1,000 | Option | Speculativ | | 3/08 | 2/13 | | |
| McCarter & English (10) | 1,000 | Option | Speculativ | | 3/13 | 2/18 | | |
| McCarter & English (11-15) | 1100-1500 | Office | Contract | 109,890 | 9/98 | 2/08 | 4,180,642 | 4,180,642 |
| McCarter & English (11-15) | 1100-1500 | Option | Speculativ | | 3/08 | 2/13 | | |
| McCarter & English (11-15) | 1100-1500 | Option | Speculativ | | 3/13 | 2/18 | | |
| McCarter & English (LL) | B050 | Office | Contract | 2,520 | 9/98 | 2/08 | 26,888 | 26,888 |
| McCarter & English (LL) | B050 | Option | Speculativ | | 3/08 | 2/13 | | |
| McCarter & English (LL) | B050 | Option | Speculativ | | 3/13 | 2/18 | | |
| McCarter & English (LL) | B054 | Office | Contract | 1,341 | 9/98 | 2/08 | 22,234 | 22,234 |
| McCarter & English (LL) | B054 | Option | Speculativ | | 3/08 | 2/13 | | |
| McCarter & English (LL) | B054 | Option | Speculativ | | 3/13 | 2/18 | | |
| *Potential Retail Lease* | Lobby 1-3 | Retail | Speculativ | | 1/08 | 12/17 | | |
| Prudential | B003 | Office | Contract | 2,418 | 9/98 | 12/14 | 28,412 | 28,412 |
| Prudential | 0100-0900 | Office | Contract | 136,252 | 2/88 | 12/14 | 3,660,744 | 3,660,744 |
| Speculative Tenant | 300 | Office | Speculativ | | 8/07 | 7/14 | 48,790 | (217,046) |
| United HealthCare (PENDING) | 400 | Office | Contract | | 1/07 | 12/13 | 512,641 | (164,609) |
| Total | | | | 297,590 | | | $9,711,221 | $8,768,135 |
| Average per SqFt. | | | | | | | $32.63 | $29.46 |

**SCHEDULE II**

**INTENTIONALLY OMITTED**

**SCHEDULE III**

# ORGANIZATIONAL CHART

000000576

**Proposed TIC Structure**
**Gateway 4, 100 Mulberry Street**
**Newark, NJ**

**GATEWAY 4, 100 MULBERRY STREET, NEWARK, NJ**
Property to be operated by G4 Operating Company, LLC pursuant to a separate management agreement with each TIC

**Heritage Gateway, LLC**
Single Member
Delaware LLC
___% undivided interest

**570 Partners II, LLC**
Single Member
Delaware, LLC

| 570 Partners, LLC | |
|---|---|
| Steven Greenberg | 16.825% |
| Jeffrey Greenberg | 16.825% |
| Jim DePelro | 2.34% |
| Judy Greenberg | 14.02% |
| Phil DiPaulis | 24.30% |
| Chuck Puth | 2.34% |
| Donny Surdoval | 4.67% |
| Frank James | 4.67% |
| TBD | 4.67% |
| TBD | 4.67% |
| TBD | 4.67% |

**Marine One Associates III, LLC**
Single Member
Delaware LLC
___% undivided interest

**Marine One Associates II, LLC**
Single Member
Delaware, LLC

| Marine One Associates, LLC | |
|---|---|
| Steven Greenberg | 40.84% |
| Jeffrey Greenberg | 40.84% |
| Frank Verdi | 5.00% |
| Jim DePalro | 10.00% |
| Bill Hanson | 3.32% |

**Ridgewood 2000 Associates III, LLC**
Single Member
Delaware LLC
___% undivided interest

**Ridgewood 2000 Associates II, LLC**
Single Member
Delaware, LLC

| Ridgewood 2000 Associates, LLC | |
|---|---|
| Steven Greenberg | 99.00% |
| Jeffrey Greenberg | 1.00% |

**JPG Real Estate III, LLC**
Single Member
Delaware LLC
___% undivided interest

**JPG Real Estate II, LLC**
Single Member
Delaware, LLC

| JPG Real Estate, LLC | |
|---|---|
| Steven Greenberg | 1.00% |
| Jeffrey Greenberg | 99.00% |

**Ivy Gateway, LLC**
Single Member
Delaware LLC
___% undivided interest

**IVY REALTY FUND I, LP**

Case 2:17-cv-02036-KM-MAH Document 1-3 Filed 03/28/17 Page 103 of 215 PageID: 131

Gateway IV

| | |
|---|---|
| Heritage Total | 61% |
| Ivy Total | 39% |

**SUMMARY OF PARTNERS AND RESPECTIVE OWNERSHIP**

| Partner | 570 Partners, LLC (Heritage Gateway, LLC) | Marine One Associates, LLC (Marine One Associates III, LLC) | JPG Real Estate, LLC (JPG Real Estate III, LLC) | Ridgewood 2000 Associates, LLC (Ridgewood 2000 Associates III, LLC | IVY Realty Fund I, LP (Ivy Gateway, LLC) | TOTAL% SHARE |
|---|---|---|---|---|---|---|
| Steven Greenberg | 16.825% | 40.84% | 1.00% | 99.00% | | 19.91% |
| Jeffrey Greenberg | 16.825% | 40.84% | 99.00% | 1.00% | | 19.91% |
| Frank Verdi | | 5.00% | | | | 0.88% |
| Jim DePelro | 2.34% | 10.00% | | | | 2.40% |
| Bill Hanson | | 3.32% | | | | 0.59% |
| Judy Greenberg | 14.02% | | | | | 3.79% |
| Phil DiPaulis | 24.30% | | | | | 6.57% |
| Chuck Puth | 2.34% | | | | | 0.63% |
| Donny Surdoval | 4.67% | | | | | 1.26% |
| Frank James | 4.67% | | | | | 1.26% |
| TBD | 4.67% | | | | | 1.26% |
| TBD | 4.67% | | | | | 1.26% |
| TBD | 4.67% | | | | | 1.26% |
| Ivy Realty Fund I, LP | | | | | 100% | 39.00% |
| Total | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% |
| TIC % of Entire Deal | 27.04% | 17.68% | 8.14% | 8.14% | 39.00% | 100.00% |

Case 2:17-cv-02036-KM-MAH Document 1-3 Filed 03/28/17 Page 104 of 115 PageID: 132

**SCHEDULE IV**

________________________
(Lender)

- and -

________________________
(Tenant)

**SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT**

Dated:

Location:

Section :
Block:
Lot:
County:

PREPARED BY AND UPON
RECORDATION RETURN TO:

DLA Piper US LLP
1251 Avenue of the Americas
New York, New York 10020
Attention:

File No.:
Title No.:

000000479

# SUBORDINATION, NON DISTURBANCE AND ATTORNMENT AGREEMENT

THIS SUBORDINATION, NON DISTURBANCE AND ATTORNMENT AGREEMENT (this "Agreement") is made as of the ____ day of ______________, 20__ by and between [LENDER], having an address at [LENDER'S ADDRESS] ("Lender") and ______________________________________, having an address at ______________________________________________________ ("Tenant").

RECITALS:

A. Lender has made a loan in the approximate amount of $_______ to Landlord (defined below), which Loan is given pursuant to the terms and conditions of that certain Loan Agreement dated ________________, 20__, between Lender and Landlord (the "Loan Agreement"). The Loan is evidenced by a certain Promissory Note dated ________________, 20__, given by Landlord to Lender (the "Note") and secured by a certain [Mortgage][Deed of Trust] and Security Agreement dated ______________, 20__, given by Landlord to Lender (the "Mortgage"), which encumbers the fee estate of Landlord in certain premises described in Exhibit A attached hereto (the "Property");

B. Tenant occupies a portion of the Property under and pursuant to the provisions of a certain lease dated ________________, ____ between ________________, as landlord ("Landlord") and Tenant, as tenant (the "Lease"); and

C. Tenant has agreed to subordinate the Lease to the Mortgage and to the lien thereof and Lender has agreed to grant non-disturbance to Tenant under the Lease on the terms and conditions hereinafter set forth.

AGREEMENT:

For good and valuable consideration, Tenant and Lender agree as follows:

A. Subordination. Tenant agrees that the Lease and all of the terms, covenants and provisions thereof and all rights, remedies and options of Tenant thereunder are and shall at all times continue to be subject and subordinate in all respects to the Mortgage and to the lien thereof and all terms, covenants and conditions set forth in the Mortgage and the Loan Agreement including without limitation all renewals, increases, modifications, spreaders, consolidations, replacements and extensions thereof and to all sums secured thereby with the same force and effect as if the Mortgage and Loan Agreement had been executed, delivered and (in the case of the Mortgage) recorded prior to the execution and delivery of the Lease.

B. Non-Disturbance. Lender agrees that if any action or proceeding is commenced by Lender for the foreclosure of the Mortgage or the sale of the Property, Tenant shall not be named as a party therein unless such joinder shall be required by law; provided, however, such joinder shall not result in the termination of the Lease or disturb the Tenant's possession or use of the premises demised thereunder, and the sale of the Property in any such action or proceeding and the exercise by Lender of any of its other rights under the Note, the Mortgage and the Loan

Case 2:17-cv-02036-KM-MAH Document 1-3 Filed 03/26/17 Page 106 of 115 PageID: 134

Agreement shall be made subject to all rights of Tenant under the Lease, provided that at the time of the commencement of any such action or proceeding or at the time of any such sale or exercise of any such other rights (a) the term of the Lease shall have commenced pursuant to the provisions thereof, (b) Tenant shall be in possession of the premises demised under the Lease, (c) the Lease shall be in full force and effect and (d) Tenant shall not be in default under any of the terms, covenants or conditions of the Lease or of this Agreement on Tenant's part to be observed or performed beyond the expiration of any applicable notice or grace periods.

C. Attornment. Lender and Tenant agree that upon the conveyance of the Property by reason of the foreclosure of the Mortgage or the acceptance of a deed or assignment in lieu of foreclosure or otherwise, the Lease shall not be terminated or affected thereby (at the option of the transferee of the Property (the "Transferee") if the conditions set forth in Section 2 above have not been met at the time of such transfer) but shall continue in full force and effect as a direct lease between the Transferee and Tenant upon all of the terms, covenants and conditions set forth in the Lease and in that event, Tenant agrees to attorn to the Transferee and the Transferee shall accept such attornment, provided, however, that the provisions of the Mortgage and the Loan Agreement shall govern with respect to the disposition of any casualty insurance proceeds or condemnation awards and the Transferee shall not be (a) obligated to complete any construction work required to be done by Landlord pursuant to the provisions of the Lease or to reimburse Tenant for any construction work done by Tenant, (b) liable (i) for Landlord's failure to perform any of its obligations under the Lease which have accrued prior to the date on which the Transferee shall become the owner of the Property, or (ii) for any act or omission of Landlord, whether prior to or after such foreclosure or sale, (c) required to make any repairs to the Property or to the premises demised under the Lease required as a result of fire, or other casualty or by reason of condemnation unless the Transferee shall be obligated under the Lease to make such repairs and shall have received sufficient casualty insurance proceeds or condemnation awards to finance the completion of such repairs, (d) required to make any capital improvements to the Property or to the premises demised under the Lease which Landlord may have agreed to make, but had not completed, or to perform or provide any services not related to possession or quiet enjoyment of the premises demised under the Lease, (e) subject to any offsets, defenses, abatements or counterclaims which shall have accrued to Tenant against Landlord prior to the date upon which the Transferee shall become the owner of the Property, (f) liable for the return of rental security deposits, if any, paid by Tenant to Landlord in accordance with the Lease unless such sums are actually received by the Transferee, (g) bound by any payment of rents, additional rents or other sums which Tenant may have paid more than one (1) month in advance to any prior Landlord unless (i) such sums are actually received by the Transferee or (ii) such prepayment shall have been expressly approved of by the Transferee, (h) bound to make any payment to Tenant which was required under the Lease, or otherwise, to be made prior to the time the Transferee succeeded to Landlord's interest, (i) bound by any agreement amending, modifying or terminating the Lease made without the Lender's prior written consent prior to the time the Transferee succeeded to Landlord's interest or (j) bound by any assignment of the Lease or sublease of the Property, or any portion thereof, made prior to the time the Transferee succeeded to Landlord's interest other than if pursuant to the provisions of the Lease.

Case 2:17-cv-02036-KM-MAH Document 1-3 Filed 03/28/17 Page 107 of 115 PageID: 135

D. Notice to Tenant. After notice is given to Tenant by Lender that the Landlord is in default under the Note and the Mortgage and that the rentals under the Lease should be paid to Lender pursuant to the terms of the assignment of leases and rents executed and delivered by Landlord to Lender in connection therewith, Tenant shall thereafter pay to Lender or as directed by the Lender, all rentals and all other monies due or to become due to Landlord under the Lease and Landlord hereby expressly authorizes Tenant to make such payments to Lender and hereby releases and discharges Tenant from any liability to Landlord on account of any such payments.

E. Lender's Consent. Tenant shall not, without obtaining the prior written consent of Lender, (a) enter into any agreement amending, modifying or terminating the Lease, (b) prepay any of the rents, additional rents or other sums due under the Lease for more than one (1) month in advance of the due dates thereof, (c) voluntarily surrender the premises demised under the Lease or terminate the Lease without cause or shorten the term thereof, or (d) assign the Lease or sublet the premises demised under the Lease or any part thereof other than pursuant to the provisions of the Lease; and any such amendment, modification, termination, prepayment, voluntary surrender, assignment or subletting, without Lender's prior consent, shall not be binding upon Lender.

F. Lender to Receive Notices. Tenant shall provide Lender with copies of all written notices sent to Landlord pursuant to the Lease simultaneously with the transmission of such notices to the Landlord. Tenant shall notify Lender of any default by Landlord under the Lease which would entitle Tenant to cancel the Lease or to an abatement of the rents, additional rents or other sums payable thereunder, and agrees that, notwithstanding any provisions of the Lease to the contrary, no notice of cancellation thereof or of such an abatement shall be effective unless Lender shall have received notice of default giving rise to such cancellation or abatement and shall have failed within sixty (60) days after receipt of such notice to cure such default, or if such default cannot be cured within sixty (60) days, shall have failed within sixty (60) days after receipt of such notice to commence and thereafter diligently pursue any action necessary to cure such default.

G. Notices. All notices or other written communications hereunder shall be deemed to have been properly given (i) upon delivery, if delivered in person or by facsimile transmission with receipt acknowledged by the recipient thereof and confirmed by telephone by sender, (ii) one (1) Business Day (hereinafter defined) after having been deposited for overnight delivery with any reputable overnight courier service, or (iii) three (3) Business Days after having been deposited in any post office or mail depository regularly maintained by the U.S. Postal Service and sent by registered or certified mail, postage prepaid, return receipt requested, addressed as follows:

If to Tenant: ______________________________
______________________________
______________________________
Attention: ______________
Facsimile No. ____________

If to Lender: [Lender's Notice]

Case 2:17-cv-02036-KM-MAH Document 1-3 Filed 03/28/17 Page 108 of 115 PageID: 136

With a copy to: DLA Piper US LLP
1251 Avenue of the Americas
New York, New York 10020
Attention: Willard S. Moore, Esq.
Facsimile No. (212) 335-4150

or addressed as such party may from time to time designate by written notice to the other parties. For purposes of this Section, the term "Business Day" shall mean a day on which commercial banks are not authorized or required by law to close in New York, New York.

Either party by notice to the other may designate additional or different addresses for subsequent notices or communications.

H. Joint and Several Liability. If Tenant consists of more than one person, the obligations and liabilities of each such person hereunder shall be joint and several. This Agreement shall be binding upon and inure to the benefit of Lender and Tenant and their respective successors and assigns.

I. Definitions. The term "Lender" as used herein shall include the successors and assigns of Lender and any person, party or entity which shall become the owner of the Property by reason of a foreclosure of the Mortgage or the acceptance of a deed or assignment in lieu of foreclosure or otherwise. The term "Landlord" as used herein shall mean and include the present landlord under the Lease and such landlord's predecessors and successors in interest under the Lease, but shall not mean or include Lender. The term "Property" as used herein shall mean the Property, the improvements now or hereafter located thereon and the estates therein encumbered by the Mortgage.

J. No Oral Modifications. This Agreement may not be modified in any manner or terminated except by an instrument in writing executed by the parties hereto.

K. Governing Law. This Agreement shall be deemed to be a contract entered into pursuant to the laws of the State where the Property is located and shall in all respects be governed, construed, applied and enforced in accordance with the laws of the State where the Property is located.

L. Inapplicable Provisions. If any term, covenant or condition of this Agreement is held to be invalid, illegal or unenforceable in any respect, this Agreement shall be construed without such provision.

M. Duplicate Originals; Counterparts. This Agreement may be executed in any number of duplicate originals and each duplicate original shall be deemed to be an original. This Agreement may be executed in several counterparts, each of which counterparts shall be deemed an original instrument and all of which together shall constitute a single Agreement. The failure of any party hereto to execute this Agreement, or any counterpart hereof, shall not relieve the other signatories from their obligations hereunder.

N. Number and Gender. Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns and pronouns shall include the plural and vice versa.

O. Transfer of Loan. Lender may sell, transfer and deliver the Note and assign the Mortgage, this Agreement and the other documents executed in connection therewith to one or more investors in the secondary mortgage market ("Investors"). In connection with such sale, Lender may retain or assign responsibility for servicing the loan, including the Note, the Mortgage, this Agreement and the other documents executed in connection therewith, or may delegate some or all of such responsibility and/or obligations to a servicer including, but not limited to, any subservicer or master servicer, on behalf of the Investors. All references to Lender herein shall refer to and include any such servicer to the extent applicable.

P. Further Acts. Tenant will, at the cost of Tenant, and without expense to Lender, do, execute, acknowledge and deliver all and every such further acts and assurances as Lender shall, from time to time, require, for the better assuring and confirming unto Lender the property and rights hereby intended now or hereafter so to be, or for carrying out the intention or facilitating the performance of the terms of this Agreement or for filing, registering or recording this Agreement, or for complying with all applicable laws.

Q. Limitations on Lender's Liability. Tenant acknowledges that Lender is obligated only to Landlord to make the Loan upon the terms and subject to the conditions set forth in the Loan Agreement. In no event shall Lender or any purchaser of the Property at foreclosure sale or any grantee of the Property named in a deed-in-lieu of foreclosure, nor any heir, legal representative, successor, or assignee of Lender or any such purchaser or grantee (collectively the Lender, such purchaser, grantee, heir, legal representative, successor or assignee, the "Subsequent Landlord") have any personal liability for the obligations of Landlord under the Lease and should the Subsequent Landlord succeed to the interests of the Landlord under the Lease, Tenant shall look only to the estate and property of any such Subsequent Landlord in the Property for the satisfaction of Tenant's remedies for the collection of a judgment (or other judicial process) requiring the payment of money in the event of any default by any Subsequent Landlord as landlord under the Lease, and no other property or assets of any Subsequent Landlord shall be subject to levy, execution or other enforcement procedure for the satisfaction of Tenant's remedies under or with respect to the Lease; provided, however, that the Tenant may exercise any other right or remedy provided thereby or by law in the event of any failure by Subsequent Landlord to perform any such material obligation.

Case 2:17-cv-02036-KM-MAH Document 1-3 Filed 03/28/17 Page 110 of 115 PageID: 138

IN WITNESS WHEREOF, Lender and Tenant have duly executed this Agreement as of the date first above written.

LENDER:
[Lender]
By:
Name:
Title:
TENANT:

______________________________
a ________________
By:
Name:
Title:

The undersigned accepts and agrees to the provisions of Section 4 hereof:

LANDLORD:

______________________, a
______________________________

By:____________________________
Name:
Title:

# ACKNOWLEDGMENTS

[INSERT STATE SPECIFIC ACKNOWLEDGMENT]

# **EXHIBIT A**

## LEGAL DESCRIPTION

Case 2:17-cv-02036-KM-MAH Document 1-3 Filed 03/28/17 Page 113 of 154 PageID: 141

## LEGAL DESCRIPTION

BEGINNING at a point in the Easterly line of Mulberry Street (variable width Right of Way), said point being situate South 27ø24'42" West, a distance of 212.84 feet and South 25ø36'05" West, a distance of 42.26 feet from a point located at the intersection of the Southerly Right of Way line of Commerce Street (60 feet wide R.O.W.) with the Easterly Right of Way line of Mulberry Street, and from said beginning point running, thence:

1) South 74ø26'00" East, a distance of 197.94 feet, coincident with Lot 122, Block 151 to a point; thence

2) Along the same North 60ø34'00" East, a distance of 8.49 feet to a point in the same; thence

3) South 74ø26'00" East, a distance of 52.17 feet along the same to a point in the Westerly line of Lot 1, Block 151; thence

4) South 15ø34'00" West, a distance of 185.14 feet, coincident with Lot 1, Block 151 to a point in the Northerly line of Market Street; thence

5) Along the Northerly right of way line of Market Street (variable width right of way), North 76ø30'37" West, a distance of 278.72 feet to a point in the Easterly line of Mulberry Street; thence

6) Along the Easterly line of Mulberry Street, North 14ø25'59" East, a distance of 47.25 feet to a point in the same; thence

7) North 75ø36'18" West, a distance of 1.78 feet to a point in the same; thence

8) Still along the same, North 25ø36'05" East, a distance of 144.24 feet to the point and place of BEGINNING.

TOGETHER with the free and uninterrupted use, and the liberty and privilege of uninterrupted passage along an overhead Pedestrian Walkway (including two bridges noted hereafter) which extends from its Easterly most point at the Pennsylvania Railroad Station located at the Easterly side of Raymond Plaza West, (variable width) crossing and bridging the aforesaid Raymond Plaza West at and between the elevations of 34.2 and 51.2 feet above City Datum to the entrance of One Gateway Center Condominium at and between the elevations of 34.1 feet and 51.2 feet above City Datum; thence passing along and through the aforesaid Condominium at and between the elevations as set forth in the Condominium Plans to the land now or late of the Prudential Insurance Company of America; thence crossing the aforesaid land and also crossing and bridging McCarter Highway also known as New Jersey State Highway Route 21 (variable width) at and between the elevations of 42.9 feet and 60.2 feet above City Datum to the entrance of Two Gateway Center at and between the elevations of 46.6 feet and 60.7 feet above City Datum; thence extending through the building and crossing the land of Two Gateway Center at and between the elevations of 43.1 feet and 64.7 feet above City Datum to the entrance of Three

Gateway Garage at and between the elevations of 43.1 feet and 64.7 feet above City Datum; thence extending through the building and crossing the land of Three Gateway Garage and also crossing the land of Three Gateway at and between the elevations of 43.0 feet and 64.7 feet above the City Datum to the entrance of Three Gateway Center; thence extending through Three Gateway Center at and between the elevations of 43.0 feet and 64.7 feet above the City Datum to the Westerly most point at or near Mulberry Street (variable width) (such entire described Pedestrian Walkway (including the bridges described above), the "Pedestrian Walkway").

Subject to and together with easements as set forth in Deed Book 4768 page 941 and Deed Book 5164 page 592 as modified and or superseded by that certain Amended and Restated Grant and Agreement between One Gateway Center Condominium Association, Inc.; The Prudential Insurance Company of America; Third Newark Gateway Urban Renewal Association, a New Jersey Partnership; Gateway Four Urban Renewal, L.P. and Gateway South Urban Renewal Association, a New Jersey Partnership; dated December 21, 1999 and recorded December 27, 1999 in Deed Book 5664 page 680.

TOGETHER with and subject to the Amended and Restated Grant and Agreement between One Gateway Center Condominium Association, Inc.; The Prudential Insurance Company of America; Third Newark Gateway Urban Renewal Association, a New Jersey Partnership; Gateway Four Urban Renewal, L.P. and Gateway South Urban Renewal Association, a New Jersey Partnership; dated December 21, 1999 and recorded December 27, 1999 in Deed Book 5664 page 680.

TOGETHER with and subject to the Grant and Declaration of Easements between Gateway III Newark, L.L.C.; Gateway IV Newark Urban Renewal, L.L.C.; Gateway V Newark, L.L.C.; and Gateway Parking Newark, L.L.C.; dated December 22, 1999 and recorded December 27, 1999 in Deed Book 5664 page 852.

TOGETHER with and subject to Parking Agreement set forth in Deed Book 5892 page 921 as assigned and assumed as set forth in Deed Book 6073 page 770.

BEING in accordance with a Survey prepared by CONTROL POINT ASSOCIATES, INC., (GREGORY S. GALLAS, NJPLS), dated September 25, 2006 and revised September 29, 2006.

**SCHEDULE V**

## DESCRIPTION OF OPERATING AGREEMENTS

Parking Agreement, dated as of June 11, 2002 and recorded as of June 18, 2002 in the Essex County Register as Deed Book 5892, page 921, by and between Gateway VII Newark, L.L.C., Gateway Parking Newark, L.L.C., and Fortune Funding, LLC, as modified by that certain Assignment and Assumption of Parking Agreement, dated as of May 28, 2004 and recorded as of June 7, 2004 in the Essex County Register as Deed Book 6073, page 773, by and between Gateway VII Newark, L.L.C., Gateway Parking Newark, L.L.C., and Gateway IV LLC.

Grant and Agreement, dated as of April 18, 1991 and recorded as of April 18, 1991 in the Essex County Register as Deed Book 5164, page 592, by First Newark Gateway Urban Renewal Association, Second Newark Gateway Urban Renewal Association, Third Newark Gateway Urban Renewal Association and The Prudential Insurance Company of America in favor of Gateway Four Urban Renewal, L.P., as superseded by that certain Amended and Restated Grant and Agreement, dated as of December 21, 1999 and recorded as of December 27, 1999 in the Essex County Register as Deed Book 5664, page 680, by and between One Gateway Center Condominium Association, Inc., Third Newark Gateway Urban Renewal Association, Gateway Four Urban Renewal, L.P., Gateway South Urban Renewal Association and The Prudential Insurance Company of America, as further amended by that certain First Amendment to Amended and Restated Grant and Easement, dated as of September 19, 2000 and recorded as of September 31, 2000 in the Essex County Register as Deed Book 5723, page 610, by and between One Gateway Center Condominium Association, Inc., Gateway I Newark, L.L.C., Gateway III Newark, L.L.C., Gateway VI Newark Urban Renewal, L.L.C., Gateway V Newark, L.L.C., Gateway Parking Newark, L.L.C., Gateway VII Newark, L.L.C., and Gateway South Urban Renewal Association, as modified by that certain Assignment and Assumption of Grant and Agreement, dated as of June 11, 2002 and recorded as of June 18, 2002 in the Essex County Register as Deed Book 5892, page 878, by and between Gateway IV Newark Urban Renewal, L.L.C., Gateway V Newark, L.L.C. and Fortune Funding, LLC, as further modified by that certain Assignment and Assumption of Grant and Agreement, dated as of May 28, 2004 and recorded as of June 7, 2004 in the Essex County Register as Deed Book 6073, page 764 and Deed Book 6073, page 760, by and between Gateway IV Acquisition LLC and Gateway IV LLC.

# EXHIBIT C

Case 2:17-cv-02036-KM-MAH Document 1-4 Filed 03/28/17 Page 2 of 35 PageID: 145

1 10 11

See Mtg. Book 12291 Page 5216

MAY 30 2007
ASSG'T. REC'D.
BK 12059 PAGE 1227

H-6158038

**ATTENTION: COUNTY CLERK THIS SECURITY INSTRUMENT IS A SECURITY AGREEMENT AND FINANCING STATEMENT UNDER THE NEW JERSEY UNIFORM COMMERCIAL CODE. PORTIONS OF THE PROPERTY ARE GOODS WHICH ARE OR ARE TO BECOME AFFIXED TO OR FIXTURES ON THE LAND. THIS SECURITY INSTRUMENT IS, THEREFORE, TO BE FILED FOR RECORD OR RECORDED AS A FIXTURE FILING IN, AMONG OTHER PLACES, THE REAL ESTATE RECORDS OF EACH COUNTY IN WHICH SAID LAND OR ANY PORTION THEREOF IS LOCATED. THE BORROWER/DEBTOR IS THE OWNER OF A RECORD INTEREST IN THE REAL ESTATE CONCERNED. THIS INSTRUMENT IS ALSO TO BE INDEXED IN THE INDEX OF FINANCING STATEMENTS.**

---

HERITAGE GATEWAY, LLC,

MARINE ONE ASSOCIATES III, LLC,

RIDGEWOOD 2000 ASSOCIATES III, LLC,

JPG REAL ESTATE III, LLC,

and

IVY GATEWAY, LLC,

together as tenants-in-common, as mortgagor
(Borrower)

to

LASALLE BANK NATIONAL ASSOCIATION, as mortgagee
(Lender)

Not Certified Copy

---

# MORTGAGE AND SECURITY AGREEMENT

---

Dated: As of October 25, 2006

Location: 100 Mulberry Street, Newark, New Jersey 07102

County: Essex County

PREPARED BY AND UPON RECORDATION RETURN TO:

DLA Piper US LLP
1251 Avenue of the Americas
New York, New York 10020
Attention: Willard Moore, Esq.

NEWY1\8035273.4

Instr# 6158038 Carole A. Graves
Recorded/Filed RG 2 Essex County Register
10/30/2006 13:32:4 Bk 11600 Pg 888 #Pgs 34

MORTGAGE AND SECURITY AGREEMENT

THIS MORTGAGE AND SECURITY AGREEMENT (this "**Security Instrument**") is made as of this 25 day of October, 2006, by HERITAGE GATEWAY, LLC, MARINE ONE ASSOCIATES III, LLC, RIDGEWOOD 2000 ASSOCIATES III, LLC, JPG REAL ESTATE III, LLC, each a Delaware limited liability company having its principal place of business at 123 Prospect Street, Ridgewood, New Jersey 07451, and IVY GATEWAY, LLC, a Delaware limited liability company, having its principal place of business at 1 Paragon Drive, Suite 125, Montvale, New Jersey 07645, together as tenants-in-common and as mortgagor, (collectively, the "**Borrower**") for the benefit of LASALLE BANK NATIONAL ASSOCIATION, having an address at 135 South LaSalle Street, Suite 3410, Chicago, Illinois 60603, as mortgagee ("**Lender**").

WITNESSETH:

WHEREAS, this Security Instrument is given to secure a loan (the "**Loan**") in the principal sum of SIXTY-ONE MILLION AND NO/100 DOLLARS ($61,000,000) or so much thereof as may be advanced pursuant to that certain Loan Agreement dated as of the date hereof between Borrower and Lender (as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, the "**Loan Agreement**") and evidenced by that certain Promissory Note dated the date hereof made by Borrower to Lender (such Note, together with all extensions, renewals, replacements, restatements or modifications thereof being hereinafter referred to as the "**Note**");

Not Certified Copy

WHEREAS, Borrower desires to secure the payment of the Debt (as defined in the Loan Agreement) and the performance of all of its obligations under the Note, the Loan Agreement and the other Loan Documents; and

WHEREAS, this Security Instrument is given pursuant to the Loan Agreement, and payment, fulfillment, and performance by Borrower of its obligations thereunder and under the other Loan Documents are secured hereby, and each and every term and provision of the Loan Agreement and the Note, including the rights, remedies, obligations, covenants, conditions, agreements, indemnities, representations and warranties of the parties therein, are hereby incorporated by reference herein as though set forth in full and shall be considered a part of this Security Instrument (the Loan Agreement, the Note, this Security Instrument, that certain Assignment of Leases and Rents of even date herewith made by Borrower in favor of Lender (the "**Assignment of Leases**") and all other documents evidencing or securing the Debt or delivered in connection with the making of the Loan are hereinafter referred to collectively as the "**Loan Documents**").

NOW THEREFORE, in consideration of the making of the Loan by Lender and the covenants, agreements, representations and warranties set forth in this Security Instrument:

## ARTICLE 1 - GRANTS OF SECURITY

SECTION 1.1 PROPERTY MORTGAGED. Borrower does hereby irrevocably mortgage, grant, bargain, sell, pledge, assign, warrant, transfer and convey to Lender and its successors and

assigns the following property, rights, interests and estates now owned, or hereafter acquired by Borrower (collectively, the "**Property**"):

(a) Land. The real property described in Exhibit A attached hereto and made a part hereof (the "**Land**");

(b) Additional Land. All additional lands, estates and development rights hereafter acquired by Borrower for use in connection with the Land and the development of the Land and all additional lands and estates therein which may, from time to time, by supplemental mortgage or otherwise be expressly made subject to the lien of this Security Instrument;

(c) Improvements. The buildings, structures, fixtures, additions, enlargements, extensions, modifications, repairs, replacements and improvements now or hereafter erected or located on the Land (collectively, the "**Improvements**");

(d) Easements. All easements, rights-of-way or use, rights, strips and gores of land, streets, ways, alleys, passages, sewer rights, water, water courses, water rights and powers, air rights and development rights, all rights to the non-exclusive use of common driveway entries, and all estates, rights, titles, interests, privileges, liberties, servitudes, tenements, hereditaments and appurtenances of any nature whatsoever, in any way now or hereafter belonging, relating or pertaining to the Land and the Improvements and the reversion and reversions, remainder and remainders, and all land lying in the bed of any street, road or avenue, opened or proposed, in front of or adjoining the Land, to the center line thereof and all the estates, rights, titles, interests, dower and rights of dower, curtesy and rights of curtesy, property, possession, claim and demand whatsoever, both at law and in equity, of Borrower of, in and to the Land and the Improvements and every part and parcel thereof, with the appurtenances thereto;

(e) Equipment. All "equipment," as such term is defined in Article 9 of the Uniform Commercial Code (as hereinafter defined), now owned or hereafter acquired by Borrower, which is used at or in connection with the Improvements or the Land or is located thereon or therein (including, but not limited to, all machinery, equipment, furnishings, and electronic data-processing and other office equipment now owned or hereafter acquired by Borrower and any and all additions, substitutions and replacements of any of the foregoing), together with all attachments, components, parts, equipment and accessories installed thereon or affixed thereto (collectively, the "**Equipment**"). Notwithstanding the foregoing, Equipment shall not include any property belonging to tenants under leases except to the extent that Borrower shall have any right or interest therein;

(f) Fixtures. All Equipment now owned, or the ownership of which is hereafter acquired, by Borrower which is so related to the Land and Improvements forming part of the Property that it is deemed fixtures or real property under the law of the particular state in which the Equipment is located, including, without limitation, all building or construction materials intended for construction, reconstruction, alteration or repair of or installation on the Property, construction equipment, appliances, machinery, plant equipment, fittings, apparatuses, fixtures and other items now or hereafter attached to, installed in or used in connection with (temporarily or permanently) any of the Improvements or the Land, including, but not limited to, engines, devices for the operation of pumps, pipes, plumbing, cleaning, call and sprinkler systems, fire

Case 2:17-cv-02036-KM-MAH Document 1-4 Filed 03/28/17 Page 5 of 35 PageID: 148

extinguishing apparatuses and equipment, heating, ventilating, plumbing, laundry, incinerating, electrical, air conditioning and air cooling equipment and systems, gas and electric machinery, appurtenances and equipment, pollution control equipment, security systems, disposals, dishwashers, refrigerators and ranges, recreational equipment and facilities of all kinds, and water, gas, electrical, storm and sanitary sewer facilities, utility lines and equipment (whether owned individually or jointly with others, and, if owned jointly, to the extent of Borrower's interest therein) and all other utilities whether or not situated in easements, all water tanks, water supply, water power sites, fuel stations, fuel tanks, fuel supply, and all other structures, together with all accessions, appurtenances, additions, replacements, betterments and substitutions for any of the foregoing and the proceeds thereof (collectively, the "**Fixtures**"). Notwithstanding the foregoing, "Fixtures" shall not include any property which tenants are entitled to remove pursuant to leases except to the extent that Borrower shall have any right or interest therein;

(g) Personal Property. All furniture, furnishings, objects of art, machinery, goods, tools, supplies, appliances, general intangibles, contract rights, accounts, accounts receivable, franchises, licenses, certificates and permits, and all other personal property of any kind or character whatsoever (as defined in and subject to the provisions of the Uniform Commercial Code as hereinafter defined), other than Fixtures, which are now or hereafter owned by Borrower and which are located within or about the Land and the Improvements, together with all accessories, replacements and substitutions thereto or therefor and the proceeds thereof (collectively, the "**Personal Property**"), and the right, title and interest of Borrower in and to any of the Personal Property which may be subject to any security interests, as defined in the Uniform Commercial Code, as adopted and enacted by the state or states where any of the Property is located (the "**Uniform Commercial Code**"), superior in lien to the lien of this Security Instrument and all proceeds and products of the above;

(h) Leases and Rents. All leases and other agreements affecting the use, enjoyment or occupancy of the Land and the Improvements heretofore or hereafter entered into, whether before or after the filing by or against Borrower of any petition for relief under 11 U.S.C. §101 et seq., as the same may be amended from time to time (the "**Bankruptcy Code**") (collectively, the "**Leases**") and all right, title and interest of Borrower, its successors and assigns therein and thereunder, including, without limitation, cash or securities deposited thereunder to secure the performance by the lessees of their obligations thereunder and all rents, additional rents, revenues, issues and profits (including all oil and gas or other mineral royalties and bonuses) from the Land and the Improvements whether paid or accruing before or after the filing by or against Borrower of any petition for relief under the Bankruptcy Code (collectively, the "**Rents**") and all proceeds from the sale or other disposition of the Leases and the right to receive and apply the Rents to the payment of the Debt;

(i) Condemnation Awards. All awards or payments, including interest thereon, which may heretofore and hereafter be made with respect to the Property, whether from the exercise of the right of eminent domain (including but not limited to any transfer made in lieu of or in anticipation of the exercise of the right), or for a change of grade, or for any other injury to or decrease in the value of the Property;

(j) Insurance Proceeds. All proceeds in respect of the Property under any insurance policies covering the Property, including, without limitation, the right to receive and apply the

proceeds of any insurance, judgments, or settlements made in lieu thereof, for damage to the Property;

(k) Tax Certiorari. All refunds, rebates or credits in connection with reduction in real estate taxes and assessments charged against the Property as a result of tax certiorari or any applications or proceedings for reduction;

(l) Rights. The right, in the name and on behalf of Borrower, to appear in and defend any action or proceeding brought with respect to the Property and to commence any action or proceeding to protect the interest of Lender in the Property;

(m) Agreements. All agreements, contracts, certificates, instruments, franchises, permits, licenses, plans, specifications and other documents, now or hereafter entered into, and all rights therein and thereto, respecting or pertaining to the use, occupation, construction, management or operation of the Land and any part thereof and any Improvements or respecting any business or activity conducted on the Land and any part thereof and all right, title and interest of Borrower therein and thereunder, including, without limitation, the right, upon the happening of any default hereunder, to receive and collect any sums payable to Borrower thereunder;

(n) Trademarks. All tradenames, trademarks, servicemarks, logos, copyrights, goodwill, books and records and all other general intangibles relating to or used in connection with the operation of the Property;

Not Certified Copy

(o) Proceeds. All proceeds of any of the foregoing, including, without limitation, proceeds of insurance and condemnation awards, whether cash, liquidation or other claims or otherwise;

(p) Tenancy-In-Common Agreement. All of Borrower's rights under that certain Tenancy-In-Common Agreement dated as of even date herewith, by and among Heritage Gateway, LLC, Marine One Associates III, LLC, Ridgewood 2000 Associates III, LLC, JPG Real Estate III, LLC, and Ivy Gateway, LLC; and

(q) Other Rights. Any and all other rights of Borrower in and to the items set forth in Subsections (a) through (p) above.

AND without limiting any of the other provisions of this Security Instrument, to the extent permitted by applicable law, Borrower expressly grants to Lender, as secured party, a security interest in the portion of the Property which is or may be subject to the provisions of the Uniform Commercial Code which are applicable to secured transactions; it being understood and agreed that the Improvements and Fixtures are part and parcel of the Land (the Land, the Improvements and the Fixtures collectively referred to as the "**Real Property**") appropriated to the use thereof and, whether affixed or annexed to the Real Property or not, shall for the purposes of this Security Instrument be deemed conclusively to be real estate and mortgaged hereby.

SECTION 1.2 ASSIGNMENT OF RENTS. Borrower hereby absolutely and unconditionally assigns to Lender all of Borrower's right, title and interest in and to all current and future Leases and Rents; it being intended by Borrower that this assignment constitutes a

present, absolute assignment and not an assignment for additional security only. Nevertheless, subject to the terms of the Assignment of Leases and Section 7.1(h) of this Security Instrument, Lender grants to Borrower a revocable license to collect, receive, use and enjoy the Rents. Borrower shall hold the Rents, or a portion thereof sufficient to discharge all current sums due on the Debt, for use in the payment of such sums.

SECTION 1.3 Security Agreement. This Security Instrument is both a real property mortgage and a "security agreement" within the meaning of the Uniform Commercial Code. The Property includes both real and personal property and all other rights and interests, whether tangible or intangible in nature, of Borrower in the Property. By executing and delivering this Security Instrument, Borrower hereby grants to Lender, as security for the Obligations (hereinafter defined), a security interest in the Fixtures, the Equipment, the Personal Property and other property constituting the Property to the full extent that the Fixtures, the Equipment, the Personal Property and such other property may be subject to the Uniform Commercial Code (said portion of the Property so subject to the Uniform Commercial Code being called the "**Collateral**"). If an Event of Default shall occur and be continuing, Lender, in addition to any other rights and remedies which it may have, shall have and may exercise immediately and without demand, any and all rights and remedies granted to a secured party upon default under the Uniform Commercial Code, including, without limiting the generality of the foregoing, the right to take possession of the Collateral or any part thereof, and to take such other measures as Lender may deem necessary for the care, protection and preservation of the Collateral. Upon request or demand of Lender after the occurrence and during the continuance of an Event of Default, Borrower shall, at its expense, assemble the Collateral and make it available to Lender at a convenient place (at the Land if tangible property) reasonably acceptable to Lender. Borrower shall pay to Lender on demand any and all expenses, including reasonable legal expenses and attorneys' fees, incurred or paid by Lender in protecting its interest in the Collateral and in enforcing its rights hereunder with respect to the Collateral after the occurrence and during the continuance of an Event of Default. Any notice of sale, disposition or other intended action by Lender with respect to the Collateral sent to Borrower in accordance with the provisions hereof at least ten (10) business days prior to such action, shall, except as otherwise provided by applicable law, constitute reasonable notice to Borrower. The proceeds of any disposition of the Collateral, or any part thereof, may, except as otherwise required by applicable law, be applied by Lender to the payment of the Debt in such priority and proportions as Lender in its discretion shall deem proper. The principal place of business of Borrower (Debtor) is as set forth on page one hereof and the address of Lender (Secured Party) is as set forth on page one hereof.

SECTION 1.4 Fixture Filing. Certain of the Property is or will become "fixtures" (as that term is defined in the Uniform Commercial Code) on the Land, described or referred to in this Security Instrument, and this Security Instrument, upon being filed for record in the real estate records of the city or county wherein such fixtures are situated, shall operate also as a financing statement filed as a fixture filing in accordance with the applicable provisions of said Uniform Commercial Code upon such of the Property that is or may become fixtures.

SECTION 1.5 Pledges of Monies Held. Borrower hereby pledges to Lender any and all monies now or hereafter held by Lender or on behalf of Lender in connection with the Loan, including, without limitation, any sums deposited in the Accounts (as defined in the Cash

Management Agreement) and Net Proceeds, as additional security for the Obligations until expended or applied as provided in this Security Instrument.

CONDITIONS TO GRANT

TO HAVE AND TO HOLD the above granted and described Property unto and to the use and benefit of Lender and its successors and assigns, forever;

PROVIDED, HOWEVER, these presents are upon the express condition that, if Borrower shall well and truly pay to Lender the Debt at the time and in the manner provided in the Note, the Loan Agreement and this Security Instrument, shall well and truly perform the Other Obligations as set forth in this Security Instrument and shall well and truly abide by and comply with each and every covenant and condition set forth herein and in the Note, the Loan Agreement and the other Loan Documents, these presents and the estate hereby granted shall cease, terminate and be void.

ARTICLE 2 - DEBT AND OBLIGATIONS SECURED

SECTION 2.1 DEBT. This Security Instrument and the grants, assignments and transfers made in Article 1 are given for the purpose of securing the Debt.

SECTION 2.2 OTHER OBLIGATIONS. This Security Instrument and the grants, assignments and transfers made in Article 1 are also given for the purpose of securing the following (the "**Other Obligations**"):

Not Certified Copy

(a) the performance of all other obligations of Borrower contained herein;

(b) the performance of each obligation of Borrower contained in the Loan Agreement and any other Loan Document; and

(c) the performance of each obligation of Borrower contained in any renewal, extension, amendment, modification, consolidation, change of, or substitution or replacement for, all or any part of the Note, the Loan Agreement or any other Loan Document.

SECTION 2.3 DEBT AND OTHER OBLIGATIONS. Borrower's obligations for the payment of the Debt and the performance of the Other Obligations shall be referred to collectively herein as the "**Obligations**."

ARTICLE 3 - BORROWER COVENANTS

Borrower covenants and agrees that:

SECTION 3.1 PAYMENT OF DEBT. Borrower will pay the Debt at the time and in the manner provided in the Loan Agreement, the Note and this Security Instrument.

SECTION 3.2 INCORPORATION BY REFERENCE. All the covenants, conditions and agreements contained in (a) the Loan Agreement, (b) the Note and (c) all and any of the other Loan Documents, are hereby made a part of this Security Instrument to the same extent and with

the same force as if fully set forth herein, subject in each case to the terms and provisions thereof.

SECTION 3.3 <u>INSURANCE</u>. Borrower shall obtain and maintain, or cause to be maintained, in full force and effect at all times insurance with respect to Borrower and the Property as required pursuant to the Loan Agreement.

SECTION 3.4 <u>MAINTENANCE OF PROPERTY</u>. Borrower shall cause the Property to be maintained in a good and safe condition and repair. The Improvements, the Fixtures, the Equipment and the Personal Property shall not be removed, demolished or materially altered (except for normal replacement of the Fixtures, the Equipment or the Personal Property, tenant finish and refurbishment of the Improvements) without the consent of Lender. Borrower shall promptly repair, replace or rebuild any part of the Property which may be destroyed by any Casualty or become damaged, worn or dilapidated or which may be affected by any Condemnation, and shall complete and pay for any structure at any time in the process of construction or repair on the Land.

SECTION 3.5 <u>WASTE</u>. Borrower shall not commit or suffer any waste of the Property or make any change in the use of the Property which will in any way materially increase the risk of fire or other hazard arising out of the operation of the Property, or take any action that might invalidate or allow the cancellation of any Policy, or do or permit to be done thereon anything that may in any way materially impair the value of the Property or the security of this Security Instrument. Borrower will not, without the prior written consent of Lender, permit any drilling or exploration for or extraction, removal, or production of any minerals from the surface or the subsurface of the Land, regardless of the depth thereof or the method of mining or extraction thereof.

SECTION 3.6 <u>PAYMENT FOR LABOR AND MATERIALS</u>.

(a) Borrower will promptly pay when due all bills and costs for labor, materials, and specifically fabricated materials ("**<u>Labor and Material Costs</u>**") incurred in connection with the Property and never permit to exist beyond the due date thereof in respect of the Property or any part thereof any lien or security interest, even though inferior to the liens and the security interests hereof, and in any event never permit to be created or exist in respect of the Property or any part thereof any other or additional lien or security interest other than the liens or security interests hereof except for the Permitted Encumbrances.

(b) After prior written notice to Lender, Borrower, at its own expense, may contest by appropriate legal proceeding, promptly initiated and conducted in good faith and with due diligence, the amount or validity or application in whole or in part of any of the Labor and Material Costs, provided that (i) no Event of Default has occurred and is continuing under the Loan Agreement, the Note, this Security Instrument or any of the other Loan Documents, (ii) Borrower is permitted to do so under the provisions of any other mortgage, deed of trust or deed to secure debt affecting the Property, (iii) such proceeding shall suspend the collection of the Labor and Material Costs from Borrower and from the Property or Borrower shall have paid all of the Labor and Material Costs under protest, (iv) such proceeding shall be permitted under and be conducted in accordance with the provisions of any other instrument to which Borrower is

Case 2:17-cv-02036-KM-MAH Document 1-4 Filed 03/28/17 Page 10 of 35 PageID: 153

subject and shall not constitute a default thereunder, (v) neither the Property nor any part thereof or interest therein will be in danger of being sold, forfeited, terminated, canceled or lost, and (vi) Borrower shall have furnished the security as may be required in the proceeding, or as may be reasonably requested by Lender to insure the payment of any contested Labor and Material Costs, together with all interest and penalties thereon.

SECTION 3.7 PERFORMANCE OF OTHER AGREEMENTS. Borrower shall observe and perform each and every term, covenant and provision to be observed or performed by Borrower pursuant to the Loan Agreement, any other Loan Document and any other agreement or recorded instrument affecting or pertaining to the Property and any amendments, modifications or changes thereto.

SECTION 3.8 CHANGE OF NAME, IDENTITY OR STRUCTURE. Borrower shall not change Borrower's name, identity (including its trade name or names) or, if not an individual, Borrower's corporate, partnership or other structure without first (a) notifying Lender of such change in writing at least thirty (30) days prior to the effective date of such change, (b) taking all action required by Lender for the purpose of perfecting or protecting the lien and security interest of Lender and (c) in the case of a change in Borrower's structure, without first obtaining the prior written consent of Lender. Borrower shall promptly notify Lender in writing of any change in its organizational identification number. If Borrower does not now have an organizational identification number and later obtains one, Borrower shall promptly notify Lender in writing of such organizational identification number. Borrower shall execute and deliver to Lender, prior to or contemporaneously with the effective date of any such change, any financing statement or financing statement change required by Lender to establish or maintain the validity, perfection and priority of the security interest granted herein. At the request of Lender, Borrower shall execute a certificate in form satisfactory to Lender listing the trade names under which Borrower intends to operate the Property, and representing and warranting that Borrower does business under no other trade name with respect to the Property.

## ARTICLE 4 - OBLIGATIONS AND RELIANCES

SECTION 4.1 RELATIONSHIP OF BORROWER AND LENDER. The relationship between Borrower and Lender is solely that of debtor and creditor, and Lender has no fiduciary or other special relationship with Borrower, and no term or condition of any of the Loan Agreement, the Note, this Security Instrument and the other Loan Documents shall be construed so as to deem the relationship between Borrower and Lender to be other than that of debtor and creditor.

SECTION 4.2 NO RELIANCE ON LENDER. The general partners, members, principals and (if Borrower is a trust) beneficial owners of Borrower are experienced in the ownership and operation of properties similar to the Property, and Borrower and Lender are relying solely upon such expertise and business plan in connection with the ownership and operation of the Property. Borrower is not relying on Lender's expertise, business acumen or advice in connection with the Property.

SECTION 4.3 NO LENDER OBLIGATIONS.

Case 2:17-cv-02036-KM-MAH Document 1-4 Filed 03/28/17 Page 11 of 35 PageID: 154

(a) Notwithstanding the provisions of Subsections 1.1(h) and (m) or Section 1.2, Lender is not undertaking the performance of (i) any obligations under the Leases; or (ii) any obligations with respect to such agreements, contracts, certificates, instruments, franchises, permits, trademarks, licenses and other documents.

(b) By accepting or approving anything required to be observed, performed or fulfilled or to be given to Lender pursuant to this Security Instrument, the Loan Agreement, the Note or the other Loan Documents, including, without limitation, any officer's certificate, balance sheet, statement of profit and loss or other financial statement, survey, appraisal, or insurance policy, Lender shall not be deemed to have warranted, consented to, or affirmed the sufficiency, the legality or effectiveness of same, and such acceptance or approval thereof shall not constitute any warranty or affirmation with respect thereto by Lender.

SECTION 4.4 RELIANCE. Borrower recognizes and acknowledges that in accepting the Loan Agreement, the Note, this Security Instrument and the other Loan Documents, Lender is expressly and primarily relying on the truth and accuracy of the warranties and representations set forth in Article III of the Loan Agreement without any obligation to investigate the Property and notwithstanding any investigation of the Property by Lender; that such reliance existed on the part of Lender prior to the date hereof, that the warranties and representations are a material inducement to Lender in making the Loan; and that Lender would not be willing to make the Loan and accept this Security Instrument in the absence of the warranties and representations as set forth in Article III of the Loan Agreement.

Not Certified Copy

## ARTICLE 5 - FURTHER ASSURANCES

SECTION 5.1 RECORDING OF SECURITY INSTRUMENT, ETC. Borrower forthwith upon the execution and delivery of this Security Instrument and thereafter, from time to time, will cause this Security Instrument and any of the other Loan Documents creating a lien or security interest or evidencing the lien hereof upon the Property and each instrument of further assurance to be filed, registered or recorded in such manner and in such places as may be required by any present or future law in order to publish notice of and fully to protect and perfect the lien or security interest hereof upon, and the interest of Lender in, the Property. Borrower will pay all taxes, filing, registration or recording fees, and all expenses incident to the preparation, execution, acknowledgment and/or recording of the Note, this Security Instrument, the other Loan Documents, any note, deed of trust or mortgage supplemental hereto, any security instrument with respect to the Property and any instrument of further assurance, and any modification or amendment of the foregoing documents, and all federal, state, county and municipal taxes, duties, imposts, assessments and charges arising out of or in connection with the execution and delivery of this Security Instrument, any deed of trust or mortgage supplemental hereto, any security instrument with respect to the Property or any instrument of further assurance, and any modification or amendment of the foregoing documents, except where prohibited by law so to do.

SECTION 5.2 INTENTIONALLY OMITTED.

SECTION 5.3 CHANGES IN TAX, DEBT, CREDIT AND DOCUMENTARY STAMP LAWS.

(a) if any law is enacted or adopted or amended after the date of this Security Instrument which deducts the Debt from the value of the Property for the purpose of taxation or which imposes a tax, either directly or indirectly, on the Debt or Lender's interest in the Property, Borrower will pay the tax, with interest and penalties thereon, if any. If Lender is advised by counsel chosen by it that the payment of tax by Borrower would be unlawful or taxable to Lender or unenforceable or provide the basis for a defense of usury then Lender shall have the option by written notice of not less than one hundred twenty (120) days to declare the Debt immediately due and payable.

(b) Borrower will not claim or demand or be entitled to any credit or credits on account of the Debt for any part of the Taxes or Other Charges assessed against the Property, or any part thereof, and no deduction shall otherwise be made or claimed from the assessed value of the Property, or any part thereof, for real estate tax purposes by reason of this Security Instrument or the Debt. If such claim, credit or deduction shall be required by law, Lender shall have the option, by written notice of not less than one hundred twenty (120) days, to declare the Debt immediately due and payable.

(c) If at any time the United States of America, any State thereof or any subdivision of any such State shall require revenue or other stamps to be affixed to the Note, this Security Instrument, or any of the other Loan Documents or impose any other tax or charge on the same, Borrower will pay for the same, with interest and penalties thereon, if any.

SECTION 5.4 <u>SPLITTING OF MORTGAGE</u>. This Security Instrument and the Note shall, at any time until the same shall be fully paid and satisfied, at the sole election of Lender, be split or divided into two or more notes and two or more security instruments, each of which shall cover all or a portion of the Property to be more particularly described therein. To that end, Borrower, upon written request of Lender, shall execute, acknowledge and deliver, or cause to be executed, acknowledged and delivered by the then owner of the Property, to Lender and/or its designee or designees substitute notes and security instruments in such principal amounts, aggregating not more than the then unpaid principal amount of the Note, and containing terms, provisions and clauses similar to those contained herein and in the Note, and such other documents and instruments as may be required by Lender.

SECTION 5.5 <u>REPLACEMENT DOCUMENTS</u>. Upon receipt of an affidavit of an officer of Lender as to the loss, theft, destruction or mutilation of the Note or any other Loan Document which is not of public record, and, in the case of any such mutilation, upon surrender and cancellation of such Note or other Loan Document, Borrower will issue, in lieu thereof, a replacement Note or other Loan Document, dated the date of such lost, stolen, destroyed or mutilated Note or other Loan Document in the same principal amount thereof and otherwise of like tenor.

## ARTICLE 6 - DUE ON SALE/ENCUMBRANCE

SECTION 6.1 <u>LENDER RELIANCE</u>. Borrower acknowledges that Lender has examined and relied on the experience of Borrower and its general partners, members, principals and (if Borrower is a trust) beneficial owners in owning and operating properties such as the Property in agreeing to make the Loan, and will continue to rely on Borrower's ownership of the

Case 2:17-cv-02036-KM-MAH Document 1-4 Filed 03/28/17 Page 13 of 35 PageID: 156

Property as a means of maintaining the value of the Property as security for repayment of the Debt and the performance of the Other Obligations. Borrower acknowledges that Lender has a valid interest in maintaining the value of the Property so as to ensure that, should Borrower default in the repayment of the Debt or the performance of the Other Obligations, Lender can recover the Debt by a sale of the Property.

SECTION 6.2 NO TRANSFER. Borrower shall not permit or suffer any transfer of the Property to occur, unless specifically permitted by Article 8 of the Loan Agreement or unless Lender shall, in its sole discretion, consent thereto in writing.

SECTION 6.3 INTENTIONALLY OMITTED.

SECTION 6.4 INTENTIONALLY OMITTED.

ARTICLE 7 - RIGHTS AND REMEDIES UPON DEFAULT

SECTION 7.1 REMEDIES. Upon the occurrence and during the continuance of any Event of Default (as defined in the Loan Agreement), Borrower agrees that Lender may take such action, without notice or demand, as it deems advisable to protect and enforce its rights against Borrower and in and to the Property, including, but not limited to, the following actions, each of which may be pursued concurrently or otherwise, at such time and in such order as Lender may determine, in its sole discretion, without impairing or otherwise affecting the other rights and remedies of Lender:

Not Certified Copy

(a) declare the entire unpaid Debt to be immediately due and payable;

(b) institute proceedings, judicial or otherwise, for the complete foreclosure of this Security Instrument under any applicable provision of law, in which case the Property or any interest therein may be sold for cash or upon credit in one or more parcels or in several interests or portions and in any order or manner, and in no event shall Borrower be entitled to any credit by reason of the payment of taxes thereon;

(c) with or without entry, to the extent permitted and pursuant to the procedures provided by applicable law, institute proceedings for the partial foreclosure of this Security Instrument for the portion of the Debt then due and payable, subject to the continuing lien and security interest of this Security Instrument for the balance of the Debt not then due, unimpaired and without loss of priority;

(d) sell for cash or upon credit the Property or any part thereof and all estate, claim, demand, right, title and interest of Borrower therein and rights of redemption thereof, pursuant to power of sale or otherwise, at one or more sales, as an entirety or in parcels, at such time and place, upon such terms and after such notice thereof as may be required or permitted by law;

(e) institute an action, suit or proceeding in equity for the specific performance of any covenant, condition or agreement contained herein, in the Note, the Loan Agreement or in the other Loan Documents;

(f) recover judgment on the Note either before, during or after any proceedings for the enforcement of this Security Instrument or the other Loan Documents;

(g) apply for the appointment of a receiver, trustee, liquidator or conservator of the Property, without notice and without regard for the adequacy of the security for the Debt and without regard for the solvency of Borrower, any guarantor, indemnitor with respect to the Loan or of any Person liable for the payment of the Debt;

(h) enter into or upon the Property, either personally or by its agents, nominees or attorneys and dispossess Borrower and its agents and servants therefrom, without liability for trespass, damages or otherwise and exclude Borrower and its agents or servants wholly therefrom, and take possession of all books, records and accounts relating thereto and Borrower agrees to surrender possession of the Property and of such books, records and accounts to Lender upon demand, and thereupon Lender may (i) use, operate, manage, control, insure, maintain, repair, restore and otherwise deal with all and every part of the Property and conduct the business thereat; (ii) complete any construction on the Property in such manner and form as Lender deems advisable; (iii) make alterations, additions, renewals, replacements and improvements to or on the Property; (iv) exercise all rights and powers of Borrower with respect to the Property, whether in the name of Borrower or otherwise, including, without limitation, the right to make, cancel, enforce or modify Leases, obtain and evict tenants, and demand, sue for, collect and receive all Rents of the Property and every part thereof; (v) require Borrower to pay monthly in advance to Lender, or any receiver appointed to collect the Rents, the fair and reasonable rental value for the use and occupation of such part of the Property as may be occupied by Borrower; (vi) require Borrower to vacate and surrender possession of the Property to Lender or to such receiver and, in default thereof, Borrower may be evicted by summary proceedings or otherwise; and (vii) apply the receipts from the Property to the payment of the Debt, in such order, priority and proportions as Lender shall deem appropriate in its sole discretion after deducting therefrom all expenses (including reasonable attorneys' fees) incurred in connection with the aforesaid operations and all amounts necessary to pay the Taxes, Other Charges, insurance and other expenses in connection with the Property, as well as just and reasonable compensation for the services of Lender, its counsel, agents and employees;

(i) exercise any and all rights and remedies granted to a secured party upon default under the Uniform Commercial Code, including, without limiting the generality of the foregoing: (i) the right to take possession of the Fixtures, the Equipment and the Personal Property, or any part thereof, and to take such other measures as Lender may deem necessary for the care, protection and preservation of the Fixtures, the Equipment and the Personal Property, and (ii) request Borrower at its expense to assemble the Fixtures, the Equipment and the Personal Property and make it available to Lender at a convenient place acceptable to Lender. Any notice of sale, disposition or other intended action by Lender with respect to the Fixtures, the Equipment and/or the Personal Property sent to Borrower in accordance with the provisions hereof at least ten (10) days prior to such action, shall constitute commercially reasonable notice to Borrower;

(i) apply any sums then deposited or held in escrow or otherwise by or on behalf of Lender in accordance with the terms of the Loan Agreement;

Case 2:17-cv-02036-KM-MAH Document 1-4 Filed 03/28/17 Page 15 of 35 PageID: 158

(j) pursue such other remedies as Lender may have under applicable law; or

(k) apply the undisbursed balance of any Net Proceeds Deficiency deposit, together with interest thereon, to the payment of the Debt in such order, priority and proportions as Lender shall deem to be appropriate in its discretion.

In the event of a sale, by foreclosure, power of sale or otherwise, of less than all of Property, this Security Instrument shall continue as a lien and security interest on the remaining portion of the Property unimpaired and without loss of priority.

SECTION 7.2 APPLICATION OF PROCEEDS. The purchase money, proceeds and avails of any disposition of the Property, and or any part thereof, or any other sums collected by Lender pursuant to the Note, this Security Instrument or the other Loan Documents, may be applied by Lender to the payment of the Debt in such priority and proportions as Lender in its discretion shall deem proper.

SECTION 7.3 INTENTIONALLY OMITTED.

SECTION 7.4 ACTIONS AND PROCEEDINGS. Lender has the right to appear in and defend any action or proceeding brought with respect to the Property and to bring any action or proceeding, in the name and on behalf of Borrower, which Lender, in its discretion, decides should be brought to protect its interest in the Property.

SECTION 7.5 RECOVERY OF SUMS REQUIRED TO BE PAID. Lender shall have the right from time to time to take action to recover any sum or sums which constitute a part of the Debt as the same become due, without regard to whether or not the balance of the Debt shall be due, and without prejudice to the right of Lender thereafter to bring an action of foreclosure, or any other action, for a default or defaults by Borrower existing at the time such earlier action was commenced.

SECTION 7.6 INTENTIONALLY OMITTED.

SECTION 7.7 OTHER RIGHTS, ETC.

(a) The failure of Lender to insist upon strict performance of any term hereof shall not be deemed to be a waiver of any term of this Security Instrument. Borrower shall not be relieved of Borrower's obligations hereunder by reason of (i) the failure of Lender to comply with any request of Borrower or any guarantor or indemnitor with respect to the Loan to take any action to foreclose this Security Instrument or otherwise enforce any of the provisions hereof or of the Note or the other Loan Documents, (ii) the release, regardless of consideration, of the whole or any part of the Property, or of any person liable for the Debt or any portion thereof, or (iii) any agreement or stipulation by Lender extending the time of payment or otherwise modifying or supplementing the terms of the Note, this Security Instrument or the other Loan Documents.

(b) It is agreed that the risk of loss or damage to the Property is on Borrower, and Lender shall have no liability whatsoever for decline in value of the Property, for failure to maintain the Policies, or for failure to determine whether insurance in force is adequate as to the

amount of risks insured. Possession by Lender shall not be deemed an election of judicial relief, if any such possession is requested or obtained, with respect to any Property or collateral not in Lender's possession.

(c) Lender may resort for the payment of the Debt to any other security held by Lender in such order and manner as Lender, in its discretion, may elect. Lender may take action to recover the Debt, or any portion thereof, or to enforce any covenant hereof without prejudice to the right of Lender thereafter to foreclose this Security Instrument. The rights of Lender under this Security Instrument shall be separate, distinct and cumulative and none shall be given effect to the exclusion of the others. No act of Lender shall be construed as an election to proceed under any one provision herein to the exclusion of any other provision. Lender shall not be limited exclusively to the rights and remedies herein stated but shall be entitled to every right and remedy now or hereafter afforded at law or in equity.

SECTION 7.8 Right to Release Any Portion of the Property. Lender may release any portion of the Property for such consideration as Lender may require without, as to the remainder of the Property, in any way impairing or affecting the lien or priority of this Security Instrument, or improving the position of any subordinate lienholder with respect thereto, except to the extent that the obligations hereunder shall have been reduced by the actual monetary consideration, if any, received by Lender for such release, and may accept by assignment, pledge or otherwise any other property in place thereof as Lender may require without being accountable for so doing to any other lienholder. This Security Instrument shall continue as a lien and security interest in the remaining portion of the Property.

Not Certified Copy

SECTION 7.9 Violation of Laws. If the Property is not in material compliance with Legal Requirements, Lender may impose additional requirements upon Borrower in connection herewith including, without limitation, monetary reserves or financial equivalents.

SECTION 7.10 Recourse and Choice of Remedies. Notwithstanding any other provision of this Security Instrument or the Loan Agreement, including, without limitation, Section 11.22 of the Loan Agreement, Lender and other Indemnified Parties (as hereinafter defined) are entitled to enforce the obligations of Borrower contained in Section 9.2 of the Loan Agreement without first resorting to or exhausting any security or collateral and without first having recourse to the Note or any of the Property, through foreclosure or acceptance of a deed in lieu of foreclosure or otherwise, and in the event Lender commences a foreclosure action against the Property, Lender is entitled to pursue a deficiency judgment with respect to such obligations against Borrower. The provisions of Section 9.2 of the Loan Agreement are exceptions to any non-recourse or exculpation provisions in the Loan Agreement, the Note, this Security Instrument or the other Loan Documents, and Borrower with respect to the Loan is fully and personally liable for the obligations pursuant to Section 9.2 of the Loan Agreement. The liability of Borrower with respect to the Loan pursuant to Section 9.2 of the Loan Agreement is not limited to the original principal amount of the Note. Notwithstanding the foregoing, nothing herein shall inhibit or prevent Lender from foreclosing or exercising any other rights and remedies pursuant to the Loan Agreement, the Note, this Security Instrument and the other Loan Documents, whether simultaneously with foreclosure proceedings or in any other sequence. A separate action or actions may be brought and prosecuted against Borrower pursuant to Section 9.2 of the Loan Agreement, whether or not action is brought against any other Person or whether

Case 2:17-cv-02036-KM-MAH Document 1-4 Filed 03/28/17 Page 17 of 35 PageID: 160

or not any other Person is joined in the action or actions. In addition, Lender shall have the right but not the obligation to join and participate in, as a party if it so elects, any administrative or judicial proceedings or actions initiated in connection with any matter addressed in the Environmental Indemnity.

SECTION 7.11 RIGHT OF ENTRY. Upon reasonable notice to Borrower, Lender and its agents shall have the right to enter and inspect the Property at all reasonable times.

## ARTICLE 8 - INTENTIONALLY OMITTED

## ARTICLE 9 - INDEMNIFICATION

SECTION 9.1 GENERAL INDEMNIFICATION. Subject to Section 11.22 of the Loan Agreement, Borrower shall, at its sole cost and expense, protect, defend, indemnify, release and hold harmless the Indemnified Parties from and against any and all claims, suits, liabilities (including, without limitation, strict liabilities), actions, proceedings, obligations, debts, damages, losses, costs, expenses, diminutions in value, fines, penalties, charges, fees, expenses, judgments, awards, amounts paid in settlement, punitive damages, foreseeable and unforeseeable consequential damages, of whatever kind or nature (including but not limited to reasonable attorneys' fees and other costs of defense) (collectively, the "**Losses**") imposed upon or incurred by or asserted against any Indemnified Parties and directly or indirectly arising out of or in any way relating to any one or more of the following: (a) ownership of this Security Instrument, the Property or any interest therein or receipt of any Rents; (b) any amendment to, or restructuring of, the Debt, and the Note, the Loan Agreement, this Security Instrument, or any other Loan Documents; (c) any and all lawful action that may be taken by Lender in connection with the enforcement of the provisions of this Security Instrument or the Loan Agreement or the Note or any of the other Loan Documents, whether or not suit is filed in connection with same, or in connection with Borrower, any guarantor or indemnitor and/or any partner, joint venturer or shareholder thereof becoming a party to a voluntary or involuntary federal or state bankruptcy, insolvency or similar proceeding; (d) any accident, injury to or death of persons or loss of or damage to property occurring in, on or about the Property or any part thereof or on the adjoining sidewalks, curbs, adjacent property or adjacent parking areas, streets or ways; (e) any use, nonuse or condition in, on or about the Property or any part thereof or on the adjoining sidewalks, curbs, adjacent property or adjacent parking areas, streets or ways; (f) any failure on the part of Borrower to perform or be in compliance with any of the terms of this Security Instrument; (g) performance of any labor or services or the furnishing of any materials or other property in respect of the Property or any part thereof; (h) the failure of any person to file timely with the Internal Revenue Service an accurate Form 1099-B, Statement for Recipients of Proceeds from Real Estate, Broker and Barter Exchange Transactions, which may be required in connection with this Security Instrument, or to supply a copy thereof in a timely fashion to the recipient of the proceeds of the transaction in connection with which this Security Instrument is made; (i) any failure of the Property to be in compliance with any Legal Requirements; (j) the enforcement by any Indemnified Party of the provisions of this Article 9; (k) any and all claims and demands whatsoever which may be asserted against Lender by reason of any alleged obligations or undertakings on its part to perform or discharge any of the terms, covenants, or agreements contained in any Lease; (l) the payment of any commission, charge or brokerage fee to anyone claiming through Borrower which may be payable in connection with the funding of

Case 2:17-cv-02036-KM-MAH Document 1-4 Filed 03/28/17 Page 18 of 35 PageID: 161

the Loan; or (m) any misrepresentation made by Borrower in this Security Instrument or any other Loan Document. Any amounts payable to Lender by reason of the application of this Section 9.1 shall become immediately due and payable and shall bear interest at the Default Rate from the date loss or damage is sustained by Lender until paid. For purposes of this Article 9, the term "**Indemnified Parties**" means Lender and any Person who is or will have been involved in the origination of the Loan, any Person who is or will have been involved in the servicing of the Loan secured hereby, any Person in whose name the encumbrance created by this Security Instrument is or will have been recorded, persons and entities who may hold or acquire or will have held a full or partial interest in the Loan secured hereby (including, but not limited to, investors or prospective investors in the Securities, as well as custodians, trustees and other fiduciaries who hold or have held a full or partial interest in the Loan secured hereby for the benefit of third parties) as well as the respective directors, officers, shareholders, partners, employees, agents, servants, representatives, contractors, subcontractors, affiliates, subsidiaries, participants, successors and assigns of any and all of the foregoing (including but not limited to any other Person who holds or acquires or will have held a participation or other full or partial interest in the Loan, whether during the term of the Loan or as a part of or following a foreclosure of the Loan and including, but not limited to, any successors by merger, consolidation or acquisition of all or a substantial portion of Lender's assets and business).

SECTION 9.2 MORTGAGE AND/OR INTANGIBLE TAX. Subject to Section 11.22 of the Loan Agreement, Borrower shall, at its sole cost and expense, protect, defend, indemnify, release and hold harmless the Indemnified Parties from and against any and all Losses imposed upon or incurred by or asserted against any Indemnified Parties and directly or indirectly arising out of or in any way relating to any tax on the making and/or recording of this Security Instrument, the Note or any of the other Loan Documents, but excluding any income, franchise or other similar taxes.

SECTION 9.3 ERISA INDEMNIFICATION. Subject to Section 11.22 of the Loan Agreement, Borrower shall, at its sole cost and expense, protect, defend, indemnify, release and hold harmless the Indemnified Parties from and against any and all Losses (including, without limitation, reasonable attorneys' fees and costs incurred in the investigation, defense, and settlement of Losses incurred in correcting any prohibited transaction or in the sale of a prohibited loan, and in obtaining any individual prohibited transaction exemption under ERISA that may be required, in Lender's sole discretion) that Lender may incur, directly or indirectly, as a result of a default under Section 3.1.8 or 4.2.11 of the Loan Agreement.

SECTION 9.4 INTENTIONALLY OMITTED

SECTION 9.5 DUTY TO DEFEND; ATTORNEYS' FEES AND OTHER FEES AND EXPENSES. Upon written request by any Indemnified Party, Borrower shall defend such Indemnified Party (if requested by any Indemnified Party, in the name of the Indemnified Party) by attorneys and other professionals approved by the Indemnified Parties. Notwithstanding the foregoing, if the defendants in any such claim or proceeding include both Borrower and any Indemnified Party and Borrower and such Indemnified Party shall have reasonably concluded that there are any legal defenses available to it and/or other Indemnified Parties that are different from or additional to those available to Borrower, such Indemnified Party shall have the right to select separate counsel to assert such legal defenses and to otherwise participate in the defense of

such action on behalf of such Indemnified Party, provided that no compromise or settlement shall be entered without Borrower's consent, which consent shall not be unreasonably withheld. Upon demand, Borrower shall pay or, in the sole and absolute discretion of the Indemnified Parties, reimburse, the Indemnified Parties for the payment of reasonable fees and disbursements of attorneys, engineers, environmental consultants, laboratories and other professionals in connection therewith.

ARTICLE 10 - WAIVERS

SECTION 10.1 INTENTIONALLY OMITTED.

SECTION 10.2 INTENTIONALLY OMITTED.

SECTION 10.3 INTENTIONALLY OMITTED.

SECTION 10.4 WAIVER OF STATUTE OF LIMITATIONS. To the extent permitted by applicable law, Borrower hereby expressly waives and releases to the fullest extent permitted by law, the pleading of any statute of limitations as a defense to payment of the Debt or performance of its Other Obligations.

SECTION 10.5 INTENTIONALLY OMITTED.

ARTICLE 11 - EXCULPATION

Not Certified Copy

Notwithstanding any provision hereof to the contrary, the provisions of Section 11.22 of the Loan Agreement are hereby incorporated by reference into this Security Instrument to the same extent and with the same force as if fully set forth herein.

ARTICLE 12 - NOTICES

All notices or other written communications hereunder shall be delivered in accordance with Section 11.6 of the Loan Agreement.

ARTICLE 13 - APPLICABLE LAW

SECTION 13.1 **GOVERNING LAW.**

(a) **THIS SECURITY INSTRUMENT WAS NEGOTIATED IN THE STATE OF NEW JERSEY, AND MADE BY BORROWER AND ACCEPTED BY LENDER IN THE STATE OF NEW JERSEY, AND THE PROCEEDS OF THE NOTE SECURED HEREBY WERE DISBURSED FROM THE STATE OF NEW JERSEY, WHICH STATE THE PARTIES AGREE HAS A SUBSTANTIAL RELATIONSHIP TO THE PARTIES AND TO THE UNDERLYING TRANSACTION EMBODIED HEREBY, AND IN ALL RESPECTS, INCLUDING, WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THIS SECURITY INSTRUMENT AND THE OBLIGATIONS ARISING HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW JERSEY APPLICABLE TO CONTRACTS MADE**

Case 2:17-cv-02036-KM-MAH Document 1-4 Filed 03/28/17 Page 20 of 35 PageID: 163

AND PERFORMED IN SUCH STATE (WITHOUT REGARD TO PRINCIPLES OF CONFLICT LAWS) AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA, EXCEPT THAT AT ALL TIMES THE PROVISIONS FOR THE CREATION, PERFECTION, AND ENFORCEMENT OF THE LIENS AND SECURITY INTERESTS CREATED PURSUANT HERETO AND PURSUANT TO THE OTHER LOAN DOCUMENTS WITH RESPECT TO THE PROPERTY SHALL BE GOVERNED BY AND CONSTRUED ACCORDING TO THE LAW OF THE STATE IN WHICH THE PROPERTY IS LOCATED, IT BEING UNDERSTOOD THAT, TO THE FULLEST EXTENT PERMITTED BY THE LAW OF SUCH STATE, THE LAW OF THE STATE OF NEW JERSEY SHALL GOVERN THE CONSTRUCTION, VALIDITY AND ENFORCEABILITY OF ALL LOAN DOCUMENTS AND ALL OF THE OBLIGATIONS ARISING HEREUNDER OR THEREUNDER. TO THE FULLEST EXTENT PERMITTED BY LAW, BORROWER HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS SECURITY INSTRUMENT OR THE OTHER LOAN DOCUMENTS, AND THIS SECURITY INSTRUMENT AND THE OTHER LOAN DOCUMENTS SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW JERSEY.

(b) ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST LENDER OR BORROWER ARISING OUT OF OR RELATING TO THIS SECURITY INSTRUMENT MAY AT LENDER'S OPTION BE INSTITUTED IN ANY FEDERAL OR STATE COURT IN THE STATE OF NEW JERSEY, AND BORROWER WAIVES ANY OBJECTIONS WHICH IT MAY NOW OR HEREAFTER HAVE BASED ON VENUE AND/OR FORUM NON CONVENIENS OF ANY SUCH SUIT, ACTION OR PROCEEDING, AND BORROWER HEREBY IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING. BORROWER DOES HEREBY DESIGNATE AND APPOINT

**as Agent for Heritage Gateway, LLC, Marine One Associates III, LLC, Ridgewood 2000 Associates III, LLC, and JPG Real Estate III, LLC:**

Jeffrey Greenberg
Heritage Management Company, LLC
P.O. Box 627
123 Prospect Street
Ridgewood, New Jersey 07451

**as Agent for Ivy Gateway, LLC:**

Anthony P. DiTommaso, Jr.
Ivy Equities, LLC
1 Paragon Drive
Montvale, NJ 07645

**AS ITS AUTHORIZED AGENT TO ACCEPT AND ACKNOWLEDGE ON ITS BEHALF SERVICE OF ANY AND ALL PROCESS WHICH MAY BE SERVED IN ANY SUCH SUIT, ACTION OR PROCEEDING IN ANY FEDERAL OR STATE COURT IN NEW JERSEY, AND AGREES THAT SERVICE OF PROCESS UPON SAID AGENT AT SAID ADDRESS AND WRITTEN NOTICE OF SAID SERVICE MAILED OR DELIVERED TO BORROWER IN THE MANNER PROVIDED HEREIN SHALL BE DEEMED IN EVERY RESPECT EFFECTIVE SERVICE OF PROCESS UPON BORROWER IN ANY SUCH SUIT, ACTION OR PROCEEDING IN THE STATE OF NEW JERSEY. BORROWER (I) SHALL GIVE PROMPT NOTICE TO LENDER OF ANY CHANGED ADDRESS OF ITS AUTHORIZED AGENT HEREUNDER, (II) MAY AT ANY TIME AND FROM TIME TO TIME DESIGNATE A SUBSTITUTE AUTHORIZED AGENT WITH AN OFFICE IN NEW JERSEY (WHICH SUBSTITUTE AGENT AND OFFICE SHALL BE DESIGNATED AS THE PERSON AND ADDRESS FOR SERVICE OF PROCESS), AND (III) SHALL PROMPTLY DESIGNATE SUCH A SUBSTITUTE IF ITS AUTHORIZED AGENT CEASES TO HAVE AN OFFICE IN NEW JERSEY OR IS DISSOLVED WITHOUT LEAVING A SUCCESSOR.**

SECTION 13.2 Intentionally Omitted.

SECTION 13.3 Provisions Subject to Applicable Law. All rights, powers and remedies provided in this Security Instrument may be exercised only to the extent that the exercise thereof does not violate any applicable provisions of law and are intended to be limited to the extent necessary so that they will not render this Security Instrument invalid, unenforceable or not entitled to be recorded, registered or filed under the provisions of any applicable law. If any term of this Security Instrument or any application thereof shall be invalid or unenforceable, the remainder of this Security Instrument and any other application of the term shall not be affected thereby.

## ARTICLE 14 - DEFINITIONS

All capitalized terms not defined herein shall have the respective meanings set forth in the Loan Agreement. Unless the context clearly indicates a contrary intent or unless otherwise specifically provided herein, words used in this Security Instrument may be used interchangeably in singular or plural form and the word "**Borrower**" shall mean "each Borrower and any subsequent owner or owners of the Property or any part thereof or any interest therein," the word "**Lender**" shall mean "Lender and any subsequent holder of the Note," the word "**Note**" shall mean "the Note and any other evidence of indebtedness secured by this Security Instrument," the word "**Property**" shall include any portion of the Property and any interest therein, and the phrases "**attorneys' fees**", "**legal fees**" and "**counsel fees**" shall include any and all reasonably attorneys', paralegal and law clerk fees and disbursements, including, but not limited to, fees and disbursements at the pre-trial, trial and appellate levels incurred or paid by Lender in protecting its interest in the Property, the Leases and the Rents and enforcing its rights hereunder.

## ARTICLE 15 - MISCELLANEOUS PROVISIONS

SECTION 15.1 No Oral Change. This Security Instrument, and any provisions hereof, may not be modified, amended, waived, extended, changed, discharged or terminated

Case 2:17-cv-02036-KM-MAH Document 1-4 Filed 03/28/17 Page 22 of 35 PageID: 165

orally or by any act or failure to act on the part of Borrower or Lender, but only by an agreement in writing signed by the party against whom enforcement of any modification, amendment, waiver, extension, change, discharge or termination is sought.

SECTION 15.2 <u>SUCCESSORS AND ASSIGNS</u>. This Security Instrument shall be binding upon and inure to the benefit of Borrower and Lender and their respective successors and assigns forever.

SECTION 15.3 <u>INAPPLICABLE PROVISIONS</u>. If any term, covenant or condition of the Loan Agreement, the Note or this Security Instrument is held to be invalid, illegal or unenforceable in any respect, the Loan Agreement, the Note and this Security Instrument shall be construed without such provision.

SECTION 15.4 <u>HEADINGS, ETC.</u> The headings and captions of various Sections of this Security Instrument are for convenience of reference only and are not to be construed as defining or limiting, in any way, the scope or intent of the provisions hereof.

SECTION 15.5 <u>NUMBER AND GENDER</u>. Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns and pronouns shall include the plural and vice versa.

SECTION 15.6 <u>SUBROGATION</u>. If any or all of the proceeds of the Note have been used to extinguish, extend or renew any indebtedness heretofore existing against the Property, then, to the extent of the funds so used, Lender shall be subrogated to all of the rights, claims, liens, titles, and interests existing against the Property heretofore held by, or in favor of, the holder of such indebtedness and such former rights, claims, liens, titles, and interests, if any, are not waived but rather are continued in full force and effect in favor of Lender and are merged with the lien and security interest created herein as cumulative security for the repayment of the Debt, the performance and discharge of Borrower's obligations hereunder, under the Loan Agreement, the Note and the other Loan Documents and the performance and discharge of the Other Obligations.

SECTION 15.7 <u>ENTIRE AGREEMENT</u>. The Note, the Loan Agreement, this Security Instrument and the other Loan Documents constitute the entire understanding and agreement between Borrower and Lender with respect to the transactions arising in connection with the Debt and supersede all prior written or oral understandings and agreements between Borrower and Lender with respect thereto. Borrower hereby acknowledges that, except as incorporated in writing in the Note, the Loan Agreement, this Security Instrument and the other Loan Documents, there are not, and were not, and no persons are or were authorized by Lender to make, any representations, understandings, stipulations, agreements or promises, oral or written, with respect to the transaction which is the subject of the Note, the Loan Agreement, this Security Instrument and the other Loan Documents.

SECTION 15.8 <u>LIMITATION ON LENDER'S RESPONSIBILITY</u>. No provision of this Security Instrument shall operate to place any obligation or liability for the control, care, management or repair of the Property upon Lender, nor shall it operate to make Lender responsible or liable for any waste committed on the Property by the tenants or any other Person,

Case 2:17-cv-02036-KM-MAH Document 1-4 Filed 03/28/17 Page 23 of 35 PageID: 166

or for any dangerous or defective condition of the Property, or for any negligence in the management, upkeep, repair or control of the Property resulting in loss or injury or death to any tenant, licensee, employee or stranger. Nothing herein contained shall be construed as constituting Lender a "mortgagee in possession."

ARTICLE 16 - STATE-SPECIFIC PROVISIONS

SECTION 16.1 Principles Of Construction. In the event of any inconsistencies between the terms and conditions of this Article 16 and the other terms and conditions of this Security Instrument, the terms and conditions of this Article 16 shall control and be binding.

SECTION 16.2 Copy of Mortgage. Borrower represents and warrants that it has received a true copy of this Security Instrument without charge.

SECTION 16.3 Modification of Security Instrument. This Security Instrument is subject to the provisions governing a "Modification" set forth in P.L. 1986 c. 353 (N.J.S.A. 46:9-8.2 et seq.) and shall be subject to the priority provisions thereof.

SECTION 16.4 Termination of Security Instrument. This Security Instrument shall terminate upon the payment in full of the Obligations and the fulfillment or performance of all of the conditions of this Security Instrument and the Obligations. Thereupon, Lender shall release the Property and shall execute at the request, and sole cost of Borrower, a release of this Security Instrument and any other instrument to that effect deemed necessary or desirable.

Not Certified Copy

SECTION 16.5 New Jersey Spill Act and ISRA.

(a) Borrower represents and warrants, based upon the Environmental Report (as defined below), except as disclosed in the written reports resulting from environmental site assessments of the Properties delivered to and approved by Lender prior to the Closing Date (the "**Environmental Report**") that: (i) there are no Hazardous Materials or underground storage tanks in, on, or under the Property except those that are both (A) in compliance with current Environmental Laws and with permits issued pursuant thereto (if such permits are required), and (B) either (1) in amounts not in excess of that necessary to operate, clean, repair and maintain the Property or tenant's respective business at the Property as set forth in their respective Leases, or (2) held by a tenant for sale to the public in its ordinary course of business, (ii) there are no past, present or threatened Releases of Hazardous Materials in violation of any Environmental Law and which would require remediation by a Governmental Authority in, on, under or from the Property; (iii) there is no threat of any Release of Hazardous Materials migrating to the Property; (iv) there is no past or present non-compliance with current Environmental Laws, or with permits issued pursuant thereto, in connection with the Property except as described in the Environmental Report; (v) Borrower does not know of, and has not received, any written or oral notice or other communication from any Person (including but not limited to a Governmental Authority) relating to Hazardous Materials in, on, under or from the Property; (vi) Borrower has truthfully and fully provided to Lender, in writing, any and all information relating to environmental conditions in, on, under or from the Property known to Borrower or contained in Borrower's files and records, including but not limited to any reports relating to Hazardous Materials in, on, under or migrating to or from the Property and/or to the environmental

Case 2:17-cv-02036-KM-MAH Document 1-4 Filed 03/28/17 Page 24 of 35 PageID: 167

condition of the Property; (vii) no portion of the Property is now nor at any time that Borrower has owned the Property, nor at any time prior to Borrower acquiring title to the Property has ever been, used as a "Major Facility," as that term is defined in the New Jersey Spill Compensation and Control Act, N.J.S.A. 58:10-23.11 et seq. (said Spill Compensation and Control Act together with any amendments or revisions thereof and any regulations promulgated pursuant thereto being hereinafter collectively called the "**Spill Act**"), and that Borrower has not used, and does not intend to use, any portion of the Property for that purpose; and (viii) no lien has been attached to the Property under the Spill Act or any other Environmental Laws; and (vi) Borrower has not in the past, and does not now own, operate or control any "Major Facility" (as such term is defined in the Spill Act) or any hazardous or solid waste disposal facility.

(b) If a lien is filed against the Property pursuant to the Spill Act or any other Environmental Law, Borrower shall immediately either: (i) pay the claim and remove the lien from the Property, or (ii) furnish (1) a note reasonably satisfactory to Lender and the title insurance company which insures the priority of the lien of this Security Instrument in the amount of the claim out of which the lien arises, (2) a cash deposit in the amount of the claim out of which the lien arises, or (3) other security reasonably satisfactory to Lender in an amount sufficient to discharge the claim out of which the lien arises. In addition to the foregoing, Borrower hereby agrees to defend, indemnify and to save Lender harmless from and against all loss, damage, liability and expense (including reasonable attorney's fees and expenses) which Lender may sustain by reason of any lien filed against the Property pursuant to the Spill Act or any other federal, state or local laws, ordinances, rules or regulations. Borrower shall be personally liable to Lender for the foregoing notwithstanding any exculpatory provisions contained in the Loan Agreement, this Security Instrument, the Note, or the other Loan Documents.

(c) All references herein to executives, departments, funds, statutes, and acts of the State of New Jersey are not intended to be exclusive and shall be deemed to apply to any successors, replacements, amendments, thereof and any additional statutes, rules, regulations, organizations and persons of a similar nature, whether of the State of New Jersey or the United States of America.

(d) Upon Lender's request, and in all events no later than sixty (60) days prior to "closing, terminating or transferring operations" (as such term is defined in the New Jersey Industrial Site Recovery Act, Senate No. 1070, N.J. Laws 1993, c. 139 (effective June 16, 1993), N.J.S.A. 13:1K-6 et. seq., and the regulations promulgated pursuant thereto (said New Jersey Industrial Site Recovery Act together with any amendments or revisions thereof and any regulations promulgated pursuant thereto hereinafter collectively called "**ISRA**") by Borrower and/or any one or more tenants, Borrower, at its sole cost and expense, shall, to the extent required by law, provide Lender with a certified true copy of the following, as applicable:

(i) an opinion letter or a letter of non-applicability (accompanied by the Applicant's supporting affidavit) from the New Jersey Department of Environmental Protection (or such other agency or body as shall then have jurisdiction over ISRA matters) ("**DEP**"), or an attorney's opinion letter addressed to Lender in a form reasonably satisfactory to Lender's counsel, stating that ISRA does not then apply to: (1) Borrower, (2) the use of

and occupancy of the Property and (3) the closing, terminating or transferring of operations of all or any portion of the Property; or

(ii) a Negative Declaration (as such term is defined in ISRA) duly and finally approved by DEP; or

(iii) a Remedial Action Workplan (as such term is defined in ISRA) duly and finally approved by DEP; or

(iv) a De Minimis Quantity Exemption (as such term is defined in ISRA) issued by DEP to Borrower; or

(v) a Remediation Agreement issued in accordance with ISRA by DEP to Borrower, permitting the closing, terminating or transferring of operations; or

(vi) a No Further Action Letter issued in accordance with ISRA by DEP to Borrower.

Nothing in this subsection (d) shall be construed as limiting Borrower's obligation to otherwise comply with ISRA.

(e) If Borrower complies with subsection (d) by:

Not Certified Copy

(i) obtaining an approved and final Remedial Action Workplan, Borrower shall (1) promptly implement and prosecute to completion or cause to be so implemented and prosecuted the Remedial Action Workplan or the requirements of the Remediation Agreement, as the case may be, in accordance with the schedules contained therein or as may be otherwise ordered or directed by DEP or such other agency or body as shall then have jurisdiction over the Remedial Action Workplan or the Remediation Agreement. Borrower expressly understands and acknowledges that Borrower's compliance with the provisions of subsections (d) and (e) may require Borrower to expend funds or do acts after the expiration or termination of the Leases. Borrower shall expend such funds and do such acts and shall not be excused therefrom even though the term of an applicable Lease shall have previously expired or been terminated and notwithstanding any provisions in any such Lease or in ISRA placing the burden of compliance on a tenant, and (2) provide an affidavit dated not more than ten (10) days nor less than five (5) days prior to the closing, terminating or transferring of operations that it is in full compliance with and has not received any notice that it has violated the terms of the Remedial Action Workplan or the Remediation Agreement, as the case may be, including without limitation, the terms regarding the establishment and maintenance of a remediation funding source, such affidavit is to be provided to Lender within two (2) days after its execution; or

(ii) providing an opinion letter or a letter of non-applicability from DEP, or an attorney's opinion letter, Borrower shall reiterate, in affidavit form, dated not more than ten (10) days nor less than five (5) days prior to the closing, terminating or transferring of operations, that the facts upon which the opinion letter, letter of non-applicability or

Case 2:17-cv-02036-KM-MAH Document 1-4 Filed 03/28/17 Page 26 of 35 PageID: 169

attorney's letter are based are and remain true as of that date, such affidavit to be provided to Lender within two (2) days after its execution.

(f) The obligations and liabilities of Borrower under this Security Instrument shall survive any entry of a judgment of foreclosure or the delivery of a deed in lieu of foreclosure of this Security Instrument.

SECTION 16.8 LIEN PRIORITY. The maximum principal amount of the obligations secured by this Security Instrument on such portion of the Property as constitutes an interest in real property under applicable state law is [$61,000,000.]

[NO FURTHER TEXT ON THIS PAGE]

Not Certified Copy

IN WITNESS WHEREOF, THIS SECURITY INSTRUMENT has been executed by Borrower as of the day and year first above written.

**BORROWER:**

HERITAGE GATEWAY, LLC, a Delaware limited liability company

By: ______________________________
Name: Steven Greenberg
Title: Manager

MARINE ONE ASSOCIATES III, LLC, a Delaware limited liability company

By: ______________________________
Name: Jeffrey Greenberg
Title: Manager

Not Certified Copy

RIDGEWOOD 2000 ASSOCIATES III, LLC, a Delaware limited liability company

By: ______________________________
Name: Steven Greenberg
Title: Manager

JPG REAL ESTATE III, LLC, a Delaware limited liability company

By: ______________________________
Name: Jeffrey Greenberg
Title: Manager

IVY GATEWAY, LLC, a Delaware limited liability company

By: ______________________________
Name: Anthony P. DiTommaso, Jr.
Title: Manager

NEWY1\8035273.4

Case 2:17-cv-02036-KM-MAH Document 1-4 Filed 03/28/17 Page 28 of 35 PageID: 171

**ACKNOWLEDGMENT**

STATE OF )
)
COUNTY OF )

I certify that on October 17, 2006, STEVEN GREENBERG personally came before me and this person acknowledged under oath, to my satisfaction, that:

(a) this person signed, sealed and delivered the attached document as the Manager of HERITAGE GATEWAY, LLC, a Delaware limited liability company, the Borrower named in this document;

(b) the proper seal was affixed; and

(c) this document was signed, and made by the Manager as his voluntary act and deed on behalf of said limited liability company.

(Name and Title)

Not Certified Copy

DONNA R. KEARNS
A Notary Public of New Jersey
My Commission Expires 7-29-2007

NEWY1\8035273.4

Case 2:17-cv-02036-KM-MAH Document 1-4 Filed 03/28/17 Page 29 of 35 PageID: 172

## ACKNOWLEDGMENT

STATE OF )
)
COUNTY OF )

I certify that on October 17, 2006, JEFFREY GREENBERG personally came before me and this person acknowledged under oath, to my satisfaction, that:

(a) this person signed, sealed and delivered the attached document as the Manager of MARINE ONE ASSOCIATES III, LLC, a Delaware limited liability company, the Borrower named in this document;

(b) the proper seal was affixed; and

(c) this document was signed, and made by the Manager as his voluntary act and deed on behalf of said limited liability company.

(Name and Title)

Not Certified Copy

DONNA R. KEARNS
A Notary Public of New Jersey
My Commission Expires 7-29-2007



NEWY1\8035273.4

## ACKNOWLEDGMENT

STATE OF )
)
COUNTY OF )

I certify that on October 12, 2006, STEVEN GREENBERG personally came before me and this person acknowledged under oath, to my satisfaction, that:

(a) this person signed, sealed and delivered the attached document as the Manager of RIDGEWOOD 2000 ASSOCIATES III, LLC, a Delaware limited liability company, the Borrower named in this document;

(b) the proper seal was affixed; and

(c) this document was signed, and made by the Manager as his voluntary act and deed on behalf of said limited liability company.

Donna R. Kearns

(Name and Title)

Not Certified Copy

DONNA R. KEARNS
A Notary Public of New Jersey
My Commission Expires 7-29-2007

Case 2:17-cv-02036-KM-MAH Document 1-4 Filed 03/28/17 Page 31 of 35 PageID: 174

**ACKNOWLEDGMENT**

STATE OF )
)
COUNTY OF )

I certify that on October 17, 2006, JEFFREY GREENBERG personally came before me and this person acknowledged under oath, to my satisfaction, that:

(a) this person signed, sealed and delivered the attached document as the Manager of of JPG REAL ESTATE III, LLC, a Delaware limited liability company, the Borrower named in this document;

(b) the proper seal was affixed; and

(c) this document was signed, and made by the Manager as his voluntary act and deed on behalf of said limited liability company.

Donna R. Kearns
(Name and Title)

DONNA R. KEARNS
A Notary Public of New Jersey
My Commission Expires 7-29-2007

Not Certified Copy

IN WITNESS WHEREOF, THIS SECURITY INSTRUMENT has been executed by Borrower as of the day and year first above written.

**BORROWER:**

HERITAGE GATEWAY, LLC, a Delaware limited liability company

By: ______________________
Name: Steven Greenberg
Title: Manager

MARINE ONE ASSOCIATES III, LLC, a Delaware limited liability company

By: ______________________
Name: Jeffrey Greenberg
Title: Manager

Not Certified Copy

RIDGEWOOD 2000 ASSOCIATES III, LLC, a Delaware limited liability company

By: ______________________
Name: Steven Greenberg
Title: Manager

JPG REAL ESTATE III, LLC, a Delaware limited liability company

By: ______________________
Name: Jeffrey Greenberg
Title: Manager

IVY GATEWAY, LLC, a Delaware limited liability company

By: ______________________
Name: Anthony P. DiTommaso, Jr.
Title: Manager

NEWY1\8035273.4

**ACKNOWLEDGMENT**

STATE OF New Jersey )
)
COUNTY OF Bergen )

I certify that on October 17th, 2006, ANTHONY P. DITOMMASO, JR. personally came before me and this person acknowledged under oath, to my satisfaction, that:

(a) this person signed, sealed and delivered the attached document as the Manager of IVY GATEWAY, LLC, a Delaware limited liability company, the Borrower named in this document;

(b) the proper seal was affixed; and

(c) this document was signed, and made by the Manager as his voluntary act and deed on behalf of said limited liability company.

Barbara Ann Manzo
(Name and Title) Office Manager

BARBARA ANN MANZO
NOTARY PUBLIC OF NEW JERSEY
MY COMMISSION EXPIRES JULY 12, 2011

Not Certified Copy



NEWY1\8035273.4

**EXHIBIT A**

**LEGAL DESCRIPTION**

BEGINNING at a point in the Easterly line of Mulberry Street (variable width Right of Way), said point being situate South 27ø24'42" West, a distance of 212.84 feet and South 25ø36'05" West, a distance of 42.26 feet from a point located at the intersection of the Southerly Right of Way line of Commerce Street (60 feet wide R.O.W.) with the Easterly Right of Way line of Mulberry Street, and from said beginning point running, thence:

1) South 74ø26'00" East, a distance of 197.94 feet, coincident with Lot 122, Block 151 to a point; thence

2) Along the same North 60ø34'00" East, a distance of 8.49 feet to a point in the same; thence

3) South 74ø26'00" East, a distance of 52.17 feet along the same to a point in the Westerly line of Lot 1, Block 151; thence

4) South 15ø34'00" West, a distance of 185.14 feet, coincident with Lot 1, Block 151 to a point in the Northerly line of Market Street; thence

5) Along the Northerly right of way line of Market Street (variable width right of way), North 76ø30'37" West, a distance of 278.72 feet to a point in the Easterly line of Mulberry Street; thence

Not Certified Copy

6) Along the Easterly line of Mulberry Street, North 14ø25'59" East, a distance of 47.25 feet to a point in the same; thence

7) North 75ø36'18" West, a distance of 1.78 feet to a point in the same; thence

8) Still along the same, North 25ø36'05" East, a distance of 144.24 feet to the point and place of BEGINNING.

TOGETHER with the free and uninterrupted use, and the liberty and privilege of uninterrupted passage along an overhead Pedestrian Walkway (including two bridges noted hereafter) which extends from its Easterly most point at the Pennsylvania Railroad Station located at the Easterly side of Raymond Plaza West, (variable width) crossing and bridging the aforesaid Raymond Plaza West at and between the elevations of 34.2 and 51.2 feet above City Datum to the entrance of One Gateway Center Condominium at and between the elevations of 34.1 feet and 51.2 feet above City Datum; thence passing along and through the aforesaid Condominium at and between the elevations as set forth in the Condominium Plans to the land now or late of the Prudential Insurance Company of America; thence crossing the aforesaid land and also crossing and bridging McCarter Highway also known as New Jersey State Highway Route 21 (variable width) at and between the elevations of 42.9 feet and 60.2 feet above City Datum to the entrance of Two Gateway Center at and between the elevations of 46.6 feet and 60.7 feet above City Datum; thence extending through the building and crossing the land of Two Gateway Center at and between the elevations of 43.1 feet and 64.7 feet above City Datum to the entrance of Three

NEWY1\8035273.4

Gateway Garage at and between the elevations of 43.1 feet and 64.7 feet above City Datum; thence extending through the building and crossing the land of Three Gateway Garage and also crossing the land of Three Gateway at and between the elevations of 43.0 feet and 64.7 feet above the City Datum to the entrance of Three Gateway Center; thence extending through Three Gateway Center at and between the elevations of 43.0 feet and 64.7 feet above the City Datum to the Westerly most point at or near Mulberry Street (variable width) (such entire described Pedestrian Walkway (including the bridges described above), the "Pedestrian Walkway").

Subject to and together with easements as set forth in Deed Book 4768 page 941 and Deed Book 5164 page 592 as modified and or superseded by that certain Amended and Restated Grant and Agreement between One Gateway Center Condominium Association, Inc.; The Prudential Insurance Company of America; Third Newark Gateway Urban Renewal Association, a New Jersey Partnership; Gateway Four Urban Renewal, L.P. and Gateway South Urban Renewal Association, a New Jersey Partnership; dated December 21, 1999 and recorded December 27, 1999 in Deed Book 5664 page 680.

TOGETHER with and subject to the Amended and Restated Grant and Agreement between One Gateway Center Condominium Association, Inc.; The Prudential Insurance Company of America; Third Newark Gateway Urban Renewal Association, a New Jersey Partnership; Gateway Four Urban Renewal, L.P. and Gateway South Urban Renewal Association, a New Jersey Partnership; dated December 21, 1999 and recorded December 27, 1999 in Deed Book 5664 page 680.

Not Certified Copy

TOGETHER with and subject to the Grant and Declaration of Easements between Gateway III Newark, L.L.C.; Gateway IV Newark Urban Renewal, L.L.C.; Gateway V Newark, L.L.C.; and Gateway Parking Newark, L.L.C.; dated December 22, 1999 and recorded December 27, 1999 in Deed Book 5664 page 852.

TOGETHER with and subject to Parking Agreement set forth in Deed Book 5892 page 921 as assigned and assumed as set forth in Deed Book 6073 page 770.

BEING in accordance with a Survey prepared by CONTROL POINT ASSOCIATES, INC., (GREGORY S. GALLAS, NJPLS), dated September 25, 2006 and revised September 29, 2006.

# EXHIBIT D

Case 2:17-cv-02036-KM-MAH Document 1-5 Filed 03/28/17 Page 2 of 21 PageID: 180

M-6158040

HERITAGE GATEWAY, LLC,
MARINE ONE ASSOCIATES III, LLC,
RIDGEWOOD 2000 ASSOCIATES III, LLC,
JPG REAL ESTATE III, LLC,
and
IVY GATEWAY, LLC,

together as tenants-in-common, as assignor
(Borrower)

to

LASALLE BANK NATIONAL ASSOCIATION, as assignee
(Lender)

# ASSIGNMENT OF LEASES AND RENTS

Dated: As of October 25, 2006

Location: 100 Mulberry Street, Newark, New Jersey 07102

County: Essex County

PREPARED BY AND UPON
RECORDATION RETURN TO:

DLA Piper US LLP
1251 Avenue of the Americas
New York, New York 10020
Attention: Willard Moore, Esq.

Instr# 6158040 Carole A. Graves
Recorded/Filed RG 2 Essex County Register
10/30/2006 13:33:1 Bk 11600 Pg 888 #Pgs 20

Case 2:17-cv-02036-KM-MAH Document 1-5 Filed 03/28/17 Page 3 of 21 PageID: 181

THIS ASSIGNMENT OF LEASES AND RENTS (this "**Assignment**") made as of the 25 day of October, 2006, by HERITAGE GATEWAY, LLC, MARINE ONE ASSOCIATES III, LLC, RIDGEWOOD 2000 ASSOCIATES III, LLC, JPG REAL ESTATE III, LLC, each a Delaware limited liability company having its principal place of business at 123 Prospect Street, Ridgewood, New Jersey 07451, and IVY GATEWAY, LLC, a Delaware limited liability company, having its principal place of business at 1 Paragon Drive, Suite 125, Montvale, New Jersey 07645, together as tenants-in-common (collectively, the "**Borrower**") to LASALLE BANK NATIONAL ASSOCIATION, as assignee, having an address at 135 South LaSalle Street, Suite 3410, Chicago, Illinois 60603 ("**Lender**").

WITNESSETH:

WHEREAS, this Assignment is given in connection with a loan in the principal sum of SIXTY-ONE MILLION AND NO/100 DOLLARS ($61,000,000) (the "**Loan**") made by Lender to Borrower pursuant to that certain Loan Agreement dated as of the date hereof (as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, the "**Loan Agreement**") and evidenced by that certain Promissory Note dated the date hereof made by Borrower to Lender (as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, the "**Note**");

WHEREAS, the Note is secured by that certain Mortgage and Security Agreement dated the date hereof (as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, the "**Security Instrument**") made by Borrower for the benefit of Lender; and

WHEREAS, Borrower desires to further secure the payment of the Debt (as defined in the Loan Agreement) and the performance of all of its obligations under the Note, the Loan Agreement and the other Loan Documents.

NOW THEREFORE, in consideration of the making of the Loan by Lender and the covenants, agreements, representations and warranties set forth in this Assignment:

## ARTICLE 1 - ASSIGNMENT

SECTION 1.1 PROPERTY ASSIGNED. Borrower hereby absolutely and unconditionally assigns and grants to Lender the following property, rights, interests and estates, now owned, or hereafter acquired by Borrower:

(a) LEASES. All existing and future "leases" and "lease provisions" (as described in Exhibit B annexed hereto and made a part hereof) affecting the use, enjoyment, or occupancy of all or any part of that certain lot or piece of land, more particularly described in Exhibit A annexed hereto and made a part hereof, or all or any part of the buildings, structures, fixtures, additions, enlargements, extensions, modifications, repairs, replacements and improvements now or hereafter located thereon (collectively, the "**Property**") and the right, title and interest of Borrower, its successors and assigns, therein and thereunder.

(b) OTHER LEASES AND AGREEMENTS. All other leases and other agreements, whether or not in writing, affecting the use, enjoyment or occupancy of the Property or any portion thereof now or hereafter made, whether made before or after the filing by or against Borrower of any petition for relief under 11 U.S.C. §101 et seq., as the same may be amended from time to time (the "**Bankruptcy Code**") together with any extension, renewal or replacement of the same, this Assignment of other present and future leases and present and future agreements being effective without further or supplemental assignment. The "leases" and the "lease provisions" described in Subsection 1.1(a) and the leases and other agreements described in this Subsection 1.1(b) are collectively referred to as the "**Leases**".

(c) RENTS. All "rents" (as described in Exhibit B annexed hereto and made a part hereof) whether paid or accruing before or after the filing by or against Borrower of any petition for relief under the Bankruptcy Code (collectively, the "**Rents**").

(d) BANKRUPTCY CLAIMS. All of Borrower's claims and rights (the "**Bankruptcy Claims**") to the payment of damages arising from any rejection by a lessee of any Lease under the Bankruptcy Code.

(e) LEASE GUARANTIES. All of Borrower's right, title and interest in and claims under any and all lease guaranties, letters of credit and any other credit support (individually, a "**Lease Guaranty**", collectively, the "**Lease Guaranties**") given by any guarantor in connection with any of the Leases or leasing commissions (individually, a "**Lease Guarantor**", collectively, the "**Lease Guarantors**") to Borrower.

(f) PROCEEDS. All proceeds from the sale or other disposition of the Leases, the Rents, the Lease Guaranties and the Bankruptcy Claims.

(g) OTHER. All rights, powers, privileges, options and other benefits of Borrower as lessor under the Leases and beneficiary under the Lease Guaranties, including without limitation the immediate and continuing right to make claim for, receive, collect and receipt for all Rents payable or receivable under the Leases and all sums payable under the Lease Guaranties or pursuant thereto (and to apply the same to the payment of the Debt or the Other Obligations), and to do all other things which Borrower or any lessor is or may become entitled to do under the Leases or the Lease Guaranties.

(h) ENTRY. The right, at Lender's option, upon revocation of the license granted herein, to enter upon the Property in person, by agent or by court-appointed receiver, to collect the Rents.

(i) POWER OF ATTORNEY. Borrower's irrevocable power of attorney, coupled with an interest, to take any and all of the actions set forth in Section 3.1 of this Assignment and any or all other actions designated by Lender for the proper management and preservation of the Property.

(j) OTHER RIGHTS AND AGREEMENTS. Any and all other rights of Borrower in and to the items set forth in subsections (a) through (i) above, and all amendments, modifications, replacements, renewals and substitutions thereof.

ARTICLE 2 - TERMS OF ASSIGNMENT

SECTION 2.1 PRESENT ASSIGNMENT AND LICENSE BACK. It is intended by Borrower that this Assignment constitute a present, absolute assignment of the Leases, Rents, Lease Guaranties and Bankruptcy Claims, and not an assignment for additional security only. Nevertheless, subject to the terms of this Section 2.1 and the Cash Management Agreement, Lender grants to Borrower a revocable license to collect, receive, use and enjoy the Rents, as well as other sums due under the Lease Guaranties.

SECTION 2.2 NOTICE TO LESSEES. Borrower hereby authorizes and directs the lessees named in the Leases or any other future lessees or occupants of the Property and all Lease Guarantors to pay over to Lender or to such other party as Lender directs all Rents and all sums due under any Lease Guaranties upon receipt from Lender of written notice to the effect that Lender is then the holder of this Assignment and that an Event of Default (as defined in the Loan Agreement) exists, and to continue so to do until otherwise notified by Lender.

SECTION 2.3 INCORPORATION BY REFERENCE. All representations, warranties, covenants, conditions and agreements contained in the Loan Agreement and the other Loan Documents as same may be modified, renewed, substituted or extended are hereby made a part of this Assignment to the same extent and with the same force as if fully set forth herein.

ARTICLE 3 - REMEDIES

SECTION 3.1 REMEDIES OF LENDER. Upon the occurrence of an Event of Default, the license granted to Borrower in Section 2.1 of this Assignment shall automatically be revoked, and Lender shall immediately be entitled to possession of all Rents and sums due under any Lease Guaranties, whether or not Lender enters upon or takes control of the Property. In addition, Lender may, at its option, without waiving such Event of Default, without regard to the adequacy of the security for the Debt, either in person or by agent, nominee or attorney, with or without bringing any action or proceeding, or by a receiver appointed by a court, dispossess Borrower and its agents and servants from the Property, without liability for trespass, damages or otherwise and exclude Borrower and its agents or servants wholly therefrom, and take possession of the Property and all books, records and accounts relating thereto and have, hold, manage, lease and operate the Property on such terms and for such period of time as Lender may deem proper and either with or without taking possession of the Property in its own name, demand, sue for or otherwise collect and receive all Rents and sums due under all Lease Guaranties, including those past due and unpaid with full power to make from time to time all alterations, renovations, repairs or replacements thereto or thereof as Lender may deem proper and may apply the Rents and sums received pursuant to any Lease Guaranties to the payment of the following in such order and proportion as Lender in its sole discretion may determine, any law, custom or use to the contrary notwithstanding: (a) all expenses of managing and securing the Property, including, without being limited thereto, the salaries, fees and wages of a managing agent and such other employees or agents as Lender may deem necessary or desirable and all expenses of operating and maintaining the Property, including, without being limited thereto, all taxes, charges, claims, assessments, water charges, sewer rents and any other liens, and premiums for all insurance which Lender may deem necessary or desirable, and the cost of all alterations, renovations, repairs or replacements, and all expenses incident to taking and retaining possession of the



NEWY1\8035131.3

Property; and (b) the Debt, together with all costs and reasonable attorneys' fees. In addition, upon the occurrence of an Event of Default, Lender, at its option, may (1) complete any construction on the Property in such manner and form as Lender deems advisable, (2) exercise all rights and powers of Borrower, including, without limitation, the right to negotiate, execute, cancel, enforce or modify Leases, obtain and evict tenants, and demand, sue for, collect and receive all Rents from the Property and all sums due under any Lease Guaranties, (3) either require Borrower to pay monthly in advance to Lender, or any receiver appointed to collect the Rents, the fair and reasonable rental value for the use and occupancy of such part of the Property as may be in possession of Borrower or (4) require Borrower to vacate and surrender possession of the Property to Lender or to such receiver and, in default thereof, Borrower may be evicted by summary proceedings or otherwise.

SECTION 3.2 OTHER REMEDIES. Nothing contained in this Assignment and no act done or omitted by Lender pursuant to the power and rights granted to Lender hereunder shall be deemed to be a waiver by Lender of its rights and remedies under the Loan Agreement, the Note, or the other Loan Documents and this Assignment is made and accepted without prejudice to any of the rights and remedies possessed by Lender under the terms thereof. The right of Lender to collect the Debt and to enforce any other security therefor held by it may be exercised by Lender either prior to, simultaneously with, or subsequent to any action taken by it hereunder. Borrower hereby absolutely, unconditionally and irrevocably waives any and all rights to assert any setoff, counterclaim or crossclaim of any nature whatsoever with respect to the obligations of Borrower under this Assignment, the Loan Agreement, the Note, the other Loan Documents or otherwise with respect to the Loan in any action or proceeding brought by Lender to collect same, or any portion thereof, or to enforce and realize upon the lien and security interest created by this Assignment, the Loan Agreement, the Note, or any of the other Loan Documents (provided, however, that the foregoing shall not be deemed a waiver of Borrower's right to assert any compulsory counterclaim if such counterclaim is compelled under local law or rule of procedure, nor shall the foregoing be deemed a waiver of Borrower's right to assert any claim which would constitute a defense, setoff, counterclaim or crossclaim of any nature whatsoever against Lender in any separate action or proceeding).

SECTION 3.3 OTHER SECURITY. Lender may take or release other security for the payment of the Debt, may release any party primarily or secondarily liable therefor and may apply any other security held by it to the reduction or satisfaction of the Debt without prejudice to any of its rights under this Assignment.

SECTION 3.4 NON-WAIVER. The exercise by Lender of the option granted it in Section 3.1 of this Assignment and the collection of the Rents and sums due under the Lease Guaranties and the application thereof as herein provided shall not be considered a waiver of any default by Borrower under the Note, the Loan Agreement, the Leases, this Assignment or the other Loan Documents. The failure of Lender to insist upon strict performance of any term hereof shall not be deemed to be a waiver of any term of this Assignment. Borrower shall not be relieved of Borrower's obligations hereunder by reason of (a) the failure of Lender to comply with any request of Borrower or any other party to take any action to enforce any of the provisions hereof or of the Loan Agreement, the Note or the other Loan Documents, (b) the release regardless of consideration, of the whole or any part of the Property, or (c) any agreement or stipulation by Lender extending the time of payment or otherwise modifying or supplementing

the terms of this Assignment, the Loan Agreement, the Note, or the other Loan Documents. Lender may resort for the payment of the Debt to any other security held by Lender in such order and manner as Lender, in its discretion, may elect. Lender may take any action to recover the Debt, or any portion thereof, or to enforce any covenant hereof without prejudice to the right of Lender thereafter to enforce its rights under this Assignment. The rights of Lender under this Assignment shall be separate, distinct and cumulative and none shall be given effect to the exclusion of the others. No act of Lender shall be construed as an election to proceed under any one provision herein to the exclusion of any other provision.

SECTION 3.5 BANKRUPTCY.

(a) Upon or at any time after the occurrence of an Event of Default, Lender shall have the right to proceed in its own name or in the name of Borrower in respect of any claim, suit, action or proceeding relating to the rejection of any Lease, including, without limitation, the right to file and prosecute, to the exclusion of Borrower, any proofs of claim, complaints, motions, applications, notices and other documents, in any case in respect of the lessee under such Lease under the Bankruptcy Code.

(b) If there shall be filed by or against Borrower a petition under the Bankruptcy Code, and Borrower, as lessor under any Lease, shall determine to reject such Lease pursuant to Section 365(a) of the Bankruptcy Code, then Borrower shall give Lender not less than ten (10) days' prior notice of the date on which Borrower shall apply to the bankruptcy court for authority to reject the Lease. Lender shall have the right, but not the obligation, to serve upon Borrower within such ten-day period a notice stating that (i) Lender demands that Borrower assume and assign the Lease to Lender pursuant to Section 365 of the Bankruptcy Code and (ii) Lender covenants to cure or provide adequate assurance of future performance under the Lease. If Lender serves upon Borrower the notice described in the preceding sentence, Borrower shall not seek to reject the Lease and shall comply with the demand provided for in clause (i) of the preceding sentence within thirty (30) days after the notice shall have been given, subject to the performance by Lender of the covenant provided for in clause (ii) of the preceding sentence.

## ARTICLE 4 - NO LIABILITY, FURTHER ASSURANCES

SECTION 4.1 NO LIABILITY OF LENDER. This Assignment shall not be construed to bind Lender to the performance of any of the covenants, conditions or provisions contained in any Lease or Lease Guaranty or otherwise impose any obligation upon Lender. Lender shall not be liable for any loss sustained by Borrower resulting from Lender's failure to let the Property after an Event of Default or from any other act or omission of Lender in managing the Property after an Event of Default unless such loss is caused by the willful misconduct or bad faith of Lender. Lender shall not be obligated to perform or discharge any obligation, duty or liability under the Leases or any Lease Guaranties or under or by reason of this Assignment and Borrower shall indemnify Lender for, and hold Lender harmless from, any and all liability, loss or damage which may or might be incurred under the Leases, any Lease Guaranties or under or by reason of this Assignment and from any and all claims and demands whatsoever at all times prior to the date Lender takes title to the Property, including the defense of any such claims or demands which may be asserted against Lender by reason of any alleged obligations and undertakings on its part to perform or discharge any of the terms, covenants or agreements

contained in the Leases or any Lease Guaranties. Should Lender incur any such liability, the amount thereof, including costs, expenses and reasonable attorneys' fees, shall be secured by this Assignment and by the Security Instrument and the other Loan Documents and Borrower shall reimburse Lender therefor immediately upon demand and upon the failure of Borrower so to do Lender may, at its option, declare all sums secured by this Assignment and by the Security Instrument and the other Loan Documents immediately due and payable. This Assignment shall not operate to place any obligation or liability for the control, care, management or repair of the Property upon Lender, nor for the carrying out of any of the terms and conditions of the Leases or any Lease Guaranties prior to the date that Lender takes title to the Property; nor shall it operate to make Lender responsible or liable for any waste committed on the Property by the tenants or any other parties, or for any dangerous or defective condition of the Property prior to the date that Lender takes title to the Property including, without limitation, the presence of any Hazardous Substances (as defined in the Security Instrument), or for any negligence in the management, upkeep, repair or control of the Property resulting in loss or injury or death to any tenant, licensee, employee or stranger.

SECTION 4.2 NO MORTGAGEE IN POSSESSION. Nothing herein contained shall be construed as constituting Lender a "mortgagee in possession" in the absence of the taking of actual possession of the Property by Lender. In the exercise of the powers herein granted Lender, no liability shall be asserted or enforced against Lender, all such liability being expressly waived and released by Borrower.

SECTION 4.3 FURTHER ASSURANCES. Borrower will, at the cost of Borrower, and without expense to Lender, do, execute, acknowledge and deliver all and every such further acts, conveyances, assignments, notices of assignments, transfers and assurances as Lender shall, from time to time, require for the better assuring, conveying, assigning, transferring and confirming unto Lender the property and rights hereby assigned or intended now or hereafter so to be, or which Borrower may be or may hereafter become bound to convey or assign to Lender, or for carrying out the intention or facilitating the performance of the terms of this Assignment or for filing, registering or recording this Assignment and, on demand, will execute and deliver and hereby authorizes Lender to execute in the name of Borrower to the extent Lender may lawfully do so, one or more financing statements, chattel mortgages or comparable security instruments, to evidence more effectively the lien and security interest hereof in and upon the Leases.

## ARTICLE 5 - MISCELLANEOUS PROVISIONS

SECTION 5.1 CONFLICT OF TERMS. In case of any conflict between the terms of this Assignment and the terms of the Loan Agreement, the terms of the Loan Agreement shall prevail.

SECTION 5.2 NO ORAL CHANGE. This Assignment and any provisions hereof may not be modified, amended, waived, extended, changed, discharged or terminated orally, or by any act or failure to act on the part of Borrower or Lender, but only by an agreement in writing signed by the party against whom the enforcement of any modification, amendment, waiver, extension, change, discharge or termination is sought.

SECTION 5.3 <u>GENERAL DEFINITIONS</u>. All capitalized terms not defined herein shall have the respective meanings set forth in the Loan Agreement. Unless the context clearly indicates a contrary intent or unless otherwise specifically provided herein, words used in this Assignment may be used interchangeably in singular or plural form and the word "Borrower" shall mean "each Borrower and any subsequent owner or owners of the Property or any part thereof or interest therein," the word "Lender" shall mean "Lender and any subsequent holder of the Note, the word "Note" shall mean "the Note and any other evidence of indebtedness secured by the Loan Agreement," the word "Property" shall include any portion of the Property and any interest therein, the phrases "attorneys' fees", "legal fees" and "counsel fees" shall include any and all attorney's, paralegal and law clerk fees and disbursements, including, but not limited to, fees and disbursements at the pre-trial, trial and appellate levels incurred or paid by Lender in protecting its interest in the Property, the Leases and the Rents and enforcing its rights hereunder; whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns and pronouns shall include the plural and vice versa.

SECTION 5.4 <u>INAPPLICABLE PROVISIONS</u>. If any term, covenant or condition of this Assignment is held to be invalid, illegal or unenforceable in any respect, this Assignment shall be construed without such provision.

SECTION 5.5 <u>GOVERNING LAW</u>.

(a) **THIS ASSIGNMENT WAS NEGOTIATED IN THE STATE OF NEW JERSEY, AND MADE BY BORROWER AND ACCEPTED BY LENDER IN THE STATE OF NEW JERSEY, AND THE PROCEEDS OF THE NOTE WERE DISBURSED FROM THE STATE OF NEW JERSEY, WHICH STATE THE PARTIES AGREE HAS A SUBSTANTIAL RELATIONSHIP TO THE PARTIES AND TO THE UNDERLYING TRANSACTION EMBODIED HEREBY, AND IN ALL RESPECTS, INCLUDING, WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THIS ASSIGNMENT AND THE OBLIGATIONS ARISING HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW JERSEY APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE (WITHOUT REGARD TO PRINCIPLES OF CONFLICT LAWS) AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA, EXCEPT THAT AT ALL TIMES THE PROVISIONS FOR THE CREATION, PERFECTION, AND ENFORCEMENT OF THE LIENS AND SECURITY INTERESTS CREATED PURSUANT HERETO AND PURSUANT TO THE OTHER LOAN DOCUMENTS WITH RESPECT TO THE PROPERTY SHALL BE GOVERNED BY AND CONSTRUED ACCORDING TO THE LAW OF THE STATE IN WHICH THE PROPERTY IS LOCATED, IT BEING UNDERSTOOD THAT, TO THE FULLEST EXTENT PERMITTED BY THE LAW OF SUCH STATE, THE LAW OF THE STATE OF NEW JERSEY SHALL GOVERN THE CONSTRUCTION, VALIDITY AND ENFORCEABILITY OF ALL LOAN DOCUMENTS AND ALL OF THE OBLIGATIONS ARISING HEREUNDER OR THEREUNDER. TO THE FULLEST EXTENT PERMITTED BY LAW, BORROWER HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY CLAIM TO ASSERT THAT THE LAW OF ANY**

Case 2:17-cv-02036-KM-MAH Document 1-5 Filed 03/28/17 Page 10 of 21 PageID: 188

**OTHER JURISDICTION GOVERNS THIS ASSIGNMENT AND THE NOTE, AND THIS ASSIGNMENT AND THE NOTE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW JERSEY.**

(b) **ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST LENDER OR BORROWER ARISING OUT OF OR RELATING TO THIS ASSIGNMENT MAY AT LENDER'S OPTION BE INSTITUTED IN ANY FEDERAL OR STATE COURT IN THE STATE OF NEW JERSEY AND BORROWER WAIVES ANY OBJECTIONS WHICH IT MAY NOW OR HEREAFTER HAVE BASED ON VENUE AND/OR FORUM NON CONVENIENS OF ANY SUCH SUIT, ACTION OR PROCEEDING, AND BORROWER HEREBY IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING. BORROWER DOES HEREBY DESIGNATE AND APPOINT**

**as Agent for Heritage Gateway, LLC, Marine One Associates III, LLC, Ridgewood 2000 Associates III, LLC, and JPG Real Estate III, LLC:**

Jeffrey Greenberg
Heritage Management Company, LLC
P.O. Box 627
123 Prospect Street
Ridgewood, New Jersey 07451

**as Agent for Ivy Gateway, LLC:**

Anthony P. DiTommaso, Jr.
Ivy Equities, L.L.C.
1 Paragon Drive
Montvale, NJ 07645

**AS ITS AUTHORIZED AGENT TO ACCEPT AND ACKNOWLEDGE ON ITS BEHALF SERVICE OF ANY AND ALL PROCESS WHICH MAY BE SERVED IN ANY SUCH SUIT, ACTION OR PROCEEDING IN ANY FEDERAL OR STATE COURT IN NEW JERSEY, AND AGREES THAT SERVICE OF PROCESS UPON SAID AGENT AT SAID ADDRESS AND WRITTEN NOTICE OF SAID SERVICE MAILED OR DELIVERED TO BORROWER IN THE MANNER PROVIDED HEREIN SHALL BE DEEMED IN EVERY RESPECT EFFECTIVE SERVICE OF PROCESS UPON BORROWER IN ANY SUCH SUIT, ACTION OR PROCEEDING IN THE STATE OF NEW JERSEY. BORROWER (I) SHALL GIVE PROMPT NOTICE TO LENDER OF ANY CHANGED ADDRESS OF ITS AUTHORIZED AGENT HEREUNDER, (II) MAY AT ANY TIME AND FROM TIME TO TIME DESIGNATE A SUBSTITUTE AUTHORIZED AGENT WITH AN OFFICE IN NEW JERSEY (WHICH SUBSTITUTE AGENT AND OFFICE SHALL BE DESIGNATED AS THE PERSON AND ADDRESS FOR SERVICE OF PROCESS), AND (III) SHALL PROMPTLY DESIGNATE SUCH A SUBSTITUTE IF**

Case 2:17-cv-02036-KM-MAH Document 1-5 Filed 03/28/17 Page 11 of 21 PageID: 189

**ITS AUTHORIZED AGENT CEASES TO HAVE AN OFFICE IN NEW JERSEY OR IS DISSOLVED WITHOUT LEAVING A SUCCESSOR.**

SECTION 5.6 Termination of Assignment. Upon payment in full of the Debt, this Assignment shall become and be void and of no effect.

SECTION 5.7 Notices. All notices or other written communications hereunder shall be delivered in accordance with Section 11.6 of the Loan Agreement.

SECTION 5.8 Waiver of Trial by Jury. **BORROWER HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, THE RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM, WHETHER IN CONTRACT, TORT OR OTHERWISE, RELATING DIRECTLY OR INDIRECTLY TO THE LOAN EVIDENCED BY THE NOTE, THE APPLICATION FOR THE LOAN EVIDENCED BY THE NOTE, THIS ASSIGNMENT, THE NOTE, OR THE OTHER LOAN DOCUMENTS OR ANY ACTS OR OMISSIONS OF LENDER, ITS OFFICERS, EMPLOYEES, DIRECTORS OR AGENTS IN CONNECTION THEREWITH.**

SECTION 5.9 Exculpation. The provisions of Section 11.22 of the Loan Agreement are hereby incorporated by reference into this Assignment to the same extent and with the same force as if fully set forth herein.

SECTION 5.10 Successors and Assigns. This Assignment shall be binding upon and inure to the benefit of Borrower and Lender and their respective successors and assigns forever.

SECTION 5.11 Headings, Etc. The headings and captions of various paragraphs of this Assignment are for convenience of reference only and are not to be construed as defining or limiting, in any way, the scope or intent of the provisions hereof.

[NO FURTHER TEXT ON THIS PAGE]

IN WITNESS WHEREOF, Borrower has executed this Assignment the day and year first above written.

**BORROWER:**

HERITAGE GATEWAY, LLC, a Delaware limited liability company

By: ____________________________
Name: Steven Greenberg
Title: Manager

MARINE ONE ASSOCIATES III, LLC, a Delaware limited liability company

By: ____________________________
Name: Jeffrey Greenberg
Title: Manager

RIDGEWOOD 2000 ASSOCIATES III, LLC, a Delaware limited liability company

By: ____________________________
Name: Steven Greenberg
Title: Manager

JPG REAL ESTATE III, LLC, a Delaware limited liability company

By: ____________________________
Name: Jeffrey Greenberg
Title: Manager

IVY GATEWAY, LLC, a Delaware limited liability company

By: ____________________________
Name: Anthony P. DiTommaso, Jr.
Title: Manager

## ACKNOWLEDGMENT

STATE OF )
)
COUNTY OF )

I certify that on October 17, 2006, STEVEN GREENBERG personally came before me and this person acknowledged under oath, to my satisfaction, that:

(a) this person signed, sealed and delivered the attached document as the Manager of HERITAGE GATEWAY, LLC, a Delaware limited liability company, the Borrower named in this document;

(b) the proper seal was affixed; and

(c) this document was signed, and made by the Manager as his voluntary act and deed on behalf of said limited liability company.

____________________________
(Name and Title)

DONNA R. KEARNS
A Notary Public of New Jersey
My Commission Expires 7-29-2007

**ACKNOWLEDGMENT**

STATE OF )
)
COUNTY OF )

I certify that on October 17, 2006, JEFFREY GREENBERG personally came before me and this person acknowledged under oath, to my satisfaction, that:

(a) this person signed, sealed and delivered the attached document as the Manager of MARINE ONE ASSOCIATES III, LLC, a Delaware limited liability company, the Borrower named in this document;

(b) the proper seal was affixed; and

(c) this document was signed, and made by the Manager as his voluntary act and deed on behalf of said limited liability company.

(Name and Title)

DONNA R. KEARNS
A Notary Public of New Jersey
My Commission Expires 7-29-2007



NEWY1\8035131.3

Case 2:17-cv-02036-KM-MAH Document 1-5 Filed 03/28/17 Page 15 of 21 PageID: 193

**ACKNOWLEDGMENT**

STATE OF )
)
COUNTY OF )

I certify that on October 17, 2006, STEVEN GREENBERG personally came before me and this person acknowledged under oath, to my satisfaction, that:

(a) this person signed, sealed and delivered the attached document as the Manager of RIDGEWOOD 2000 ASSOCIATES III, LLC, a Delaware limited liability company, the Borrower named in this document;

(b) the proper seal was affixed; and

(c) this document was signed, and made by the Manager as his voluntary act and deed on behalf of said limited liability company.

Donna R. Kearns
(Name and Title)

DONNA R. KEARNS
A Notary Public of New Jersey
My Commission Expires 7-29-2007



NEWY1\8035131.3

**ACKNOWLEDGMENT**

STATE OF )
)
COUNTY OF )

I certify that on October 17, 2006, JEFFREY GREENBERG personally came before me and this person acknowledged under oath, to my satisfaction, that:

(a) this person signed, sealed and delivered the attached document as the Manager of of JPG REAL ESTATE III, LLC, a Delaware limited liability company, the Borrower named in this document;

(b) the proper seal was affixed; and

(c) this document was signed, and made by the Manager as his voluntary act and deed on behalf of said limited liability company.

(Name and Title)

DONNA R. KEARNS
A Notary Public of New Jersey
My Commission Expires 7-29-2007



NEWY1\8035131.3

Case 2:17-cv-02036-KM-MAH Document 1-5 Filed 03/28/17 Page 17 of 21 PageID: 195

IN WITNESS WHEREOF, Borrower has executed this Assignment the day and year first above written.

**BORROWER:**

HERITAGE GATEWAY, LLC, a Delaware limited liability company

By: ______________________________
Name: Steven Greenberg
Title: Manager

MARINE ONE ASSOCIATES III, LLC, a Delaware limited liability company

By: ______________________________
Name: Jeffrey Greenberg
Title: Manager

RIDGEWOOD 2000 ASSOCIATES III, LLC, a Delaware limited liability company

By: ______________________________
Name: Steven Greenberg
Title: Manager

JPG REAL ESTATE III, LLC, a Delaware limited liability company

By: ______________________________
Name: Jeffrey Greenberg
Title: Manager

IVY GATEWAY, LLC, a Delaware limited liability company

By: ______________________________
Name: Anthony P. DiTommaso, Jr.
Title: Manager

Case 2:17-cv-02036-KM-MAH Document 1-5 Filed 03/28/17 Page 18 of 21 PageID: 196

**ACKNOWLEDGMENT**

STATE OF New Jersey )
)
COUNTY OF Bergen )

I certify that on October 17th, 2006, ANTHONY P. DITOMMASO, JR. personally came before me and this person acknowledged under oath, to my satisfaction, that:

(a) this person signed, sealed and delivered the attached document as the Manager of IVY GATEWAY, LLC, a Delaware limited liability company, the Borrower named in this document;

(b) the proper seal was affixed; and

(c) this document was signed, and made by the Manager as his voluntary act and deed on behalf of said limited liability company.

Barbara Ann Manzo
(Name and Title) Office Manager

BARBARA ANN MANZO
NOTARY PUBLIC OF NEW JERSEY
MY COMMISSION EXPIRES JULY 12, 2011



NEWY1\8035131.3

## EXHIBIT A

## LEGAL DESCRIPTION OF PROPERTY

BEGINNING at a point in the Easterly line of Mulberry Street (variable width Right of Way), said point being situate South 27ø24'42" West, a distance of 212.84 feet and South 25ø36'05" West, a distance of 42.26 feet from a point located at the intersection of the Southerly Right of Way line of Commerce Street (60 feet wide R.O.W.) with the Easterly Right of Way line of Mulberry Street, and from said beginning point running, thence:

1) South 74ø26'00" East, a distance of 197.94 feet, coincident with Lot 122, Block 151 to a point; thence

2) Along the same North 60ø34'00" East, a distance of 8.49 feet to a point in the same; thence

3) South 74ø26'00" East, a distance of 52.17 feet along the same to a point in the Westerly line of Lot 1, Block 151; thence

4) South 15ø34'00" West, a distance of 185.14 feet, coincident with Lot 1, Block 151 to a point in the Northerly line of Market Street; thence

5) Along the Northerly right of way line of Market Street (variable width right of way), North 76ø30'37" West, a distance of 278.72 feet to a point in the Easterly line of Mulberry Street; thence

6) Along the Easterly line of Mulberry Street, North 14ø25'59" East, a distance of 47.25 feet to a point in the same; thence

7) North 75ø36'18" West, a distance of 1.78 feet to a point in the same; thence

8) Still along the same, North 25ø36'05" East, a distance of 144.24 feet to the point and place of BEGINNING.

TOGETHER with the free and uninterrupted use, and the liberty and privilege of uninterrupted passage along an overhead Pedestrian Walkway (including two bridges noted hereafter) which extends from its Easterly most point at the Pennsylvania Railroad Station located at the Easterly side of Raymond Plaza West, (variable width) crossing and bridging the aforesaid Raymond Plaza West at and between the elevations of 34.2 and 51.2 feet above City Datum to the entrance of One Gateway Center Condominium at and between the elevations of 34.1 feet and 51.2 feet above City Datum; thence passing along and through the aforesaid Condominium at and between the elevations as set forth in the Condominium Plans to the land now or late of the Prudential Insurance Company of America; thence crossing the aforesaid land and also crossing and bridging McCarter Highway also known as New Jersey State Highway Route 21 (variable width) at and between the elevations of 42.9 feet and 60.2 feet above City Datum to the entrance of Two Gateway Center at and between the elevations of 46.6 feet and 60.7 feet above City Datum;

Case 2:17-cv-02036-KM-MAH Document 1-5 Filed 03/28/17 Page 20 of 21 PageID: 198

thence extending through the building and crossing the land of Two Gateway Center at and between the elevations of 43.1 feet and 64.7 feet above City Datum to the entrance of Three Gateway Garage at and between the elevations of 43.1 feet and 64.7 feet above City Datum; thence extending through the building and crossing the land of Three Gateway Garage and also crossing the land of Three Gateway at and between the elevations of 43.0 feet and 64.7 feet above the City Datum to the entrance of Three Gateway Center; thence extending through Three Gateway Center at and between the elevations of 43.0 feet and 64.7 feet above the City Datum to the Westerly most point at or near Mulberry Street (variable width) (such entire described Pedestrian Walkway (including the bridges described above), the "Pedestrian Walkway").

Subject to and together with easements as set forth in Deed Book 4768 page 941 and Deed Book 5164 page 592 as modified and or superseded by that certain Amended and Restated Grant and Agreement between One Gateway Center Condominium Association, Inc.; The Prudential Insurance Company of America; Third Newark Gateway Urban Renewal Association, a New Jersey Partnership; Gateway Four Urban Renewal, L.P. and Gateway South Urban Renewal Association, a New Jersey Partnership; dated December 21, 1999 and recorded December 27, 1999 in Deed Book 5664 page 680.

TOGETHER with and subject to the Amended and Restated Grant and Agreement between One Gateway Center Condominium Association, Inc.; The Prudential Insurance Company of America; Third Newark Gateway Urban Renewal Association, a New Jersey Partnership; Gateway Four Urban Renewal, L.P. and Gateway South Urban Renewal Association, a New Jersey Partnership; dated December 21, 1999 and recorded December 27, 1999 in Deed Book 5664 page 680.

TOGETHER with and subject to the Grant and Declaration of Easements between Gateway III Newark, L.L.C.; Gateway IV Newark Urban Renewal, L.L.C.; Gateway V Newark, L.L.C.; and Gateway Parking Newark, L.L.C.; dated December 22, 1999 and recorded December 27, 1999 in Deed Book 5664 page 852.

TOGETHER with and subject to Parking Agreement set forth in Deed Book 5892 page 921 as assigned and assumed as set forth in Deed Book 6073 page 770.

BEING in accordance with a Survey prepared by CONTROL POINT ASSOCIATES, INC., (GREGORY S. GALLAS, NJPLS), dated September 25, 2006 and revised September 29, 2006.

## EXHIBIT B

## DESCRIPTION OF LEASES AND RENTS

As used in Subsection 1.1(a), the term "leases" shall mean all leases, subleases, licenses, franchises, concessions or grants of other possessory interests, tenancies, and any other agreements affecting the use, possession or occupancy of the Property or any part thereof (including, without limitation, guest rooms, restaurants, bars, conference and meeting rooms, and banquet halls and other public facilities), whether now or hereafter existing or entered into (including, without limitation, any use or occupancy arrangements created pursuant to Section 365(d) of the Bankruptcy Code or otherwise in connection with the commencement or continuance of any bankruptcy, reorganization, arrangement, insolvency, dissolution, receivership or similar proceedings, or any assignment for the benefit of creditors, in respect of any tenant or occupant of any portion of the Property) and all amendments, modifications, supplements, extensions or renewals thereof, whether now or hereafter existing and all amendments, modifications, supplements, extensions or renewals thereof. As used in Subsection 1.1(a) the term "lease provisions" shall mean the right to enforce, whether at law or in equity or by any other means, all terms, covenants and provisions of the Leases.

As used in Subsection 1.1(c), the term "rents" shall mean all rents, issues, profits, royalties (including all oil and gas or other hydrocarbon substances), earnings, receipts, revenues, accounts, account receivable, security deposits and other deposits (subject to the prior right of the tenants making such deposits) and income, including, without limitation, fixed, additional and percentage rents, and all operating expense reimbursements, reimbursements for increases in taxes, sums paid by tenants to Borrower to reimburse Borrower for amounts originally paid or to be paid by Borrower or Borrower's agents or affiliates for which such tenants were liable, as, or example, tenant improvements costs in excess of any work letter, lease takeover costs, moving expenses and tax and operating expense pass-throughs for which a tenant is solely liable, parking, maintenance, common area, tax, insurance, utility and service charges and contributions, proceeds of sale of electricity, gas, heating, air-conditioning and other utilities and services, deficiency rents and liquidated damages, and other benefits now or hereafter derived from any portion of the Property or otherwise due and payable or to become due and payable as a result of any ownership, use, possession, occupancy or operation thereof and/or services rendered, goods provided and business conducted in connection therewith (including any payments received pursuant to Section 502(b) of the Bankruptcy Code or otherwise in arrangement, insolvency, dissolution, receivership or similar proceedings, or any assignment for the benefit of creditors, in respect of any tenant or other occupants of any portion of the Property and all claims as a creditor in connection with any of the foregoing) and all cash or security deposits, advance rentals, and all deposits or payments of a similar nature relating thereto, now or hereafter, including during any period of redemption, derived from the Property or any portion thereof and all proceeds from the cancellation, surrender, sale or other disposition of the Leases.

Case 2:17-cv-02036-KM-MAH Document 1-6 Filed 03/28/17 Page 1 of 92 PageID: 200

# EXHIBIT E

**ALLONGE**

Loan No.: 06-08-0055
Property Name: Gateway Center IV

Allonge endorsement attached to the Promissory Note in the stated original principal amount of $61,000,000.00, executed by HERITAGE GATEWAY, LLC; MARINE ONE ASSOCIATES III, LLC; RIDGEWOOD 2000 ASSOCIATES III, LLC; JPG REAL ESTATE III, LLC; IVY GATEWAY, LLC on October 24, 2006.

Pay to the order of WELLS FARGO BANK, N.A., AS TRUSTEE FOR MORGAN STANLEY CAPITAL I INC., COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2006-IQ12, without recourse, representation or warranty.

LASALLE BANK NATIONAL ASSOCIATION,
a national banking association

By: ______________________
Name: Brian Fetterolf
Title: Director

# EXHIBIT F

# RECORDING INFORMATION SHEET

ESSEX COUNTY REGISTER'S OFFICE
HALL OF RECORDS, ROOM 130
465 MARTIN LUTHER KING Jr. Blvd
NEWARK NJ 07102

| INSTRUMENT NUMBER: | DOCUMENT TYPE : |
|---|---|
| **7070234** | **ASSIGNMENT OF MORTGAGE** |

**Official Use Only**

CAROLE A. GRAVES, REGISTER
ESSEX COUNTY, NJ

INSTRUMENT NUMBER
7070234
RECORDED ON
May 30, 2007 11:32 am
BOOK:12059 PAGE:1227

AC

MAIL COPY ______
NO COPY ______
ENVELOPE ______

ADDITIONAL STAMPINGS ______

**Return Address** *(for recorded documents)*

VENESSA ORTA ESQ

ANDERSON MCCOY & ORTA PC

100 NO BROADWAY STE 2600

OKLAHOMA CITY OH 73102

| | |
|---|---|
| **No. Of Pages** *(excluding Summary Sheet)* | 3 |
| **Recording Fee** *(excluding Transfer Tax)* | $60.00 |
| **Realty Transfer Tax** | $0.00 |
| **Amount Charged** (Check # 26933) | $60.00 |

| | |
|---|---|
| **Municipality** | ESSEX COUNTY |
| **Parcel Information** | **Block**<br>**Lot** |
| **First Party Name** | LASALLE BANK |
| **Second Party Name** | WELLS FARGO BANK |

**Additional Information (Official Use Only)**

******************************* DO NOT REMOVE THIS PAGE. ********************************

*COVER SHEET (DOCUMENT SUMMARY FORM) IS PART OF ESSEX COUNTY FILING RECORD*

********************* RETAIN THIS PAGE FOR FUTURE REFERENCE. *********************

Case 2:17-cv-02036-KM-MAH Document 1-7 Filed 03/28/17 Page 3 of 95 PageID: 204

THIS DOCUMENT PREPARED BY AND
UPON RECORDATION RETURN TO:
VANESSA ORTA, ESQ.
ANDERSON, McCOY & ORTA, P.C.
100 North Broadway, Suite 2600
Oklahoma City, Oklahoma 73102
Telephone: 888-236-0007
AMO File No. 1531.025
72006IQ12
06-08-0055

**Essex County, New Jersey**

---

**ASSIGNMENT OF MORTGAGE AND SECURITY AGREEMENT**

KNOW THAT

**LASALLE BANK NATIONAL ASSOCIATION, a national banking association,** having an address of 135 South LaSalle Street, Suite 3410, Chicago, IL 60603, ("Assignor"),

For valuable consideration paid by:

**WELLS FARGO BANK, N.A., AS TRUSTEE FOR MORGAN STANLEY CAPITAL I INC., COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2006-IQ12**, having an address of CMBS Department, 1055 10th Avenue SE, Minneapolis, MN 55414, ("Assignee"),

the receipt and sufficiency of which is hereby acknowledged, Assignor does hereby grant, bargain, sell, convey, assign, transfer, and set over, without recourse, representation and warranty, except as set forth in that certain related Mortgage Loan Purchase Agreement all of Assignor's right, title and interest, of any kind whatsoever, including that of mortgagee, beneficiary, payee, assignee or secured party (as the case may be), in and to the following:

\\

Case 2:17-cv-02036-KM-MAH Document 1-7 Filed 03/28/17 Page 4 of 5 PageID: 205

**Mortgage and Security Agreement** dated October 25, 2006 by Heritage Gateway, LLC; Marine One Associates III, LLC; Ridgewood 2000 Associates III, LLC; JPG Real Estate III, LLC; and Ivy Gateway, LLC, each a Delaware limited liability company to Assignor and recorded October 30, 2006, as Instrument Number 6158038, in Book 11600, Page 868, with the Essex County Register of Deeds, New Jersey.

TO HAVE AND TO HOLD the same unto the Assignee and to the successors, legal representatives and assigns of the Assignee forever.

IN WITNESS WHEREOF, the Assignor has caused these presents to be effective as of December 21, 2006.

**(The remainder of this page has been intentionally left blank.)**

Case 2:17-cv-02036-KM-MAH Document 1-7 Filed 03/28/17 Page 5 of 95 PageID: 206

LASALLE BANK NATIONAL ASSOCIATION, a national banking association

By: [signature]
Name: Brian Fetterolf
Title: Director

STATE OF ILLINOIS §
§
COUNTY OF COOK §

On the 19 day of December, 2006, before me, the undersigned, a Notary Public in and for said state, personally appeared Brian Fetterolf, personally known to me or proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument, and that such individual made such appearance before the undersigned.

WITNESS my hand and official seal.

[signature]
Notary

[ S E A L ]

My Commission Expires: 12/12/09

Natalie West
Printed Name of Notary Public

OFFICIAL SEAL
NATALIE WEST
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:12/12/09

Case 2:17-cv-02036-KM-MAH Document 1-8 Filed 03/28/17 Page 1 of 93 PageID: 207

# EXHIBIT G

Case 2:17-cv-02036-KM-MAH Document 1-8 Filed 03/28/17 Page 2 of 3 PageID: 208

**OMNIBUS ASSIGNMENT**

LASALLE BANK NATIONAL ASSOCIATION, a national banking association, ("Assignor"), for good and valuable consideration, the receipt of which is hereby acknowledged, hereby sells, transfers, assigns, delivers, sets-over and conveys, unto WELLS FARGO BANK, N.A., AS TRUSTEE FOR MORGAN STANLEY CAPITAL I INC., COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2006-IQ12, its successors and assigns ("Assignee"), without recourse to Assignor and without representations, warranties or covenants, express or implied, by Assignor, except as set forth in that certain related Mortgage Loan Purchase Agreement, all right, title and interest of Assignor in and to the loan identified on Exhibit A attached hereto (the "Loan"), including without limitation all of Assignor's right, title and interest in any claims, collateral, insurance policies, certificates of deposit, letters of credit, escrow accounts, performance bonds, demands, causes of action and any other collateral arising out of and/or executed and/or delivered in or to or with respect to the Loan, together with any other documents or instruments executed and/or delivered in connection with or otherwise related to the Loan.

Assignor has executed this instrument to be effective as of December 21, 2006.

LASALLE BANK NATIONAL ASSOCIATION,
a national banking association

By: ______________________________
Name: Brian Fetterolf
Title: Director

Loan No.: 06-08-0055
File No.: 1531.025
Property: Gateway Center IV

**EXHIBIT "A"**
**TO**
**OMNIBUS ASSIGNMENT**

$61,000,000.00 loan from LASALLE BANK NATIONAL ASSOCIATION to HERITAGE GATEWAY, LLC; MARINE ONE ASSOCIATES III, LLC; RIDGEWOOD 2000 ASSOCIATES III, LLC; JPG REAL ESTATE III, LLC; IVY GATEWAY, LLC, for property located in Essex County, New Jersey.

# EXHIBIT H

Case 2:17-cv-02036-KM-MAH Document 1-9 Filed 03/28/17 Page 2 of 35 PageID: 211

# RECORDING INFORMATION SHEET

ESSEX COUNTY REGISTER'S OFFICE
HALL OF RECORDS, ROOM 130
465 MARTIN LUTHER KING Jr. Blvd
NEWARK NJ 07102

| INSTRUMENT NUMBER: | DOCUMENT TYPE: |
|---|---|
| **9085615** | **MORTGAGE** |

**Official Use Only**

CAROLE A. GRAVES, REGISTER
ESSEX COUNTY, NJ
INSTRUMENT NUMBER
9085615
RECORDED ON
October 2, 2009 02:36 pm
BOOK:12220 PAGE:4691
AC

**Return Address** *(for recorded documents)*

KILPATRICK STOCKTON LLP
1100 PEACHTREE STREET
SUITE 2800
ATLANTA GA 30309

| | |
|---|---|
| **No. Of Pages** *(excluding Summary Sheet)* | 33 |
| **Recording Fee** *(excluding Transfer Tax)* | $350.00 |
| **Realty Transfer Tax** | $0.00 |
| **Amount Charged** (Check # 3474) | $350.00 |
| **Municipality** | ESSEX COUNTY |
| **Parcel Information** | **Block**<br>**Lot** |
| **First Party Name** | HERITAGE GATEWAY LLC |
| **Second Party Name** | WELLS FARGO BANK NA (TR) |

Not Certified Copy

MAIL COPY ______
NO COPY ______
ENVELOPE ______

ADDITIONAL STAMPINGS ______

**Additional Information (Official Use Only)**

********************************** DO NOT REMOVE THIS PAGE.**********************************
***COVER SHEET (DOCUMENT SUMMARY FORM) IS PART OF ESSEX COUNTY FILING RECORD***
************************ RETAIN THIS PAGE FOR FUTURE REFERENCE.************************

Case 2:17-cv-02036-KM-MAH Document 1-9 Filed 03/28/17 Page 3 of 35 PageID: 212

This instrument prepared by
and when recorded, return to:
Kilpatrick Stockton LLP
1100 Peachtree Street, Suite 2800
Atlanta, Georgia 30309
Attn: Capital Markets Group
Ref: Capmark/Ivy and Heritage Gateway
(33979/377516)

**ABOVE SPACE FOR RECORDER'S USE**

**Capmark Loan No.: 99-1078256**

**ASSUMPTION AGREEMENT**

THIS ASSUMPTION AGREEMENT (this "**Agreement**") is entered into and made effective as of the 16th day of September, 2009 (the "**Effective Date**"), by and among **HERITAGE GATEWAY, LLC**, a Delaware limited liability company ("**Heritage Borrower**"), **MARINE ONE ASSOCIATES III, LLC**, a Delaware limited liability company ("**Marine Borrower**"), **RIDGEWOOD 2000 ASSOCIATES III, LLC**, a Delaware limited liability company ("**Ridgewood Borrower**"), **JPG REAL ESTATE III, LLC**, a Delaware limited liability company ("**JPG Borrower**"), each with a mailing address at 123 Prospect Street, Ridgewood, New Jersey 07451, and **IVY GATEWAY, LLC**, a Delaware limited liability company, with a mailing address at 1 Paragon Drive, Suite 125, Montvale, New Jersey 07645 ("**Ivy Borrower**," together with Heritage Borrower, Marine Borrower, Ridgewood Borrower, JPG Borrower, jointly and severally, as tenants-in-common, are referred to herein, individually and collectively, as "**Current TIC Borrowers**"), **NEWARK 300, LLC**, a Delaware limited liability company, with a mailing address at 123 Prospect Street, Ridgewood, New Jersey 07451 ("**Newark 300 Borrower**," together with the Current TIC Borrowers, jointly and severally, as tenants-in-common, are referred to herein, individually and collectively, as "**Borrowers**"), **STEVEN GREENBERG**, an individual, **JEFFREY GREENBERG**, an individual, each with a mailing address at 123 Prospect Street, Ridgewood, New Jersey 07451, and **IVY EQUITIES, L.L.C.**, a Delaware limited liability company, with a mailing address at 1 Paragon Drive, Suite 125, Montvale, New Jersey 07645 (jointly and severally, are referred to herein, individually and collectively, as "**Continuing Guarantors**" and together with the Current TIC Borrowers are jointly and severally referred to herein, individually and collectively, as "**Original Indemnitors**"), and **WELLS FARGO BANK, N.A.**, as Trustee for Morgan Stanley Capital I Inc., Commercial Mortgage Pass-Through Certificates, Series 2006-IQ12 ("**Lender**"), with a mailing address at c/o Capmark Finance Inc., 116 Welsh Road, Horsham, Pennsylvania 19044 ("**Capmark**").

US2008 759469.6

**RECITALS:**

The following recitals are a material part of this Agreement:

A. LaSalle Bank National Association ("**Original Lender**") made a real estate loan in the original principal amount of **$61,000,000.00** (the "**Loan**") to Current TIC Borrowers, which Loan is evidenced by that certain Promissory Note dated October 24, 2006, executed by Current TIC Borrowers (together with all addenda, modifications, amendments, riders, exhibits and supplements thereto, the "**Note**"). The Loan is evidenced, governed and/or secured by the following agreements and documents, including, without limitation, the:

1. that certain Mortgage and Security Agreement dated October 24, 2006 (together with all addenda, modifications, amendments, riders, exhibits and supplements thereto, the "**Security Instrument**"), executed and delivered by Current TIC Borrowers for the benefit of Original Lender recorded on October 30, 2006 in Book 11600, Page 868 in the official land records of Essex County, New Jersey (the "**Recorder's Office**"), encumbering the real property described on **Exhibit A** attached hereto and by this reference incorporated herein and as more particularly described in the Security Instrument (together with all other property, real and personal, encumbered by the Security Instrument, the "**Property**"), as assigned by Original Lender to Lender pursuant to that certain Assignment of Mortgage and Security Agreement as recorded in Book 12059, Page 1227, in the Recorder's Office;

2. that certain Loan Agreement (together with all addenda, modifications, amendments, riders, exhibits and supplements thereto, the "**Loan Agreement**") dated October 24, 2006, executed and delivered by Current TIC Borrowers for the benefit of Original Lender;

Not Certified Copy

3. that certain Assignment of Leases and Rents (together with all addenda, modifications, amendments, riders, exhibits and supplements thereto, the "**Assignment of Leases**"), dated October 24, 2006, executed and delivered by Current TIC Borrowers for the benefit of Original Lender, recorded on October 30, 2006 in Book 11600, Page 888 in the Recorder's Office, as assigned by Original Lender to Lender pursuant to that certain Assignment of Assignment of Leases and Rents as recorded in Book 12059, Page 1235, in the Recorder's Office;

4. those certain UCC Financing Statements naming Current TIC Borrowers, as debtor therein, and Original Lender, as secured party, and filed in the Recorder's Office and in the public records of the Secretary of State of Delaware;

5. that certain Environmental Indemnity Agreement (the "**Environmental Indemnity**") dated October 24, 2006, executed by Original Indemnitors for the benefit of Original Lender;

6. that certain Guaranty (the "**Guaranty**") dated October 24, 2006, executed by Continuing Guarantors for the benefit of Original Lender;

7. that certain Assignment of Management Agreements and Subordination of Management Fees dated October 24, 2006 (the "**Assignment of Management Agreement**"), executed by Current TIC Borrowers, Original Lender and Heritage Management Company, L.L.C., and G4 Operating Company, LLC (collectively, "**Continuing Property Managers**");

Case 2:17-cv-02036-KM-MAH Document 1-9 Filed 03/28/17 Page 5 of 35 PageID: 214

8. that certain Cash Management Agreement dated October 24, 2006, executed by Current TIC Borrowers, Original Lender, the borrowers of the LaSalle Mezzanine Financing (as defined in the Loan Agreement), G4 Operating Company, LLC and LaSalle Bank National Association, as Agent (the "**Cash Management Agreement**"); and

9. any and all other documents pertaining to the Property as well as all other documents now or hereafter executed and/or delivered in connection with the Loan, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

B. Upon the Effective Date, Current TIC Borrowers, Newark 300 Borrower, Borrowers, Continuing Guarantors, Original Indemnitors and/or Continuing Property Managers, are executing and delivering, or are causing to be delivered, to Lender the following documents, all dated as of the Effective Date:

1. this Agreement;

2. those certain UCC Financing Statements naming Borrowers, as debtor, and naming Lender, as secured party, to be filed in the Recorder's Office and the public records of the Secretary of State of Delaware;

3. that certain Acknowledgment and Reaffirmation of Environmental Indemnity Agreement and Guaranty from Original Indemnitors in favor of Lender (the "**Reaffirmation of Indemnities Agreement**");

4. that certain Assumption of Obligations under the Environmental Indemnity Agreement from Newark 300 Borrower and acknowledged by Original Indemnitors;

5. that certain First Amendment to Cash Management Agreement, to be executed by Borrowers, Lender, the borrowers of the LaSalle Mezzanine Financing, and Newark 300 II, LLC, a Delaware limited liability company, G4 Operating Company, LLC and LaSalle Bank National Association, as Agent; and

6. that certain First Amendment To Lockbox – Deposit Agreement to be executed by Borrowers, Lender, Valley National Bank, a national banking association, and G4 Operating Company, LLC.

7. that certain First Amendment to Assignment of Management Agreements and Subordination of Management Fees and Reaffirmation of Assignment of Management Agreements and Subordination of Management Fees from Continuing Property Managers and Current TIC Borrowers in favor of Lender (the "**Reaffirmation of Assignment of Management**").

The agreements and documents set forth in Recital A and Recital B above, together with all other documents evidencing, securing or otherwise pertaining to the Loan, and such other agreements and documents as Lender may reasonably require, are hereinafter referred to collectively as the "**Loan Documents**," and individually as a "**Loan Document**."



US2008 759460.6

C. Original Lender assigned, sold and transferred its interest in the Loan and the Loan Documents to Lender pursuant to certain assignment documents and Lender is the current holder of all of Original Lender's interest in the Loan and Loan Documents.

D. On June 12, 2009 (the "**Transfer Date**"), Ivy Borrower transferred 24% of its current 40% ownership interest in the fee title to the Property (the "**Transfer**") to Newark 300 Borrower, which reduced Ivy Borrower's ownership interest in the fee title to the Property to 16%. Heritage Borrower, Marine Borrower, Ridgewood Borrower and JPG Borrower kept the same percentage ownership interests in the Property, so that immediately after the Transfer, Heritage Borrower owns a 26.59% interest in the Property, Marine Borrower owns a 17.39% interest in the Property, Ridgewood Borrower owns an 8.01% interest in the Property, JPG Borrower owns an 8.01% interest in the Property, Ivy Borrower owns a 16% interest in the Property and, Newark 300 Borrower owns a 24% interest in the Property (the foregoing shall be referred to herein as the "**Post-Transfer TIC Ownership**"). The Post-Transfer TIC Ownership is more fully set forth in **Exhibit B**, attached hereto and incorporated herein by reference. In connection with the Transfer, Newark 300 Borrower has agreed to become liable, jointly and severally with Current TIC Borrowers, for the obligations of the Current TIC Borrowers under the Loan and the Loan Documents and Current TIC Borrowers have agreed that their obligations under the Loan and the Loan Documents shall be joint and several, as tenants-in-common with Newark 300 Borrower (the foregoing shall be referred to herein as the "**TIC Assumption**"). In connection with the Transfer, Newark 300 Borrower has further agreed to become liable, jointly and severally with Original Indemnitors, for the obligations of Original Indemnitors under Environmental Indemnity and Original Indemnitors have agreed that their obligations under the Environmental Indemnity shall be joint and several with Newark 300 Borrower (the "**Indemnity Assumption**," together with the TIC Assumption are referred to herein collectively as the "**Assumption**").

Not Certified Copy

E. Lender, acting by and through its servicer, Capmark, pursuant to Section 8.7 of that certain Pooling and Servicing Agreement dated December 1, 2006 (the "**Pooling and Servicing Agreement**"), consents to the Transfer and the Assumption subject to the terms and conditions stated below, including, without limitation, the execution and delivery of the agreements and documents set forth in Recital B above and such other documents and instruments as may be reasonably required by Lender.

F. Unless the context requires otherwise, references in this Agreement to Loan Documents shall be deemed to refer to such documents as amended by this Agreement, and as such documents and the other Loan Documents may be further amended, modified, extended or replaced from time to time.

**CONTRACTUAL PROVISIONS:**

NOW, THEREFORE, in consideration of the Recitals, which are incorporated herein as if set forth below in full as a substantive, contractual part of this Agreement, and the mutual promises contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1. Acknowledgement of Debt.

(a) Current TIC Borrowers and Newark 300 Borrower confirm and acknowledge that the outstanding principal balance under the Note immediately prior to the Effective Date is **$61,000,000.00** and the balances of all reserve and escrow accounts required under the Loan Documents are set forth on **Schedule I**, attached hereto and made a part hereof. Borrowers declare and acknowledge, for the specific reliance and benefit of Lender, that (i) Borrowers have no right, claim,

Case 2:17-cv-02036-KM-MAH Document 1-9 Filed 03/28/17 Page 7 of 35 PageID: 216

defense or right of offset of any kind or in any amount with respect to the Note, the Security Instrument or any of the other Loan Documents, and (ii) no amounts paid by any Borrowers pursuant to or in connection with the execution and delivery of this Agreement shall be applied to or set off against the principal balance of the Note.

(b) The parties acknowledge and agree that Lender shall continue to hold the balances in escrow and reserve accounts, if any, in accordance with the terms of the Loan Documents. All escrow and reserve balances held by Lender in connection with the Loan Documents shall, from and after the Effective Date, be for the account of Borrowers.

2. Conditions Precedent; Consent to Transfer.

(a) In reliance upon the representations, warranties and covenants set forth herein by Current TIC Borrowers, Newark 300 Borrower, Borrowers and Original Indemnitors, Lender hereby consents to the Transfer and the Assumption. Lender's consent to the Transfer and the Assumption is not intended to be and shall not be construed as a consent to any subsequent transfer or assumption which requires Lender's consent pursuant to the terms of the Security Instrument or any other Loan Document.

(b) Borrowers hereby authorize Lender to file any and all UCC financing statements and UCC financing statement amendments as Lender may deem necessary from time to time including, without limitation, financing statements containing the description "all assets of Borrowers" or "all personal property of Borrowers" or similar language.

3. Assumption of Obligations. As of the Transfer Date, Newark 300 Borrower hereby unconditionally assumes, jointly and severally, as tenants-in-common with the Current TIC Borrowers, those obligations under the Loan Documents and, as of the Transfer Date, agrees to comply with all covenants and obligations therein, including, without limitation, the obligation to pay the unpaid balance due and owing on the Loan and all interest thereon. Without limiting the foregoing, Newark 300 Borrower, jointly and severally, as tenants-in-common with Current TIC Borrowers, agrees to keep and observe all of the covenants, terms and conditions required to be kept, observed and performed pursuant to the Note, the Security Instrument and all of the other Loan Documents, to the same effect as if Newark 300 Borrower was one of the original makers of, and party to, the Loan Documents including, but not limited to, payment of all sums presently outstanding under the Note. Newark 300 Borrower, jointly and severally, as tenants-in-common with Current TIC Borrowers, hereby adopts, ratifies and confirms as of the Transfer Date all of the representations, warranties and covenants of Current TIC Borrowers contained in the Loan Documents.

4. Reaffirmation by Current TIC Borrowers, Original Indemnitors and Continuing Guarantors.

(a) Current TIC Borrowers hereby represent and warrant to Lender that they have reviewed this Agreement, and all the documents executed in accordance herewith. Current TIC Borrowers further covenant and agree that the Transfer and the Assumption shall not, and shall not be deemed to, impair, limit, abrogate or reduce in any manner or to any extent the liability or obligations of Current TIC Borrowers under the Loan Documents. Current TIC Borrowers hereby renew, reaffirm, ratify and confirm the Note, the Security Instrument, the Guaranty, the Environmental Indemnity and the other Loan Documents and acknowledge and agree that the Loan Documents remain in full force and effect without impairment and without modification (except as specifically provided herein), and that no

Case 2:17-cv-02036-KM-MAH Document 1-9 Filed 03/28/17 Page 8 of 35 PageID: 217

rights or remedies of Lender under the Loan Documents have been waived. Current TIC Borrowers reaffirm the truth and accuracy of all representations and warranties made by Current TIC Borrowers in the Loan Documents as if such representations and warranties were made on the date hereof. Current TIC Borrowers agree to continue to pay, perform, and discharge each and every obligation of payment and performance under, pursuant to and as set forth in the Note, the Security Instrument, the Environmental Indemnity, and the other Loan Documents at the time and manner therein provided. Current TIC Borrowers hereby acknowledge, agree and warrant that (i) there are no rights of set-off or counterclaim, nor any defenses of any kind, whether legal, equitable or otherwise, which would enable Current TIC Borrowers to avoid or delay timely performance of their obligations under the Note, the Security Instrument, the Environmental Indemnity, or any of the Loan Documents; (ii) there are no monetary encumbrances or liens of any kind or nature against the Property except those created by the Loan Documents, and (iii) all rights, priorities, titles, liens and equities securing the payment of the Note are expressly recognized as valid and are in all things renewed, continued and preserved in force to secure payment of the Note, except as amended herein. Current TIC Borrowers agree that their obligations under the Loan and the Loan Documents shall be joint and several, as tenants-in-common with Newark 300 Borrower.

(b) Original Indemnitors hereby represent and warrant to Lender that they have reviewed this Agreement, and all the documents executed in accordance herewith. Original Indemnitors further covenant and agree that the Transfer and the Assumption shall not, and shall not be deemed to, impair, limit, abrogate or reduce in any manner or to any extent the liability or obligations of Original Indemnitors under the Loan Documents. Original Indemnitors hereby renew, reaffirm, ratify and confirm all of their obligations and liabilities under the Environmental Indemnity and the other Loan Documents and acknowledge and agree that the Environmental Indemnity and the other Loan Documents remain in full force and effect without impairment and without modification (except as specifically provided herein), and that no rights or remedies of Lender under the Environmental Indemnity or the other Loan Documents have been waived. Original Indemnitors reaffirm the truth and accuracy of all representations and warranties made by Original Indemnitors in the Environmental Indemnity and in the other Loan Documents as if such representations and warranties were made on the date hereof. Original Indemnitors agree to continue to perform and discharge each and every obligation of payment and performance under, pursuant to and as set forth in the Environmental Indemnity and the other Loan Documents at the time and manner therein provided. Original Indemnitors agree that their obligations under the Loan Documents shall be joint and several with Newark 300 Borrower.

(c) Continuing Guarantors hereby represent and warrant to Lender that they have reviewed this Agreement, and all the documents executed in accordance herewith. Continuing Guarantors further covenant and agree that the Transfer and the Assumption shall not, and shall not be deemed to, impair, limit, abrogate or reduce in any manner or to any extent the liability or obligations of Continuing Guarantors under the Guaranty or the other Loan Documents. Continuing Guarantors hereby renew, reaffirm, ratify and confirm all of their obligations and liabilities under the Guaranty, the Environmental Indemnity and the other Loan Documents and acknowledge and agree that the Loan Documents remain in full force and effect without impairment and without modification (except as specifically provided herein), and that no rights or remedies of Lender under the Loan Documents have been waived. Continuing Guarantors reaffirm the truth and accuracy of all representations and warranties made by Continuing Guarantors in the Guaranty, the Environmental Indemnity and in the other Loan Documents as if such representations and warranties were made on the date hereof. Continuing Guarantors agree to continue to perform and discharge each and every obligation of payment and performance under, pursuant to and as set forth in the Guaranty, the Environmental Indemnity, and the other Loan Documents at the time and manner therein provided.

Case 2:17-cv-02036-KM-MAH Document 1-9 Filed 03/28/17 Page 9 of 35 PageID: 218

5. Representations.

(a) **Borrowers** represent and warrant to Capmark and Lender as of the Effective Date that:

(i) Borrowers are duly organized, validly existing and in good standing under the laws of their state of formation or organization and are duly qualified and authorized to conduct business in the State in which the Property is located, and have full power and authority to own, lease and operate the Property, jointly and severally, as tenants-in-common, and to conduct their affairs as now being conducted and as proposed to be conducted;

(ii) Borrowers have full power and authority to enter into, execute, deliver and carry out this Agreement and the Loan Documents to which they are a party, by assumption or otherwise, and to perform their obligations hereunder and thereunder and all such actions have been duly authorized by all necessary actions on their part;

(iii) This Agreement and the other documents executed in connection herewith have been duly executed and delivered by Borrowers. This Agreement and the Loan Documents to which Borrowers are a party, by assumption or otherwise, constitute legal, valid and binding obligations of Borrowers, enforceable against Borrowers in accordance with their respective terms, subject to bankruptcy, insolvency and other similar laws affecting the rights of creditors generally;

(iv) Borrowers have received and reviewed copies of all of the Loan Documents;

Not Certified Copy

(v) To Borrowers', Original Indemnitors' and Continuing Guarantors' knowledge, no person owning an interest in any of Borrowers, Original Indemnitors and/or Continuing Guarantors, is a country, territory, individual or entity named on a list maintained by the U.S. Treasury Department's Office of Foreign Assets Control ("**OFAC**"), or is a Specially Designated National or Blocked Person under the programs administered by OFAC;

(vi) Except for the LaSalle Mezzanine Financing and the pledge of 100% of the issued and outstanding membership interests in Newark 300 Borrower pursuant to the terms of that certain Mezzanine Pledge and Security Agreement of even date herewith in favor of Zais Matrix VI-C LTD, a Cayman Islands exempted company, no equity interest in Borrowers has been pledged, hypothecated or otherwise encumbered as security for any obligation, and none of the capital contributed to Borrowers was made in the form of a loan;

(vii) There is no litigation or other proceeding against Borrowers pending or overtly threatened, by written communication to Borrowers, wherein an unfavorable decision might reasonably result in a material adverse change in the financial condition of Borrowers or their ability to legally perform their obligations under this Agreement and the other Loan Documents;

Case 2:17-cv-02036-KM-MAH Document 1-9 Filed 03/28/17 Page 10 of 35 PageID: 219

(viii) The execution, delivery and performance of this Agreement, and the performance of Borrowers of their obligations under the Loan Documents, (A) does not conflict with or result in a violation of any of Borrowers' organizational documents or any judgment, order or decree of any court or arbiter in any proceeding to which any of Borrowers are a party, and (B) does not conflict with, or constitute a material breach of, or constitute a material default under, any contract, agreement or other instrument by which any of Borrowers is bound or to which any of Borrowers are a party;

(ix) There is no bankruptcy, receivership or insolvency proceeding pending or threatened against any of Borrowers;

(x) No proceeding is pending for the dissolution or annulment of Borrowers, and all license, income and franchise taxes due and payable by Borrowers have been paid in full;

(xi) There is no Event of Default or event which with the passage of time or the giving of notice, or both, would constitute an Event of Default under the Loan Documents;

(xii) Immediately after giving effect to the Transfer and the Assumption, the ownership of the Property is accurately described in each and every respect on the ownership chart attached to **Exhibit B** attached hereto;

(xiii) The Transfer is to an Affiliate (as defined in the Loan Agreement) of Heritage Management Company, LLC;

Not Certified Copy

(xiv) Newark 300 Borrower is not the subject of a bankruptcy or similar insolvency proceeding or criminal conviction, and is not in material default under any loan;

(xv) Newark 300 Borrower is not a Prohibited Person (as defined in the Loan Agreement) and the investment by Newark 300 Borrower does not result in a violation of the Prescribed Laws (as defined in the Loan Agreement);

(xvi) There has been no material adverse financial change in the condition of Heritage Management Company, LLC;

(xvii) Each and every requirement outlined in Section 8.2.1(e) of the Loan Agreement has been satisfied and the Transfer is a Permitted Transfer under Section 8.2 of the Loan Agreement; and

(xviii) In connection with the Transfer and the Assumption, there has been no change in management of the Property and that Continuing Property Managers will continue to manage the Property.

(b) **Original Indemnitors** individually represent and warrant to Capmark and Lender as of the Effective Date that:

Case 2:17-cv-02036-KM-MAH Document 1-9 Filed 03/28/17 Page 11 of 35 PageID: 220

(i) If any Original Indemnitors is an individual, then he or she has full legal capacity or, if other than an individual, each Original Indemnitor is duly organized, validly existing and in good standing under the laws of the state of its formation and has full power and authority to conduct its affairs as now being conducted and as proposed to be conducted;

(ii) This Agreement and the other documents executed by Original Indemnitors in connection herewith have been duly executed and delivered by each of them. This Agreement and such other documents constitute Original Indemnitors' legal, valid and binding obligations, enforceable against Original Indemnitors in accordance with their respective terms, subject to bankruptcy, insolvency and other similar laws affecting the rights of creditors generally;

(iii) Original Indemnitors have received and reviewed copies of all of the Loan Documents;

(iv) There is no litigation or other proceeding against Original Indemnitors pending or overtly threatened, by written communication to Original Indemnitors, wherein an unfavorable decision might reasonably result in a material adverse change in the financial condition of Original Indemnitors or its ability to legally perform its obligations under this Agreement and the other Loan Documents to which Original Indemnitors are a party;

(v) Original Indemnitors have full power and authority to enter into, execute, deliver and perform this Agreement and the other Loan Documents contemplated herein and such execution, delivery and performance (A) have been duly and validly authorized by all necessary actions on the part of Original Indemnitors, (B) does not conflict with or result in a violation of any Original Indemnitors' organizational documents or any judgment, order or decree of any court or arbiter in any proceeding to which any Original Indemnitors are a party, and (C) does not conflict with, or constitute a material breach of, or constitute a material default under, any contract, agreement or other instrument by which any Original Indemnitors is bound or to which any Original Indemnitors are a party;

(vi) There is no bankruptcy, receivership or insolvency proceeding pending or threatened against any Original Indemnitors;

(vii) No proceeding is pending for the dissolution or annulment of Original Indemnitors, and all license, income and franchise taxes due and payable by Original Indemnitors have been paid in full;

(viii) Immediately after giving effect to the Transfer and the Assumption, the ownership of the Property is accurately described in each and every respect on the ownership chart attached to **Exhibit B** attached hereto;

(ix) The Transfer is to an Affiliate of Heritage Management Company, LLC;

Case 2:17-cv-02036-KM-MAH Document 1-9 Filed 03/28/17 Page 12 of 35 PageID: 221

(x) Newark 300 Borrower is not the subject of a bankruptcy or similar insolvency proceeding or criminal conviction, and is not in material default under any loan;

(xi) Newark 300 Borrower is not a Prohibited Person and the investment by Newark 300 Borrower does not result in a violation of the Prescribed Laws;

(xii) There has been no material adverse financial change in the condition of Heritage Management Company, LLC;

(xiii) Each and every requirement outlined in Section 8.2.1(e) of the Loan Agreement has been satisfied and the Transfer is a Permitted Transfer under Section 8.2 of the Loan Agreement; and

(xiv) In connection with the Transfer and the Assumption, there has been no change in management of the Property and that Continuing Property Managers will continue to manage the Property.

(c) **Current TIC Borrowers** represent and warrant to Capmark and Lender as of the Effective Date that:

(i) Current TIC Borrowers have not received a security instrument or security agreement from any of the other Borrowers, including Newark 300 Borrower, encumbering the Property to secure the payment of any sums due to any of Current TIC Borrowers or obligations to be performed by any of Borrowers;

(ii) There exist no defenses, offsets or counterclaims by Current TIC Borrowers to this Agreement or Current TIC Borrowers' Loan Documents;

(iii) There are no defaults by Current TIC Borrowers under the provisions of Loan Documents executed by Current TIC Borrowers, nor are there any conditions which with the giving of notice or the passage of time or both may constitute a default by Current TIC Borrowers under the provisions of the Loan Documents;

(iv) The Loan Documents are in full force and effect;

(v) There are no subordinate liens of any kind covering or relating to the Property, nor are there any mechanics' liens or liens for delinquent taxes or assessments encumbering the Property, nor has notice of a lien or notice of intent to file a lien been received;

(vi) To Current TIC Borrowers' knowledge, there are no pending or threatened condemnation or annexation proceedings affecting the Property, or any agreements to convey any portion of the Property or any rights thereto not disclosed in this Agreement, including, without limitation, to any governmental agency;

(vii) The certified rent roll for the Property provided to Lender of even date herewith, is a true, complete and accurate list of all tenant leases ("**Tenant**



12/22/2016 2:50:13 PM ESSEX COUNTY Inst.# 9085615 - Page 11 of 34

Leases" or individually a "**Tenant Lease**") affecting the Property as of the Effective Date hereof;

(viii) There is no litigation or other proceeding against the Property pending or overtly threatened, by written communication to Current TIC Borrowers;

(ix) Current TIC Borrowers have full power and authority to enter into, execute, deliver and perform this Agreement and such execution, delivery and performance (A) have been duly and validly authorized by all necessary actions on the part of Current TIC Borrowers, (B) does not conflict with or result in a violation of any of the Current TIC Borrowers' organizational documents or any judgment, order or decree of any court or arbiter in any proceeding to which Current TIC Borrowers are a party, and (C) does not conflict with, or constitute a material breach of, or constitute a material default under, any contract, agreement or other instrument by which Current TIC Borrowers are bound or to which Current TIC Borrowers are a party;

(x) Immediately after giving effect to the Transfer and the Assumption, the ownership of the Property is accurately described in each and every respect on the ownership chart attached to **Exhibit B** attached hereto;

(xi) The Transfer is to an Affiliate of Heritage Management Company, LLC;

(xii) Newark 300 Borrower is not the subject of a bankruptcy or similar insolvency proceeding or criminal conviction, and is not in material default under any loan;

Not Certified Copy

(xiii) Newark 300 Borrower is not a Prohibited Person and the investment by Newark 300 Borrower does not result in a violation of the Prescribed Laws;

(xiv) There has been no material adverse financial change in the condition of Heritage Management Company, LLC;

(xv) Each and every requirement outlined in Section 8.2.1(c) of the Loan Agreement has been satisfied and the Transfer is a Permitted Transfer under Section 8.2 of the Loan Agreement; and

(xvi) In connection with the Transfer and the Assumption, there has been no change in management of the Property and that Continuing Property Managers will continue to manage the Property.

(d) **Continuing Guarantors** represent and warrant to Capmark and Lender that:

(i) There is no Event of Default or event which with the passage of time or the giving of notice, or both, would constitute an Event of Default under the Loan Documents executed by Continuing Guarantors;

Case 2:17-cv-02036-KM-MAH Document 1-9 Filed 03/28/17 Page 14 of 35 PageID: 223

(ii) The Loan Documents executed by Continuing Guarantors are in full force and effect;

(iii) There is no litigation or other proceeding against any Continuing Guarantors pending or overtly threatened, by written communication to any Continuing Guarantors, wherein an unfavorable decision might reasonably result in a material adverse change in the financial condition of any Continuing Guarantors or its ability to legally perform its obligations under this Agreement;

(iv) Continuing Guarantors have the full power and authority to enter into this Agreement and perform their obligations hereunder. The execution, delivery and performance of this Agreement and the other documents contemplated herein by Continuing Guarantors (A) have been duly and validly authorized by all necessary action on the part of Continuing Guarantors, (B) does not conflict with or result in a violation of Continuing Guarantors' organizational documents or any judgment, order or decree of any court or arbiter in any proceeding to which Continuing Guarantors are a party, and (C) does not conflict with, or constitute a material breach of, or constitute a material default under, any contract, agreement or other instrument by which Continuing Guarantors is bound or to which Continuing Guarantors are a party;

(v) There is no bankruptcy, receivership or insolvency proceeding pending or threatened against any Continuing Guarantors;

(vi) No proceeding is pending for the dissolution or annulment of any of Continuing Guarantors, and all license, income and franchise taxes due and payable by Continuing Guarantors have been paid in full;

Not Certified Copy

(vii) Immediately after giving effect to the Transfer and the Assumption, the ownership of the Property is accurately described in each and every respect on the ownership chart attached to **Exhibit B** attached hereto;

(viii) The Transfer is to an Affiliate of Heritage Management Company, LLC;

(ix) Newark 300 Borrower is not the subject of a bankruptcy or similar insolvency proceeding or criminal conviction, and is not in material default under any loan;

(x) Newark 300 Borrower is not a Prohibited Person and the investment by Newark 300 Borrower does not result in a violation of the Prescribed Laws;

(xi) There has been no material adverse financial change in the condition of Heritage Management Company, LLC;

(xii) Each and every requirement outlined in Section 8.2.1(e) of the Loan Agreement has been satisfied and the Transfer is a Permitted Transfer under Section 8.2 of the Loan Agreement; and

Case 2:17-cv-02036-KM-MAH Document 1-9 Filed 03/28/17 Page 15 of 35 PageID: 224

(xiii) In connection with the Transfer and the Assumption, there has been no change in management of the Property and that Continuing Property Managers will continue to manage the Property.

6. Financial Information. Borrowers, Original Indemnitors and Continuing Guarantors hereby each represent and warrant to Lender that all information and materials regarding Borrowers, Original Indemnitors, Continuing Guarantors and its affiliates provided by or on behalf of Borrowers, Original Indemnitors and Continuing Guarantors to Capmark were true and correct in all material respects as of the date of delivery thereof and remain materially true and correct as of the Effective Date.

7. Addresses. Lender, Borrowers and Original Indemnitors agree that all notice provisions contained in the Loan Documents are hereby modified to amend the notice address for Lender, Borrowers and Original Indemnitors, and that from and after the Effective Date, the notice address for Lender, Borrowers and Original Indemnitors are as follows:

If to **Lender**:

Wells Fargo Bank, N.A., as Trustee for Morgan Stanley Capital I Inc., Commercial Mortgage Pass-Through Certificates, Series 2006-IQ12
c/o Capmark Finance Inc.
116 Welsh Road
Horsham, PA 19044
Attn: Client Relations Manager for Loan No.: 99-1078256

Not Certified Copy

If to **Borrowers**:

Heritage Gateway, LLC, Marine One Associates III, LLC, Ridgewood 2000 Associates III, LLC, JPG Real Estate III, LLC, and Newark 300, LLC
123 Prospect Street, Ridgewood
New Jersey 07451

Ivy Gateway, LLC
1 Paragon Drive, Suite 125
Montvale, New Jersey 07645

If to **Original Indemnitors**:

Steven Greenberg, Jeffrey Greenberg, Heritage Gateway, LLC, Marine One Associates III, LLC, Ridgewood 2000 Associates III, LLC, JPG Real Estate III, LLC, and Newark 300, LLC
123 Prospect Street, Ridgewood
New Jersey 07451

Ivy Equities, L.L.C., and Ivy Gateway, LLC
1 Paragon Drive, Suite 125
Montvale, New Jersey 07645

8. Release of Capmark and Lender. Current TIC Borrowers, Newark 300 Borrower, Borrowers, Original Indemnitors, and Continuing Guarantors hereby each unconditionally and

irrevocably release and forever discharge Capmark and Lender and their respective successors, assigns, agents, directors, officers, employees, and attorneys (collectively, the "**Indemnitees**") from all Claims, as defined below, and agree to indemnify the Indemnitees, hold the Indemnitees harmless, and defend the Indemnitees with counsel reasonably acceptable to the Indemnitees from and against any and all claims, losses, causes of action, costs and expenses of every kind or character in connection with the Claims and/or the transfer of the Property in connection with this Agreement. As used in this Agreement, the term "**Claims**" shall mean any and all possible claims, demands, actions, costs, expenses and liabilities whatsoever, known or unknown, at law or in equity, originating in whole or in part on or before the Effective Date, which Current TIC Borrowers, Newark 300 Borrower, Borrowers, Original Indemnitors, Continuing Guarantors or any of their respective directors, partners, principals, affiliates, members, shareholders, officers, agents, employees or successors, may now or hereafter have against the Indemnitees, if any, and irrespective of whether any such Claims arise out of contract, tort, violation of laws, or regulations, or otherwise in connection with the Loan or any of the Loan Documents, including, without limitation, any contracting for, charging, taking, reserving, collecting or receiving interest in excess of the highest lawful rate applicable thereto and any loss, cost or damage, of any kind or character, arising out of or in any way connected with or in any way resulting from the acts, actions or omissions of any of the Indemnitees, including any requirement that the Loan Documents be modified as a condition to the transactions contemplated by this Agreement. Current TIC Borrowers, Newark 300 Borrower, Borrowers, Original Indemnitors, and Continuing Guarantors agree that Capmark and Lender have no fiduciary or similar obligations to Current TIC Borrowers, Newark 300 Borrower, Borrowers, Original Indemnitors, and Continuing Guarantors or any of them and that their relationship is strictly that of creditor and debtor. This release is accepted by Capmark and Lender pursuant to this Agreement and shall not be construed as an admission of liability on the part of either of them. Current TIC Borrowers, Newark 300 Borrower, Borrowers, Original Indemnitors, and Continuing Guarantors each hereby represent and warrant that they are the current legal and beneficial owners of all Claims, if any, released hereby and have not assigned, pledged or contracted to assign or pledge any such Claim to any other person.

9. Confirmation of Waivers. Borrowers, without limiting the generality of its obligations under the Loan Documents, hereby confirm and ratify he submission to jurisdiction and waivers set forth in the Loan Documents.

10. Binding Effect. This Agreement shall be binding upon the parties and their respective heirs, executors, administrators, successors, permitted assigns and representatives.

11. Ratification. Notwithstanding anything to the contrary in **Section 8** of this Agreement, Lender and Borrowers hereby ratify and affirm all of the Loan Documents and all of its or the other's, as applicable, respective rights, agreements, obligations, priorities, reservations, promises and waivers as made and agreed and contained therein and as assumed pursuant to this Agreement by Borrowers, all of which shall remain in full force and effect.

12. No Impairment of Lien; No Satisfaction. Nothing set forth herein shall affect the priority or extent of the lien of the Security Instrument or any of the other Loan Documents, nor, except as expressly set forth herein, release or change the liability of any party who may now be or after the Effective Date, become liable, primarily or secondarily, under the Loan Documents. This Agreement does not, and shall not be construed to, constitute the creation of new indebtedness or the satisfaction, discharge or extinguishment of the debt secured by the Loan Documents.

13. Third Party Beneficiary Status of Capmark. Current TIC Borrowers, Newark 300 Borrower, Borrowers, Original Indemnitors, and Continuing Guarantors hereby each acknowledge and agree that Capmark, its successors and assigns, are all intended third party beneficiaries of this Agreement.

14. Bankruptcy Remote Single Purpose Entities. Each of Borrowers are currently bankruptcy-remote single purpose entities and will take all necessary company action (including, but not limited to, revising and filing charter and control documents in form, substance and structure as may be reasonably required by Lender) in order for each of Borrowers to continue as a bankruptcy-remote single purpose entities.

15. Compliance with Anti-Terrorism, Embargo, Sanctions and Anti-Money Laundering Laws. Borrowers shall comply with all Requirements of Law relating to money laundering, anti-terrorism, trade embargos and economic sanctions now or hereafter in effect. Upon Lender's request from time to time during the term of the Loan, Borrowers shall certify in writing to Lender that Borrowers' representations, warranties and obligations under this **Section 15** remain true and correct and have not been breached. Borrowers shall immediately notify Lender in writing if any of such representations, warranties or covenants are no longer true or have been breached or if Borrowers have reasonable basis to believe that they may no longer be true or have been breached. In connection with such an event, Borrowers shall comply with all Requirements of Law and directives of Governmental Authorities and, at Lender's request, provide to Lender copies of all notices, reports and other communications exchanged with or received from Governmental Authorities relating to such an event. Borrowers shall also reimburse Lender any expense incurred by Lender in evaluating the effect of such an event on the Loan and Lender's interest in the collateral for the Loan, in obtaining any necessary license from Governmental Authorities as may be necessary for Lender to enforce its rights under the Loan Documents, and in complying with all Requirements of Law applicable to Lender as the result of the existence of such an event and for any penalties or fines imposed upon Lender as a result thereof. Further, Borrowers shall immediately notify Lender in writing if any future tenant of the Property (a) is identified on the OFAC List, or (b) is a Person with whom a citizen of the United States is prohibited to engage in transactions by any trade embargo, economic sanction or other prohibition of United States law, regulation or Executive Order of the President of the United States. For purposes of this Section 15, the following definitions shall apply:

"**Governmental Authority**" means any nation or government, any state or other political subdivision thereof, and any Person exercising executive, legislative, judicial or administrative functions of or pertaining to such government.

"**OFAC List**" means the list of specially designated nationals and blocked Persons subject to financial sanctions that is maintained by the U.S. Treasury Department, Office of Foreign Assets Control and any other similar list maintained by the U.S. Treasury Department, Office of Foreign Assets Control pursuant to any Requirements of Law including, without limitation, trade embargo, economic sanctions or other prohibitions imposed by Executive Order of the President of the United States. The OFAC List currently is accessible through the internet website www.treas.gov/ofac/t11sdn.pdf.

"**Requirements of Law**" means (i) the organizational documents of an entity, and (ii) any law, regulation, ordinance, code, decree, treaty, ruling or determination of an arbitrator, court or other Governmental Authority or any Executive Order issued by the President of the United States, in each case applicable to or binding upon such Person or to which such Person any of its property or the conduct of

Case 2:17-cv-02036-KM-MAH Document 1-9 Filed 03/28/17 Page 18 of 35 PageID: 227

its business is subject including, without limitation, laws, ordinances and regulations pertaining to the zoning, occupancy and subdivision of real property.

"**Person**" means an individual, partnership, limited partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, governmental authority or other entity of whatever nature.

16. Fees. Borrowers and Lender have agreed that, simultaneously with the execution hereof, all fees, costs, and charges arising in connection with the execution of this Agreement, including without limitation, all reasonable attorneys' fees, title company fees, title insurance premiums, recording costs, assumption and/or transfer fees and other closing costs incurred by Lender in connection with this Agreement, will be paid by as of the Effective Date, and that Lender shall have no obligation whatsoever for payment thereof. Borrowers acknowledge and agree that none of the fees, costs, and charges paid in connection with the execution of this Agreement shall be applied to or set off against the principal balance of the Note.

17. Miscellaneous.

(a) Choice of Law. This Agreement shall be deemed to be a contract entered into pursuant to the laws of the State in which the Property is located and shall in all respects be governed, construed, applied and enforced in accordance with such laws without reference to choice of law principles.

(b) Severability. This Agreement is intended to be performed in accordance with and only to the extent permitted by applicable law. If any provisions of this Agreement or the application thereof to any person or circumstance shall, for any reason and to any extent, be invalid or unenforceable, the remainder of this Agreement and the application of such provision to other persons or circumstances shall not be affected thereby, but rather shall be enforced to the greatest extent permitted by law.

(c) Modifications. No change or modification of this Agreement shall be valid unless the same is in writing and signed by all parties hereto.

(d) Complete Agreement. This Agreement and the Loan Documents represent the complete agreement among the parties with regard to the items set forth herein, and there are no representations, covenants, warranties, agreements or conditions, oral or written, between the parties not set forth in this Agreement and the Loan Documents.

(e) Headings. Section, paragraph or other headings contained in this Agreement are for reference purposes only and are not intended to affect in any way the meaning or interpretation of this Agreement.

(f) Counterparts. This Agreement may be executed in any number of counterparts, each of which when taken together shall be deemed an original constituting one and the same document.

(g) Joint and Several Liability. Borrowers consist of more than one person or entity, each of which is jointly and severally liable, as tenants-in-common, to perform the obligations

of Borrowers hereunder, and all representations, warranties, covenants and agreements made by Borrowers are joint and several, as tenants-in-common.

18. Supremacy Clause. It is hereby agreed that the terms and conditions of the Security Instrument, the Note and other Loan Documents, as modified by this Agreement, shall remain in full force and effect and shall be binding upon Borrowers. It is understood and agreed that in the event there are any conflicting or omitted provisions or variations between the terms, conditions, rights, or remedies in the Security Instrument, the Note or any other Loan Document (other than this Agreement) and the terms of this Agreement, those terms, conditions, rights or remedies which are most favorable to Lender shall remain in full force and effect and shall prevail. A default under the terms and conditions of this Agreement shall constitute a default under the terms and conditions of the Security Instrument, the Note and other Loan Documents.

19. Waiver of Trial by Jury. CURRENT TIC BORROWERS, NEWARK 300 BORROWER, BORROWERS, ORIGINAL INDEMNITORS, AND CONTINUING GUARANTORS HEREBY WAIVE, TO THE FULLEST EXTENT PERMITTED BY LAW, THE RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM, WHETHER IN CONTRACT, TORT OR OTHERWISE, RELATING DIRECTLY OR INDIRECTLY TO THE LOAN, THE APPLICATION FOR THE LOAN, THE NOTE, THE LOAN DOCUMENTS OR ANY ACTS OR OMISSIONS OF LENDER, ITS OFFICERS, EMPLOYEES, DIRECTORS OR AGENTS IN CONNECTION THEREWITH.

20. Further Assurances. Current TIC Borrowers, Newark 300 Borrower, Borrowers, Original Indemnitors, and Continuing Guarantors shall cooperate with Lender and shall execute and deliver, or cause to be executed and delivered, all such other documents and instruments, and shall take all such other action that Lender may request from time to time in order to accomplish and satisfy the provisions and purposes of this Agreement, including such confirmations and/or corrective instruments as Lender reasonably may require.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

Case 2:17-cv-02036-KM-MAH Document 1-9 Filed 03/28/17 Page 20 of 35 PageID: 229

**IN WITNESS WHEREOF**, the parties hereto have executed this Assumption and Release Agreement as of the day and year first above written.

**SIGNATURE IN ITS CAPACITY AS HERITAGE BORROWER, CURRENT TIC BORROWERS, BORROWERS, AND ORIGINAL INDEMNITORS:**

**HERITAGE GATEWAY, LLC**, a Delaware limited liability company

By: ______________________
Name: Steven Greenberg
Title: Manager

STATE OF NEW JERSEY )
) SS:
COUNTY OF BERGEN )

I certify that on September 14, 2009, Steven Greenberg personally came before me and this person acknowledged under oath, to my satisfaction, that:
(a)

(a) this person signed, sealed and delivered the attached document as the manager of **HERITAGE GATEWAY, LLC**, a Delaware limited liability company, as Heritage Borrower, one of the Current TIC Borrowers, one of the Borrowers, and one of the Original Indemnitors named in this document.

(b) the proper seal was affixed; and

(c) this document was signed, made by the Manager as his voluntary act and deed on behalf of said limited liability company.

______________________
(Name and Title)

(SEAL)

DONNA R. SANDERS
A NOTARY PUBLIC OF NEW JERSEY
MY COMMISSION EXPIRES JULY 29, 2012

Not a Certified Copy

**SIGNATURE IN ITS CAPACITY AS MARINE BORROWER, CURRENT TIC BORROWERS, BORROWERS, AND ORIGINAL INDEMNITORS:**

**MARINE ONE ASSOCIATES III, LLC**, a Delaware limited liability company

By: ______________________
Name: Jeffrey Greenberg
Title: Manager

STATE OF NEW JERSEY )
) SS:
COUNTY OF BERGEN )

I certify that on September 14, 2009, Jeffrey Greenberg personally came before me and this person acknowledged under oath, to my satisfaction, that:

(a) this person signed, sealed and delivered the attached document as the manager of **MARINE ONE ASSOCIATES III, LLC**, a Delaware limited liability company, as Marine Borrower, one of the Current TIC Borrowers, one of the Borrowers, and one of the Original Indemnitors named in this document.

Not Certified Copy

(b) the proper seal was affixed; and

(c) this document was signed, made by the Manager as his voluntary act and deed on behalf of said limited liability company.

______________________
(Name and Title)

(SEAL)

DONNA R. SANDERS
A NOTARY PUBLIC OF NEW JERSEY
MY COMMISSION EXPIRES JULY 29, 2012

Case 2:17-cv-02036-KM-MAH Document 1-9 Filed 03/28/17 Page 22 of 35 PageID: 231

**SIGNATURE IN ITS CAPACITY AS RIDGEWOOD BORROWER, CURRENT TIC BORROWERS, BORROWERS, AND ORIGINAL INDEMNITORS:**

**RIDGEWOOD 2000 ASSOCIATES III, LLC**, a Delaware limited liability company

By: ______________________________
Name: Steven Greenberg
Title: Manager

STATE OF NEW JERSEY )
) SS:
COUNTY OF BERGEN )

I certify that on September 14, 2009, Steven Greenberg personally came before me and this person acknowledged under oath, to my satisfaction, that:

(a) this person signed, sealed and delivered the attached document as the manager of **RIDGEWOOD 2000 ASSOCIATES III, LLC**, a Delaware limited liability company, as Ridgewood Borrower, one of the Current TIC Borrowers, one of the Borrowers, and one of the Original Indemnitors named in this document.

(b) the proper seal was affixed; and

(c) this document was signed, made by the Manager as his voluntary act and deed on behalf of said limited liability company.

______________________________
(Name and Title)

(SEAL) DONNA R. SANDERS
A NOTARY PUBLIC OF NEW JERSEY
MY COMMISSION EXPIRES JULY 29, 2012

**SIGNATURE IN ITS CAPACITY AS JPG BORROWER, CURRENT TIC BORROWERS, BORROWERS, AND ORIGINAL INDEMNITORS:**

**JPG REAL ESTATE III, LLC**, a Delaware limited liability company

By: ______________________
Name: Jeffrey Greenberg
Title: Manager

STATE OF NEW JERSEY )
) SS:
COUNTY OF BERGEN )

I certify that on September 14, 2009, Jeffrey Greenberg personally came before me and this person acknowledged under oath, to my satisfaction, that:

(a) this person signed, sealed and delivered the attached document as the manager of **JPG REAL ESTATE III, LLC**, a Delaware limited liability company, as JPG Borrower, one of the Current TIC Borrowers, one of the Borrowers, and one of the Original Indemnitors named in this document.

(b) the proper seal was affixed; and

(c) this document was signed, made by the Manager as his voluntary act and deed on behalf of said limited liability company.

______________________
(Name and Title)

(SEAL)

DONNA R. SANDERS
A NOTARY PUBLIC OF NEW JERSEY
MY COMMISSION EXPIRES JULY 29, 2012

Case 2:17-cv-02036-KM-MAH Document 1-9 Filed 03/28/17 Page 24 of 35 PageID: 233

**SIGNATURE IN ITS CAPACITY AS IVY BORROWER, CURRENT TIC BORROWERS, BORROWERS, AND ORIGINAL INDEMNITORS:**

**IVY GATEWAY, LLC**, a Delaware limited liability company

By: ______________________
Name: Anthony P. DiTommaso, Jr.
Title: Manager

STATE OF New Jersey )
) SS:
COUNTY OF Bergen )

I certify that on SEPT. 15, 2009, Anthony P. DiTommaso, Jr. personally came before me and this person acknowledged under oath, to my satisfaction, that:

(a) this person signed, sealed and delivered the attached document as the manager of **IVY GATEWAY, LLC**, a Delaware limited liability company, as Ivy Borrower, one of the Current TIC Borrowers, one of the Borrowers, and one of the Original Indemnitors named in this document.

(b) the proper seal was affixed; and

(c) this document was signed, made by the Manager as his voluntary act and deed on behalf of said limited liability company.

______________________
(Name and Title)

(SEAL)

MICHELLE E. GAETA
NOTARY PUBLIC OF NEW JERSEY
MY COMMISSION EXPIRES DEC 20,2011

Not Certified Copy

Case 2:17-cv-02036-KM-MAH Document 1-9 Filed 03/28/17 Page 25 of 35 PageID: 234

**SIGNATURE IN ITS CAPACITY AS NEWARK BORROWER, AND BORROWERS:**

**NEWARK 300, LLC**, a Delaware limited liability company

By: ______________________
Name: Jeffrey Greenberg
Title: Manager

STATE OF NEW JERSEY )
) SS:
COUNTY OF BERGEN )

I certify that on September 14, 2009, Jeffrey Greenberg personally came before me and this person acknowledged under oath, to my satisfaction, that:

(a) this person signed, sealed and delivered the attached document as the manager of **NEWARK 300, LLC**, a Delaware limited liability company, as Newark Borrower, and one of the Borrowers named in this document.

(b) the proper seal was affixed; and

Not Certified Copy

(c) this document was signed, made by the Manager as his voluntary act and deed on behalf of said limited liability company.

______________________
(Name and Title)

(SEAL)

DONNA R. SANDERS
A NOTARY PUBLIC OF NEW JERSEY
MY COMMISSION EXPIRES JULY 29, 2012

**SIGNATURE IN ITS CAPACITY AS CONTINUING GUARANTORS AND ORIGINAL INDEMNITORS:**

**STEVEN GREENBERG**, an individual

STATE OF NEW JERSEY )

) SS:

COUNTY OF BERGEN )

I certify that on September 14, 2009, Steven Greenberg personally came before me and this person acknowledged under oath, to my satisfaction, that:

(a) this person signed, sealed and delivered the attached document as an individual, as one of the Continuing Guarantors and one of the Original Indemnitors named in this document.

(b) the proper seal was affixed; and

(c) this document was signed by Steven Greenberg as his voluntary act and deed.

Not Certified Copy

(Name and Title)

DONNA R. SANDERS
A NOTARY PUBLIC OF NEW JERSEY
(SEAL) MY COMMISSION EXPIRES JULY 29, 2012

**SIGNATURE IN ITS CAPACITY AS CONTINUING GUARANTORS AND ORIGINAL INDEMNITORS:**

______________________________
**JEFFREY GREENBERG**, an individual

STATE OF NEW JERSEY )
) SS:
COUNTY OF BERGEN )

I certify that on September 14, 2009, Jeffrey Greenberg personally came before me and this person acknowledged under oath, to my satisfaction, that:

(a) this person signed, sealed and delivered the attached document as an individual, as one of the Continuing Guarantors and one of the Original Indemnitors named in this document.

(b) the proper seal was affixed; and

(c) this document was signed by Steven Greenberg as his voluntary act and deed.

Not Certified Copy

______________________________
(Name and Title)

DONNA R. SANDERS
A NOTARY PUBLIC OF NEW JERSEY
MY COMMISSION EXPIRES JULY 29, 2012

(SEAL)

Case 2:17-cv-02036-KM-MAH Document 1-9 Filed 03/28/17 Page 28 of 35 PageID: 237

**SIGNATURE IN ITS CAPACITY AS CONTINUING GUARANTORS AND ORIGINAL INDEMNITORS:**

**IVY EQUITIES, L.L.C.**, a Delaware limited liability company

By: ______________________
Name: Anthony P. DiTommaso, Jr.
Title: Manager

STATE OF New Jersey )
) SS:
COUNTY OF Bergen )

I certify that on Sept. 15, 2009, Anthony P. DiTommaso, Jr. personally came before me and this person acknowledged under oath, to my satisfaction, that:

(a) this person signed, sealed and delivered the attached document as the manager of Ivy Equities, L.L.C., a Delaware limited liability company, as one of the Continuing Guarantors and one of the Original Indemnitors named in this document.

(b) the proper seal was affixed; and

(c) this document was signed, made by the Manager as his voluntary act and deed on behalf of said limited liability company.

______________________
(Name and Title)

(SEAL)

MICHELLE E. GAETA
NOTARY PUBLIC OF NEW JERSEY
MY COMMISSION EXPIRES DEC. 20,2011

Not Certified Copy

Case 2:17-cv-02036-KM-MAH Document 1-9 Filed 03/28/17 Page 29 of 35 PageID: 238

**LENDER:**

**WELLS FARGO BANK, N.A.**, as Trustee for Morgan Stanley Capital I Inc., Commercial Mortgage Pass-Through Certificates, Series 2006-IQ12

By: **CAPMARK FINANCE INC.**, a California corporation, as General Master Servicer, as authorized under the Pooling and Servicing Agreement

By: ______________________
Name: Gary A. Routzahn
Title: Vice President, Manager

COMMONWEALTH OF PENNSYLVANIA )
) SS:
COUNTY OF MONTGOMERY )

On this the 26 day of August, 2009, before me, the undersigned officer, personally appeared Gary A. Routzahn, who acknowledged himself to be the Vice President, Manager of Capmark Finance Inc., a California corporation, as the General Master Servicer for Wells Fargo Bank, N.A., as Trustee for Morgan Stanley Capital I Inc., Commercial Mortgage Pass-Through Certificates, Series 2006-IQ12, and that he as such Vice President, Manager being authorized to do so, executed the foregoing instrument on behalf of Wells Fargo Bank, N.A., as Trustee for Morgan Stanley Capital I Inc., Commercial Mortgage Pass-Through Certificates, Series 2006-IQ12 for the purposes therein contained.

WITNESS my hand and seal the day and year aforesaid.

______________________
NOTARY PUBLIC

(SEAL)

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
CHRISTOPHER S. HAUCK, Notary Public
Horsham Twp., Montgomery County
My Commission Expires November 17, 2009

**[Signatures continue on next page]**

Case 2:17-cv-02036-KM-MAH Document 1-9 Filed 03/28/17 Page 30 of 35 PageID: 239

**SCHEDULE I**

**RESERVE BALANCES**

Immediately prior to the Effective Date:

| | |
|---|---|
| Tax Funds (as defined in the Loan Agreement) Balance: | $346,850.44 |
| Insurance Funds (as defined in the Loan Agreement) Balance: | $ 42,319.61 |
| Capital Expenditure Funds (as defined in the Loan Agreement) Balance: | $ 52,690.32 |
| McCarter Lease Rollover Funds (as defined in the Loan Agreement) Balance: | $150,075.45 |
| Prudential Lease Rollover Funds (as defined in the Loan Agreement) Balance: | $ 0.00 |
| Master Lease Reserve Funds (as set forth in Section 6.12 of the Loan Agreement) Balance: | $ 0.00 |
| Total Escrow: | $591,935.82 |

Not Certified Copy

US2008 759469.6

Case 2:17-cv-02036-KM-MAH Document 1-9 Filed 03/28/17 Page 31 of 35 PageID: 240

**EXHIBIT A**

**LEGAL DESCRIPTION**

Not Certified Copy

US2008 759469.6

Case 2:17-cv-02036-KM-MAH Document 1-9 Filed 03/28/17 Page 32 of 35 PageID: 241

**EXHIBIT A**

**LEGAL DESCRIPTION**

BEGINNING at a point in the Easterly line of Mulberry Street (variable width Right of Way), said point being situate South 27ø24'42" West, a distance of 212.84 feet and South 25ø36'05" West, a distance of 42.26 feet from a point located at the intersection of the Southerly Right of Way line of Commerce Street (60 feet wide R.O.W.) with the Easterly Right of Way line of Mulberry Street, and from said beginning point running, thence:

1) South 74ø26'00" East, a distance of 197.94 feet, coincident with Lot 122, Block 151 to a point; thence

2) Along the same North 60ø34'00" East, a distance of 8.49 feet to a point in the same; thence

3) South 74ø26'00" East, a distance of 52.17 feet along the same to a point in the Westerly line of Lot 1, Block 151; thence

4) South 15ø34'00" West, a distance of 185.14 feet, coincident with Lot 1, Block 151 to a point in the Northerly line of Market Street; thence

5) Along the Northerly right of way line of Market Street (variable width right of way), North 76ø30'37" West, a distance of 278.72 feet to a point in the Easterly line of Mulberry Street; thence

Not Certified Copy

6) Along the Easterly line of Mulberry Street, North 14ø25'59" East, a distance of 47.25 feet to a point in the same; thence

7) North 75ø36'18" West, a distance of 1.78 feet to a point in the same; thence

8) Still along the same, North 25ø36'05" East, a distance of 144.24 feet to the point and place of BEGINNING.

TOGETHER with the free and uninterrupted use, and the liberty and privilege of uninterrupted passage along an overhead Pedestrian Walkway (including two bridges noted hereafter) which extends from its Easterly most point at the Pennsylvania Railroad Station located at the Easterly side of Raymond Plaza West, (variable width) crossing and bridging the aforesaid Raymond Plaza West at and between the elevations of 34.2 and 51.2 feet above City Datum to the entrance of One Gateway Center Condominium at and between the elevations of 34.1 feet and 51.2 feet above City Datum; thence passing along and through the aforesaid Condominium at and between the elevations as set forth in the Condominium Plans to the land now or late of the Prudential Insurance Company of America; thence crossing the aforesaid land and also crossing and bridging McCarter Highway also known as New Jersey State Highway Route 21 (variable width) at and between the elevations of 42.9 feet and 60.2 feet above City Datum to the entrance of Two Gateway Center at and between the elevations of 46.6 feet and 60.7 feet above City Datum; thence extending through the building and crossing the land of Two Gateway Center at and between the elevations of 43.1 feet and 64.7 feet above City Datum to the entrance of Three

Case 2:17-cv-02036-KM-MAH Document 1-9 Filed 03/28/17 Page 33 of 35 PageID: 242

Gateway Garage at and between the elevations of 43.1 feet and 64.7 feet above City Datum; thence extending through the building and crossing the land of Three Gateway Garage and also crossing the land of Three Gateway at and between the elevations of 43.0 feet and 64.7 feet above the City Datum to the entrance of Three Gateway Center; thence extending through Three Gateway Center at and between the elevations of 43.0 feet and 64.7 feet above the City Datum to the Westerly most point at or near Mulberry Street (variable width) (such entire described Pedestrian Walkway (including the bridges described above), the "Pedestrian Walkway").

Subject to and together with easements as set forth in Deed Book 4768 page 941 and Deed Book 5164 page 592 as modified and or superseded by that certain Amended and Restated Grant and Agreement between One Gateway Center Condominium Association, Inc.; The Prudential Insurance Company of America; Third Newark Gateway Urban Renewal Association, a New Jersey Partnership; Gateway Four Urban Renewal, L.P. and Gateway South Urban Renewal Association, a New Jersey Partnership; dated December 21, 1999 and recorded December 27, 1999 in Deed Book 5664 page 680.

TOGETHER with and subject to the Amended and Restated Grant and Agreement between One Gateway Center Condominium Association, Inc.; The Prudential Insurance Company of America; Third Newark Gateway Urban Renewal Association, a New Jersey Partnership; Gateway Four Urban Renewal, L.P. and Gateway South Urban Renewal Association, a New Jersey Partnership; dated December 21, 1999 and recorded December 27, 1999 in Deed Book 5664 page 680.

Not Certified Copy

TOGETHER with and subject to the Grant and Declaration of Easements between Gateway III Newark, L.L.C.; Gateway IV Newark Urban Renewal, L.L.C.; Gateway V Newark, L.L.C.; and Gateway Parking Newark, L.L.C.; dated December 22, 1999 and recorded December 27, 1999 in Deed Book 5664 page 852.

TOGETHER with and subject to Parking Agreement set forth in Deed Book 5892 page 921 as assigned and assumed as set forth in Deed Book 6073 page 770.

BEING in accordance with a Survey prepared by CONTROL POINT ASSOCIATES, INC., (GREGORY S. GALLAS, NJPLS), dated September 25, 2006 and revised September 29, 2006.

**EXHIBIT B**

**THE POST-TRANSFER TIC OWNERSHIP**

Not Certified Copy

US2008 759469.6

Case 2:17-cv-02036-KM-MAH Document 1-9 Filed 03/28/17 Page 35 of 35 PageID: 244

TIC Structure
Gateway 4, 100 Mulberry Street
Newark, NJ

G4 Operating:
Heritage Operating I, LLC 84.00%
Ivy Gateway, LLC 16.00%

**GATEWAY 4, 100 MULBERRY STREET, NEWARK, NJ EIN#47-0782060**
Property to be operated by G4 Operating Company, LLC pursuant to a separate management agreement with each TIC

Heritage Gateway — 26.59% undivided interest
Single Member
Delaware LLC
EIN#75-2274015

570 Partners II, LLC
Single Member
Delaware, LLC
EIN#42-1661072

570 Partners, LLC
Multi Member
New Jersey, LLC
EIN#21-3837619

Marlton One Associates III, LLC — 17.39% undivided interest
Single Member
Delaware LLC
EIN#47-0742672

Marlton One Associates II, LLC
Single Member
Delaware, LLC
EIN#42-1662004

Marlton One Associates, LLC
Multi Member
New Jersey, LLC
EIN#22-3577637

Ridgewood 2000 Associates III, — 8.01% undivided interest
Single Member
Delaware LLC
EIN#47-0782070

Ridgewood 2000 Associates II, LLC
Single Member
Delaware, LLC
EIN#42-1662000

Ridgewood 2000 Associates, LLC
Multi Member
New Jersey, LLC
EIN#22-3700271

JPB Real Estate III, LLC — 8.01% undivided interest
Single Member
Delaware LLC
EIN#47-0782062

JPB Real Estate II, LLC
Single Member
Delaware, LLC
EIN#42-1662003

JPB Real Estate, LLC
Multi Member
New Jersey, LLC
EIN#22-3700347

Newark 200, LLC — 24.00% undivided interest
Single Member
Delaware LLC
EIN# 30-0883985

Newark 200 II, LLC
Single Member
Delaware LLC
EIN# 30-0773860

Wayne Remsen, LLC
Single Member
Delaware, LLC
EIN# 73-1717907

Wayne Plaza Operating, LLC
Multi Member
New Jersey, LLC
EIN# 22-3712630

Ivy Gateway, LL — 16.00% undivided interest
Single Member
Delaware LLC

IVY Gateway Manz, LLC
Single Member
Delaware LLC

IVY REALTY FUND I, LP
Multi Member
Delaware, LP

| Partner | 570 Partners, LLC | Marlton One Associates, LLC | 2000 Associates, LLC | JPB Real Estate, LLC | Wayne Plaza Operating, LLC | IVY Realty Fund I, LP | TOTAL % SHARE |
|---|---|---|---|---|---|---|---|
| Steven Greenberg | 17.65% | 40.34% | 99.00% | 1.00% | 47.50% | | #REF! |
| Jeffrey Greenberg | 17.65% | 40.34% | 1.00% | 99.00% | 47.50% | | #REF! |
| Frank Verdi | | 5.00% | | | | | #REF! |
| Jim DePalma | 2.45% | 10.00% | | | 5.00% | | #REF! |
| Bill Hansen | | 3.32% | | | | | #REF! |
| Judy Greenberg | 14.72% | | | | | | #REF! |
| Phil DiPaolo | 28.49% | | | | | | #REF! |
| Chuck Path | 2.45% | | | | | | #REF! |
| Danny Sandoval | 4.90% | | | | | | #REF! |
| Frank Jones | 4.90% | | | | | | #REF! |
| Jon Nitzlo | 2.94% | | | | | | #REF! |
| Hopkins Simpson & Brown | 2.81% | | | | | | #REF! |
| Elizabeth DePalma | 4.90% | | | | | | #REF! |
| Ivy Realty Fund I, LP | | | | | | 100% | #REF! |
| Total | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% | #REF! |
| TIC % of Entire Deal | 26.59% | 17.39% | 8.01% | 8.01% | 32.90% | 7.30% | 100.00% |

Not Certified Copy

Case 2:17-cv-02036-KM-MAH Document 1-10 Filed 03/28/17 Page 1 of 41 PageID: 245

# EXHIBIT I

Case 2:17-cv-02036-KM-MAH Document 1-10 Filed 03/28/17 Page 2 of 41 PageID: 246

# RECORDING INFORMATION SHEET

ESSEX COUNTY REGISTER'S OFFICE
HALL OF RECORDS, ROOM 130
465 MARTIN LUTHER KING Jr. Blvd
NEWARK NJ 07102

| INSTRUMENT NUMBER: | DOCUMENT TYPE : |
|---|---|
| **11002811** | **MORTGAGE** |

**Official Use Only**

PHILIP THIGPEN, REGISTER
ESSEX COUNTY, NJ

INSTRUMENT NUMBER
11002811
RECORDED ON
January 10, 2011 10:04 am
BOOK:12291 PAGE:5216

LJ

**Return Address** *(for recorded documents)*
SUTTON LAND TITLE AGENCY
ATTN: MARY PAVELKA

515 ROCKAWAY AVENUE
VALLEY STREAM NY 11581

| | |
|---|---|
| **No. Of Pages** *(excluding Summary Sheet)* | 39 |
| **Recording Fee** *(excluding Transfer Tax)* | $442.00 |
| **Realty Transfer Tax** | $0.00 |
| **Amount Charged** (Check # 0270) | $442.00 |

| | |
|---|---|
| **Municipality** | NEWARK |
| **Parcel Information** | **Block**<br>**Lot** |
| **First Party Name** | HERITAGE GATEWAY LLC |
| **Second Party Name** | WELLS FARGO BANK NA (TR) |

MAIL COPY ______
NO COPY ______
ENVELOPE ______

ADDITIONAL STAMPINGS ______

**Additional Information (Official Use Only)**

******************************* *DO NOT REMOVE THIS PAGE.* *******************************
*COVER SHEET (DOCUMENT SUMMARY FORM) IS PART OF ESSEX COUNTY FILING RECORD*
******************** *RETAIN THIS PAGE FOR FUTURE REFERENCE.* ********************

This instrument prepared by
and when recorded, return to:
Kilpatrick Stockton LLP
1100 Peachtree Street, Suite 2800
Atlanta, Georgia 30309
Attn: Real Estate Finance & Capital Markets
Ref: Berkadia/Four Gateway Center
(33979/377516)

MARY ELLEN PAVELKA
NATIONAL COORDINATOR
SUTTON LAND TITLE
515 ROCKAWAY AVENUE
VALLEY STREAM, NY 11581

**ABOVE SPACE FOR RECORDER'S USE**

Berkadia Loan No. 99-1078256

## ASSUMPTION AND RELEASE AGREEMENT

THIS ASSUMPTION AND RELEASE AGREEMENT (this "**Agreement**") is entered into and made effective as of January 3, 2011 (the "**Effective Date**"), by and among (i) HERITAGE GATEWAY, LLC, MARINE ONE ASSOCIATES III, LLC, RIDGEWOOD 2000 ASSOCIATES III, LLC, JPG REAL ESTATE III, LLC, and NEWARK 300, LLC, each a Delaware limited liability company with a mailing address at 123 Prospect Street, Ridgewood, New Jersey 07451, and IVY GATEWAY, LLC, a Delaware limited liability company with a mailing address at 1 Paragon Drive, Suite 125, Montvale, New Jersey 07645, jointly and severally as tenants-in-common (individually and collectively, "**Current Borrower**"), (ii) LICHTER GATEWAY IV LLC, a Delaware limited liability company with a mailing address at c/o Lichter & Lichter, L.P., 850 West 176th Street, New York, New York 10033 ("**New Borrower**"), (iii) WELLS FARGO BANK, N.A., AS TRUSTEE FOR MORGAN STANLEY CAPITAL I INC., COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2006-IQ12 ("**Lender**"), with a mailing address at c/o Berkadia Commercial Mortgage LLC, 118 Welsh Road, Horsham, Pennsylvania 19044 ("**Berkadia**"), (iv) STEVEN GREENBERG and JEFFREY GREENBERG, each an individual with a mailing address at 123 Prospect Street, Ridgewood, New Jersey 07451, and IVY EQUITIES, L.L.C., a Delaware limited liability company with a mailing address at 1 Paragon Drive, Suite 125, Montvale, New Jersey 07645, jointly and severally (individually and collectively, "**Original Guarantor**;" and together with Current Borrower, the "**Original Indemnitors**"), and (v) ALFRED LICHTER, CLAIRE LICHTER, JOSEPH SCHWARTZ and SUZETTE SCHWARTZ, each an individual having an address at c/o Lichter & Lichter, L.P., 850 West 176th Street, New York, New York 10033, and THE ALFRED LICHTER 2000 FAMILY TRUST, a trust organized under the laws of the state of

Case 2:17-cv-02036-KM-MAH Document 1-10 Filed 03/28/17 Page 4 of 41 PageID: 1248

New York having its principal place of business at c/o Lichter & Lichter, L.P., 850 West 176th Street, New York, New York 10033 (individually and collectively, "**New Guarantor**;" and together with New Borrower, the "**New Indemnitors**").

**RECITALS:**

The following recitals are a material part of this Agreement:

A. LaSalle Bank National Association, a national banking association ("**Original Lender**"), made a real estate loan (the "**Loan**") to Heritage Gateway, LLC, Marine One Associates III, LLC, Ridgewood 2000 Associates III, LLC, JPG Real Estate III, LLC, and Ivy Gateway, LLC, each a Delaware limited liability company (collectively, "**Original Borrower**"), which Loan is evidenced by that certain Promissory Note dated October 24, 2006, made by Original Borrower payable to the order of Original Lender in the original principal amount of $61,000,000 (together with all addenda, modifications, amendments, riders, exhibits and supplements thereto, the "**Note**"). The Loan is evidenced, governed and/or secured by the following agreements and documents, all executed and delivered by Original Borrower for the benefit of Original Lender (unless otherwise noted):

1. that certain Mortgage and Security Agreement dated October 24, 2006 (together with all addenda, modifications, amendments, riders, exhibits and supplements thereto, the "**Security Instrument**"), recorded on October 30, 2006 in Book 11600, Page 868 in the official land records of Essex County, New Jersey (the "**Recorder's Office**"), and encumbering the real property described on **Exhibit A** attached hereto and by this reference incorporated herein and as more particularly described in the Security Instrument (together with all other property, real and personal, encumbered by the Security Instrument, the "**Property**"); 6158038

2. that certain Loan Agreement dated October 24, 2006 (together with all addenda, modifications, amendments, riders, exhibits and supplements thereto, the "**Loan Agreement**");

3. that certain Assignment of Leases and Rents dated October 24, 2006 (together with all addenda, modifications, amendments, riders, exhibits and supplements thereto, the "**Assignment of Leases**"), recorded on October 30, 2006 in Book 11600, Page 888 in the Recorder's Office; and

6158040

4. that certain Cash Management Agreement dated October 24, 2006, executed by Original Borrower, Original Lender, the original borrowers under the LaSalle Mezzanine Financing (as defined in the Loan Agreement), G4 Operating Company, LLC, a Delaware limited liability company ("**Original Manager**"), and LaSalle Bank National Association, a national banking association, in its capacity as agent and in its capacity as mezzanine lender (the "**Original Cash Management Agreement**").

Case 2:17-cv-02036-KM-MAH Document 1-10 Filed 03/28/17 Page 5 of 41 PageID: 249

B. In connection with the Loan, Original Borrower and/or Original Guarantor also executed and delivered, or caused to be executed and delivered, the following agreements and documents for the benefit of Original Lender:

1. those certain UCC Financing Statements naming Original Borrower as debtor therein and Original Lender as secured party therein, as filed in the Recorder's Office and in the public records of the Secretary of State of Delaware;

2. that certain Environmental Indemnity Agreement dated October 24, 2006 (the "**Original Environmental Indemnity**"), executed by Original Borrower and Original Guarantor in favor of Original Lender;

3. that certain Guaranty dated October 24, 2006 (the "**Original Guaranty**"), executed by Original Guarantor in favor of Original Lender;

4. that certain Assignment of Management Agreements and Subordination of Management Fees dated October 24, 2006, made by Original Borrower to Original Lender, and consented and agreed to by Original Manager and Heritage Management Company, LLC, a New Jersey limited liability company ("**Heritage Manager**"); and

5. that certain Lockbox – Deposit Account Control Agreement dated October 24, 2006, by and among Original Borrower, Original Manager, Original Lender and Valley National Bank, a national banking association ("**Original Clearing Account Bank**").

The agreements and documents set forth in Recital A and Recital B above are hereinafter referred to collectively as the "**Original Borrower's Loan Documents**."

C. Original Lender assigned, sold and transferred its interest in the Loan and Original Borrower's Loan Documents to Lender pursuant to certain assignment documents, including, without limitation, (i) that certain Assignment of Mortgage and Security Agreement dated December 31, 2006 and recorded May 30, 2007 in Book 12059, Page 1227 in the Recorder's Office and (ii) that certain Assignment of Assignment of Leases and Rents dated December 31, 2006 and recorded May 30, 2007 in Book 12059, Page 1235 in the Recorder's Office, and Lender is the current holder of all of Original Lender's interest in the Loan and Original Borrower's Loan Documents.

D. On or about June 12, 2009, and pursuant to the provisions of Section 8.2.1(e) of the Loan Agreement, Ivy Gateway, LLC, a Delaware limited liability company, transferred 24% of its initial 40% ownership interest in the fee title to the Property to Newark 300, LLC, a Delaware limited liability company ("**Newark Borrower**"), and, in connection therewith, Newark Borrower agreed to become liable, jointly and severally as tenants-in-common with Original Borrower, for the obligations of Original Borrower under the Loan and Original Borrower's Loan Documents (the "**Newark Borrower Assumption**"). In connection with the Newark Borrower Assumption, Newark Borrower and Original Borrower (i.e., Current Borrower) and/or Original Guarantor executed and delivered, or caused to be executed and delivered, the following agreements and documents for the benefit of Lender:

1. that certain Assumption Agreement dated September 16, 2009 (the "**Newark Borrower Assumption Agreement**"), by and among Current Borrower, Lender, and Original Guarantor; and

2. that certain First Amendment to Cash Management Agreement dated September 16, 2009 (the "**First Amendment**;" and together with the Original Cash Management Agreement, the "**Cash Management Agreement**"), by and among Current Borrower, Lender, the then current borrowers under the LaSalle Mezzanine Financing, Original Manager, Bank of America, National Association, as successor by merger to LaSalle Bank National Association, in its capacity as agent ("**CMA Agent**"), and Zais Matrix VI-C Ltd., a Cayman Islands exempted company, in its capacity as the then current mezzanine lender.

E. In connection with the Newark Borrower Assumption, Current Borrower and/or Original Guarantor also executed and delivered, or caused to be executed and delivered, the following agreements and documents for the benefit of Lender:

1. those certain UCC Financing Statements naming Current Borrower as debtor therein and Lender as secured party therein, as filed in the Recorder's Office and the public records of the Secretary of State of Delaware;

2. that certain Acknowledgment and Reaffirmation of Environmental Indemnity Agreement and Guaranty dated September 16, 2009 (the "**Reaffirmation of Indemnities Agreement**"), executed by Original Borrower and Original Guarantor in favor of Lender;

3. that certain Assumption of Obligations under the Environmental Indemnity Agreement dated September 16, 2009, executed by Newark Borrower for the benefit of Original Lender, and acknowledged by Original Borrower and Original Guarantor;

4. that certain First Amendment to Lockbox – Deposit Account Control Agreement dated September 16, 2009, executed by Current Borrower, Original Manager, Lender, and Original Clearing Account Bank; and

5. that certain First Amendment to Assignment of Management Agreements and Subordination of Management Fees and Reaffirmation of Assignment of Management

Case 2:17-cv-02036-KM-MAH Document 1-10 Filed 03/28/17 Page 7 of 41 PageID: 251

Agreements and Subordination of Management Fees, dated September 16, 2009, executed by Original Manager, Heritage Manager and Current Borrower in favor of Lender.

The agreements and documents set forth in Recital A, Recital B, Recital D and Recital E above are hereinafter referred to collectively as the "**Current Borrower's Loan Documents**."

F. Upon the Effective Date, New Borrower and/or each New Guarantor are executing and delivering, or are causing to be delivered, to Lender the following documents, all dated as of the Effective Date:

1. those certain UCC Financing Statements naming New Borrower as debtor therein and naming Lender as secured party therein, to be filed in the Recorder's Office and the public records of the Secretary of State of Delaware;

2. that certain Environmental Indemnity Agreement, executed by New Indemnitors in favor of Lender (the "**New Environmental Indemnity**");

3. that certain Guaranty (the "**New Guaranty**"), executed by each New Guarantor in favor of Lender;

4. that certain Guaranty of Prudential Lease Rollover Funds (the "**Prudential Reserve Guaranty**"), executed by each New Guarantor in favor of Lender;

5. that certain Assignment of Management Agreement, Consent and Agreement of Manager (the "**New Assignment of Management Agreement**"), executed by New Borrower and Heritage Newark Management, LLC, a New Jersey Limited liability company ("**New Property Manager**"), for the benefit of Lender;

6. that certain Deposit Account Control Agreement, executed by and among New Borrower, Lender and Wells Fargo Bank, National Association;

7. that certain Second Amendment to Cash Management Agreement, executed by and among New Borrower, New Property Manager, Lender, CMA Agent, Lichter Gateway IV Mezz LLC, a Delaware limited liability company and the new borrower under the LaSalle Mezzanine Financing as of the Effective Date, and Verbeck Limited, a corporation organized under the laws of Gibraltar, in its capacity as the current mezzanine lender; and

8. this Agreement.

The agreements and documents set forth in Recital A, Recital D and Recital F above, together with all other documents evidencing, securing or otherwise pertaining to the Loan (other than the documents and agreements set forth in Recital B and Recital E), and such other agreements and documents as Lender may reasonably require, are hereinafter referred to collectively as the "**Loan Documents**," and individually as a "**Loan Document**."

G. Lender, as the holder of the Note and beneficiary under the Security Instrument, has been asked to consent to the transfer of the Property to New Borrower (the "**Transfer**") and

Case 2:17-cv-02036-KM-MAH Document 1-10 Filed 03/28/17 Page 8 of 41 PageID: 252

the assumption by New Borrower and New Guarantor of the obligations of Current Borrower and Original Guarantor, respectively, under the Loan Documents (the "**Assumption**").

H. Lender, acting by and through its servicer, Berkadia, has agreed to consent to the Transfer and the Assumption subject to the terms and conditions stated below, including, without limitation, the execution and delivery of the agreements and documents set forth in Recital F above and such other documents and instruments as may be reasonably required by Lender.

I. Unless the context requires otherwise, references in this Agreement to the Current Borrower's Loan Documents shall be deemed to refer to such documents as amended by this Agreement, and as such documents and the other Loan Documents may be further amended, modified, extended or replaced from time to time.

**CONTRACTUAL PROVISIONS:**

NOW, THEREFORE, in consideration of the Recitals, which are incorporated herein as if set forth below in full as a substantive, contractual part of this Agreement, and the mutual promises contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1. Acknowledgement of Debt.

(a) Current Borrower and New Borrower confirm and acknowledge that the outstanding principal balance under the Note immediately prior to the Effective Date is $61,000,000.00, and the balances of all reserve and escrow accounts required under the Loan Documents are set forth on **Schedule 1**, attached hereto and made a part hereof. New Borrower declares and acknowledges, for the specific reliance and benefit of Lender, that (i) New Borrower has no right, claim, defense or right of offset of any kind or in any amount with respect to the Note, the Security Instrument or any of the other Loan Documents, and (ii) no amounts paid by New Borrower or Current Borrower to Lender pursuant to or in connection with the execution and delivery of this Agreement shall be applied to or set off against the principal balance of the Note.

(b) The parties acknowledge and agree that Lender shall continue to hold the balances in escrow and reserve accounts, if any, in accordance with the terms of the Loan Documents. Current Borrower and Original Guarantor covenant and agree that Lender has no further duty or obligation of any nature to Current Borrower or Original Guarantor relating to such escrow and/or reserve balances, all of which Current Borrower does hereby assign, transfer and convey to New Borrower. All escrow and reserve balances held by Lender in connection with the Loan Documents shall, from and after the Effective Date, be for the account of New Borrower.

2. Conditions Precedent; Consent to Transfer.

(a) Current Borrower represents and warrants to Lender as of the Effective Date that Current Borrower has satisfied all requirements in connection with the

assumption of the Loan set forth in the Current Borrower's Loan Documents and that certain conditional consent letter dated December 27, 2010, issued by Berkadia and executed by Current Borrower and New Borrower, including, without limitation, execution and delivery of the Prudential Reserve Guaranty by each New Guarantor and the assumption of the LaSalle Mezzanine Financing by New Borrower's sole member in accordance with the requirements of the loan documents evidencing the LaSalle Mezzanine Financing and the conditions of Mezzanine Lender and any other party required to consent to such assumption of the LaSalle Mezzanine Financing.

(b) In reliance upon the representations, warranties and covenants set forth herein by Current Borrower, Original Guarantor, New Borrower and New Guarantor, Lender hereby consents to the Transfer and the Assumption and waives its right to accelerate the Loan pursuant to any provision of the Current Borrower's Loan Documents which might otherwise provide such right to Lender solely on account of such Transfer and Assumption. Lender's consent to the Transfer and the Assumption is not intended to be and shall not be construed as a consent to any subsequent transfer or assumption which requires Lender's consent pursuant to the terms of the Loan Agreement, Security Instrument or any other Loan Document.

(c) New Borrower hereby authorizes Lender to file any and all UCC financing statements and UCC financing statement amendments as Lender may deem necessary from time to time, including, without limitation, financing statements containing the description "all assets of Debtor" or "all personal property of Debtor" or similar language.

3. Assumption of Obligations. As of the Effective Date, Current Borrower does hereby assign, transfer and convey to New Borrower all of its right, title and interest in and to the Loan Documents, and New Borrower hereby unconditionally assumes the Loan Documents and agrees to comply with all covenants and obligations therein, including, without limitation, the obligation to pay the unpaid balance due and owing on the Loan and all interest thereon. Without limiting the foregoing, New Borrower agrees to keep and observe all of the covenants, terms and conditions required to be kept, observed and performed pursuant to the Note, the Security Instrument, the Loan Agreement and all of the other Loan Documents, to the same effect as if New Borrower was the original maker of, and a party to, the Loan Documents, including, but not limited to, payment of all sums presently outstanding under the Note. New Borrower hereby adopts, ratifies and confirms as of the Effective Date all of the representations, warranties and covenants of Current Borrower contained in the Loan Documents (as modified by this Agreement) other than those representations, warranties and covenants set forth in Sections 4.1.16 and 4.2.13 of the Loan Agreement relating to the tenancy in common structure of Current Borrower.

4. Limited Release of Current Borrower and Original Guarantor; Reaffirmation.

(a) In reliance upon the representations, warranties and covenants set forth herein by Current Borrower, Original Guarantor, New Borrower and New Guarantor, Lender hereby releases: (i) Current Borrower from any liability for repayment of the principal and interest under the terms of the Note, the Security Instrument, the Loan Agreement and the

other Current Borrower's Loan Documents, and other obligations under the Current Borrower's Loan Documents, to the extent arising from matters not otherwise caused by any of them first occurring from and after the Effective Date; and (ii) Original Guarantor from any liability under the Original Guaranty, the Original Environmental Indemnity and the Reaffirmation of Indemnities Agreement to the extent arising from matters not otherwise caused by any of them first occurring from and after the Effective Date. Lender hereby reserves all rights it may have against Current Borrower and Original Guarantor for acts, omissions or events occurring prior to the Effective Date.

(b) The release of Current Borrower and Original Guarantor provided for in Section 4(a) above shall be deemed withdrawn and shall have no effect to the extent that this Agreement is held to be void or is determined to be unenforceable by any court in a final non-appealable order as a result of any action or inaction by or on behalf of Current Borrower or Original Guarantor, or if any representation or warranty by Current Borrower or Original Guarantor made in connection with this Agreement is false or misleading in any material respect when made. In all cases, Current Borrower and Original Guarantor, as applicable, shall bear the burden of proof on the issue of the time at which an act or event first occurred or an obligation first arose, which is the subject of claimed liability under any of the Loan Documents.

(c) Notwithstanding anything to the contrary contained herein, and subject to the release contained in Section 4(a) hereof, Current Borrower and Original Guarantor do hereby ratify and confirm their respective obligations under the Current Borrower's Loan Documents to the extent arising or resulting from acts, omissions or events occurring prior to the Effective Date.

5. Representations.

(a) New Borrower represents and warrants to Berkadia and Lender as of the Effective Date that:

(i) New Borrower is duly organized, validly existing and in good standing under the laws of its state of formation or organization and is duly qualified and authorized to conduct business in the state in which the Property is located, and has full power and authority to own, lease and operate the Property, and to conduct its affairs as now being conducted and as proposed to be conducted;

(ii) New Borrower has full power and authority to enter into, execute, deliver and carry out this Agreement and the Loan Documents to which it is a party, by assumption or otherwise, and to perform its obligations hereunder and thereunder and all such actions have been duly authorized by all necessary actions on its part;

(iii) This Agreement and the other documents executed in connection herewith have been duly executed and delivered by New Borrower. This Agreement and the Loan Documents to which New Borrower is a party, by

assumption or otherwise, constitute legal, valid and binding obligations of New Borrower, enforceable against New Borrower in accordance with their respective terms, subject to bankruptcy, insolvency and other similar laws affecting the rights of creditors generally;

(iv) New Borrower has received and reviewed copies of all of the Loan Documents;

(v) Neither New Borrower, New Guarantor nor, to New Borrower's knowledge, any person owning an interest in New Borrower or any applicable New Guarantor (except that New Borrower's knowledge shall not require any investigation into ownership of publicly traded stock or other publicly traded securities), is a country, territory, individual or entity named on a list maintained by the U.S. Treasury Department's Office of Foreign Assets Control ("**OFAC**"), or is a Specially Designated National or Blocked Person under the programs administered by OFAC;

(vi) Except for the LaSalle Mezzanine Financing and the pledge of 100% of the ownership interests in New Borrower to Mezzanine Lender pursuant to the terms of that certain Mezzanine Pledge and Security Agreement of even date herewith, made by New Borrower's sole member in favor of Mezzanine Lender, no equity interest in New Borrower has been pledged, hypothecated or otherwise encumbered as security for any obligation, and none of the capital contributed to New Borrower was made in the form of a loan;

(vii) There is no litigation or other proceeding against New Borrower pending or overtly threatened, by written communication to New Borrower, wherein an unfavorable decision might reasonably result in a material adverse change in the financial condition of New Borrower or its ability to legally perform its obligations under this Agreement and the other Loan Documents;

(viii) The execution, delivery and performance of this Agreement, and the performance of New Borrower's obligations under the Loan Documents, (A) does not conflict with or result in a violation of New Borrower's organizational documents or any judgment, order or decree of any court or arbiter in any proceeding to which New Borrower is a party, and (B) does not conflict with, or constitute a material breach of, or constitute a material default under, any contract, agreement or other instrument by which New Borrower is bound or to which New Borrower is a party;

(ix) There is no bankruptcy, receivership or insolvency proceeding pending or threatened against New Borrower; and

(x) No proceeding is pending for the dissolution or annulment of New Borrower, and all license, income and franchise taxes due and payable by New Borrower have been paid in full.

(b) Each New Guarantor, individually as to such New Guarantor, represents and warrants to Berkadia and Lender as of the Effective Date that:

(i) If New Guarantor is an individual, then he or she has full legal capacity or, if other than an individual, New Guarantor is duly organized, validly existing and in good standing under the laws of the state of its formation and has full power and authority to conduct its affairs as now being conducted and as proposed to be conducted;

(ii) This Agreement, the New Guaranty, the New Environmental Indemnity, the Prudential Reserve Guaranty and the other documents executed by New Guarantor in connection herewith have been duly executed and delivered by each of them. This Agreement, the New Guaranty, the New Environmental Indemnity, the Prudential Reserve Guaranty and such other documents constitute New Guarantor's legal, valid and binding obligations, enforceable against New Guarantor in accordance with their respective terms, subject to bankruptcy, insolvency and other similar laws affecting the rights of creditors generally;

(iii) New Guarantor has received and reviewed copies of all of the Loan Documents;

(iv) There is no litigation or other proceeding against New Guarantor pending or overtly threatened, by written communication to New Guarantor, wherein an unfavorable decision might reasonably result in a material adverse change in the financial condition of New Guarantor or its ability to legally perform its obligations under this Agreement and the other Loan Documents to which New Guarantor is a party;

(v) New Guarantor has full power and authority to enter into, execute, deliver and perform this Agreement and the other Loan Documents contemplated herein and such execution, delivery and performance (A) have been duly and validly authorized by all necessary actions on the part of New Guarantor, (B) does not conflict with or result in a violation of any New Guarantor's organizational documents or any judgment, order or decree of any court or arbiter in any proceeding to which New Guarantor is a party, and (C) does not conflict with, or constitute a material breach of, or constitute a material default under, any contract, agreement or other instrument by which New Guarantor is bound or to which New Guarantor is a party;

(vi) There is no bankruptcy, receivership or insolvency proceeding pending or threatened against New Guarantor; and

(vii) No proceeding is pending for the dissolution or annulment of any applicable New Guarantor, and all license, income and franchise taxes due and payable by New Guarantor have been paid in full.

(c) Current Borrower represents and warrants to Berkadia and Lender as of the Effective Date that:

(i) Contemporaneously with the execution and delivery hereof, Current Borrower has conveyed and transferred the Property to New Borrower;

(ii) Contemporaneously with the execution and delivery hereof, Current Borrower has assigned and transferred to New Borrower the Tenant Leases (as hereinafter defined), and Current Borrower has retained no rights therein or thereto;

(iii) Current Borrower has not received a security instrument or security agreement from New Borrower encumbering the Property to secure the payment of any sums due Current Borrower or obligations to be performed by New Borrower;

(iv) There exist no defenses, offsets or counterclaims by Current Borrower to this Agreement or the Current Borrower's Loan Documents;

(v) There are no defaults by Current Borrower under the provisions of the Current Borrower's Loan Documents executed or assumed by Current Borrower, nor are there any conditions which with the giving of notice or the passage of time or both may constitute a default by Current Borrower under the provisions of the Current Borrower's Loan Documents;

(vi) The Current Borrower's Loan Documents are in full force and effect;

(vii) There are no subordinate liens of any kind covering or relating to the Property, nor are there any mechanics' liens or liens for delinquent taxes or assessments encumbering the Property, nor has notice of a lien or notice of intent to file a lien been received;

(viii) To Current Borrower's knowledge, there are no pending or threatened condemnation or annexation proceedings affecting the Property, or any agreements to convey any portion of the Property or any rights thereto not disclosed in this Agreement, including, without limitation, to any governmental agency;

(ix) The certified rent roll for the Property provided to Lender of even date herewith, is a true, complete and accurate list of all tenant leases ("**Tenant Leases**" or individually a "**Tenant Lease**") affecting the Property as of the Effective Date hereof;

(x) There is no litigation or other proceeding against Current Borrower or the Property pending or overtly threatened, by written

Case 2:17-cv-02036-KM-MAH Document 1-10 Filed 03/28/17 Page 14 of 41 PageID: 258

communication to Current Borrower, wherein an unfavorable decision might reasonably result in a material adverse change in the financial condition of Current Borrower or its ability to legally perform its obligations under this Agreement and the Current Borrower's Loan Documents;

(xi) There is no bankruptcy, receivership or insolvency proceeding pending or threatened against Current Borrower;

(xii) No proceeding is pending for the dissolution or annulment of Current Borrower, and all license, income and franchise taxes due and payable by Current Borrower have been paid in full; and

(xiii) Current Borrower has full power and authority to enter into, execute, deliver and perform this Agreement and such execution, delivery and performance (A) have been duly and validly authorized by all necessary actions on the part of Current Borrower, (B) does not conflict with or result in a violation of Current Borrower's organizational documents or any judgment, order or decree of any court or arbiter in any proceeding to which Current Borrower is a party, and (C) does not conflict with, or constitute a material breach of, or constitute a material default under, any contract, agreement or other instrument by which Current Borrower is bound or to which Current Borrower is a party.

(d) Each Original Guarantor, individually as to such Original Guarantor, represents and warrants to Berkadia and Lender as of the Effective Date that:

(i) There is no Event of Default or event which with the passage of time or the giving of notice, or both, would constitute an Event of Default under the Current Borrower's Loan Documents executed or assumed by Original Guarantor;

(ii) The Current Borrower's Loan Documents executed by Original Guarantor are in full force and effect;

(iii) There is no litigation or other proceeding against Original Guarantor pending or overtly threatened, by written communication to Original Guarantor, wherein an unfavorable decision might reasonably result in a material adverse change in the financial condition of Original Guarantor or its ability to legally perform its obligations under this Agreement;

(iv) Original Guarantor has the full power and authority to enter into this Agreement and perform its obligations hereunder. The execution, delivery and performance of this Agreement and the other documents contemplated herein by Original Guarantor (A) have been duly and validly authorized by all necessary action on the part of Original Guarantor, (B) does not conflict with or result in a violation of any Original Guarantor's organizational documents or any judgment, order or decree of any court or arbiter in any

proceeding to which Original Guarantor is a party, and (C) does not conflict with, or constitute a material breach of, or constitute a material default under, any contract, agreement or other instrument by which Original Guarantor is bound or to which Original Guarantor is a party;

(v) There is no bankruptcy, receivership or insolvency proceeding pending or threatened against Original Guarantor; and

(vi) No proceeding is pending for the dissolution or annulment of any applicable Original Guarantor, and all license, income and franchise taxes due and payable by Original Guarantor have been paid in full.

6. Financial Information. New Borrower and New Guarantor hereby each represents and warrants to Lender that all information and materials regarding New Guarantor, New Borrower and its affiliates provided by or on behalf of New Borrower and New Guarantor to Berkadia were true and correct in all material respects as of the date of delivery thereof and remain materially true and correct as of the Effective Date.

7. Addresses. Lender, New Borrower and New Guarantor agree that all notice provisions contained in the Loan Documents are hereby modified to amend the notice addresses for Lender, New Borrower and New Guarantor, and that from and after the Effective Date, the notice addresses for Lender, New Borrower and New Guarantor are as follows:

If to Lender:

c/o Berkadia Commercial Mortgage LLC
118 Welsh Road
Horsham, PA 19044
Attn: Client Relations Manager for Loan No. 99-1078256

If to New Borrower:

Lichter Gateway IV LLC
c/o Lichter & Lichter, L.P.
850 West 176th Street
New York, NY 10033

If to New Guarantor:

c/o Lichter & Lichter, L.P.
850 West 176th Street
New York, NY 10033

8. Additional Modifications to Loan Agreement. On and subject to the terms and conditions of this Agreement and in strict reliance on the representations, warranties, acknowledgements and covenants set forth in this Agreement, the Loan Agreement is hereby modified and amended as follows:

(a) The term "**Assignment of Management Agreement**" defined in Article I of the Loan Agreement, and any reference to the "**Assignment of Management Agreement**" in the Loan Agreement or the other Loan Documents, shall hereafter be deemed to mean and refer to the New Assignment of Management Agreement, as amended, supplemented or otherwise modified from time to time.

(b) The term "**Borrower**" defined in Article I of the Loan Agreement, and any reference to "**Borrower**" in the Loan Agreement or the other Loan Documents, shall hereafter be deemed to mean and refer to New Borrower, together with its successors and permitted assigns.

(c) The term "**Environmental Indemnity**" defined in Article I of the Loan Agreement, and any reference to the "**Environmental Indemnity**" in the Loan Agreement or the other Loan Documents, shall hereafter be deemed to mean and refer to the New Environmental Indemnity, as amended, supplemented or otherwise modified from time to time.

(d) The term "**Guarantor(s)**" defined in Article I of the Loan Agreement, and any reference to "**Guarantor(s)**" in the Loan Agreement or the other Loan Documents, shall hereafter be deemed to mean and refer to collectively New Guarantor, and, individually, any of such individuals or entities comprising New Guarantor, together with their respective successors and permitted assigns.

(e) The term "**Guaranty**" defined in Article I of the Loan Agreement, and any reference to the "**Guaranty**" in the Loan Agreement or the other Loan Documents, shall hereafter be deemed to mean and refer to the New Guaranty, as amended, supplemented or otherwise modified from time to time.

(f) The term "**Insolvency Opinion**" defined in Article I of the Loan Agreement, and any reference to the "**Insolvency Opinion**" in the Loan Agreement or the other Loan Documents, shall hereafter be deemed to mean and refer to that certain bankruptcy nonconsolidation opinion letter dated of even date herewith delivered by counsel for New Borrower in connection with the Loan.

(g) The term "**Management Agreement**" defined in Article I of the Loan Agreement, and any reference to the "**Management Agreement**" in the Loan Agreement or the other Loan Documents, shall hereafter be deemed to mean and refer to the property management agreement entered into between New Borrower and New Property Manager on or about the date hereof, as amended, supplemented or otherwise modified from time to time.

(h) The term "**Manager**" defined in Article I of the Loan Agreement, and any reference to the "**Manager**" in the Loan Agreement or the other Loan Documents, shall

hereafter be deemed to mean and refer to New Property Manager, together with its successors and permitted assigns.

(i) The last sentence of Section 3.1.1 of the Loan Agreement is hereby amended to reflect the organizational identification number of New Borrower as 4902565 and the federal tax identification number of New Borrower as 27-4197712.

(j) The organizational chart of Original Borrower set forth on **Schedule III** of the Loan Agreement is deleted in its entirety and replaced with the organizational chart of New Borrower attached hereto as **Exhibit B** and incorporated herein by reference.

(k) The rent roll for the Property set forth on **Schedule I** of the Loan Agreement is deleted in its entirety and replaced with the rent roll for the Property dated as of December 31, 2010 and certified as of December 30, 2010 by Current Borrower to Lender in connection with the Transfer and the Assumption.

(l) From and after the date of this Agreement and for so long as the Property is not owned in a tenancy in common structure, the provisions of the Loan Agreement and the other Loan Documents relating to the TIC Agreement and a tenancy in common ownership of the Property shall be of no further force and effect.

9. Acknowledgment Regarding Legal Description of the Property. New Borrower and New Guarantor hereby acknowledge and agree that the Property encumbered by and subject to the Security Instrument includes certain easements, rights of way or use, and the benefit of other agreements set forth on the legal description of the Property attached hereto as **Exhibit A** (collectively, the "**Appurtenant Rights**") and that such Appurtenant Rights subject to and encumbered by the Security Instrument include any amendments, assignments or other modifications of the documents or agreements creating such Appurtenant Rights in effect as of the Effective Date and any future amendments, assignments or other modifications of such documents and agreements approved by Lender.

10. Release of Berkadia and Lender. Current Borrower, New Borrower, Original Guarantor and New Guarantor hereby each unconditionally and irrevocably releases and forever discharges Berkadia and Lender and their respective successors, assigns, agents, directors, officers, employees, and attorneys (collectively, the "**Indemnitees**") from all Claims, as defined below, and agrees to indemnify the Indemnitees, hold the Indemnitees harmless, and defend the Indemnitees with counsel reasonably acceptable to the Indemnitees from and against any and all claims, losses, causes of action, costs and expenses of every kind or character in connection with the Claims and/or the transfer of the Property in connection with this Agreement. As used in this Agreement, the term "**Claims**" shall mean any and all possible claims, demands, actions, costs, expenses and liabilities whatsoever, known or unknown, at law or in equity, originating in whole or in part on or before the Effective Date, which Current Borrower, New Borrower, Original Guarantor or New Guarantor or any of their respective directors, partners, principals, affiliates, members, shareholders, officers, agents, employees or successors, may now or hereafter have against the Indemnitees, if any, and irrespective of

Case 2:17-cv-02036-KM-MAH Document 1-10 Filed 03/28/17 Page 18 of 41 PageID: 262

whether any such Claims arise out of contract, tort, violation of laws, or regulations, or otherwise in connection with the Loan or any of the Loan Documents or the Current Borrower's Loan Documents, including, without limitation, any contracting for, charging, taking, reserving, collecting or receiving interest in excess of the highest lawful rate applicable thereto and any loss, cost or damage, of any kind or character, arising out of or in any way connected with or in any way resulting from the acts, actions or omissions of any of the Indemnitees, including any requirement that the Loan Documents or the Current Borrower's Loan Documents be modified as a condition to the transactions contemplated by this Agreement. Current Borrower, New Borrower, Original Guarantor and New Guarantor agree that Berkadia and Lender have no fiduciary or similar obligations to Current Borrower, New Borrower, Original Guarantor or New Guarantor or either of them and that their relationship is strictly that of creditor and debtor. This release is accepted by Berkadia and Lender pursuant to this Agreement and shall not be construed as an admission of liability on the part of either of them. Current Borrower, New Borrower, Original Guarantor and New Guarantor each hereby represents and warrants that it is the current legal and beneficial owners of all Claims, if any, released hereby and that it has not assigned, pledged or contracted to assign or pledge any such Claim to any other person.

11. Confirmation of Waivers. New Borrower, without limiting the generality of its obligations under the Loan Documents, hereby confirms and ratifies the submission to jurisdiction and waivers set forth in the Loan Documents.

12. Binding Effect. This Agreement shall be binding upon the parties and their respective heirs, executors, administrators, successors, permitted assigns and representatives.

13. Ratification. Lender and New Borrower hereby ratify and affirm all of the Loan Documents and all of its or the other's, as applicable, respective rights, agreements, obligations, priorities, reservations, promises and waivers as made and agreed and contained therein and as assumed pursuant to this Agreement by New Borrower, all of which shall remain in full force and effect.

14. No Impairment of Lien; No Satisfaction. Nothing set forth herein shall affect the priority or extent of the lien of the Security Instrument or any of the other Loan Documents, nor, except as expressly set forth herein, release or change the liability of any party who may now be or after the Effective Date, become liable, primarily or secondarily, under the Loan Documents. This Agreement does not, and shall not be construed to, constitute the creation of new indebtedness or the satisfaction, discharge or extinguishment of the debt secured by the Loan Documents.

15. Third Party Beneficiary Status of Berkadia. New Borrower, Current Borrower, Original Guarantor and New Guarantor hereby each acknowledges and agrees that Berkadia, its successors and assigns, are all intended third party beneficiaries of this Agreement.

16. Bankruptcy Remote Single Purpose Entities. New Borrower is currently a bankruptcy-remote single purpose entity and will take all necessary company action (including, but not limited to, revising and filing charter and control documents in form, substance and

structure as may be reasonably required by Lender) in order for the New Borrower to continue as a bankruptcy-remote single purpose entity.

17. Compliance with Anti-Terrorism, Embargo, Sanctions and Anti-Money Laundering Laws. New Borrower shall comply with all Requirements of Law relating to money laundering, anti-terrorism, trade embargos and economic sanctions now or hereafter in effect. Upon Lender's request from time to time during the term of the Loan, New Borrower shall certify in writing to Lender that New Borrower's representations, warranties and obligations under this Section 17 remain true and correct and have not been breached. New Borrower shall immediately notify Lender in writing if any of such representations, warranties or covenants are no longer true or have been breached or if New Borrower has reasonable basis to believe that they may no longer be true or have been breached. In connection with such an event, New Borrower shall comply with all Requirements of Law and directives of Governmental Authorities and, at Lender's request, provide to Lender copies of all notices, reports and other communications exchanged with or received from Governmental Authorities relating to such an event. New Borrower shall also reimburse Lender any expense incurred by Lender in evaluating the effect of such an event on the Loan and Lender's interest in the collateral for the Loan, in obtaining any necessary license from Governmental Authorities as may be necessary for Lender to enforce its rights under the Loan Documents, and in complying with all Requirements of Law applicable to Lender as the result of the existence of such an event and for any penalties or fines imposed upon Lender as a result thereof. Further, New Borrower shall immediately notify Lender in writing if any future tenant of the Property (a) is identified on the OFAC List, or (b) is a Person with whom a citizen of the United States is prohibited to engage in transactions by any trade embargo, economic sanction or other prohibition of United States law, regulation or Executive Order of the President of the United States. For purposes of this Section 17, the following definitions shall apply:

"**Governmental Authority**" means any nation or government, any state or other political subdivision thereof, and any Person exercising executive, legislative, judicial or administrative functions of or pertaining to such government.

"**OFAC List**" means the list of specially designated nationals and blocked Persons subject to financial sanctions that is maintained by the U.S. Treasury Department, Office of Foreign Assets Control and any other similar list maintained by the U.S. Treasury Department, Office of Foreign Assets Control pursuant to any Requirements of Law including, without limitation, trade embargo, economic sanctions or other prohibitions imposed by Executive Order of the President of the United States. The OFAC List currently is accessible through the internet website www.treas.gov/ofac/t11sdn.pdf.

"**Requirements of Law**" means (i) the organizational documents of an entity, and (ii) any law, regulation, ordinance, code, decree, treaty, ruling or determination of an arbitrator, court or other Governmental Authority or any Executive Order issued by the President of the United States, in each case applicable to or binding upon such Person or to which such Person any of its property or the conduct of its business is subject including, without limitation, laws, ordinances and regulations pertaining to the zoning, occupancy and subdivision of real property.

"**Person**" means an individual, partnership, limited partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, governmental authority or other entity of whatever nature.

18. Fees. Current Borrower, New Borrower and Lender have agreed that, simultaneously with the execution hereof, all fees, costs, and charges arising in connection with the execution of this Agreement, including without limitation, all reasonable attorneys' fees, title company fees, title insurance premiums, recording costs, assumption and/or transfer fees and other closing costs incurred by Lender in connection with this Agreement, will be paid as of the Effective Date, and that Lender shall have no obligation whatsoever for payment thereof. New Borrower acknowledges and agrees that none of the fees, costs, and charges paid in connection with the execution of this Agreement shall be applied to or set off against the principal balance of the Note.

19. Miscellaneous.

(a) Choice of Law. This Agreement shall be deemed to be a contract entered into pursuant to the laws of the state in which the Property is located and shall in all respects be governed, construed, applied and enforced in accordance with such laws without reference to choice of law principles.

(b) Severability. This Agreement is intended to be performed in accordance with and only to the extent permitted by applicable law. If any provisions of this Agreement or the application thereof to any person or circumstance shall, for any reason and to any extent, be invalid or unenforceable, the remainder of this Agreement and the application of such provision to other persons or circumstances shall not be affected thereby, but rather shall be enforced to the greatest extent permitted by law.

(c) Modifications. No change or modification of this Agreement shall be valid unless the same is in writing and signed by all parties hereto.

(d) Complete Agreement. This Agreement and the Loan Documents represent the complete agreement among the parties with regard to the items set forth herein, and there are no representations, covenants, warranties, agreements or conditions, oral or written, between the parties not set forth in this Agreement and the Loan Documents.

(e) Headings. Section, paragraph or other headings contained in this Agreement are for reference purposes only and are not intended to affect in any way the meaning or interpretation of this Agreement.

(f) Counterparts. This Agreement may be executed in any number of counterparts, each of which when taken together shall be deemed an original constituting one and the same document.

(g) Joint and Several Liability. If New Borrower consists of more than one person or entity, each is jointly and severally liable to perform the obligations of New

Borrower hereunder, and all representations, warranties, covenants and agreements made by New Borrower are joint and several.

20. Supremacy Clause. It is hereby agreed that the terms and conditions of the Security Instrument, the Note and other Loan Documents, as modified by this Agreement, shall remain in full force and effect and shall be binding upon New Borrower. It is understood and agreed that in the event there are any conflicting or omitted provisions or variations between the terms, conditions, rights, or remedies in the Security Instrument, the Note or any other Loan Document (other than this Agreement) and the terms of this Agreement, those terms, conditions, rights or remedies which are most favorable to Lender shall remain in full force and effect and shall prevail. A default under the terms and conditions of this Agreement shall constitute a default under the terms and conditions of the Security Instrument, the Note and other Loan Documents.

21. Waiver of Trial by Jury. CURRENT BORROWER, NEW BORROWER, ORIGINAL GUARANTOR AND NEW GUARANTOR HEREBY WAIVE, TO THE FULLEST EXTENT PERMITTED BY LAW, THE RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM, WHETHER IN CONTRACT, TORT OR OTHERWISE, RELATING DIRECTLY OR INDIRECTLY TO THE LOAN, THE APPLICATION FOR THE LOAN, THE NOTE, THE LOAN DOCUMENTS OR ANY ACTS OR OMISSIONS OF LENDER, ITS OFFICERS, EMPLOYEES, DIRECTORS OR AGENTS IN CONNECTION THEREWITH.

22. Further Assurances. Current Borrower, Original Guarantor, New Borrower and New Guarantor shall cooperate with Lender and shall execute and deliver, or cause to be executed and delivered, all such other documents and instruments, and shall take all such other action that Lender may request from time to time in order to accomplish and satisfy the provisions and purposes of this Agreement, including such confirmations and/or corrective instruments as Lender reasonably may require.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

**IN WITNESS WHEREOF**, the parties hereto have executed this Assumption and Release Agreement as of the day and year first above written.

**CURRENT BORROWER:**

HERITAGE GATEWAY, LLC, a Delaware limited liability company

By: ______________________
Name: Steven Greenberg
Title: Manager

STATE OF New Jersey )
) SS:
COUNTY OF Bergen )

I certify that on December 23, 2010, Steven Greenberg personally came before me and this person acknowledged under oath, to my satisfaction, that:

(a)

(a) this person signed, sealed and delivered the attached document as the manager of HERITAGE GATEWAY, LLC, a Delaware limited liability company, as a Current Borrower and one of the Original Indemnitors named in this document.

(b) the proper seal was affixed; and

(c) this document was signed, made by the Manager as his voluntary act and deed on behalf of said limited liability company.

______________________
(Name and Title)

(SEAL)

DONNA R. SANDERS
A NOTARY PUBLIC OF NEW JERSEY
MY COMMISSION EXPIRES JULY 29, 2012

**[Signatures continue on next page]**

**CURRENT BORROWER:**

MARINE ONE ASSOCIATES III, LLC, a Delaware limited liability company

By: ______________________
Name: Jeffrey Greenberg
Title: Manager

STATE OF New Jersey )
) SS:
COUNTY OF Bergen )

I certify that on December 23, 2010, Jeffrey Greenberg personally came before me and this person acknowledged under oath, to my satisfaction, that:

(a) this person signed, sealed and delivered the attached document as the manager of MARINE ONE ASSOCIATES III, LLC, a Delaware limited liability company, as a Current Borrower and one of the Original Indemnitors named in this document.

(b) the proper seal was affixed; and

(c) this document was signed, made by the Manager as his voluntary act and deed on behalf of said limited liability company.

______________________
(Name and Title)

(SEAL)

DONNA R. SANDERS
A NOTARY PUBLIC OF NEW JERSEY
MY COMMISSION EXPIRES JULY 29, 2012

**[Signatures continue on next page]**

**CURRENT BORROWER:**

RIDGEWOOD 2000 ASSOCIATES III, LLC, a Delaware limited liability company

By: ______________________
Name: Steven Greenberg
Title: Manager

STATE OF New Jersey )
) SS:
COUNTY OF Bergen )

I certify that on December 20, 2010, Steven Greenberg personally came before me and this person acknowledged under oath, to my satisfaction, that:

(a) this person signed, sealed and delivered the attached document as the manager of RIDGEWOOD 2000 ASSOCIATES III, LLC, a Delaware limited liability company, as a Current Borrower and one of the Original Indemnitors named in this document.

(b) the proper seal was affixed; and

(c) this document was signed, made by the Manager as his voluntary act and deed on behalf of said limited liability company.

______________________
(Name and Title)

DONNA R. SANDERS
A NOTARY PUBLIC OF NEW JERSEY
MY COMMISSION EXPIRES JULY 29, 2012

(SEAL)

**[Signatures continue on next page]**

**CURRENT BORROWER:**

JPG REAL ESTATE III, LLC, a Delaware limited liability company

By: ______________________________
Name: Jeffrey Greenberg
Title: Manager

STATE OF New Jersey )
) SS:
COUNTY OF Bergen )

I certify that on December 23, 2010, Jeffrey Greenberg personally came before me and this person acknowledged under oath, to my satisfaction, that:

(a) this person signed, sealed and delivered the attached document as the manager of JPG REAL ESTATE III, LLC, a Delaware limited liability company, as a Current Borrower and one of the Original Indemnitors named in this document.

(b) the proper seal was affixed; and

(c) this document was signed, made by the Manager as his voluntary act and deed on behalf of said limited liability company.

______________________________
(Name and Title)

DONNA R. SANDERS
A NOTARY PUBLIC OF NEW JERSEY
MY COMMISSION EXPIRES JULY 29, 2012

(SEAL)

**[Signatures continue on next page]**

**CURRENT BORROWER:**

IVY GATEWAY, LLC, a Delaware limited liability company

By: ______________________________
Name: Anthony P. DiTommaso, Jr.
Title: Manager

STATE OF New Jersey )
) SS:
COUNTY OF Bergen )

I certify that on December 23, 2010, Anthony P. DiTommaso, Jr. personally came before me and this person acknowledged under oath, to my satisfaction, that:

(a) this person signed, sealed and delivered the attached document as the manager of IVY GATEWAY, LLC, a Delaware limited liability company, as a Current Borrower and one of the Original Indemnitors named in this document.

(b) the proper seal was affixed; and

(c) this document was signed, made by the Manager as his voluntary act and deed on behalf of said limited liability company.

______________________________
(Name and Title)

(SEAL)

DONNA R. SANDERS
A NOTARY PUBLIC OF NEW JERSEY
MY COMMISSION EXPIRES JULY 29, 2012

**[Signatures continue on next page]**

**CURRENT BORROWER:**

NEWARK 300, LLC, a Delaware limited liability company

By: ______________________
Name: Steven Greenberg
Title: Manager

STATE OF New Jersey )
) SS:
COUNTY OF Bergen )

I certify that on December 23, 2010, Steven Greenberg personally came before me and this person acknowledged under oath, to my satisfaction, that:

(a) this person signed, sealed and delivered the attached document as the manager of NEWARK 300, LLC, a Delaware limited liability company, as a Current Borrower and one of the Original Indemnitors named in this document.

(b) the proper seal was affixed; and

(c) this document was signed, made by the Manager as his voluntary act and deed on behalf of said limited liability company.

______________________
(Name and Title)

(SEAL)

DONNA R. SANDERS
A NOTARY PUBLIC OF NEW JERSEY
MY COMMISSION EXPIRES JULY 29, 2012

**[Signatures continue on next page]**

Case 2:17-cv-02036-KM-MAH Document 1-10 Filed 03/28/17 Page 28 of 41 PageID: 272

**NEW BORROWER**:

LICHTER GATEWAY IV LLC, a Delaware limited liability company

By:______________________________
Alfred Lichter, Authorized Person

STATE OF NY )

) SS:

COUNTY OF NY )

I certify that on December 28, 2010, Alfred Lichter personally came before me and this person acknowledged under oath, to my satisfaction, that:

(a) this person signed, sealed and delivered the attached document as an Authorized Person for LICHTER GATEWAY IV LLC, a Delaware limited liability company, as New Borrower and one of the New Indemnitors named in this document.

(b) the proper seal was affixed; and

(c) this document was signed, made by the Authorized Person as his voluntary act and deed on behalf of said limited liability company.

______________________________
(Name and Title)

JOSEPH WROBLEWSKI
NOTARY PUBLIC, State of New York
No. 4906919
Qualified in New York County
Commission Expires Oct. 5, 2013

(SEAL)

**[Signatures continue on next page]**

**LENDER:**

WELLS FARGO BANK, N.A., AS TRUSTEE FOR MORGAN STANLEY CAPITAL I INC., COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2006-IQ12

By: Berkadia Commercial Mortgage LLC, a Delaware limited liability company, solely in its capacity as General Master Servicer under that certain Pooling and Servicing Agreement dated as of December 1, 2006

By: ______________________________
Name: Gary A. Routzahn
Title: Authorized Representative

COMMONWEALTH OF PENNSYLVANIA )
) SS:
COUNTY OF MONTGOMERY )

On this the 23rd day of December, 2010, before me, the undersigned officer, personally appeared Gary A. Routzahn, who acknowledged himself to be the Authorized Representative of Berkadia Commercial Mortgage LLC, a Delaware limited liability company, solely in its capacity as General Master Servicer under that certain Pooling and Servicing Agreement dated as of December 1, 2006 for Wells Fargo Bank, N.A., as Trustee for Morgan Stanley Capital I Inc., Commercial Mortgage Pass-Through Certificates, Series 2006-IQ12, and that he as such Authorized Representative being authorized to do so, executed the foregoing instrument on behalf of said entities for the purposes therein contained.

WITNESS my hand and seal the day and year aforesaid.

______________________________
NOTARY PUBLIC

(SEAL) COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
SANDY THIEU - NOTARY PUBLIC
Horsham Twp., Montgomery County
MY COMMISSION EXPIRES APR. 25, 2013

**[Signatures continue on next page]**

Case 2:17-cv-02036-KM-MAH Document 1-10 Filed 03/28/17 Page 30 of 41 PageID: 274

**ORIGINAL GUARANTOR:**

STEVEN GREENBERG, an individual

STATE OF New Jersey )
) SS:
COUNTY OF Bergen )

I certify that on December 23, 2010, Steven Greenberg personally came before me and this person acknowledged under oath, to my satisfaction, that:

(a) this person signed, sealed and delivered the attached document as an individual, as an Original Guarantor and one of the Original Indemnitors named in this document.

(b) the proper seal was affixed; and

(c) this document was signed by Steven Greenberg as his voluntary act and deed.

(Name and Title)

DONNA R. SANDERS
A NOTARY PUBLIC OF NEW JERSEY
MY COMMISSION EXPIRES JULY 29, 2012

(SEAL)

**[Signatures continue on next page]**

Case 2:17-cv-02036-KM-MAH Document 1-10 Filed 03/28/17 Page 31 of 41 PageID: 275

**ORIGINAL GUARANTOR:**

JEFFREY GREENBERG, an individual

STATE OF New Jersey )
) SS:
COUNTY OF Bergen )

I certify that on December 23, 2010, Jeffrey Greenberg personally came before me and this person acknowledged under oath, to my satisfaction, that:

(a) this person signed, sealed and delivered the attached document as an individual, as an Original Guarantor and one of the Original Indemnitors named in this document.

(b) the proper seal was affixed; and

(c) this document was signed by Steven Greenberg as his voluntary act and deed.

(Name and Title)

(SEAL)

DONNA R. SANDERS
A NOTARY PUBLIC OF NEW JERSEY
MY COMMISSION EXPIRES JULY 29, 2012

**[Signatures continue on next page]**

Case 2:17-cv-02036-KM-MAH Document 1-10 Filed 03/28/17 Page 32 of 41 PageID: 276

**ORIGINAL GUARANTOR:**

IVY EQUITIES, L.L.C., a Delaware limited liability company

By: ______________________
Name: Anthony P. DiTommaso, Jr.
Title: Manager

STATE OF New Jersey )
) SS:
COUNTY OF Bergen )

I certify that on December 23, 2010, Anthony P. DiTommaso, Jr. personally came before me and this person acknowledged under oath, to my satisfaction, that:

(a) this person signed, sealed and delivered the attached document as the manager of Ivy Equities, L.L.C., a Delaware limited liability company, as an Original Guarantor and one of the Original Indemnitors named in this document.

(b) the proper seal was affixed; and

(c) this document was signed, made by the Manager as his voluntary act and deed on behalf of said limited liability company.

______________________
(Name and Title)

DONNA R. SANDERS
A NOTARY PUBLIC OF NEW JERSEY
MY COMMISSION EXPIRES JULY 29, 2012

(SEAL)

**[Signatures continue on next page]**

Case 2:17-cv-02036-KM-MAH Document 1-10 Filed 03/28/17 Page 33 of 41 PageID: 277

**NEW GUARANTOR:**

ALFRED LICHTER, an individual

STATE OF NY )
) SS:
COUNTY OF NY )

I certify that on DEC 28, 2010, Alfred Lichter personally came before me and this person acknowledged under oath, to my satisfaction, that:

(a) this person signed, sealed and delivered the attached document as an individual, as a New Guarantor and one of the New Indemnitors named in this document.

(b) the proper seal was affixed; and

(c) this document was signed by Alfred Lichter as his voluntary act and deed.

(Name and Title)
JOSEPH WROBLEWSKI
NOTARY PUBLIC, State of New York
No. 4906919
Qualified in New York County
Commission Expires Oct. 5, 2013
(SEAL)

**[Signatures continue on next page]**

**NEW GUARANTOR:**

________________________________
CLAIRE LICHTER, an individual

STATE OF NY )
) SS:
COUNTY OF NY )

I certify that on DEC 28, 2010, Claire Lichter personally came before me and this person acknowledged under oath, to my satisfaction, that:

(a) this person signed, sealed and delivered the attached document as an individual, as a New Guarantor and one of the New Indemnitors named in this document.

(b) the proper seal was affixed; and

(c) this document was signed by Claire Lichter as her voluntary act and deed.

________________________________
(Name and Title) JOSEPH WROBLEWSKI
NOTARY PUBLIC, State of New York
No. 4906919
Qualified in New York County
(SEAL) Commission Expires Oct. 5, 2013

**[Signatures continue on next page]**

**NEW GUARANTOR:**

JOSEPH SCHWARTZ, an individual

STATE OF New York )
) SS:
COUNTY OF Nassau )

I certify that on Dec. 28, 2010, Joseph Schwartz personally came before me and this person acknowledged under oath, to my satisfaction, that:

(a) this person signed, sealed and delivered the attached document as an individual, as a New Guarantor and one of the New Indemnitors named in this document.

(b) the proper seal was affixed; and

(c) this document was signed by Joseph Schwartz as his voluntary act and deed.

Daniel Russo
Notary Public State of New York
No.01RU6078118
Qualified in Queens County
Commission expires July 22, 2014.

(Name and Title)

(SEAL)

JOSEPH WROBLEWSKI
NOTARY PUBLIC, State of New York
No. 4806919
Qualified in New York County
Commission Expires Oct. 5, ____

**[Signatures continue on next page]**

Case 2:17-cv-02036-KM-MAH Document 1-10 Filed 03/28/17 Page 36 of 41 PageID: 280

**NEW GUARANTOR:**

SUZETTE SCHWARTZ, an individual

STATE OF New York )
) SS:
COUNTY OF Nassau )

I certify that on Dec. 28, 2010, Suzette Schwartz personally came before me and this person acknowledged under oath, to my satisfaction, that:

(a) this person signed, sealed and delivered the attached document as an individual, as a New Guarantor and one of the New Indemnitors named in this document.

(b) the proper seal was affixed; and

(c) this document was signed by Suzette Schwartz as her voluntary act and deed.

Daniel Russo
Notary Public State of New York
No.01RU6078118
Qualified in Queens County
Commission expires July 22, 2014

(Name and Title)

(SEAL)

**[Signatures continue on next page]**

Case 2:17-cv-02036-KM-MAH Document 1-10 Filed 03/28/17 Page 37 of 41 PageID: 281

**NEW GUARANTOR:**

THE ALFRED LICHTER 2000 FAMILY TRUST, a trust organized under the laws of the state of New York

By: ______________________
Alfred Lichter, Trustee

STATE OF NY )
) SS:
COUNTY OF NY )

I certify that on DEC 28, 2010, Alfred Lichter personally came before me and this person acknowledged under oath, to my satisfaction, that:

(a) this person signed, sealed and delivered the attached document as the Trustee of the Alfred Lichter 2000 Family Trust, as a New Guarantor and one of the New Indemnitors named in this document.

(b) the proper seal was affixed; and

(c) this document was signed, made by the Trustee as his voluntary act and deed on behalf of said trust.

______________________
(Name and Title)

(SEAL)

JOSEPH WROBLEWSKI
NOTARY PUBLIC, State of New York
No. 4906919
Qualified in New York County
Commission Expires Oct. 5, 2013

## SCHEDULE 1

## RESERVE BALANCES

Immediately prior to the Effective Date:

| | |
|---|---|
| Tax Funds Balance: | $227,884.05 |
| Insurance Funds Balance: | $ 98,437.59 |
| Capital Expenditure Funds Balance: | $ 7,600.03 |
| McCarter Lease Rollover Funds Balance: | $150,424.44 |
| **Total Escrow:** | **$484,346.11** |

Not Certified Copy

**EXHIBIT A**

**LEGAL DESCRIPTION**

**All that certain Lot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the City of Newark, County of Essex, State of New Jersey:**

**BEGINNING at a point in the easterly line of Mulberry Street (variable width right of way), said point being situate South 27 degrees 24 minutes 42 seconds West, a distance of 212.84 feet and South 25 degrees 36 minutes 05 seconds West, a distance of 42.26 feet from a point located at the intersection of the southerly right of way line of Commerce Street (60 foot wide R.O.W.) with the easterly right of way line of Mulberry Street, and from said beginning point running; thence**

**1. South 74 degrees 26 minutes 00 seconds East, a distance of 197.94 feet, coincident with Lot 122, Block 151 to a point; thence**

**2. Along the same, North 60 degrees 34 minutes 00 seconds East, a distance 8.49 feet to a point in the same; thence**

**3. South 74 degrees 26 minutes 00 seconds East, a distance of 52.17 feet along the same to a point in the westerly line of Lot 1, Block 151; thence**

**4. South 15 degrees 34 minutes 00 seconds West, a distance of 185.14 feet, coincident with Lot 1, Block 151 to a point in the Northerly line of Market Street; thence**

**5. Along the northerly right of way of Market Street (variable width right of way), North 76 degrees 30 minutes 37 seconds West, a distance of 278.72 feet to a point in the easterly line of Mulberry Street; thence**

**6. Along the easterly line of Mulberry Street, North 14 degrees 25 minutes 59 seconds East, a distance of 47.25 feet to a point in the same; thence**

**7. North 75 degrees 36 minutes 18 seconds West a distance of 1.78 feet to a point in same; thence**

**8. Still along the same, North 25 degrees 36 minutes 05 seconds East a distance of 144.24 feet to the point and place of BEGINNING.**

**Together with and uninterrupted use, and the liberty and privilege of uninterrupted passage along an overhead Pedestrian Walkway (including two bridges noted hereafter) which extends from its easterly most point at the Pennsylvania Railroad Station located at the easterly side of Raymond Plaza West, (variable width) crossing and bridging the aforesaid Raymond Plaza West at and between the elevations of 34.2 and 51.2 feet above City Datum to the entrance of One Gateway Center Condominium at and between the elevations of 34.1 and 51.2 feet above the City Datum; thence passing along and through the aforesaid Condominium at and between the elevations as set forth in the Condominium Plans to the land now or late of the Prudential Insurance Company of America; thence crossing the aforesaid land and also crossing and bridging McCarter Highway also known as New Jersey State Highway Route 21 (variable width) at and between the elevations of 42.9 feet and 60.2 feet above City Datum to the entrance of Two Gateway Center at and between the elevations of 46.6 feet and 60.7 feet above City Datum; thence extending through the building and crossing the land of Two Gateway Center at and between the elevations of 43.1 and 64.7 feet above City Datum to the entrance of Three Gateway Garage at and between the elevations of 43.1 feet and 64.7 feet above City Datum; thence extending through the building and crossing the land of Three Gateway Garage and also crossing the land of Three Gateway at and between the elevations of 43.0 and 64.7 feet above the City Datum to the entrance of Three Gateway Center; thence extending through Three Gateway Center at and between the elevations of 43.0 and 64.7 feet above the City Datum to the westerly most point at or near Mulberry Street (variable width) such entire described Pedestrian Walkway (including bridges described above), the "Pedestrian Walkway".**

**Subject to and together with the easements as set forth in Deed Book 4768 Page 941.**

Four Gateway Center
Loan Number: 99-1078256
Assumption and Release Agreement

US2008 1736762.1

Case 2:17-cv-02036-KM-MAH Document 1-10 Filed 03/28/17 Page 40 of 41 PageID: 284

## LEGAL DESCRIPTION

## CONTINUED

Subject to and together with the Grant and Agreement made by First Newark Gateway Urban Renewal Association, Second Newark Gateway Urban Renewal Association, Third Newark Gateway Urban Renewal Association and The Prudential Insurance Company of America in favor of Gateway Four Urban Renewal, L.P., dated April 18, 1991 and recorded April 18, 1991 in Deed Book 5164, Page 592; as assigned and assumed as set forth in Deed Book 5892, Page 878, Deed Book 6073, Page 760, Deed Book 6400, Page 763, and Deed Book ______, Page _______; as modified and or superseded by that certain Amended and Restated Grant and Agreement by and between One Gateway Center Condominium Association, Inc.; The Prudential Insurance Company of America; Third Newark Gateway Urban Renewal Association; Gateway Four Urban Renewal, L.P. and Gateway South Urban Renewal Association, dated December 21, 1999 and recorded December 27, 1999 in Deed Book 5664, Page 680; as amended by that certain First Amendment to Amended and Restated Grant and Agreement by and between One Gateway Center Condominium Association, Inc.; Gateway I Newark, L.L.C.; Gateway III Newark, L.L.C; Gateway IV Newark Urban Renewal, L.L.C.; Gateway V Newark, L.L.C.; Gateway Parking Newark, L.L.C.; Gateway VII Newark, L.L.C.; Gateway South Urban Renewal Association, dated September 19, 2000 and recorded September 21, 2000 in Deed Book 5723, Page 610; and as assigned and assumed as set forth in Deed Book 5892, Page 887, Deed Book 6073, Page 764, Deed Book 6400, Page 867, and Deed Book ______, Page _______.

Together with and subject to the Amended and Restated Grant and Agreement by and between One Gateway Center Condominium Association, Inc.; The Prudential Insurance Company of America; Third Newark Gateway Urban Renewal Association; Gateway Four Urban Renewal, L.P. and Gateway South Urban Renewal Association, dated December 21, 1999 and recorded December 27, 1999 in Deed Book 5664, Page 680; as amended by that certain First Amendment to Amended and Restated Grant and Agreement by and between One Gateway Center Condominium Association, Inc.; Gateway I Newark, L.L.C.; Gateway III Newark, L.L.C; Gateway IV Newark Urban Renewal, L.L.C.; Gateway V Newark, L.L.C.; Gateway Parking Newark, L.L.C.; Gateway VII Newark, L.L.C.; Gateway South Urban Renewal Association, dated September 19, 2000 and recorded September 21, 2000 in Deed Book 5723, Page 610; and as assigned and assumed as set forth in Deed Book 5892, Page 887, Deed Book 6073, Page 764, Deed Book 6400, Page 867, and Deed Book ______, Page _______.

Together with and subject to the Grant and Declaration of Easements between Gateway III Newark, L.L.C.; Gateway IV Newark Urban Renewal, L.L.C.; Gateway V Newark, L.L.C.; and Gateway Parking Newark, L.L.C. dated as of December 22, 1999 and recorded December 27, 1999 in Deed Book 5664, Page 852; as assigned and assumed as set forth in Deed Book 5892, Page 866, Deed Book 6073, Page 770, Deed Book 6400, Page 710, and Deed Book ______, Page _______.

Together with and subject to Parking Agreement as set forth in Deed Book 5892, Page 921, Assignment and Assumption of Parking Agreement set forth in Deed Book 6073, Page 773, Deed Book 6400, Page 802, and Deed Book ________, Page _______.

The above description is drawn in accordance with a survey made by Control Point Associates Inc, dated September 25, 2006, revised to September 29, 2006.

FOR INFORMATION PURPOSES ONLY: "In compliance with Chapter 157, Laws of 1977, premises herein is Lot 121 Block 151 on the City of Newark Tax Map."

## EXHIBIT B

## ORGANIZATIONAL STRUCTURE OF NEW BORROWER




Four Gateway Center
Loan Number: 99-1078256
Assumption and Release Agreement

US2008 1736762.1

# EXHIBIT J

Case 2:17-cv-02036-KM-MAH Document 1-11 Filed 03/28/17 Page 2 of 25 PageID: 287

# GUARANTY

This GUARANTY (this "**Guaranty**") is executed as of January 3, 2011, by ALFRED LICHTER, CLAIRE LICHTER, JOSEPH SCHWARTZ and SUZETTE SCHWARTZ, each an individual having an address at c/o Lichter & Lichter, L.P., 850 West 176th Street, New York, New York 10033, and THE ALFRED LICHTER 2000 FAMILY TRUST, a trust organized under the laws of the state of New York having its principal place of business at c/o Lichter & Lichter, L.P., 850 West 176th Street, New York, New York 10033 (whether one or more collectively referred to as "**Guarantor**"), for the benefit of WELLS FARGO BANK, N.A., AS TRUSTEE FOR MORGAN STANLEY CAPITAL I INC., COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2006-IQ12, having an address at c/o Berkadia Commercial Mortgage LLC, 118 Welsh Road, Horsham, Pennsylvania 19044 ("**Lender**").

W I T N E S S E T H:

WHEREAS, pursuant to that certain Promissory Note, dated October 24, 2006, executed by Heritage Gateway, LLC, Marine One Associates III, LLC, Ridgewood 2000 Associates III, LLC, JPG Real Estate III, LLC, and Ivy Gateway, LLC, each a Delaware limited liability company, together as tenants-in-common (collectively, the "**Original Borrower**"), and payable to the order of LaSalle Bank National Association, a national banking association ("**Original Lender**"), in the original principal amount of Sixty-One Million and No/100 Dollars ($61,000,000) (together with all renewals, modifications, increases and extensions thereof, the "**Note**"), Original Borrower became indebted to Original Lender with respect to a loan (the "**Loan**") which was made pursuant to that certain Loan Agreement, dated October 24, 2006, between Original Borrower and Original Lender (as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, the "**Loan Agreement**");

WHEREAS, Original Lender assigned, sold and transferred its interest in the Loan and the Loan Documents to Lender, and Lender is the current holder of all of Original Lender's interest in the Loan and the Loan Documents;

WHEREAS, Ivy Gateway, LLC, a Delaware limited liability company, transferred 24% of its initial 40% ownership interest in the fee title to the Property to Newark 300, LLC, a Delaware limited liability company ("**Newark Borrower**;" and together with Original Borrower, collectively, the "**Current Borrower**"), and Newark Borrower assumed the Loan and agreed to become liable, jointly and severally with Original Borrower, for the obligations of Original Borrower under the Loan and the Loan Documents pursuant to that certain Assumption Agreement, dated September 16, 2009, by and among, Current Borrower, Lender, and the Continuing Guarantors defined therein;

WHEREAS, Lender, as the holder of the Note and beneficiary under the Mortgage has been asked to consent to the transfer of the Property (the "**Transfer**") to Lichter Gateway IV LLC, a Delaware limited liability company ("**Borrower**"), and the assumption by Borrower of the obligations of Current Borrower under the Note, the Mortgage, the Loan Agreement and the other Loan Documents as of the origination date of the Loan (the "**Assumption**");

Case 2:17-cv-02036-KM-MAH Document 1-11 Filed 03/28/17 Page 3 of 15 PageID: 288

WHEREAS, Lender is not willing to consent to the Transfer and the Assumption unless Guarantor unconditionally guarantees payment and performance to Lender of the Guaranteed Obligations (as herein defined); and

WHEREAS, Guarantor is the owner of a direct or indirect interest in Borrower, and Guarantor will directly benefit from Lender's consenting to the Transfer and the Assumption.

NOW, THEREFORE, as an inducement to Lender to consent to the Transfer and the Assumption, and for other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, the parties do hereby agree as follows:

## ARTICLE I

## NATURE AND SCOPE OF GUARANTY

**1.1 Guaranty of Obligation.** Guarantor hereby irrevocably and unconditionally guarantees to Lender and its successors and assigns the payment and performance of the Guaranteed Obligations as and when the same shall be due and payable, whether by lapse of time, by acceleration of maturity or otherwise. Guarantor hereby irrevocably and unconditionally covenants and agrees that it is liable for the Guaranteed Obligations as a primary obligor.

**1.2 Definition of Guaranteed Obligations.** As used herein, the term "**Guaranteed Obligations**" means the obligations or liabilities of Borrower to Lender for any loss, damage, cost, expense, liability, claim or other obligation incurred by Lender (including attorneys' fees and costs reasonably incurred) arising out of or in connection with the following:

(a) waste of the Property;

(b) the breach of any representation, warranty, covenant or indemnification provision in the Environmental Indemnity or in the Mortgage concerning environmental laws, hazardous substances and asbestos and any indemnification of Lender with respect thereto in either document;

(c) the removal or disposal of any portion of the Property after a Default or Event of Default; or

(d) the misapplication, misappropriation or conversion by Borrower of (A) any insurance proceeds paid by reason of any loss, damage or destruction to the Property, (B) any Awards or other amounts received in connection with the Condemnation of all or a portion of the Property, or (C) any Rents or other funds of Borrower.

Notwithstanding anything to the contrary in any of the Loan Documents, (i) Lender shall not be deemed to have waived any right which Lender may have under Section 506(a), 506(b), 1111(b) or any other provisions of the U.S. Bankruptcy Code to file a claim for the full amount of the Debt or to require that all collateral shall continue to secure all of the Debt owing to Lender in

accordance with the Loan Documents and (ii) Guarantor shall be liable for the full amount of the Debt in the event that (A) there has been at any time fraud, willful misconduct or intentional material misrepresentation by Borrower or any Guarantor in connection with the Loan; (B) the first full monthly payment of interest on the Note is not paid when due; (C) Borrower fails to obtain Lender's prior written consent to any subordinate financing or other voluntary lien encumbering the Property as may be required by the Loan Agreement; (D) Borrower fails to obtain Lender's prior written consent to any assignment, transfer, or conveyance of the Property or any interest therein as required by the Loan Agreement or the Mortgage; (E) Borrower files a voluntary petition under the Bankruptcy code or any other Federal or state bankruptcy or insolvency law; (F) an Affiliate, officer, director, or representative which controls, directly or indirectly, Borrower files, or joins in the filing of, an involuntary petition against Borrower under the Bankruptcy Code or any other Federal or state bankruptcy or insolvency law, or solicits or causes to be solicited petitioning creditors for any involuntary petition against Borrower from any Person; (G) Borrower files an answer consenting to or otherwise acquiescing in or joining in any involuntary petition filed against it, by any other Person under the Bankruptcy Code or any other Federal or state bankruptcy or insolvency law, or solicits or causes to be solicited petitioning creditors for any involuntary petition from any Person; (H) any Affiliate, officer, director, or representative which controls Borrower consents to or colludes with respect to or joins in an application for the appointment of a custodian, receiver, trustee, or examiner for Borrower or any portion of the Property; or (I) Borrower makes an assignment for the benefit of creditors, or admits, in writing or in any legal proceeding, its insolvency or inability to pay its debts as they become due.

**1.3** **<u>Nature of Guaranty</u>.** This Guaranty is an irrevocable, absolute, continuing guaranty of payment and performance and not a guaranty of collection. This Guaranty may not be revoked by Guarantor and shall continue to be effective with respect to any Guaranteed Obligations arising or created after any attempted revocation by Guarantor and after (if Guarantor is a natural person) Guarantor's death (in which event this Guaranty shall be binding upon Guarantor's estate and Guarantor's legal representatives and heirs). Notwithstanding the foregoing, upon the death of any natural person party hereto, the obligations hereunder of such deceased individual shall be released and discharged if (1) no Event of Default exists at the time of such individual's death and (2) there remains a party to this Guaranty who (i) is a natural person and (ii) exercises management authority over the Borrower. The fact that at any time or from time to time the Guaranteed Obligations may be increased or reduced shall not release or discharge the obligation of Guarantor to Lender with respect to the Guaranteed Obligations. This Guaranty may be enforced by Lender and any subsequent holder of the Note and shall not be discharged by the assignment or negotiation of all or part of the Note.

**1.4** **<u>Guaranteed Obligations Not Reduced by Offset</u>.** The Guaranteed Obligations and the liabilities and obligations of Guarantor to Lender hereunder shall not be reduced, discharged or released because or by reason of any existing or future offset, claim or defense of Borrower or any other party against Lender or against payment of the Guaranteed Obligations, whether such offset, claim or defense arises in connection with the Guaranteed Obligations (or the transactions creating the Guaranteed Obligations) or otherwise.

Case 2:17-cv-02036-KM-MAH Document 1-11 Filed 03/28/17 Page 5 of 15 PageID: 290

**1.5 Payment By Guarantor.** If all or any part of the Guaranteed Obligations shall not be punctually paid when due, whether at demand, maturity, acceleration or otherwise, Guarantor shall, immediately upon demand by Lender and without presentment, protest, notice of protest, notice of non-payment, notice of intention to accelerate the maturity, notice of acceleration of the maturity or any other notice whatsoever, pay in lawful money of the United States of America, the amount due on the Guaranteed Obligations to Lender at Lender's address as set forth herein. Such demand(s) may be made at any time coincident with or after the time for payment of all or part of the Guaranteed Obligations and may be made from time to time with respect to the same or different items of Guaranteed Obligations. Such demand shall be deemed made, given and received in accordance with the notice provisions hereof.

**1.6 No Duty To Pursue Others.** It shall not be necessary for Lender (and Guarantor hereby waives any rights which Guarantor may have to require Lender), in order to enforce the obligations of Guarantor hereunder, first to (i) institute suit or exhaust its remedies against Borrower or others liable on the Loan or the Guaranteed Obligations or any other person, (ii) enforce Lender's rights against any collateral which shall ever have been given to secure the Loan, (iii) enforce Lender's rights against any other guarantors of the Guaranteed Obligations, (iv) join Borrower or any others liable on the Guaranteed Obligations in any action seeking to enforce this Guaranty, (v) exhaust any remedies available to Lender against any collateral which shall ever have been given to secure the Loan, or (vi) resort to any other means of obtaining payment of the Guaranteed Obligations. Lender shall not be required to mitigate damages or take any other action to reduce, collect or enforce the Guaranteed Obligations.

**1.7 Waivers.** Guarantor agrees to the provisions of the Loan Documents and hereby waives notice of (i) any loans or advances made by Lender to Borrower, (ii) acceptance of this Guaranty, (iii) any amendment or extension of the Note, the Mortgage, the Loan Agreement or of any other Loan Documents, (iv) the execution and delivery by Borrower and Lender of any other loan or credit agreement or of Borrower's execution and delivery of any promissory notes or other documents arising under the Loan Documents or in connection with the Property, (v) the occurrence of any breach by Borrower or an Event of Default, (vi) Lender's transfer or disposition of the Guaranteed Obligations, or any part thereof, (vii) sale or foreclosure (or posting or advertising for sale or foreclosure) of any collateral for the Guaranteed Obligations, (viii) protest, proof of non-payment or default by Borrower, or (ix) any other action at any time taken or omitted by Lender and, generally, all demands and notices of every kind in connection with this Guaranty, the Loan Documents, any documents or agreements evidencing, securing or relating to any of the Guaranteed Obligations and the obligations hereby guaranteed.

**1.8 Payment of Expenses.** In the event that Guarantor should breach or fail to timely perform any provisions of this Guaranty, Guarantor shall, immediately upon demand by Lender, pay Lender all reasonable, out-of-pocket costs and expenses (including court costs and attorneys' fees) incurred by Lender in the enforcement hereof or the preservation of Lender's rights hereunder. The covenant contained in this Section shall survive the payment and performance of the Guaranteed Obligations.

**1.9 Effect of Bankruptcy.** In the event that pursuant to any insolvency, bankruptcy, reorganization, receivership or other debtor relief law or any judgment, order or decision

thereunder, Lender must rescind or restore any payment or any part thereof received by Lender in satisfaction of the Guaranteed Obligations, as set forth herein, any prior release or discharge from the terms of this Guaranty given to Guarantor by Lender shall be without effect and this Guaranty shall remain in full force and effect. It is the intention of Borrower and Guarantor that Guarantor's obligations hereunder shall not be discharged except by Guarantor's performance of such obligations and then only to the extent of such performance.

**1.10 Waiver of Subrogation, Reimbursement and Contribution.** Notwithstanding anything to the contrary contained in this Guaranty, Guarantor hereby unconditionally and irrevocably waives, releases and abrogates any and all rights it may now or hereafter have under any agreement, at law or in equity (including, without limitation, any law subrogating the Guarantor to the rights of Lender), to assert any claim against or seek contribution, indemnification or any other form of reimbursement from Borrower or any other party liable, until Guarantor's obligations under this Guaranty have been released and this Guaranty has been terminated, for payment of any or all of the Guaranteed Obligations for any payment made by Guarantor under or in connection with this Guaranty or otherwise.

**1.11 Borrower.** The term "**Borrower**" as used herein shall include any new or successor corporation, association, partnership (general or limited), limited liability company joint venture, trust or other individual or organization formed as a result of any merger, reorganization, sale, transfer, devise, gift or bequest of Borrower or any interest in Borrower.

## ARTICLE II

## EVENTS AND CIRCUMSTANCES NOT REDUCING OR DISCHARGING GUARANTOR'S OBLIGATIONS

Guarantor hereby consents and agrees to each of the following and agrees that Guarantor's obligations under this Guaranty shall not be released, diminished, impaired, reduced or adversely affected by any of the following and waives any common law, equitable, statutory or other rights (including without limitation rights to notice) which Guarantor might otherwise have as a result of or in connection with any of the following:

**2.1 Modifications.** Any renewal, extension, increase, modification, alteration or rearrangement of all or any part of the Guaranteed Obligations, the Note, the Mortgage, the Loan Agreement, the other Loan Documents or any other document, instrument, contract or understanding between Borrower and Lender or any other parties pertaining to the Guaranteed Obligations or any failure of Lender to notify Guarantor of any such action.

**2.2 Adjustment.** Any adjustment, indulgence, forbearance or compromise that might be granted or given by Lender to Borrower or any Guarantor.

**2.3 Condition of Borrower or Guarantor.** The insolvency, bankruptcy, arrangement, adjustment, composition, liquidation, disability, dissolution or lack of power of Borrower, Guarantor or any other party at any time liable for the payment of all or part of the Guaranteed Obligations; or any dissolution of Borrower or Guarantor or any sale, lease or

transfer of any or all of the assets of Borrower or Guarantor or any changes in the shareholders, partners or members of Borrower or Guarantor; or any reorganization of Borrower or Guarantor.

**2.4 <u>Invalidity of Guaranteed Obligations</u>.** The invalidity, illegality or unenforceability of all or any part of the Guaranteed Obligations or any document or agreement executed in connection with the Guaranteed Obligations for any reason whatsoever, including without limitation the fact that (i) the Guaranteed Obligations or any part thereof exceeds the amount permitted by law, (ii) the act of creating the Guaranteed Obligations or any part thereof is ultra vires, (iii) the officers or representatives executing the Note, the Mortgage, the Loan Agreement or the other Loan Documents or otherwise creating the Guaranteed Obligations acted in excess of their authority, (iv) the Guaranteed Obligations violate applicable usury laws, (v) the Borrower has valid defenses, claims or offsets (whether at law, in equity or by agreement) which render the Guaranteed Obligations wholly or partially uncollectible from Borrower, (vi) the creation, performance or repayment of the Guaranteed Obligations (or the execution, delivery and performance of any document or instrument representing part of the Guaranteed Obligations or executed in connection with the Guaranteed Obligations or given to secure the repayment of the Guaranteed Obligations) is illegal, uncollectible or unenforceable, or (vii) the Note, the Mortgage, the Loan Agreement or any of the other Loan Documents have been forged or otherwise are irregular or not genuine or authentic, it being agreed that Guarantor shall remain liable hereon regardless of whether Borrower or any other person be found not liable on the Guaranteed Obligations or any part thereof for any reason.

**2.5 <u>Release of Obligors</u>.** Any full or partial release of the liability of Borrower on the Guaranteed Obligations or any part thereof, or of any co-guarantors, or any other Person now or hereafter liable, whether directly or indirectly, jointly, severally, or jointly and severally, to pay, perform, guarantee or assure the payment of the Guaranteed Obligations, or any part thereof, it being recognized, acknowledged and agreed by Guarantor that Guarantor may be required to pay the Guaranteed Obligations in full without assistance or support of any other party, and Guarantor has not been induced to enter into this Guaranty on the basis of a contemplation, belief, understanding or agreement that other parties will be liable to pay or perform the Guaranteed Obligations, or that Lender will look to other parties to pay or perform the Guaranteed Obligations.

**2.6 <u>Other Collateral</u>.** The taking or accepting of any other security, collateral or guaranty, or other assurance of payment, for all or any part of the Guaranteed Obligations.

**2.7 <u>Release of Collateral</u>.** Any release, surrender, exchange, subordination, deterioration, waste, loss or impairment (including without limitation negligent, willful, unreasonable or unjustifiable impairment) of any collateral, property or security at any time existing in connection with, or assuring or securing payment of, all or any part of the Guaranteed Obligations.

**2.8 <u>Care and Diligence</u>.** The failure of Lender or any other party to exercise diligence or reasonable care in the preservation, protection, enforcement, sale or other handling or treatment of all or any part of any collateral, property or security, including but not limited to any neglect, delay, omission, failure or refusal of Lender (i) to take or prosecute any action for



US2008 1731185.1

the collection of any of the Guaranteed Obligations or (ii) to foreclose, or initiate any action to foreclose, or, once commenced, prosecute to completion any action to foreclose upon any security therefor, or (iii) to take or prosecute any action in connection with any instrument or agreement evidencing or securing all or any part of the Guaranteed Obligations.

**2.9 Unenforceability.** The fact that any collateral, security, security interest or lien contemplated or intended to be given, created or granted as security for the repayment of the Guaranteed Obligations, or any part thereof, shall not be properly perfected or created, or shall prove to be unenforceable or subordinate to any other security interest or lien, it being recognized and agreed by Guarantor that Guarantor is not entering into this Guaranty in reliance on, or in contemplation of the benefits of, the validity, enforceability, collectibility or value of any of the collateral for the Guaranteed Obligations.

**2.10 Offset.** The Note, the Guaranteed Obligations and the liabilities and obligations of the Guarantor to Lender hereunder shall not be reduced, discharged or released because of or by reason of any existing or future right of offset, claim or defense of Borrower against Lender, or any other party, or against payment of the Guaranteed Obligations, whether such right of offset, claim or defense arises in connection with the Guaranteed Obligations (or the transactions creating the Guaranteed Obligations) or otherwise.

**2.11 Merger.** The reorganization, merger or consolidation of Borrower into or with any other Person.

**2.12 Preference.** Any payment by Borrower to Lender is held to constitute a preference under bankruptcy laws or for any reason Lender is required to refund such payment or pay such amount to Borrower or someone else.

**2.13 Other Actions Taken or Omitted.** Any other action taken or omitted to be taken with respect to the Loan Documents, the Guaranteed Obligations, or the security and collateral therefor, whether or not such action or omission prejudices Guarantor or increases the likelihood that Guarantor will be required to pay the Guaranteed Obligations pursuant to the terms hereof, it is the unambiguous and unequivocal intention of Guarantor that Guarantor shall be obligated to pay the Guaranteed Obligations when due, notwithstanding any occurrence, circumstance, event, action, or omission whatsoever, whether contemplated or uncontemplated, and whether or not otherwise or particularly described herein, which obligation shall be deemed satisfied only upon the full and final payment and satisfaction of the Guaranteed Obligations.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES

To induce Lender to consent to the Transfer and the Assumption, Guarantor represents and warrants to Lender as follows:

**3.1 Benefit.** Guarantor is an Affiliate of Borrower, is (with the exception of Joseph Schwartz) the owner of a direct or indirect interest in Borrower, and has received, or will receive,

direct or indirect benefit from the making of this Guaranty with respect to the Guaranteed Obligations.

**3.2 Familiarity and Reliance.** Guarantor is familiar with, and has independently reviewed books and records regarding, the financial condition of the Borrower and is familiar with the value of any and all collateral intended to be created as security for the payment of the Note or Guaranteed Obligations; however, Guarantor is not relying on such financial condition or the collateral as an inducement to enter into this Guaranty.

**3.3 No Representation By Lender.** Neither Lender nor any other party has made any representation, warranty or statement to Guarantor in order to induce the Guarantor to execute this Guaranty.

**3.4 Guarantor's Financial Condition.** As of the date hereof, and after giving effect to this Guaranty and the contingent obligation evidenced hereby, Guarantor is and will be solvent and has and will have assets which, fairly valued, exceed its obligations, liabilities and debts, and has and will have property and assets sufficient to satisfy and repay its obligations and liabilities.

**3.5 Legality.** The execution, delivery and performance by Guarantor of this Guaranty and the consummation of the transactions contemplated hereunder do not and will not contravene or conflict with any law, statute or regulation whatsoever to which Guarantor is subject or constitute a default (or an event which with notice or lapse of time or both would constitute a default) under, or result in the breach of, any indenture, mortgage, charge, lien, or any contract, agreement or other instrument to which Guarantor is a party or which may be applicable to Guarantor. This Guaranty is a legal and binding obligation of Guarantor and is enforceable in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to the enforcement of creditors' rights.

**3.6 Survival.** All representations and warranties made by Guarantor herein shall survive the execution hereof. Notwithstanding the foregoing, Guarantor's obligations and liabilities under this Guaranty shall be deemed satisfied in full and discharged on the date that is two (2) years after the Loan is paid in full.

## ARTICLE IV

## SUBORDINATION OF CERTAIN INDEBTEDNESS

**4.1 Subordination of All Guarantor Claims.** As used herein, the term "**Guarantor Claims**" shall mean all debts and liabilities of Borrower to Guarantor, whether such debts and liabilities now exist or are hereafter incurred or arise, or whether the obligations of Borrower thereon be direct, contingent, primary, secondary, several, joint and several, or otherwise, and irrespective of whether such debts or liabilities be evidenced by note, contract, open account, or otherwise, and irrespective of the person or persons in whose favor such debts or liabilities may, at their inception, have been, or may hereafter be created, or the manner in which they have been or may hereafter be acquired by Guarantor. The Guarantor Claims shall include without limitation all rights and claims of Guarantor against Borrower (arising as a result of subrogation

Case 2:17-cv-02036-KM-MAH Document 1-11 Filed 03/28/17 Page 10 of 13 PageID: 295

or otherwise) as a result of Guarantor's payment of all or a portion of the Guaranteed Obligations. After the occurrence of an Event of Default or the occurrence of an event which would, with the giving of notice or the passage of time, or both, constitute an Event of Default, Guarantor shall not receive or collect, directly or indirectly, from Borrower or any other party any amount upon the Guarantor Claims.

**4.2** **<u>Claims in Bankruptcy</u>.** In the event of any receivership, bankruptcy, reorganization, arrangement, debtor's relief, or other insolvency proceedings involving Guarantor as debtor, Lender shall have the right to prove its claim in any such proceeding so as to establish its rights hereunder and receive directly from the receiver, trustee or other court custodian dividends and payments which would otherwise be payable upon Guarantor Claims. Guarantor hereby assigns such dividends and payments to Lender. Should Lender receive, for application against the Guaranteed Obligations, any dividend or payment which is otherwise payable to Guarantor and which, as between Borrower and Guarantor, shall constitute a credit against the Guarantor Claims, then, upon payment to Lender in full of the Guaranteed Obligations, Guarantor shall become subrogated to the rights of Lender to the extent that such payments to Lender on the Guarantor Claims have contributed toward the liquidation of the Guaranteed Obligations, and such subrogation shall be with respect to that proportion of the Guaranteed Obligations which would have been unpaid if Lender had not received dividends or payments upon the Guarantor Claims.

**4.3** **<u>Payments Held in Trust</u>.** In the event that, notwithstanding anything to the contrary in this Guaranty, Guarantor should receive any funds, payment, claim or distribution which is prohibited by this Guaranty, Guarantor agrees to hold in trust for Lender an amount equal to the amount of all funds, payments, claims or distributions so received, and agrees that it shall have absolutely no dominion over the amount of such funds, payments, claims or distributions so received except to pay them promptly to Lender, and Guarantor covenants promptly to pay the same to Lender.

**4.4** **<u>Liens Subordinate</u>.** Guarantor agrees that any liens, security interests, judgment liens, charges or other encumbrances upon Borrower's assets securing payment of the Guarantor Claims shall be and remain inferior and subordinate to any liens, security interests, judgment liens, charges or other encumbrances upon Borrower's assets securing payment of the Guaranteed Obligations, regardless of whether such encumbrances in favor of Guarantor or Lender presently exist or are hereafter created or attach. Without the prior written consent of Lender, Guarantor shall not (i) exercise or enforce any creditor's right it may have against Borrower, or (ii) foreclose, repossess, sequester or otherwise take steps or institute any action or proceedings (judicial or otherwise, including without limitation the commencement of, or joinder in, any liquidation, bankruptcy, rearrangement, debtor's relief or insolvency proceeding) to enforce any liens, mortgage, deeds of trust, security interests, collateral rights, judgments or other encumbrances on assets of Borrower held by Guarantor.

## ARTICLE V

## MISCELLANEOUS

5.1 **Waiver.** No failure to exercise, and no delay in exercising, on the part of Lender, any right hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right. The rights of Lender hereunder shall be in addition to all other rights provided by law. No modification or waiver of any provision of this Guaranty, nor consent to departure therefrom, shall be effective unless in writing and no such consent or waiver shall extend beyond the particular case and purpose involved. No notice or demand given in any case shall constitute a waiver of the right to take other action in the same, similar or other instances without such notice or demand.

5.2 **Notices.** All notices given hereunder shall be in writing and shall be either hand delivered or mailed, by registered U.S. mail, Return Receipt Requested, first class postage prepaid, to the parties at their respective addresses set forth in the Assumption and Release Agreement of even date herewith executed by Borrower, Guarantor, Lender, Current Borrower and Current Borrower's principals or at such other address for any party as such party may designate by notice to the other parties hereto.

5.3 **Governing Law; Submission to Jurisdiction.** This Guaranty shall be governed by and construed in accordance with the laws of the State of New Jersey and the applicable laws of the United States of America. Any legal suit, action or proceeding against Lender or Guarantor arising out of or relating to this Guaranty may at Lender's option be instituted in any Federal or State court in the State of New Jersey, and Guarantor waives any objections which it may now or hereafter have based on venue and/or forum non conveniens of any such suit, action or proceeding, and Guarantor hereby irrevocably submits to the jurisdiction of any such court in any suit, action or proceeding.

5.4 **Invalid Provisions.** If any provision of this Guaranty is held to be illegal, invalid, or unenforceable under present or future laws effective during the term of this Guaranty, such provision shall be fully severable and this Guaranty shall be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part of this Guaranty, and the remaining provisions of this Guaranty shall remain in full force and effect and shall not be affected by the illegal, invalid or unenforceable provision or by its severance from this Guaranty, unless such continued effectiveness of this Guaranty, as modified, would be contrary to the basic understandings and intentions of the parties as expressed herein.

5.5 **Amendments.** This Guaranty may be amended only by an instrument in writing executed by the party or an authorized representative of the party against whom such amendment is sought to be enforced.

5.6 **Parties Bound; Assignment; Joint and Several.** This Guaranty shall be binding upon and inure to the benefit of the parties hereto and their respective successors, assigns and legal representatives; provided, however, that Guarantor may not, without the prior written

consent of Lender, assign any of its rights, powers, duties or obligations hereunder. If Guarantor consists of more than one person or party, the obligations and liabilities of each such person or party shall be joint and several.

**5.7 Headings.** Section headings are for convenience of reference only and shall in no way affect the interpretation of this Guaranty.

**5.8 Recitals.** The recitals and introductory paragraphs hereof are a part hereof, form a basis for this Guaranty and shall be considered prima facie evidence of the facts and documents referred to therein.

**5.9 Counterparts.** To facilitate execution, this Guaranty may be executed in as many counterparts as may be convenient or required. It shall not be necessary that the signature of, or on behalf of, each party, or that the signature of all persons required to bind any party, appear on each counterpart. All counterparts shall collectively constitute a single instrument. It shall not be necessary in making proof of this Guaranty to produce or account for more than a single counterpart containing the respective signatures of, or on behalf of, each of the parties hereto. Any signature page to any counterpart may be detached from such counterpart without impairing the legal effect of the signatures thereon and thereafter attached to another counterpart identical thereto except having attached to it additional signature pages.

**5.10 Rights and Remedies.** If Guarantor becomes liable for any indebtedness owing by Borrower to Lender, by endorsement or otherwise, other than under this Guaranty, such liability shall not be in any manner impaired or affected hereby and the rights of Lender hereunder shall be cumulative of any and all other rights that Lender may ever have against Guarantor. The exercise by Lender of any right or remedy hereunder or under any other instrument, or at law or in equity, shall not preclude the concurrent or subsequent exercise of any other right or remedy.

**5.11 Other Defined Terms. Any capitalized term utilized herein shall have the meaning as specified in the Loan Agreement, unless such term is otherwise specifically defined herein.**

**5.12 Entirety. THIS GUARANTY EMBODIES THE FINAL, ENTIRE AGREEMENT OF GUARANTOR AND LENDER WITH RESPECT TO GUARANTOR'S GUARANTY OF THE GUARANTEED OBLIGATIONS AND SUPERSEDES ANY AND ALL PRIOR COMMITMENTS, AGREEMENTS, REPRESENTATIONS, AND UNDERSTANDINGS, WHETHER WRITTEN OR ORAL, RELATING TO THE SUBJECT MATTER HEREOF. THIS GUARANTY IS INTENDED BY GUARANTOR AND LENDER AS A FINAL AND COMPLETE EXPRESSION OF THE TERMS OF THE GUARANTY, AND NO COURSE OF DEALING BETWEEN GUARANTOR AND LENDER, NO COURSE OF PERFORMANCE, NO TRADE PRACTICES, AND NO EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OR DISCUSSIONS OR OTHER EXTRINSIC EVIDENCE OF ANY NATURE SHALL BE USED TO CONTRADICT, VARY, SUPPLEMENT OR MODIFY ANY TERM OF THIS**

**GUARANTY. THERE ARE NO ORAL AGREEMENTS BETWEEN GUARANTOR AND LENDER.**

**5.13 <u>Waiver of Right To Trial By Jury</u>. GUARANTOR HEREBY AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THIS GUARANTY, THE NOTE, THE MORTGAGE, THE LOAN AGREEMENT, OR THE OTHER LOAN DOCUMENTS, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY GUARANTOR, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. LENDER IS HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY GUARANTOR.**

**5.14 <u>Cooperation</u>.** Guarantor acknowledges that Lender and its successors and assigns may (i) sell this Guaranty, the Note and other Loan Documents to one or more investors as a whole loan or in part, (ii) participate the Loan secured by this Guaranty to one or more investors, (iii) deposit this Guaranty, the Note and other Loan Documents with a trust, which trust may sell certificates to investors evidencing an ownership interest in the trust assets, or (iv) otherwise sell the Loan or interest therein to investors (the transactions referred to in clauses (i) through (iv) are hereinafter each referred to as "**<u>Secondary Market Transaction</u>**". Guarantor shall cooperate with Lender, at no cost to Guarantor, in effecting any such Secondary Market Transaction and shall cooperate to implement all requirements imposed by any Rating Agency involved in any Secondary Market Transaction. Guarantor shall provide such information and documents relating to Guarantor, Borrower, the Property and any tenants of the Improvements as Lender may reasonably request in connection with such Secondary Market Transaction. In addition, Guarantor shall make available to Lender all information concerning its business and operations that Lender may reasonably request. Lender shall be permitted to share all such information with the investment banking firms, Rating Agencies, accounting firms, law firms and other third-party advisory firms involved with the Loan and the Loan Documents or the applicable Secondary Market Transaction. It is understood that the information provided by Guarantor to Lender may ultimately be incorporated into the offering documents for the Secondary Market Transaction and thus various investors may also see some or all of the information. Lender and all of the aforesaid third-party advisors and professional firms shall be entitled to rely on the information supplied by, or on behalf of, Guarantor in the form as provided by Guarantor. Lender may publicize the existence of the Loan in connection with its marketing for a Secondary Market Transaction or otherwise as part of its business development.

**5.15 <u>Reinstatement in Certain Circumstances</u>.** If at any time any payment of the principal of or interest under the Note or any other amount payable by the Borrower under the Loan Documents is rescinded or must be otherwise restored or returned upon the insolvency, bankruptcy or reorganization of the Borrower or otherwise, the Guarantor's obligations

Case 2:17-cv-02036-KM-MAH Document 1-11 Filed 03/28/17 Page 14 of 15 PageID: 299

hereunder with respect to such payment shall be reinstated as though such payment has been due but not made at such time.

**[NO FURTHER TEXT ON THIS PAGE]**

EXECUTED as of the day and year first above written.

**GUARANTOR:**

By: ______________________________
ALFRED LICHTER, an individual resident of the state of New York

By: ______________________________
CLAIRE LICHTER, an individual resident of the state of New York

By: ______________________________
JOSEPH SCHWARTZ, an individual resident of the state of New York

By: ______________________________
SUZETTE SCHWARTZ, an individual resident of the state of New York

THE ALFRED LICHTER 2000 FAMILY TRUST, a trust organized under the laws of the state of New York

By: ______________________________
Alfred Lichter, Trustee

# EXHIBIT K

Case 2:17-cv-02036-KM-MAH Document 1-12 Filed 03/28/17 Page 2 of 3 PageID: 302

[redacted]

## UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

DELAWARE DEPARTMENT OF STATE
U.C.C. FILING SECTION
FILED 10:10 AM 01/06/2011
INITIAL FILING # 2011 0358922

SRV: 110022297

A. NAME & PHONE OF CONTACT AT FILER (optional)
404-815-6500

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

Maritza Winfunke, Esquire
Kilpatrick Stockton LLP
1100 Peachtree Street, Suite 2800
Atlanta, GA 30309

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| | | | | | |
|---|---|---|---|---|---|
| 1a. ORGANIZATION'S NAME: LICHTER GATEWAY IV LLC | | | | | |
| OR 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | | MIDDLE NAME | | SUFFIX |
| 1c. MAILING ADDRESS: c/o Lichter & Lichter, L.P., 850 West 176th Street | CITY: New York | STATE: NY | POSTAL CODE: 10033 | | COUNTRY: USA |
| 1d. SEE INSTRUCTIONS / ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION: LLC | 1f. JURISDICTION OF ORGANIZATION: Delaware | 1g. ORGANIZATIONAL ID #, if any: 4902565 | | ☐ NONE |

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| | | | | | |
|---|---|---|---|---|---|
| 2a. ORGANIZATION'S NAME | | | | | |
| OR 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | | MIDDLE NAME | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | | COUNTRY |
| 2d. SEE INSTRUCTIONS / ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any | | ☐ NONE |

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| | | | | | |
|---|---|---|---|---|---|
| 3a. ORGANIZATION'S NAME: WELLS FARGO BANK, N.A., as Trustee for Morgan Stanley Capital I Inc., Commercial Mortgage Pass-Through Certificates, Series 2006-IQ12 | | | | | |
| OR 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | | MIDDLE NAME | | SUFFIX |
| 3c. MAILING ADDRESS: c/o Berkadia Commercial Mortgage LLC, 118 Welsh Road | CITY: Horsham | STATE: PA | POSTAL CODE: 19044 | | COUNTRY: USA |

4. This FINANCING STATEMENT covers the following collateral:

All of Debtor's assets and personal property, whether now owned or hereafter acquired.

5. ALTERNATIVE DESIGNATION (if applicable): ☐ LESSEE/LESSOR ☐ CONSIGNEE/CONSIGNOR ☐ BAILEE/BAILOR ☐ SELLER/BUYER ☐ AG. LIEN ☐ NON-UCC FILING

6. ☐ This FINANCING STATEMENT is to be filed (for record) (or recorded) in the REAL ESTATE RECORDS. Attach Addendum (if applicable)
7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) (ADDITIONAL FEE) (optional) ☐ All Debtors ☐ Debtor 1 ☐ Debtor 2

8. OPTIONAL FILER REFERENCE DATA

Filed With: Secretary of State, Delaware 33979/377516 Loan No. 99-1078256 (LIB)

FILING OFFICE COPY — UCC FINANCING STATEMENT (FORM UCC1) (REV. 05/22/02)

[redacted]

# UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)
Phone: (800) 331-3282 Fax: (818) 662-4141

B. E-MAIL CONTACT AT FILER (optional)
CLS-CTLS_Glendale_Customer_Service@wolterskluwer.com

C. SEND ACKNOWLEDGMENT TO: (Name and Address) 8839 - BCM

CT Lien Solutions
P.O. Box 29071
Glendale, CA 91209-9071

49668958
DEDE

File with: Secretary of State, DE

Delaware Department of State
U.C.C. Filing Section
Filed: 10:30 AM 09/15/2015
U.C.C. Initial Filing No: 2011 0358922
Amendment No: 20154615836
Service Request No: 20150198700

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1a. INITIAL FINANCING STATEMENT FILE NUMBER
20110358922 1/6/2011 SS DE

1b. ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS
Filer: attach Amendment Addendum (Form UCC3Ad) and provide Debtor's name in item 13

2. ☐ TERMINATION: Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement

3. ☐ ASSIGNMENT (full or partial): Provide name of Assignee in item 7a or 7b, and address of Assignee in item 7c and name of Assignor in item 9
For partial assignment, complete items 7 and 9 and also indicate affected collateral in item 8

4. ☒ CONTINUATION: Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

5. ☐ PARTY INFORMATION CHANGE:
Check one of these two boxes: This Change affects ☐ Debtor or ☐ Secured Party of record
AND Check one of these three boxes to: ☐ CHANGE name and/or address: Complete item 6a or 6b; and item 7a or 7b and item 7c ☐ ADD name: Complete item 7a or 7b, and item 7c ☐ DELETE name: Give record name to be deleted in item 6a or 6b

6. CURRENT RECORD INFORMATION: Complete for Party Information Change - provide only one name (6a or 6b)

6a. ORGANIZATION'S NAME

OR 6b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX

7. CHANGED OR ADDED INFORMATION: Complete for Assignment or Party Information Change - provide only one name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

7a. ORGANIZATION'S NAME

OR 7b. INDIVIDUAL'S SURNAME

INDIVIDUAL'S FIRST PERSONAL NAME

INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX

7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY

8. ☐ COLLATERAL CHANGE: Also check one of these four boxes: ☐ ADD collateral ☐ DELETE collateral ☐ RESTATE covered collateral ☐ ASSIGN collateral

Indicate collateral:

9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT: Provide only one name (9a or 9b) (name of Assignor, if this is an Assignment)
If this is an Amendment authorized by a DEBTOR, check here ☐ and provide name of authorizing Debtor

9a. ORGANIZATION'S NAME
WELLS FARGO BANK, N.A., AS TRUSTEE FOR MORGAN STANLEY CAPITAL I INC., COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2006-IQ12

OR 9b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX

10. OPTIONAL FILER REFERENCE DATA: Debtor Name: LICHTER GATEWAY IV LLC
49668958 991078256 A

# EXHIBIT L

*DANA RONE*

***ESSEX COUNTY REGISTER OF DEEDS & MORTGAGES***

COUNTY OF ESSEX NEW JERSEY

**Hall of Records**
**465 Martin Luther King Jr Blvd**
**Room 130**
**Newark, NJ 07102**
**(973) 621-4960**

*RETURN DOCUMENT TO:
CT CORPORATION
4400 EASTON COMMONS WAY
SUITE 125
COLUMBUS, OH 43219
ATTN: NANCY WIFORD

**Instrument Number - 2017008503**
Recorded On 1/30/2017 At 12:06:21 PM
* Instrument Type - UCC 1
Invoice Number - 109148 User ID: YN
* Debtor - LICHTER GATEWAY IV LLC
* Secured Party - WELLS FARGO BANK N.A. (TRUSTEE)
* PARCEL IDENTIFICATION NUMBER
N/A-NEWARK

***Total Pages - 6**

**COPY**

* FEES

| | |
|---|---|
| REGISTER RECORDING FEE | $25.00 |
| TOTAL PAID | $25.00 |

I hereby CERTIFY that this document is Recorded in the Register of Deeds & Mortgages Office of Essex County, New Jersey

Dana Rone
Register of Deeds & Mortgages

THIS IS A CERTIFICATION PAGE

# Do Not Detach

THIS PAGE IS NOW PART OF THIS LEGAL DOCUMENT

* - Information denoted by an asterisk may change during the verification process and may not be reflected on this page.

00211T

INSTRUMENT NUMBER - **2017008503**

Case 2:17-cv-02036-KM-MAH Document 1-13 Filed 03/28/17 Page 8 of 8 PageID: 306

[redacted]

# UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)

B. E-MAIL CONTACT AT FILER (optional)

C. SEND ACKNOWLEDGMENT TO: (Name and Address)

CT Corporation
Nancy Wiford
4400 Easton Commons Way, Suite 125
Columbus, Ohio 43219

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

1a. ORGANIZATION'S NAME
**Lichter Gateway IV LLC**

OR

| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
|---|---|---|---|---|
| | | | | |
| **1c. MAILING ADDRESS** | **CITY** | **STATE** | **POSTAL CODE** | **COUNTRY** |
| c/o Lichter & Lichter, L.P., 850 West 176th Street | New York | NY | 10033 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

2a. ORGANIZATION'S NAME

OR

| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
|---|---|---|---|---|
| | | | | |
| **2c. MAILING ADDRESS** | **CITY** | **STATE** | **POSTAL CODE** | **COUNTRY** |
| | | | | |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

3a. ORGANIZATION'S NAME
**Wells Fargo Bank, N.A., as Trustee for Morgan Stanley Capital I Inc., Commercial Mortgage Pass-Through Certificates, Series 2006-IQ12**

OR

| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
|---|---|---|---|---|
| | | | | |
| **3c. MAILING ADDRESS** | **CITY** | **STATE** | **POSTAL CODE** | **COUNTRY** |
| c/o C-III Asset Management LLC, 5221 N. O'Connor Blvd., Suite 600 | Irving | TX | 75039 | USA |

4. COLLATERAL: This financing statement covers the following collateral:

**All of Debtor's assets and personal property, whether now owned or hereafter acquired.**

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
**To be filed in Essex County, New Jersey** **57406771**

# EXHIBIT M

# THOMPSON & KNIGHT LLP

ATTORNEYS AND COUNSELORS

VIVIAN M. ARIAS
DIRECT DIAL: (212) 751-3325
EMAIL: Vivian.Arias@tklaw.com

900 THIRD AVENUE • 20TH FLOOR
NEW YORK, NEW YORK 10022
212.751.3001
FAX 212.751.3113
www.tklaw.com

AUSTIN
DALLAS
FORT WORTH
HOUSTON
LOS ANGELES
NEW YORK

ALGIERS
LONDON
MEXICO CITY
MONTERREY
PARIS

January 4, 2017

**NOTICE OF MATURITY DEFAULT / DEMAND FOR PAYMENT**

Lichter Gateway IV LLC
c/o Lichter & Lichter, L.P.
850 West 176th Street
New York, NY 10033

***VIA FED EX 778100820757***
***FOLLOWED BY FIRST CLASS CERTIFIED MAIL, POSTAGE PREPAID,***
***RRR NO. 70051820000617423640***

| | | |
|---|---|---|
| ***Re:*** | ***Securitization:*** | ***MSCI 2006-IQ12*** |
| | ***C-III Loan No.:*** | ***991078256*** |
| | ***Borrower:*** | ***Lichter Gateway IV LLC*** |
| | ***Property:*** | ***100 Mulberry St Newark, New Jersey 07102*** |

Ladies and Gentlemen:

Thompson & Knight LLP is legal counsel to Noteholder[1] in connection with the Loan.[2]

---

[1] "**Noteholder**" means Wells Fargo Bank, N.A., as Trustee for Morgan Stanley Capital I Inc., Commercial Mortgage Pass-Through Certificates, Series 2006-IQ12, acting by and through the Special Servicer (defined below).

"**Special Servicer**" means C-III Asset Management LLC, a Delaware limited liability company (f/k/a ARCap Servicing, Inc.), not individually but solely in its authorized capacity as special servicer pursuant to that certain Pooling and Servicing Agreement, dated December 1, 2006.

[2] "**Loan**" means the debt evidenced by the Note (defined below).

"**Note**" means that certain Promissory Note (as amended and/or modified), dated October 24, 2006, executed by Original Borrower (defined below), as maker, payable to the order of Original Noteholder (defined below), as payee, in the original principal amount of $61,000,000.00, as assumed by Borrower (defined below) pursuant to the Assumption Agreement (defined below).

"**Original Borrower**" means, collectively, Heritage Gateway, LLC, a Delaware limited liability company, Marine One Associates III, LLC, a Delaware limited liability company, Ridgewood 2000 Associates III, LLC, a Delaware limited liability company, JPG Real Estate III, LLC, a Delaware limited liability company, and Ivy Gateway, LLC, a Delaware limited liability company.

"**Original Noteholder**" means LaSalle Bank National Association, a banking association chartered under the laws of the United States of America.

"**Borrower**" means Lichter Gateway IV LLC, a Delaware limited liability company.

The right to receive payments due under the Note, and the outstanding indebtedness evidenced by the Note, are secured by the liens, security interests, terms and provisions contained within the Loan Documents.[3] Pursuant to certain assignments, endorsements, and/or transfers of the Loan Documents, Noteholder is the current owner of the Loan Documents. This Letter[4] supersedes any prior correspondence from Noteholder, and/or its respective agents and representatives.

First, the Note matured on November 1, 2016 (Tuesday) and Borrower failed to timely pay to Noteholder all amounts required by the Loan Documents.

Second, on behalf of and at the request and direction of Noteholder, written demand is hereby made upon Borrower to immediately pay to Noteholder all amounts required by the Loan Documents. You may contact Mr. Michael Nikula, Servicing Officer with Special Servicer, at (972) 868- 5364 to determine the total amount due.

Third, if the foregoing sums are not paid as required above, Borrower is further advised that Noteholder will exercise all remedies available under the Loan Documents, at law and/or in equity, which will cause Noteholder to incur additional attorneys' fees and other amounts which, together with the remaining amounts due under the Loan Documents, may accrue interest for which Borrower, any guarantor, and/or any other obligated party may be liable. If the Property[5] is sold at judicial or nonjudicial foreclosure sale for an amount insufficient to satisfy all amounts due and owing under the Loan Documents, Borrower, and/or any guarantor or otherwise liable party, may be liable for the deficiency, subject to applicable limitations on liability (including, but not limited to, constitutional limitations, statutory limitations and/or any limitations on liability contained within the Loan Documents or applicable law).

All of Noteholder's claims, demands and accruals regarding the above described indebtedness, whenever made, and whether for principal, interest or otherwise, are intended to comply in all respects,

---

"**Assumption Agreement**" means that certain Assumption and Release Agreement, dated January 3, 2011, entered into by and among Original Borrower, Newark Borrower (defined below), Borrower, Noteholder, Original Guarantor (defined below), and Guarantor (defined below).

"**Newark Borrower**" means Newark 300, LLC, a Delaware limited liability company.

"**Original Guarantor**" means, jointly and severally, Steven Greenberg, Jeffrey Greenberg, and Ivy Equities, L.L.C., a Delaware limited liability company.

"**Guarantor**" means, jointly and severally, Alfred Lichter, Claire Lichter, Joseph Schwartz, Suzette Schwartz, and The Alfred Lichter 2000 Family Trust, a trust organized under the laws of the State of New York.

3 "**Loan Documents**" means the Note, the Mortgage (defined below), and any and all other documents executed in connection therewith and/or relating in any way thereto.

"**Mortgage**" means that certain Mortgage and Security Agreement (as amended and/or modified), dated effective October 24, 2006, executed and delivered by Borrower, as mortgagor, to Original Noteholder, as mortgagee, recorded on October 30, 2006, in Book 11600 Page 868 in the Real Property Records in Essex County, New Jersey, covering, among other things, the Property (defined below).

4 "**Letter**" means this Notice of Maturity Default / Demand for Payment Letter.

5 "**Property**" means that certain real property, personal property, and general intangibles described in the Mortgage.

both independently and collectively, with applicable usury laws, and are accordingly limited so that applicable usury laws are not violated.

Noteholder reserves the right to exercise, in such order as Noteholder elects, any one or more of the remedies available to Noteholder pursuant to the Loan Documents or otherwise at law and/or in equity (including, without limitation, actions to seek the appointment of a receiver and collect the rents and other income from the Property, and to apply the Collateral[6] to any Obligations[7] in such order of priority as Lender may determine pursuant to Section 5.2(c) of the Cash Management Agreement[8]), and nothing contained in this Letter shall constitute a waiver of any rights of Noteholder to pursue such rights and remedies.

Borrower is hereby advised that negotiations, if any, between Noteholder and Borrower shall not constitute a waiver of Noteholder's right to exercise its rights and remedies under the Loan Documents or otherwise at law and/or in equity, including, but not limited to, those described in this Letter. Any such waiver shall not be effective unless set forth in writing, duly executed by an authorized representative of Noteholder. Borrower shall not be entitled to rely upon any verbal statements made or purported to be made by or on behalf of Noteholder in connection with any alleged agreement by or on behalf of Noteholder to refrain from exercising any of Noteholder's rights under the Loan Documents or otherwise at law or in equity.

Neither this Letter nor any statement by or on behalf of Noteholder as to the amount due and owing under the Loan Documents shall constitute a waiver of any rights of Noteholder to collect any additional amounts to which Noteholder may be lawfully entitled pursuant to the terms of the Loan Documents or otherwise at law and/or in equity. The specific enumeration of default(s) contained in this Letter shall not constitute a waiver of any other default(s) which may now or hereafter exist under the Loan Documents.

**NOTEHOLDER IS ATTEMPTING TO COLLECT THE INDEBTEDNESS EVIDENCED BY THE LOAN DOCUMENTS AND ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.**

To the extent your obligations have been discharged, dismissed, or are subject to an automatic stay of a bankruptcy order under Title 11 of the United States Code, this notice is for compliance and informational purposes only and does not constitute a demand for payment or any attempt to collect any such obligation. This notice is given pursuant to 11 U.S.C. Section 362(b)11, if applicable.

<u>To assert and protect your rights as a member of the armed forces of the United States, if you are or your spouse is serving on active military duty, including active military duty as a member of the New Jersey National Guard or the National Guard of another state or as a member of a reserve component of</u>

[6] "**<u>Collateral</u>**" shall have the meaning given such term in the Cash Management Agreement (defined below).

[7] "**<u>Obligations</u>**" shall have the meaning given such term in the Cash Management Agreement (defined below)

[8] "**<u>Cash Management Agreement</u>**" means that certain Cash Management Agreement (as amended and/or modified), dated effective October 24, 2006, executed and delivered by Original Borrower, 570 Partners II, LLC, Marine One Associates II, LLC, Ridgewood 2000 Associates II, LLC, JPG Real Estate II, LLC, and Ivy Gateway Mezz, LLC, Original Lender, and G4 Operating Company, LLC.

the armed forces of the United States, please send written notice of the active duty military service to the sender of this notice immediately.

Sincerely,

Vivian M. Arias

cc: Mr. Michael Nikula (via email)
Mr. William M. O'Connor, Esq. (via email)

**<u>FOR NOTICE PURPOSES ONLY</u>**

Alfred Lichter
850 West 176th Street
New York, NY 10033
(guarantor)

***VIA FED EX 778100919686***
***FOLLOWED BY FIRST CLASS CERTIFIED MAIL, POSTAGE PREPAID, RRR NO. 70051820000617423657***

Claire Lichter
c/o Lichter & Lichter, L.P.
850 West 176th Street
New York, NY 10033
(guarantor)

***VIA FED EX778100975918***
***FOLLOWED BY FIRST CLASS CERTIFIED MAIL, POSTAGE PREPAID, RRR NO. 70060100000572617738***

Joseph Schwartz
c/o Lichter & Lichter, L.P.
850 West 176th Street
New York, NY 10033
(guarantor)

***VIA FED EX 778101002925***
***FOLLOWED BY FIRST CLASS CERTIFIED MAIL, POSTAGE PREPAID, RRR NO. 70060100000572617745***

Suzette Schwartz
c/o Lichter & Lichter, L.P.
850 West 176th Street
New York, NY 10033
(guarantor)

***VIA FED EX778101025867***
***FOLLOWED BY FIRST CLASS CERTIFIED MAIL, POSTAGE PREPAID, RRR NO. 70060100000572618339***

The Alfred Lichter 2000 Family Trust
c/o Lichter & Lichter, L.P.
850 West 176th Street
New York, NY 10033
(guarantor)

***VIA FED EX 778101055686***
***FOLLOWED BY FIRST CLASS CERTIFIED MAIL, POSTAGE PREPAID, RRR NO. 70060100000572618346***