# EXHIBIT 5

9/21/2000 See Deed Book 5723 Page

9/21/2000 See Deed Book 5723 Page 63

BK 5664 PG 0680

9/21/2000 See Deed Book 5723 Page

6/18/02 See Deed Book 5892 Page 887

See Deed 5491-332

# AMENDED AND RESTATED GRANT AND AGREEMENT

by and among:

6-7-2004 See Deed Book 6073 Page 764

ONE GATEWAY CENTER CONDOMINIUM ASSOCIATION, INC.,

THE PRUDENTIAL INSURANCE COMPANY OF AMERICA,

THIRD NEWARK GATEWAY URBAN RENEWAL ASSOCIATION,

GATEWAY FOUR URBAN RENEWAL, L.P.

and

GATEWAY SOUTH URBAN RENEWAL ASSOCIATION

Received & Recorded
Register's Office
Essex County, NJ
12/27/1999 12:49:0
Carole A. Graves
23 1 236337

THIS INSTRUMENT PREPARED BY:

Robert A. Del Vecchio

RTR

LAND TITLE AGENCY, INC.
464 Valley Brook Avenue
Lyndhurst, NJ 07071
(201) 804-8844
99-LT-0515

December 23, 1999

SONCHI03\SAL\9715100\0088\140(7003.4

SFNJ1 633936v6

**AMENDED AND RESTATED GRANT AND AGREEMENT**

THIS AMENDED AND RESTATED GRANT AND AGREEMENT ("Agreement") is made as of the 21st day of December, 1999, by and among the following parties: (i) ONE GATEWAY CENTER CONDOMINIUM ASSOCIATION, INC., a New Jersey non-profit corporation ("Gateway I Association"); (ii) THE PRUDENTIAL INSURANCE COMPANY OF AMERICA ("Prudential"); (iii) THIRD NEWARK GATEWAY URBAN RENEWAL ASSOCIATION, a New Jersey partnership ("Third Gateway"); (iv) GATEWAY FOUR URBAN RENEWAL, L.P., a New Jersey limited partnership ("Fourth Gateway"); and (v) GATEWAY SOUTH URBAN RENEWAL ASSOCIATION, a New Jersey partnership ("Gateway South").

RECITALS

A. The Gateway I Association is the association of the "Unit Owners" under that certain Master Deed for One Gateway Center dated August 21, 1997, and recorded in the office of the recorder of Essex County, New Jersey ("Recorder"), in Book 5491, page 332 (the "Master Deed"). As of the date of this Agreement, First Newark Gateway Urban Renewal Association, a New Jersey partnership ("First Gateway") is the owner of the "Office Unit" and "Garage Unit" as defined and described in the Master Deed, and H-Gateway, LLC, a Delaware limited liability company ("H-Gateway") is the owner of the "Hotel Unit" as defined and described in the Master Deed. The Office Unit, Garage Unit, and Hotel Unit, together with the "Common Elements" appurtenant thereto as described in the Master Deed and the "Condominium Plans" referred to therein comprise a mixed use development commonly known as "One Gateway Center" located upon the land described in Exhibit A attached hereto (the "Gateway I Property"). The Gateway I Association is entering into this Agreement (i) on behalf of First Gateway and H-Gateway, as all of the Unit Owners (as defined in the Master Deed) within the Gateway I Property, and (ii) as the party charged under the Master Deed with responsibility for the operation, maintenance and repair of the "common elements" relating to the Gateway I Property, which common elements include the Gateway I Concourse (as hereinafter defined) and the easement rights of the Unit Owners within the Gateway I Property in and to the other portions of the Concourse (as hereinafter defined).

B. Prudential is the owner of that certain parcel of land described in Exhibit B attached hereto, on which is located certain surface parking and other improvements (the "McCarter Property"), as more particularly described in that certain Declaration of Easements, Covenants and Restrictions dated August 21, 1997, and recorded with the Recorder in Book 5491, page 478 (the "Declaration").

C. Third Gateway is (i) the owner of that certain parcel of land described in Exhibit D attached hereto, on which is located an office building and related improvements commonly known as "Three Gateway Center" (the "Gateway III Property") and (ii) the lessee of that certain parcel of land described in Exhibit E attached hereto, on which is located a multi-level commercial parking garage and related improvements (the "Gateway III Garage"), under that certain Lease for Garage dated June 15, 1982, between Newark Economic Development Corporation ("NEDC"), as landlord, and Third Gateway, as tenant, a memorandum of which is recorded in Book 4773, page 588, with the Recorder, as modified by a First Modification of Lease dated December, 1986, between NEDC and Third Gateway (collectively, the "Gateway III Lease").

D. Third Gateway is the owner and lessor, and Fourth Gateway is the lessee, of that certain parcel of land described in Exhibit F attached hereto, on which is located an office building and related improvements commonly known as "Four Gateway Center" (the "Gateway IV Property"), under that certain Ground Lease dated September 20, 1985, between Third Gateway, as landlord, and Fourth Gateway, as tenant, dated as of April 18, 1991, a memorandum of which is recorded in Book 4950, page 78, with the Recorder, as amended by Memorandum of Modification of Ground Lease between Third Gateway and Fourth Gateway recorded in Deed Book 5164, page 629 (Fourth Gateway's rights, title and interests under such lease being herein called the "Leasehold Estate").

E. The Gateway I Property, Gateway III Property, Gateway III Garage, and Gateway IV Property, together with that certain land described on Exhibit C attached hereto, on which is located an office building and related improvements commonly known as "Two Gateway Center" (the Gateway II Property"; and the owner thereof, the "Gateway II Owner"), are collectively referred to as the "Gateway Complex".

F. The properties within the Gateway Complex are interconnected by a pedestrian concourse depicted on Exhibit H attached hereto, consisting of the following components:

(a) an overhead walkway across Raymond Plaza, connecting Penn Station to the Gateway I Property, located within the airspace described in Exhibit I attached hereto ("Raymond Plaza Walkway");

(b) a pedestrian concourse through the Gateway I Property located as shown in the "Condominium Plans" referred to in the Master Deed ("Gateway I Concourse");

(c) an overhead walkway across the McCarter Property and McCarter Highway, connecting the Gateway I Property to the Gateway II Property, located within the airspace described in Exhibit J attached hereto ("McCarter Walkway");

(d) a pedestrian concourse through the Gateway II Property located as shown on Exhibit H hereto ("Gateway II Concourse");

(e) an overhead walkway connecting the Gateway II Property to the Gateway III Garage, located within the airspace described in Exhibit K attached hereto ("Walkway III");

(f) a pedestrian concourse through the Gateway III Garage located within the airspace described in Exhibit L hereto ("Gateway III Garage Concourse");

(g) an overhead walkway connecting the Gateway III Garage to the Gateway III Property and Gateway IV Property, located within the airspace described in Exhibit M attached hereto ("Walkway IV"); and

(h) a pedestrian concourse shared by the Gateway III Property and Gateway IV Property to Mulberry Street, located within the airspace described in Exhibit N hereto ("Gateway III/IV Concourse").





The Raymond Plaza Walkway, McCarter Walkway, Walkway III, and Walkway IV are collectively referred to herein as the "Walkways". The Gateway I Concourse, Gateway II Concourse, Gateway III Garage Concourse, and Gateway III/IV Concourse are collectively referred to herein as the "Interior Concourse Areas", and the Walkways and Interior Concourse Areas are collectively referred to herein as the "Concourse"); provided, however, that because the Gateway II Owner is not joining in this Agreement, the term "Interior Concourse Areas" and the term "Concourse" shall be deemed to include only such easements and other rights as the parties to this Agreement may have with respect to the Gateway II Concourse, it being hereby expressly understood that this Agreement does not bind or create any encumbrance upon the Gateway II Property, nor confer upon any Person any rights, easements, or interests in the Gateway II Property that do not otherwise exist by reason of the Original Grant and Agreement (as herein after defined), any of the Underlying Documents, any other instrument or agreement, or otherwise, nor confer upon the Gateway II Owner any rights, easements, or interests in any of the Properties (as hereinafter defined) that do not otherwise exist by reason of the Original Grant and Agreement (as hereinafter defined), any of the Underlying Documents, or any other instrument or agreement.

G. Gateway South is the owner of that certain parcel of land described in Exhibit G attached hereto, on which is located a multi-level commercial parking garage and related improvements (the "Gateway South Property"). The Gateway South Property is connected to the Concourse through:

(a) a pedestrian passageway through the Gateway III Garage to Market Street, located as shown on Exhibit O hereto ("Garage Passageway"); and

(b) an overhead walkway connecting the Gateway III Garage to the Gateway South Property, located within the airspace described in Exhibit P attached hereto ("Market Street Walkway").

The Market Street Walkway and Garage Passageway provide access to and from the Gateway South Property by persons parking in the parking garage thereon and are not used as part of the system of pedestrian passageways that serve the Gateway Complex. Accordingly, the term "Walkways" does not include the Market Street Walkway or Garage Passageway, and the Market Street Walkway and Garage Passageway are not part of the Concourse. Nevertheless, Gateway South and the Gateway South Property benefit to some extent from being connected to the Concourse.

H. Certain of the parties hereto (or their predecessors in title) entered into a certain Grant and Agreement dated April 18, 1991, and recorded in the office of the recorder of Essex County, New Jersey, in Book 5164, page 592 (the "Original Grant and Agreement"), which granted certain easements and created certain obligations with respect to portions of the Concourse. In addition, certain of the parties hereto (or their predecessors in interest) have entered into certain other agreements and documents from which their rights with respect to the applicable Walkways derives and that impose certain obligations with respect to such Walkways and/or Interior Concourse Areas, which are referenced in Exhibit Q attached hereto (collectively, the "Underlying Documents").

I. Third Gateway agreed in the Original Grant and Agreement to provide three hundred (300) parking spaces in the Gateway III Garage for the benefit of Gateway IV and its

successors and assigns and the tenants, subtenants, licensees, invitees, and other occupants of the Gateway IV Property, at the market rates for parking in the vicinity of the Gateway IV Property, and otherwise as set forth herein. Such rights and obligations are being dealt with separately between the parties and therefore need not be dealt with in this Agreement.

J. The parties hereto are entering into this Agreement to provide a comprehensive statement of the easements, covenants, rights, duties and obligations between the parties with respect to the Concourse and, to the extent the Concourse is controlled by the parties hereto, to provide for a unified system for the maintenance, repair, and operation of the Concourse; provided, that Prudential is a party to this Agreement for the limited purposes set forth in Section 32.9 of this Agreement.

K. Concurrently with the execution of this Agreement, the Gateway 1 Association (as the representative of the Unit Owners within the Gateway I Property) and each of Third Gateway, Fourth Gateway, and Gateway South (collectively, the "Gateway Owners") are forming the Gateway Concourse Association, Inc., a New Jersey not-for-profit corporation (the "Association"), of which each of the Gateway Owners is a member, for the purposes set forth hereinbelow.

<u>AGREEMENT</u>

NOW, THEREFORE, in consideration of the reciprocal easements and mutual covenants and agreements contained herein, the parties hereto do hereby grant, declare, and agree as follows:

1. <u>Definitions</u>. For the purpose hereof, the terms defined in this Section 1 shall have the following respective meanings given them below unless the context in which same are utilized clearly indicates otherwise. Terms defined elsewhere in this Agreement shall have the meanings given them in the respective paragraphs or sections referenced on <u>Schedule 1</u> attached hereto and made a part hereof.

1.1. "Assessment" shall mean, collectively, any annual or special assessment for Common Expenses or any Reimbursement Assessment.

1.2. "Association" shall mean the Gateway Concourse Association, Inc., a New Jersey nonprofit corporation formed to administer, manage and operate the common affairs of the Gateway Owners as provided in this Agreement, the Certificate of Incorporation, and the By-laws.

1.3. "Board" shall mean the Board of Trustees of the Association. Any reference herein or in the By-laws or Rules and Regulations to any exercise of any power, duty, right of approval, or any other right of the Association shall be deemed to refer to the Board and not to the general membership of the Association, unless expressly provided to the contrary, and subject to the provisions of Section 4.11 of the By-Laws.

1.4. "Budget" means each annual written itemized projection of the Common Expenses to be incurred in accordance with this Agreement, as prepared and approved pursuant to Section 6 hereof.





1.5. "By-laws" shall mean the By-laws of the Association, a copy of which document is attached hereto and made a part hereof as <u>Exhibit R</u>, together with all future amendments or supplements thereto.

1.6. "Casualty" shall mean any kind or manner of damage, destruction, or physical loss of any kind affecting any portion of the Concourse or any improvements required for the support or existence thereof, from any cause whatsoever, including fire, storm, flood, earthquake, explosion, act of God, act of war, structural or mechanical failure, or any act or failure to act of any person, whether or not the same may be insured or insurable, other than as a result of (x) normal obsolescence or ordinary wear and tear, or (y) any Taking.

1.7. "Certificate of Incorporation" shall mean the Certificate of Incorporation of the Association, which shall be in the form attached hereto and made a part hereof as <u>Exhibit T</u> and shall be filed on or about the date of recordation hereof with the New Jersey Secretary of State, together with all future amendments or supplements thereto.

1.8. "Claims" shall mean any and all claims, actions, causes of action, suits, penalties, orders, demands, liens, litigation, liabilities, or judgments, and all losses, costs, damages, and expenses arising in connection with or as a result of the foregoing, of every kind and nature, whether based in tort, contract, strict liability, statute, or other legal or equitable theory of recovery.

1.9. "Common Expenses" shall mean, collectively, all of the expenses incurred by the Association, or its respective trustees, officers, agents or employees, in the lawful performance of their respective duties or powers under this Agreement and the By-laws, and all other charges, fees, costs, and expenses expressly designated as "Common Expenses" under this Agreement.

1.10. "Emergency Conditions" shall mean and include any condition that (i) poses an immediate risk of injury to persons or damage to property or (ii) has resulted in, or poses an immediate risk of, loss of use or service such that normal operation of the Concourse or an Owner's Property would be materially impaired.

1.11. "First Mortgagee" shall mean, at any time, (i) where there is only one Mortgage upon a Property, the holder of such Mortgage, and (ii) where there is more than one Mortgage upon a Property, the Mortgagee whose Mortgage is first in priority among Mortgages on such Property at such time, provided that, in any case in which there shall be two or more Mortgages having equal priority and there shall be no other Mortgage having a higher priority, then the holders of such Mortgages shall collectively be a "First Mortgagee" hereunder. References to "Property" in this Section shall include the Gateway South Property.

1.12. "Including" or "including" shall mean including by way of example and not limitation.

1.13. "Index" shall mean the index described in Section 30 hereof.

1.14. "Law" shall mean all present and future laws, ordinances, orders, rules, regulations and requirements of all federal, state, county and municipal governments, courts, departments, commissions, boards and offices and of any other body or board or sovereign

concurrently or successively exercising similar functions, and of any other lawful authority having jurisdiction over any of the Properties (including the Gateway South Property) or the Concourse or any part thereof.

1.15. "Law Center Walkway Agreement" shall mean that certain Agreement dated as of December 11, 1990, by and between First Gateway and The Newark Legal and Communications Center Urban Renewal Corporation, a wholly-owned subsidiary of The Port Authority of New York and New Jersey, a copy of which is attached to the Master Deed.

1.16. "Maintenance Work" shall mean all cleaning, maintenance, and repair work with respect to the Concourse or any part thereof or any equipment or fixtures therein performed by any one or more Owners or their Permittees or by the Association, including costs of supervision and other related costs, but excluding repairs, replacements, upgrades or other improvements that are required to be capitalized under generally accepted accounting principles, other than minor replacements and upgrades costing in any instance less than $10,000 (which shall be deemed "Maintenance Work" for purposes of this Agreement notwithstanding that the costs thereof would be capitalized as aforesaid).

1.17. "Major Repairs" shall mean all repairs, replacements, upgrades, or other improvements made or performed by any one or more Owners or their Permittees or by the Association, to the Concourse or any part thereof or equipment or fixtures therein that are required to be capitalized under generally accepted accounting principles, other than minor replacements and upgrades that are treated as "Maintenance Work" hereunder.

1.18. "Majority Owners" shall mean the Gateway Owners whose Percentage Shares aggregate more than 50%.

1.19. "Master Deed" shall mean the Master Deed as defined in Recital A to this Agreement, as the same shall be amended from time to time, and shall be deemed to include (unless the context otherwise requires), the By-laws and other exhibits thereto, as each may be amended from time to time.

1.20. "Mortgage" shall mean any duly recorded mortgage, deed of trust, or other security instrument creating a lien on any Property (including the Gateway South Property), together with the underlying obligation secured by such instrument, as the same may be amended from time to time, whether now existing or hereafter created and granted.

1.21. "Mortgagee" means one or more parties named as a mortgagee or beneficiary under any Mortgage by which the interest of any Owner is encumbered, or any successor to the interest of any such party under such Mortgage.

1.22. "Necessary Major Repairs" means any Major Repairs that are required to be performed on any portion or portions of the Concourse in order to keep the same in a condition that is structurally sound, weather-tight, safe, secure, and/or in compliance with Laws and the provisions of the Underlying Documents, expressly including (where necessary or reasonably advisable) replacement or reconstruction of the Walkways or portions thereof.





1.23. "Non-Necessary Major Repairs" means any Major Repairs that are not Necessary Major Repairs.

1.24. "Other Parties" means, collectively, those parties to any one or more of the Underlying Documents other than the parties to this Agreement or their respective predecessors in title in and to the Properties. Without limiting the foregoing, it is expressly provided that the Gateway II Owner is an "Other Party" but that Gateway South is not.

1.25. "Owner" means any person, or any combination of persons, in whom record fee simple title to one or more of the Properties (including the Gateway South Property and the McCarter Property, but excluding the Gateway II Property) is vested; provided, however, that:

(a) in any case in which all or substantially all of a Property has been demised to a single lessee under a lease having an stated initial term of at least forty (40) years, the party entitled to exercise the rights, powers and privileges of the "Owner" of such Property shall be the holder of the leasehold interest under such lease, and not to the lessor thereunder, unless the lessor has expressly reserved in the applicable lease the right to act as "Owner" under this Agreement; however, any such lessor (other than NEDC with respect to the Gateway III Garage, unless NEDC shall have agreed, by joining in the execution of this Agreement or by executing another-written, recorded instrument, to be bound in the provisions of this Agreement) shall nevertheless be bound by this Agreement and subject to the obligations arising hereunder or pursuant hereto (but no such lessor shall be bound by any amendment to this Agreement unless it shall have consented thereto in a written, recorded instrument); and

(b) notwithstanding any applicable theory of mortgage, "Owner" shall not mean or refer to any Mortgagee unless and until such Mortgagee has acquired legal title to any such Property pursuant to foreclosure, sale in bankruptcy, deed in lieu of foreclosure, or other means of realization upon the lien and security under a Mortgage.

In any case in which more than one person constitutes an Owner with respect to any Property, such as where such persons hold title as tenants in common, all such persons shall constitute a single Owner for purposes of this Agreement, and all votes, consents, approvals, and other actions shall be taken and done on a unified basis (it being expressly recognized and agreed that, so long as the Gateway I Property remains a condominium, the Gateway I Association shall be authorized and required to act as the representative of all Owners within the Gateway I Property). So long as the Gateway I Property remains a condominium, in any case in which the term "Owner" is used or is applied in reference to the Gateway I Property, such reference shall be deemed to mean the Gateway I Association, as the representative of the Unit Owners within the Gateway I Property, unless otherwise clearly required by the context thereof. In addition, except where any reference to "Owner" or "Owners" herein pertains to the easements granted under Section 3 of this Agreement or the enforcement of this Agreement for the benefit of the Owner of the McCarter Property, the use of the terms "Owner" or "Owners" shall not be deemed to include the Owner of the McCarter Property unless otherwise clearly required by the context thereof.

1.26. "Permittees" means and includes, as to any Owner, such of the tenants, sub-tenants, contractors, subcontractors, agents, employees, licensees, and invitees and their

respective officers, directors, contractors, subcontractors, agents, employees, licensees, invitees, customers, and visitors.

1.27. "Person" or "person" shall mean any individual, firm, corporation, partnership, limited liability company, trust, association, governmental agency or political subdivision, or other entity recognized as legally distinct for any purpose.

1.28. "Prime Rate" shall mean a varying rate of interest from time to time, equal to the "Prime Rate" as reported from time to time in the "Money Rates" section of *The Wall Street Journal*, as published and distributed in New York, New York, or if such rate shall cease to be published, such other rate as shall at the time be representative of the rates announced by major U.S. money center banks as the typical rate of interest charged on unsecured corporate loans.

1.29. "Property" shall mean, individually or collectively, any or all (as the context shall indicate) of the Gateway I Property, McCarter Property, Gateway III Property, Gateway III Garage, Gateway IV Property, or Gateway South Property; provided, that except where any reference to "Property" or "Properties" herein pertains to the easements granted under Section 2.1 or Section 3 of this Agreement or the enforcement of this Agreement for the benefit of the Owner of the McCarter Property or the Gateway South Property, the use of the terms "Property" or "Properties" shall not be deemed to include the McCarter Property or Gateway South Property unless otherwise clearly required by the context thereof. The terms "Property" and "Properties" shall not be deemed to include the Gateway II Property for any purpose.

1.30. "Reimbursement Assessments" shall have the meaning given such term in Subsection 23.2 hereof.

1.31. "Restoration" shall mean the repair, restoration, replacement, or reconstruction of any improvements, structures, fixtures, or equipment comprising a part of the Concourse or its supporting columns, footings, structures and elements that shall be affected by any Casualty to substantially the same design, condition, and functionality as existed prior to such Casualty. The term "Restore" (and related verb forms) shall mean to effect a Restoration.

1.32. "Rules and Regulations" shall mean any and all rules and regulations established pursuant to the provisions of this Agreement, together with all future amendments or supplements thereto provided such amendments or supplements are adopted pursuant to and in accordance with all applicable provisions of this Agreement and the By-Laws.

1.33. "Taking" shall mean any transfer of title to all or any part of legal or beneficial ownership of any Property, or any transfer of possession thereof, pursuant to the exercise of the power of condemnation or eminent domain by any governmental authority or governmental unit, any agency thereof, any public utility company, or any other person granted the power of condemnation under the laws of the United States, the State of New Jersey, or any political subdivision thereof, whether such transfer is temporary or permanent, and whether the same occurs by force of legal process or by conveyance in lieu thereof, and expressly including any changes in Laws that have the effect of rendering any Property or any part thereof unusable. References to "Property" in this Section shall include the Gateway South Property and McCarter Property.





1.34. "Utility Facilities" means and includes private and public utility lines, systems, or facilities of any type or nature, including wires, pipes, mains, conduits, valves, cables, fiber optic lines, and ducts, which supply or are used in the supply of domestic cold and hot water, sanitary sewer service, storm sewer service, chilled water, condenser water, steam, steam condensate, natural gas, compressed air, electricity, fire alarm, emergency communications, systems control and automation, video and other security monitoring, antennae, satellite dishes, telephone, television, other telecommunications systems, and other mechanical, electrical, and life safety systems, and including all meters for any of the foregoing.

2. <u>Grant of Reciprocal Easements</u>. Each of the Gateway Owners (other than Gateway South) hereby GRANTS AND CONVEYS the following rights and easements to (i) each of the other Gateway Owners (other than Gateway South), their successors and assigns, (ii) the respective Owners of the McCarter Property and Gateway South Property, their successors and assigns (as to the easements granted under Section 2.1 and the second sentence of Section 2.3 only), and (iii) where applicable, the Association:

2.1. <u>Easements for Pedestrian Passage</u>. The non-exclusive right and easement for pedestrian passage over and through (a) the respective Interior Concourse Area on its Property and (b) to the extent of its interests therein, each of the Walkways, for the mutual and reciprocal use and benefit of the Gateway Owners, their successors and assigns, the Owner of the McCarter Property, its successors and assigns, and the respective Permittees of each such Owner's Property;

2.2. <u>Easements for Utilities</u>. A permanent, non-exclusive easement appurtenant to the Walkways for the existence, operation, maintenance, repair and use from time to time of Utility Facilities used in or required to serve the Concourse through service provided or available through any of the Properties; provided, that the location of any such Utility Facilities hereafter installed or relocated within the Concourse shall be subject to the approval of (i) the Owner responsible for Major Repairs thereto (as specified in Section 11 thereof) and to the approval of the Majority Owners, which approvals shall not be unreasonably withheld, conditioned, or delayed.

2.3. <u>Easements for Repair Work</u>. The non-exclusive right and easement for interior and exterior access to the Walkways and the portions of the buildings and Walkways on each Owner's Property (with such contractors and equipment as may be reasonably required for such purpose, and subject to the provisions of Section 12 hereof), for the use and benefit of each Owner and/or the Association (as the case may be) in the exercise of their respective rights and duties to perform Maintenance Work, Major Repairs, or Restoration on the Walkways, where authorized or required to do so under this Agreement or the Underlying Documents. The foregoing rights and easements shall expressly include a right of access to each Property by the Association and each Owner to make any repairs (including Major Repairs) that are necessitated by Emergency Conditions, where the party primarily responsible therefor has not promptly acted to correct the same, or that are necessitated by the failure of the party primarily responsible therefor to have performed the same (after notice and opportunity to cure as provided in Subsection 23.1 hereof). Such repairs shall be made only upon at least five (5) business days notice to the responsible party, except that repairs necessitated by Emergency Conditions shall be made upon such notice (if any) as is reasonably possible under the circumstances, and shall be performed in accordance with the other provisions of this Agreement, including but not limited to Section 12 hereof.

The foregoing rights and easements shall be perpetual and irrevocable, except as otherwise provided in Sections 16, 17, and 18 hereof. The foregoing grant and conveyance by each such Gateway Owner of such rights and easements is subject to the express limitations that (i) such grant and conveyance is made only to the extent that the same shall not constitute a default or violation of the provisions of any of the Underlying Documents and (ii) the rights and easements granted and conveyed hereunder are subject to the provisions of the Underlying Documents, including (without limitation) the provisions of certain of the Underlying Documents permitting an Other Party to terminate such Underlying Documents under certain conditions. Each Gateway Owner hereby agrees that, except as otherwise expressly provided in this Agreement, each Gateway Owner shall perform the respective obligations to the Other Parties for which such Gateway Owner is responsible under the terms of the Underlying Documents and to make reasonable efforts (consistent with the provisions of this Agreement and without incurring material financial obligations beyond those contemplated under this Agreement) to keep the Underlying Documents in full force and effect. No Owner shall agree to terminate, modify, supplement, amend, alter or replace any of the Underlying Documents or to waive any of its rights thereunder, in a manner that would have a material, adverse effect on any other Owner or Owners, without the prior, written consent of each Owner who may be so adversely affected. Costs and expenses incurred by an Owner to perform or comply with the obligations of such Owner under any of the Underlying Documents shall be borne by such Owner except to the extent this Agreement otherwise expressly provides.

3. Grant of Easement over McCarter Property. Prudential hereby GRANTS AND CONVEYS to First Gateway, its successors and assigns, and the Association, its successors and assigns (as the parties with primary responsibilities for the repair, maintenance, replacement, removal, and reconstruction of the McCarter Walkway); and to the other Gateway Owners (as beneficiaries of the easements granted herein for the use and enjoyment of the McCarter Walkway and for the exercise of the remedies set forth herein with respect to the McCarter Walkway), the right and easement over the portion of the McCarter Property within the area bounded by the perimeter of the McCarter Walkway as described in Exhibit J, for the existence, support, maintenance, repair, replacement, removal, and reconstruction from time to time of the McCarter Walkway and all supporting columns, footings, structures and elements, in accordance with the provisions of this Agreement and the Underlying Documents applicable thereto. Prudential agrees that it shall not terminate, modify, supplement, amend, alter or replace any of those Underlying Documents pertaining to the McCarter Walkway, or waive any of its rights thereunder, or otherwise restrict or interfere with the use of the McCarter Walkway, in a manner that would have a material, adverse effect on any other Owner or Owners, without the prior, written consent of each Owner who may be so adversely affected, except to the extent that any Other Party exercises any rights it may have under such Underlying Documents to terminate, modify, cancel, restrict, or interfere with the use of the McCarter Walkway over the right-of-way of New Jersey State Highway 21. It is hereby expressly agreed that neither Prudential nor its successors in interest in the McCarter Property shall have any obligations or liabilities for maintenance, repair, replacement, removal, and reconstruction from time to time of the McCarter Walkway.

4. Limitations and Reservations on Use. The Walkways shall be used solely for pedestrian passage between and through the Properties and access to the tenant spaces, retail operations, and other business located within or along the Concourse or within any of the Properties by the Owners, their tenants, and other Permittees. Such use shall be subject to the





restrictions on use imposed by any Other Party under the terms of the Underlying Documents (such as the restrictions therein on advertising and retail activities). The Interior Concourse Areas shall be used solely for the foregoing purposes, except that, to the extent otherwise permitted under the Underlying Documents and applicable law, the Owner of any Property in which an Interior Concourse Area is located may permit such Interior Concourse Area to be used (i) for the operation of retail carts and kiosks, (ii) for temporary or periodic extensions of retail operations that are conducted in spaces along such Interior Concourse Area, and (iii) the posting of identification signs and advertising or retail operations within the Concourse on or along the walls of such Interior Concourse Area (and the easements granted hereunder shall be deemed to include the rights necessary for a respective Owner to conduct such operations); provided, however, that (a) none of the foregoing shall cause any unreasonable interference with pedestrian passage through such Interior Concourse Area, and (b) hours of operation under (i) and (ii) above and signage and advertising under (iii) above shall be subject to such Rules and Regulations as may be adopted by the Association on a uniform basis to govern the Concourse. Subject to the provisions of Sections 12, 16, 17, and 18 hereof (as applicable), each Gateway Owner (other than Gateway South) shall be entitled to make such repairs, replacements, additions, improvements, and alterations (structural or otherwise) to the Interior Concourse Area within its Property as it deems appropriate, so long as the use of such Interior Concourse Area as a pedestrian passageway is not unreasonably impaired. Gateway South shall be entitled to make such repairs, replacements, additions, improvements, and alterations (structural or otherwise) to the Market Street Walkway as it deems appropriate, at its sole cost and expense, subject to compliance with the terms of the Underlying Documents pertaining to the Market Street Walkway as identified on Exhibit Q hereto.

5. Concourse Association. Concurrently with the execution of this Agreement, the Gateway Owners are forming the Association to carry out the duties and responsibilities conferred upon the Association as set forth in this Agreement; provided, that with respect to the Gateway I Property, so long as the Gateway I Property continues to be a condominium regime, the Gateway I Association shall be a member, as the representative of the respective owners of the condominium units within the Gateway I Property, and such unit owners shall not be, or be entitled to be, separate members of the Association. The Association shall, on a consistent basis throughout the Concourse and in compliance with the requirements of this Agreement, the By-Laws and any requirements with respect to such activities in the Underlying Documents:

(a) be responsible for, and perform or cause to be performed on behalf of the Gateway Owners, all Maintenance Work for all portions of the Concourse, so as to keep the same in compliance with Laws, in good operating condition and repair, and reasonably clean and free of dirt, debris, and pedestrian hazards, in a manner consistent with the general quality and character of the Properties; provided, that the duty and authority to contract for the performance of such work or otherwise expend funds for such purpose shall be limited by the Budget (excepting any Maintenance Work that may be necessitated by Emergency Conditions) and the Association shall only be obligated for the foregoing to the extent funds are made available to it to do so;

(b) contract for the provision of security services for the Concourse through reputable companies in the business of providing such services to owners of commercial properties and oversee the performance of such services; provided, that (i) the manner and extent of the security services so provided shall be subject to the approval of the Majority

Owners and (ii) the duty and authority to make improvements, acquire or install equipment, and otherwise expend funds for such purpose shall be limited by the Budget; and

(c) oversee the determination of utility charges that are applicable to the Concourse and administer the allocation of such charges among the Gateway Owners;

(d) bill and collect from the Gateway Owners all Assessments to cover the costs of the foregoing and all other Common Expenses; and

(e) perform such other duties as provided for in this Agreement or as determined from time to time by the Majority Owners.

To the extent the Underlying Documents impose any of the foregoing responsibilities on a particular Gateway Owner or Gateway Owners (other than Gateway South), the Association is hereby designated as such Gateway Owners' agent to discharge such responsibilities and the Association hereby undertakes to perform such responsibilities in a commercially reasonable manner, subject to the receipt of sufficient funds to do so. The Association shall be entitled to enter into such contracts, leases, or other agreements and to retain such personnel as shall be necessary to carry out its duties hereunder, as determined in good faith by the Board from time to time (subject to the Budget in effect hereunder from time to time), and shall have such other powers as are expressly conferred upon it in this Agreement or in the By-Laws. The Association shall not be responsible for performance of, or payment for, Maintenance Work, utilities, or other obligations of any kind with respect to the Market Street Walkway, all of which are to be performed and paid for by Gateway South under the terms of the applicable Underlying Documents governing the Market Street Walkway. However, because the Gateway South Property derives some benefits from its connection to the Concourse, Gateway South shall share in the obligations of the Gateway Owners with respect to the Concourse as set forth above.

6. Annual Budgets. The Board shall cause to be prepared and delivered to each Gateway Owner, at least sixty (60) days prior to the commencement of each calendar year, a proposed Budget for such calendar year (except that as to the balance of the calendar year in which this Agreement is executed and recorded, the Budget for such year shall be as set forth on Exhibit U attached hereto and made a part hereof). The Budget shall include line items for Maintenance Work, security services, utility services to the Concourse, insurance required to be maintained by the Association hereunder, any proposed reserves, a contingency item, and any other category or categories of costs or expenses anticipated for the forthcoming year. The proposed Budget shall be delivered to the Gateway Owners with a notice setting a date for a meeting of the Gateway Owners to consider ratification of the Budget, which date shall be a business day that is not less than fourteen (14) nor more than thirty (30) days after delivery of the Budget. The Budget shall be approved if (and only if) approved by the Majority Owners. If the Budget is rejected, the Budget last ratified by the Majority Owners shall continue to be used until the Majority Owners ratify a new Budget, provided that each category of expense item shall be increased in proportion to the increase in the Index between (i) the November immediately preceding the current year in which a New Budget shall not have been approved and (ii) the November that is twelve months earlier, and the expenses for utilities, insurance and emergency repairs shall be deemed approved.

7. Assessments. Assessments for Common Expenses shall be made on a calendar year basis and shall be payable in monthly installments due on the first day of each month, or at such





lesser frequency as may be determined from time to time by the Board. At such time as the Budget is adopted (and if, as of the date ten (10) business days prior to the beginning of any calendar year, a Budget has not yet been adopted, then no later than such tenth business day) the Board shall deliver to each Gateway Owner a written notice, containing the following:

(a) a statement of the total Common Expenses projected for the next calendar year under the Budget then approved (or the adjustment of the prior Budget where no new Budget has been approved, as the case may be), including a copy of the applicable Budget on which such projection is based; and

(b) a list of the Gateway Owners, the annual Assessment payable by each such Owner (allocated in accordance with Section 8 below), and the amounts and due dates of the installments of Assessments required to be paid during such calendar year.

In any case in which a Budget is carried forward from a prior year because the Majority Owners have not approved the same, but then a Budget is subsequently approved for the current year, a new notice shall be delivered to the Gateway Owners in accordance with the foregoing, and any adjustment in assessments required thereby shall be charged to (or credited against) the first monthly assessments coming due after such new Budget has been approved. The list of Assessments applicable to each Gateway Owner from time to time, as described in paragraph (b) above, shall be kept in the office of the Association and shall be open to inspection during reasonable business hours, upon request, by any Gateway Owner, any prospective purchaser of any Property from any Owner, and any Mortgagee or prospective Mortgagee of any such Property or Owner.

8. Cost Allocation; Percentage Shares. Each Gateway Owner shall pay a percentage share of all Common Expenses, which share is set forth on (and has been determined in the manner described in) Exhibit S attached hereto (any Gateway Owner's share being referred to herein as its "Percentage Share"). Notwithstanding the foregoing, if, due to the negligent, reckless or intentional act or omission of an Owner, damage shall be caused to the Concourse, or additional Maintenance Work or Major Repairs are required which would otherwise not have been necessary (whether the same would have been a Common Expense or would have been payable directly by an Owner), then the Owner who shall have caused or permitted such damage or the need for such additional Maintenance Work or Major Repairs shall pay for such damage and be liable for the costs and expenses of such work, including attorneys' fees, caused by or arising out of such circumstances, except as otherwise provided in Subsection 25.5. The foregoing shall not be deemed to adversely affect the ability of such Owners to receive any insurance proceeds to pay for the same, nor shall it operate to vitiate any waiver of subrogation to be included in insurance covering the Concourse or such Owner(s).

9. Liability for Assessments; Liens. Each Assessment shall be a continuing lien upon the Property of each Gateway Owner against which it was made, together with any interest thereon, late charges, or the cost of collection thereof (including reasonable attorneys' fees); provided, however, that in the case of the Gateway 1 Property and the Assessments against the Gateway I Association, no lien shall attach to the individual condominium units within such Property, but the Association shall be entitled to collect any judgment against the Gateway I Association out of the assessments collected by the Gateway I Association from the Unit Owners and shall be subrogated to the rights, claims and liens of the Association to obtain payment or

recovery of the amounts due the Association from the respective Unit Owners. Liens for unpaid Assessments may be foreclosed by suit brought in the name of the Association, or in the name of the Owner claiming such lien (as the case may be), in the same manner as a foreclosure of a mortgage on real property. Suit to recover a money judgment for unpaid Assessments may be maintained without foreclosing the lien securing the same. Any lien for unpaid Assessments shall be subordinate to any lien for past due and unpaid taxes and the lien of any Mortgage of record as of the date a claim of lien is first recorded by the Association; provided, however, that such subordination shall apply to liens with respect to Common Expenses and other obligations that may be the subject of Assessments hereunder, to the extent that the same were first incurred prior to any sale or transfer of any such Property pursuant to a decree of foreclosure or any sale or proceeding in lieu of foreclosure, and no such sale or transfer shall relieve any such Property from liability for any Assessments for Common Expenses or other obligations that may be the subject of Assessments hereunder that were first incurred following any such sale or transfer, nor from any lien for such Assessments first imposed after such sale.

10. <u>Voting Rights</u>. Each Gateway Owner shall have a weighted vote in the Association as to all decisions required or permitted to be made by the Association, so that voting is in proportion to the Gateway Owners' respective Percentage Shares. No Gateway Owner shall be entitled to "split" its vote (such as in the case of the Gateway I Association, where it is acting on behalf of more than one Unit Owner). Except as otherwise provided in this Agreement or the By-laws, all such decisions shall be made on the basis of the approval of the Majority Owners.

11. <u>Major Repairs</u>.

11.1. <u>Responsibility for Necessary Major Repairs</u>. All Necessary Major Repairs shall be made by the Association and each Gateway Owner shall pay its Percentage Share of all Common Expenses in connection therewith. Notwithstanding the foregoing, if, due to the negligent, reckless or intentional act or omission of an Owner, damage shall be caused to the Concourse, or additional Maintenance Work or Major Repairs are required which would otherwise not have been necessary (whether the same would have been a Common Expense or would have been payable directly by an Owner), then the Owner who shall have caused or permitted such damage or the need for such additional Maintenance Work or Major Repairs shall pay for such damage and be liable for the costs and expenses of such work, including attorneys' fees, caused by or arising out of such circumstances, except as otherwise provided in Subsection 25.5. The foregoing shall not be deemed to adversely affect the ability of such Owners to receive any insurance proceeds to pay for the same, nor shall it operate to vitiate any waiver of subrogation to be included in insurance covering the Concourse or such Owner(s).

11.2. <u>Responsibility for Non-Necessary Major Repairs</u>. All Non-Necessary Major Repairs shall be made by the Association. Except as set forth in the second sentence of Section 11.1 above and in the last sentence of this Section 11.2, Non-Necessary Major Repairs to the Walkways and/or Concourses shall be paid fifty percent (50%) by the Gateway Owner responsible for such Walkway and Concourses as specified below and the remaining fifty percent (50%) of such costs shall be paid by the Gateway Owners (other than Gateway South) in the percentage set forth on Exhibit S (with the Gateway Owner responsible for such Walkways and/or Concourses also being responsible for its allocable share of the remaining fifty percent (50%)):





(a) Non-Necessary Major Repairs to the Gateway I Concourse shall be the responsibility of the Gateway I Association;

(b) Non-Necessary Major Repairs to Gateway III/IV Concourses shall be paid 56.58% by the Gateway III Owner and 43.42% by the Gateway IV Owner;

(c) Non-Necessary Major Repairs to the Gateway III Garage Concourse shall be paid by the Gateway III Garage Owner.

Non-Necessary Major Repairs to all other Concourses and Walkways not described in clauses (a), (b) and (c) of this Section 11.2 shall be paid by each Gateway Owner in its Percentage Share of all Common Expenses in connection therewith.

11.3. <u>Performance and Payment for Major Repairs</u>. The Association shall have the right to levy special Assessments to pay for all Major Repairs. The Association shall have the rght to collect such Assessment in the manner provided in Section 9 hereof.

11.4 <u>Disputes With Respect to Major Repairs</u>. In the event one or more such other Gateway Owners (other than Gateway South) shall dispute whether the costs of the Major Repairs are required to be shared by the Gateway Owners hereunder (other than Gateway South), or shall dispute the cost thereof, such dispute shall be resolved in accordance with the Dispute Resolution Plan, and except in the case of Major Repairs required to address Emergency Conditions (in which case the Major Repairs shall be completed and reimbursed in accordance with Section 11.1 above), no Major Repairs that are the subject of any such dispute shall be commenced until such dispute is resolved, either by agreement of the parties or by a final determination of such dispute pursuant to the Dispute Resolution Plan; provided, that to the extent the nature and estimated cost of such work have been approved as part of the Budget for such year (or any amendment thereto) in accordance with Section 6 hereof, then no Gateway Owner shall be entitled to dispute the necessity for such work, nor the cost thereof if such cost is within the amount estimated in the Budget, unless written notice of such dispute is given by the objecting Gateway Owner to the other Gateway Owners (other than Gateway South) within thirty (30) days after approval thereof by the Majority Owners.

11.5. <u>Major Repairs to Market Street Walkway</u>. All Major Repairs with respect to the Market Street Walkway shall be performed and paid for solely by Gateway South in accordance with the terms of the applicable Underlying Documents governing the Market Street Walkway. Because the Gateway South Property receives only minor benefits from its connection to the Concourse, Gateway South shall not share in the obligations of the Gateway Owners with respect to Major Repairs for the Concourse.

12. <u>Performance of Work</u>. All Maintenance Work and Major Repairs shall be performed (a) in a prompt, good and workmanlike manner consistent with the overall standards of construction, maintenance, and repair that are characteristic of the Properties, (b) in accordance with the provisions and requirements of this Agreement, the Underlying Documents, and applicable Laws, and (c) in a commercially reasonable manner that is designed to minimize (to the extent reasonably possible under the circumstances) interruption of or interference with the use and operation of the Concourse, the activities and operations therein, and the activities, operations and rights of the Owners of the Properties adjacent thereto and their tenants and other Permittees. The Association and any Gateway Owner performing Maintenance Work or Major Repairs shall restore

any improvements or areas that may be damaged or disturbed thereby substantially to the condition that existed prior to commencing such work (and the costs of such restoration shall be deemed a part of the cost of the Maintenance Work or Major Repairs hereunder, except as otherwise provided immediately below). In the event that there shall be any dispute between the Gateway Owners, or between any Gateway Owner and the Association, regarding whether any Maintenance Work or Major Repairs conform to the requirements of this Agreement, such dispute shall be resolved in accordance with Section 22.

13. Utilities. The costs of providing heating, cooling, lighting, and any other utilities to the Concourse, to the extent the same can reasonably be determined for the Concourse separately from the other improvements in the various Properties, shall constitute Common Expenses and shall be shared among the Gateway Owners in proportion to their respective Percentage Shares. All such utilities that are metered to a particular Gateway Owner (whether separately as to the Concourse or not) shall be timely paid by such Gateway Owner so as to ensure continuity of service to the Concourse. Where either (i) utility service to any portion or portions of the Concourse is metered separately from utility service to any Property, or (ii) another method of measurement or allocation of the charges for utility services as between any portion or portions of the Concourse and the service to the Property in which or through which such service is provided has been approved by the Board, the charges for such utility services shall constitute Common Expenses, for which any Gateway Owner having paid such charges shall be entitled to reimbursement. Such reimbursements shall be made on a periodic basis (but not less frequently than quarterly) within thirty (30) days after submission of evidence of payment of utility charges by any Gateway Owner, in accordance with procedures established by the Board, and the annual amount of such charges shall be estimated by the Board in its preparation of the annual Budget and included in the Gateway Owners' Assessments (and shall be adjusted following the end of each calendar year according to the amount of such utility charges actually incurred). In calculating the amount of reimbursements to be made between or among the Gateway Owners and/or the Association, appropriate credit shall be given for payments that are subject to reimbursement under the provisions of this Section and that have previously been made by any Gateway Owner directly to the providers of such services, so that the total costs incurred by all Gateway Owners are properly allocated among such Owners.

14. Liability Insurance. Each Gateway Owner shall obtain and keep in full force and effect at all times commercial general liability insurance covering (x) public liability for bodily injury and property damage, and (y) claims of one or more insured parties against other insured parties, including a contractual liability endorsement covering the indemnity set forth in Section 25 below. Such liability insurance shall, at a minimum, have limits of coverage that are not less than the following:

(a) $5,000,000 per occurrence with respect to personal injury (including death);

(b) $5,000,000 per occurrence with respect to damage to property;

(c) $5,000,000 per occurrence with respect to contractual liability; and

(d) $30,000,000 umbrella liability with respect to the liability coverages required hereunder.





Such insurance shall also include premises/operations, personal/advertising injury, and property/legal liability coverages and shall expressly provide that additional insureds shall be entitled to defense of claims. All liability policies under this Section shall cover as additional insureds (with respect to liabilities arising out of the use, operation, repair, and maintenance of the Concourse or any part thereof) all of the other Gateway Owners, the Unit Owners within the Gateway I Property, the Owner of the McCarter Property, the Board, the Association, NEDC and any other lessor of any Property that is not an "Owner" hereunder, each Mortgagee (at the written request of such Mortgagee to the party carrying such insurance), and their respective officers, employees and agents. Evidence of such insurance (in the form of insurance certificates in customary form) shall be provided by each Gateway Owner to each other Gateway Owner, the Owner of the McCarter Property, and the Association on the date of this Agreement and at least thirty (30) days prior to the expiration date of each such policy. Each Gateway Owner providing such insurance shall also be solely responsible for determining whether such insurance meets the requirements of the Underlying Documents that are applicable to such Owner and for providing to any and all Other Parties all evidence of insurance as may be required under such Underlying Documents and for causing any other parties to be named as additional insureds, as necessary to comply with the provisions of the Underlying Documents. With respect to claims that arise as a result of acts or events occurring, or circumstances existing, within a particular portion of the Concourse, the particular Gateway Owner who is responsible for such portion of the Concourse under the provisions of Section 11.1 hereof (and where the Gateway I Association is the responsible party, the "Owner" under the Master Deed who is charged with carrying the insurance with respect to the portions of the Concourse that are within the Gateway I Property) shall be the Gateway Owner whose liability insurance is deemed to provide the primary coverage.

15. Casualty Insurance.

15.1. Responsibility for Obtaining Insurance. The Concourse shall be insured against property damage through the policies that each Gateway Owner shall carry with respect to its Property, as follows:

(a) the Interior Concourse Areas shall be insured by the respective Gateway Owners within whose Property such areas are located;

(b) the Raymond Plaza Walkway and McCarter Walkway shall be insured by First Gateway, or any subsequent owner of the "Office Unit" under the Master Deed;

(c) Walkway III shall be insured by Third Gateway;

(d) Walkway IV shall be insured by Fourth Gateway; and

(e) the Market Street Walkway shall be insured by Gateway South.

15.2. Insurance Requirements. All property damage insurance shall, at a minimum, meet the following requirements:

(a) Such insurance shall provide full replacement cost coverage, with an agreed value endorsement;

(b) Such insurance shall include demolition, increased cost of construction, and building ordinance coverages, boiler and machinery coverage, and an inflation-guard endorsement;

(c) Such insurance shall designate the Association, as the agent for the other Gateway Owners, as additional named insured with respect to any loss affecting the Walkways and shall require that the insurance proceeds allocable to Restoration of any of the Walkways be disbursed (i) to the Gateway Owner responsible for Restoration of the applicable Walkway under Section 16 below, for application to such Restoration, or (ii) to the Association as provided in Section 16 (subject in all cases to the rights of any First Mortgagee).

(d) To the extent obtainable, such insurance shall waive subrogation against third parties, consistent with the waiver of claims provision in Section 25.5 hereof, and defenses to coverage based on acts of insured parties, and shall provide for at least thirty (30) days prior notice of cancellation to the Association and all other named insureds.

(e) In the event that, by Law, the Gateway Owners shall not be permitted to insure under their respective insurance policies any one or more of the Walkways, or in the event that the Majority Owners shall determine that it is not practicable to have the Gateway Owners separately insure the various Walkways, then the Association shall carry such insurance for the Walkways, which shall designate each Gateway Owner as an additional named insured (in the case of casualty insurance) or additional insured (in the case of liability insurance) and shall otherwise meet the requirements of this Agreement as to form, content, and application of proceeds.

(f) Evidence of payment for such insurance shall be provided by each Gateway Owner (or where paragraph (e) above applies, the Association) to each other Gateway Owner and the Association at least thirty (30) days prior to the expiration date of each such policy, and insurance certificates in customary form shall be provided prior to expiration of the existing policies. In addition, if reasonably required by any Gateway Owner or any Mortgagee, copies of the applicable policies and endorsements (or the relevant portions thereof in the case of blanket policies) shall be provided by the Gateway Owner responsible for obtaining such policies within twenty (20) business days following receipt of a written request for such policies containing a statement of the purposes for which copies are being requested.

(g) Each Gateway Owner providing such insurance shall be solely responsible for determining whether such insurance meets the requirements of the Underlying Documents that are applicable to such Gateway Owner and for providing to any and all Other Parties all evidence of insurance as may be required under such Underlying Documents.

(h) The Board may, from time to time, review the insurance requirements under this Section 15 and recommend to the Gateway Owners such additional or modified coverages and limits as are at the time customarily being carried by prudent owners of similar properties. Upon such recommendation, the requirements of this Section may be modified in accordance with such recommendation upon the approval of the Majority





Owners, and upon such approval, the Board shall cause to be prepared, executed, and recorded an amendment to this Agreement reflecting the modifications so approved; provided, however, that to the extent that compliance with such requirements would violate the terms of any Mortgage in effect at the time the same are so approved, the Gateway Owner of the Property that is subject to such Mortgage shall not be required to comply with such requirements unless and until such Mortgage is released or is amended to permit the Gateway Owner to so comply (it being agreed that no Gateway Owner shall be obligated to obtain any such amendment). Any amendment adopted pursuant to this paragraph (h) may be executed by any two officers of the Association and shall contain a certification by such officers that the modifications reflected therein have been approved by the Majority Owners and is being executed and recorded pursuant to this paragraph.

16. Casualty. Except as provided below, if any Casualty to any Walkway shall occur, the Gateway Owner responsible for Major Repairs thereon under Section 11 above shall be responsible for, and shall promptly commence and diligently pursue to completion, the Restoration of such Walkway. If any Casualty shall affect any Interior Concourse Area and/or the principal building in which any Interior Concourse Area is located, or to which any Walkway is connected, (a) so long as the Gateway Owner of the affected Property Restores such building or reconstructs any similar building on such Property, such Restoration or reconstruction shall be performed so as to (i) Restore the Interior Concourse Area or provide an interior passageway through such building in a substantially equivalent location and with a pedestrian traffic capacity sufficient to handle the maximum population of the buildings in the Gateway Complex (but in no event larger than the applicable Interior Concourse Area as it existed prior to the occurrence of such Casualty) and (ii) permit the connection between such Interior Concourse Area (as so Restored or reconstructed) and the Walkways adjacent thereto to be re-established, so as to preserve the benefits of the easements granted under this Agreement. During the period of any Restoration, the Gateway Owner performing the same shall make reasonable efforts to provide reasonable passage through, or alternative passage around, any portions of the Interior Concourse Area and/or Walkway(s) affected by the Casualty or any Restoration or reconstruction activities. Notwithstanding the foregoing, in the event any Gateway Owner (other than Gateway South) determines that it will not Restore the principal building on its Property or otherwise reconstruct any similar building, such that the provision of a pedestrian passageway into and through its Property consistent with the function of the Concourse is not feasible, such Gateway Owner shall notify the other Gateway Owners of such determination, and in such case the provisions of Section 17 shall apply. In any case in which there are insurance proceeds that are payable on account of any Casualty affecting any of the Walkways, but such proceeds are not applied to Restoration or rebuilding of such Walkways where permitted by this Agreement, any such excess proceeds shall be paid to the Gateway Owner carrying such insurance (subject to the rights of any First Mortgagee of such Gateway Owner). Neither the Association nor any Gateway Owner (other than the Gateway Owner(s) whose Property or Properties have been damaged by a Casualty) shall have any right to receive any insurance proceeds payable on account of such Casualty. No Owner other than Gateway South shall have any right to receive any insurance proceeds with respect to any Casua[lty] affecting the Market Street Walkway, and Gateway South shall have no obligation to restore the Market Street Walkway or the Gateway South Property in the event of any Casualty affecting th[e] same, other than as may be provided for in the applicable Underlying Documents or as may be required by Law. In any case in which Gateway South shall be entitled not to restore, and shall elect not to restore, the Market Street Walkway (thereby severing its connection to the Concour[se]

Gateway South shall notify the other Gateway Owners of such election in writing, and Gateway South shall thereupon cease (i) to be a "Gateway Owner" under this Agreement, (ii) to be a member of the Association, and (iii) to have the benefits of the easements and other rights granted under this Agreement or the Certificate of Incorporation and By-Laws. Notwithstanding any provision in this Agreement to the contrary, in the event of (x) any failure or refusal by the Gateway II Owner to perform any Restoration with respect to the Gateway II Property that results in the Gateway II Concourse not being open and available for passage or (y) any failure or refusal by the Gateway II Owner to permit Restoration of the McCarter Walkway or Walkway III in areas that are located on or attached to the Gateway II Property, neither the Association nor any Gateway Owner shall have any liability or responsibility for Restoration of the McCarter Walkway and/or Walkway III (as applicable) unless and until the Gateway II Concourse is open and available for passage and the Gateway II Owner permits the McCarter Walkway and/or Walkway III (as applicable) to be Restored and re-connected to the Gateway II Property. In the event any such failure or refusal by the Gateway II Owner shall prevent Restoration of the McCarter Walkway, Walkway III, and/or the Gateway II Concourse to a condition that permits open passage through those portions of the Concourse, and if such circumstance shall continue for more than one (1) year, the Gateway Owners shall either (A) modify this Agreement by approval of the Gateway Owners or (B) if the Gateway Owners have not agreed to such a modification within 180 days after expiration of such one-year period, then, upon the written approval of the Majority Owners, this Agreement shall be terminated, provided that upon such termination, (I) the easements provided for under Section 2 of this Agreement shall survive and continue as between the Gateway III Owner, Gateway III Garage Owner, Gateway IV Owner, and Gateway South Owner with respect to that portion of the Concourse other than the Raymond Plaza Walkway, Gateway I Concourse, and McCarter Walkway, and (II) the responsibilities of each Owner for the applicable Concourse Areas and Walkways shall be governed solely by the Underlying Documents, unless otherwise agreed in writing among the Owners of such Properties.

17. Demolition and Construction of New Buildings. Each of the Gateway Owners shall be entitled to determine that the buildings on such Owner's Property have become obsolete or uneconomical to operate and that the same therefore need to be demolished. In such event, such Gateway Owner (other than Gateway South, whose obligations are governed by the applicable Underlying Documents and not the provisions of this Section) may either:

(a) replace the building so demolished with a new building or buildings, in which event such reconstructed building (i) shall contain an interior passageway through such building in a substantially equivalent location and with a pedestrian traffic capacity sufficient to handle the maximum population of the buildings in the Gateway Complex (but in no event larger than the applicable Interior Concourse Area as it existed prior to the occurrence of such Casualty, demolition or construction) and (ii) shall be connected to the Walkways adjacent thereto, so as to preserve the benefits of the easements granted under this Agreement (and during the period of such demolition and reconstruction, the Gateway Owner performing the same shall provide reasonable alternative passage around or through its Property); or

(b) not replace the building so demolished and remove all debris and return its Property to a sightly, unimproved state, in which event the Gateway Owners shall either (A) modify this Agreement by approval of the Gateway Owners (other than the Gateway





Owner having not rebuilt its building as aforesaid) or (B) if the Gateway Owners have not agreed to such a modification within 180 days after expiration of such one-year period, then (i) the easements provided for in Section 2 and the provisions of the Underlying Documents shall remain in effect with respect to the Walkways and Interior Concourse Areas that remain in use, (ii) the Owner of such Property shall cease to be an "Owner" or "Gateway Owner" and shall cease to have any further rights or obligations as an "Owner" or "Gateway Owner" under this Agreement (unless and until new improvements are constructed as described immediately below), and (iii) the Gateway Owner making such election shall provide a grade-level, enclosed walkway (with heating and cooling facilities) across its Property that connects with the remainder of the Concourse, which shall remain in place for so long as such Property remains unimproved. Thereafter, the Association shall be responsible for the costs and expenses of maintaining, repairing, and insuring such grade-level walkway, as a Common Expense hereunder.

If construction of a walkway is required under paragraph (b) above, (1) the construction thereof shall be at the expense of the affected Gateway Owner (and such Owner shall apply its casualty insurance proceeds to the cost of constructing the same), but all costs of operating and maintaining such walkway shall be borne by the other Gateway Owners, and (2) an easement for the use, operation, maintenance, and repair of such walkway shall exist for the benefit of the other Gateway Owners for so long as such Property remains unimproved. At such time as new improvements are constructed on such Property, the provisions of paragraph (a) above shall apply to the design and construction of such new improvements, and the Owner thereof shall thereupon become entitled to the rights and subject to the obligations of an "Owner" and "Gateway Owner" under this Agreement.

18. Condemnation. If any portion of the Concourse shall be affected by any Taking, each Gateway Owner affected thereby and the Association shall be entitled to notice of such Taking and to participate in the proceedings incident thereto. Any awards or proceeds in connection with such proceedings shall, to the extent possible (and subject to any controlling provisions in the Underlying Documents), specifically allocate the awards between and among the affected Properties (including the Gateway South Property) and the easement rights of the other Gateway Owners under this Agreement; provided, that the payment of any awards or proceeds on account of any such Taking shall be subject and subordinate to the rights and interests of any First Mortgagees of such Property. The portion of any proceeds or awards allocated to the Taking of such easement rights shall be paid to the Gateway Owners according to the losses and damages suffered by them as a result of such Taking, as determined by agreement among the Gateway Owners and the applicable condemning authority or by final judgment (after conclusion of any appeals or expiration of any appeal periods) of the court in which the awards for such Taking are being adjudicated. Upon any Taking of any portion of the Concourse, the provisions of Sections 16 and 17 above shall govern the rights and obligations of the affected Gateway Owners to Restore or otherwise rebuild or relocate the affected portions of the Concourse; provided, however, that:

(a) In any case in which the State of New Jersey shall cause a Taking of, or otherwise terminate the right to use and maintain, the McCarter Walkway and require the removal thereof, (A) the Association shall effect such removal, including the closure of the buildings to which the McCarter Walkway is connected (the costs of which shall be shared in the same manner as a Major Repair), and (B) upon completion and payment for such

removal, this Agreement may be terminated upon the approval of the Majority Owners, except that in the event of such termination, (x) the easements provided for under Section 2 of this Agreement shall survive and continue as between the Gateway III Owner, Gateway III Garage Owner, Gateway IV Owner, and Gateway South Owner with respect to that portion of the Concourse other than the Raymond Plaza Walkway, Gateway I Concourse, and McCarter Walkway, and (y) the responsibilities of each Owner for the applicable Concourse Areas and Walkways shall be governed solely by the Underlying Documents, unless otherwise agreed in writing among the Owners of such Properties.

(b) In the event the Gateway II Property shall be affected by a Taking and the Gateway II Owner does not effect a Restoration or does not otherwise permit passage over or through the Gateway II Property, and if such circumstance shall continue for more than one (1) year, the Gateway Owners shall either (A) modify this Agreement by approval of the Gateway Owners or (B) if the Gateway Owners have not agreed to such a modification within 180 days after expiration of such one-year period, then, upon the written approval of the Majority Owners, this Agreement shall be terminated, provided that upon such termination, (I) the easements provided for under Section 2 of this Agreement shall survive and continue as between the Gateway III Owner, Gateway III Garage Owner, Gateway IV Owner, and Gateway South Owner with respect to that portion of the Concourse other than the Raymond Plaza Walkway, Gateway I Concourse, and McCarter Walkway, and (II) the responsibilities of each Owner for the applicable Concourse Areas and Walkways shall be governed solely by the Underlying Documents, unless otherwise agreed in writing among the Owners of such Properties.

No Owner other than Gateway South shall have any right to share or participate in any awards or proceedings with respect to the Market Street Walkway, and Gateway South shall have no obligation to restore the Market Street Walkway or the Gateway South Property in the event of any Taking affecting the same, other than as may be provided for in the applicable Underlying Documents or as may be required by Law. In any case in which Gateway South shall be unable to restore, or shall be entitled not to restore and shall elect not to restore, the Market Street Walkway (thereby severing its connection to the Concourse), Gateway South shall notify the other Gateway Owners thereof in writing, and Gateway South shall thereupon (i) cease to be a "Gateway Owner" under this Agreement, (ii) cease to be a member of the Association, and (iii) cease to have the benefits of the easements and other rights granted under this Agreement, the Certificate of Incorporation and By-Laws.

19. Extension of Easements. In the event that any person who is a Gateway Owner or an Affiliate of a Gateway Owner hereunder (collectively, an "Adjacent Owner") shall (i) acquire, develop, or construct any commercial building on any property that is adjacent to the Gateway Complex (an "Adjacent Property"), and (ii) such Adjacent Owner desires to have such Adjacent Property joined to the Concourse via overhead walkway at approximately the same level as the Concourse, so that such new walkway and the Adjacent Property would become a part of an integrated pedestrian walkway system, such Adjacent Owner shall apply to the Association for permission to so connect to the Concourse, and such permission shall be granted only upon the approval of the Majority Owners (excluding for this purpose the Owner that is, or is affiliated with, the Adjacent Owner making such request). It is hereby expressly agreed that such approval shall not be required in the case of the development by the Gateway III Owner or its Affiliate of the





portion of the Gateway III Property currently devoted to surface parking, or for the development of the McCarter Property by the Owner of the "Garage Unit" (as defined in the Master Deed) and/or the Owner of the McCarter Property. Upon any Adjacent Property being connected to the Concourse in accordance with the foregoing:

(a) the Adjacent Owner (A) shall become a party to this Agreement and a member of the Association, (B) shall grant easements in interior concourse areas within the Adjacent Property to the extent reasonably required to provide rights of pedestrian passage consistent in purpose with and equivalent to that provided under this Agreement, and (C) shall subject such Adjacent Property to the liens and obligations for payment of Assessments and the other covenants, agreements and restrictions allocable to it that are contained in this Agreement;

(b) the Association, on behalf of the Gateway Owners hereunder, and the Adjacent Owner shall enter into an amendment to this Agreement, which shall amend the definitions of "Concourse", "Walkways", "Interior Concourse Areas", "Owners", "Gateway Owners", "Properties", and other terms affected by such addition, and shall reallocate the Percentage Shares in manner consistent with the manner in which the same were originally determined, as reflected in Section 8 hereof;

(c) the Adjacent Owner shall satisfy such other conditions as the Association may reasonably impose, including approval of the location of the connection to the Concourse, the plans and contractors therefor, and the impact of such work and such addition on the use of the existing Concourse, and the receipt of evidence that such new walkway and connection have been approved by all applicable governmental authorities and comply with Laws; and

(d) such Adjacent Owner shall agree to bear (and shall providing reasonable evidence of its ability to pay) all costs and expenses that are involved in the construction and connection process, including the costs and expenses of review and approval thereof by the Association, it being expressly provided that, in its discretion, the Association may retain architects, engineers, legal counsel, or other consultants to assist it in the review of any such request, and the fees, costs and other obligations so incurred shall be paid by the Adjacent Owner.

20. Parking. [Intentionally omitted.]

21. Law Center Walkway Agreement. The Association shall be responsible for collecting all sums payable to the Unit Owners in One Gateway Center under the Law Center Walkway Agreement and otherwise overseeing the performance of the obligations of the parties thereunder and enforcing the rights of such Unit Owners thereunder. The Gateway I Association and each of the Unit Owners hereby assign, transfer and set over unto the Association all of their rights to receive the payments provided for under such agreement, for so long as the Association shall exist and have responsibility for the maintenance and security of the Raymond Plaza Walkway, which payments shall be credited against the contributions otherwise required to be made by the Gateway I Association and/or such Unit Owners under this Agreement.

22. Arbitration. Any claim, controversy, or dispute involving the amount, classification, or allocation of Assessments, Maintenance Work, Major Repairs, plan approvals, or other matter that, under the express provisions of this Agreement, the By-laws, or the Rules and Regulations, is subject to resolution by arbitration, or any other matters as the affected parties may mutually agree, shall be resolved by binding arbitration in accordance with the provisions of this Section (the process described in this Section being sometimes referred to herein as the "Dispute Resolution Plan").

(a) The dispute resolution process under this Section shall be commenced by a written notice by an Owner to the Association and any affected other Owner demanding that the matter in dispute be resolved by arbitration (a "Notice of Dispute"). Unless otherwise expressly provided in this Section, all elections and decisions that are required or permitted to be made by each Owner shall be made by the person then designated by such Owner as its representative on the Board.

(b) If the matter in dispute can be reduced to monetary terms, and such monetary terms are less than $100,000, the disputing Owners may select and rely upon one person, meeting the qualifications set forth in subparagraph (d) below, to resolve such dispute. If, within five (5) business days after a Notice of Dispute has been given, the disputing Owners are unable to mutually agree upon one person to resolve such dispute then: (i) within three (3) business days following their failure to select an individual, each such Owner shall appoint a representative (meeting the qualifications of subparagraph (d)); (ii) within three (3) business days of their collective selection, the two representatives selected by the disputing Owners shall select a third representative (meeting such standards); and, (iii) the three representatives shall meet within three (3) business days of their collective appointment (or at such reasonable time thereafter as a majority of said representatives may agree upon) to decide the disputed issue. If an Owner shall fail to timely appoint a representative, the other Owner may appoint such representative. The disputed issue shall be resolved by not less than a majority vote of the representatives. The representative(s) shall be discharged by the Owners as soon as a decision has been reached. If the matter in dispute can be reduced to monetary terms, and such monetary terms are $100,000 or greater, the dispute shall be promptly submitted by the disputing Owners to binding arbitration by a panel of not less than three arbitrators, in accordance with the then-current rules of the American Arbitration Association and the provisions of this Section.

(c) If the matter in dispute cannot be reduced to monetary terms, the Owners may mutually agree to use one individual or the three-representative panel process described in subparagraph (b) above; provided, however, if such agreement as to the choice of one individual or a three-member panel cannot be mutually reached by the Owners within five (5) business days after the Notice of Dispute has been given, then the matter in dispute shall be submitted to binding arbitration under the rules of the American Arbitration Association as described in subparagraph (b) above.

(d) The individual, representatives, or arbitrators selected in accordance with this Section shall be professionals or experts in the substantive area in which the dispute has arisen. For example: if the dispute arises from an engineering issue, the disputing Owners shall select the appropriate professional engineer(s) (i.e. civil, structural, mechanical, or





electrical) that has not less than five years experience in this particular area of dispute; if the matter primarily involves business management, building operating expenses, etc., such Owners may select a past officer or officers of the Building Owners and Managers Association or the Institute of Real Estate Management who served in the region that includes Newark, New Jersey. Such examples are used by way of illustration and not by way of limitation concerning the type of professional and/or expert to be selected by such Owners to resolve disputes in accordance with this Section. Any dispute with respect to the qualifications of the persons selected shall be conclusively determined by the governing board of the American Arbitration Association. In the case of any dispute that can be reduced to monetary terms, each party shall submit a written statement of its position to the arbitrators, and the arbitrators shall only be authorized to select the stated position of one of the parties and may not reach any other decision or conclusion (and the arbitrators shall be so instructed prior to commencement of such arbitration).

(e) Each Owner, during the time period in which it owns its Property, and the Association and Gateway I Association, hereby covenants and agrees, and each Owner, by acceptance of a deed therefor, whether or not it shall be so expressed in any such deed, including any purchaser at a judicial sale, shall hereafter be deemed to covenant and agree, to be bound by the decision of such representative(s) or arbitration once the appropriate resolution procedure is instituted, and each Owner, the Association, and the Gateway I Association (as the case may be) shall immediately comply with decisions of such representative(s) or arbitration. Judgment upon the determination of the representative(s) or arbitrator(s) shall be entered in and enforced by the Superior Court of Essex County, New Jersey, or in the United Stated District Court for the District of New Jersey, Northern New Jersey Division. Discovery conducted in conjunction with such arbitration shall be in accordance with the discovery provisions of the rules governing court practice in the State of New Jersey, unless the arbitrator otherwise rules. The costs of the representative(s) or arbitrator(s) shall be advanced equally by the parties to the arbitration; provided, that where the Association is a party to the dispute, the Association's share shall constitute a Common Expense; and provided further, that the prevailing party shall be entitled to reimbursement from the other party or parties for all of its costs and expenses of arbitration, including all reasonable attorneys' fees and witness fees. Notwithstanding any provision to the contrary herein, the running of all time periods relating to an alleged default of an Owner's or Association's obligations under this Agreement shall be suspended during arbitration, commencing with the delivery of the Notice of Dispute, until issuance of a written decision and the expiration of any appeal or challenge period; provided, that in any case in which payment has been delayed during the pendency of any arbitration, the party required to make any payment under the decision of the arbitrator shall pay interest thereon at the Prime Rate from the due date of payment until (x) the date on which payment is actually made or (y) the date on which failure to pay constitutes an Event of Default hereunder (whereupon the default rate under Section 23.2(f) hereof shall apply). Subject to the decision in the arbitration, a party shall not be deemed to be in default as a result of any failure to perform an obligation that was the subject of such arbitration until the later of (i) the expiration of the cure period applicable to such default under Section 23.1 hereof from the date the same occurred, or (ii) thirty (30) days following issuance of the arbitrator's decision.

(f) Notwithstanding anything in this Section to the contrary, the dispute resolution procedures set forth herein are not intended to resolve claims for breaches of covenants and obligations of the parties under this Agreement, but are intended to provide declaratory relief that will resolve disputes as to the parties' obligations hereunder when good faith attempts by the parties to resolve such disputes have resulted in impasse.

23. Default; Remedies.

23.1. Events of Default. The occurrence of any of the following shall constitute an "Event of Default" under this Agreement:

(a) Any Owner shall fail to pay any amounts required to be paid by such Owner hereunder on the date required, or any Owner or the Association shall otherwise fail in any material respect to perform or comply with any of its duties, obligations, or covenants with respect to the operation, maintenance, repair, reconstruction, or replacement from time to time of the Concourse or portion thereof for which it is responsible hereunder; and

(b) Such failure shall not have been cured within thirty (30) days after such Owner's or the Association's receipt of written notice of such failure from the Association or any other Owner, except that, in the case of any failure other than the payment of money that cannot reasonably be remedied within thirty (30) days, such period shall be extended for such additional time as shall reasonably be necessary to effect such cure (but not more than 270 days in the aggregate), provided such defaulting Owner or Association shall have commenced its efforts to cure within such thirty (30) day period and shall thereafter diligently pursue the same and complete such cure not later than 270 days after notice of default was given.

23.2. Remedies. Upon the occurrence of an Event of Default, any Owner affected by such Event of Default, or the Association on its own behalf or at the written request of any such Owner, may, subject to Subsections 23.5 and 23.6, and subject to the limitation on liabilities set forth in Section 27, take any one or more of the following actions, as applicable:

(a) Correction of Such Default. Any Owner affected by such Event of Default, or the Association (if it is not the party in default) on its own behalf or at the written request of any such Owner, shall be entitled, in the case of a default in the performance of any operational duties, Maintenance Work, Major Repairs, or other action required to be taken by the defaulting Gateway Owner or the defaulting Association (as the case may be), to enter upon the Interior Concourse Area or Walkway(s) for which the defaulting Owner or defaulting Association is responsible hereunder and upon any other areas for which an easement is otherwise granted under this Agreement for effectuating Maintenance Work or Major Repairs, for the purpose of remedying such failure, with such contractors, materials, and equipment as shall be required to do so, and to perform such duties on behalf of such defaulting Owner or Defaulting Association, at the sole cost and expense of such defaulting Owner, or at the cost and expense of the defaulting Association (as a Common Expense hereunder); provided that, in the exercise of the foregoing remedies, the party exercising such remedies shall use reasonable efforts to minimize (as reasonably possible given the nature of the work to be performed and the emergency or non-emergency nature of the work) interference with the permitted uses, activities, and operations within Concourse and





the areas and operations adjacent thereto. The remedies provided under this paragraph may be exercised with or without legal process, and no such exercise, if undertaken in good faith, shall render the Association or any Owner exercising such remedies liable for trespass or unlawful entry or entitle the defaulting Owner or defaulting Association to any claim for punitive, indirect, or consequential damages, or to any other Claims of any kind other than for gross negligence or intentional misconduct. In addition, if the Association or any Owner shall fail to maintain the insurance required under this Agreement, then any other Owner shall be entitled to obtain such additional insurance or coverages as shall reasonably be necessary to provide to such Owner the coverage that should have been provided by the defaulting Owner or defaulting Association, at the sole cost and expense of such defaulting Owner, or at the cost and expense of the defaulting Association (as a Common Expense hereunder).

(b) Suit for Collection or Other Enforcement. Subject to Section 27, the Association or an aggrieved Owner may commence a lawsuit against a defaulting Owner or defaulting Association for recovery of any and all payments, reimbursements, or damages to which the Association or such aggrieved Owner may be entitled hereunder, or to otherwise enforce the provisions of this Agreement, including the remedies of specific performance, injunctive relief, or other equitable relief, together with the recovery of late charges, interests, and all costs of collection or enforcement, including reasonable attorneys' fees. Suit to recover a money judgment shall be maintainable without foreclosing the liens set forth below, and such suit shall not be considered a waiver of the liens.

(c) Imposition of Reimbursement Assessments. The Association and any Owner shall each have the right to levy assessments against any Owner which is in default in any payment, reimbursement, or other monetary obligation to the Association or such Owner (as the case may be) under this Agreement, including (i) any failure by an Owner to pay amounts which an Owner is obligated to pay to another Owner hereunder (after notice and expiration of any cure periods hereunder), (ii) any amounts incurred to perform a defaulting Owner's obligations pursuant to (and in accordance with) paragraph (a) of this Subsection, (iii) any amount for which any Owner is obligated to indemnify any other Owner or the Association under Section 25 hereof (after expiration of any notice and cure periods required hereunder), (iv) any judgment or award for damages incurred by an Owner or the Association as a result of any Owner's breach or violation of any provision of this Agreement, and (v) all costs, expenses and other amounts incurred in collection as provided for in paragraph (f) of this Subsection and Subsection 23.4 below ("Reimbursement Assessments"). Any such Reimbursement Assessment shall secure all amounts then claimed to be due and payable by the party filing the same, together with all costs and expenses incurred by the Association or one or more other Owners in exercising any other remedies under this Agreement on account of any such default. A Reimbursement Assessment shall be due and payable and may be enforced by the Association or such Owner as provided in Section 22 hereof.

(d) Priority and Filing of Liens. All unpaid Assessments imposed by the Association in accordance with the provisions of this Agreement shall constitute a lien on each Property (including the Gateway South Property) as of the applicable date provided

for in Section 9 hereof. All Assessment liens shall be subordinate to (1) any First Mortgage recorded with the Recorder prior to recording notice of the lien and to all subsequent modifications, extensions and/or assignments of such First Mortgage, and (2) the lien for real estate taxes and general or special assessments to the extent required by Law. All liens for Reimbursement Assessments (i) shall be subordinate to (A) Association liens for Assessments that shall then, or shall thereafter, become a lien against the Properties (including the Gateway South Property), (B) any First Mortgage recorded with the Recorder prior to recording notice of the lien, and (C) the lien for real estate taxes and general or special assessments to the extent required by Law, (ii) shall be of equal priority with all other Reimbursement Assessments against a particular Property that shall at the time be unpaid, and (iii) shall otherwise have the highest priority allowed under New Jersey law. To evidence such lien, the Association or the Owner asserting such lien shall prepare a written notice of lien setting forth a description of the delinquent charges, unpaid amount, name of the Owner, and a description of the encumbered Property, and record such notice of lien with the Recorder.

(e) Enforcement of Lien. Liens filed by the Association or an Owner may be enforced by (i) court foreclosure proceedings in a manner similar to foreclosure of a mortgage on real property or (ii) as otherwise provided by New Jersey law. The delinquent Owner shall be required to pay and the lien shall also secure with the same priority all late charges, interest accrued to the date of foreclosure and period of redemption, costs, expenses, and attorneys' fees incurred in connection with filing the lien and collecting such delinquent amounts, and in the event of foreclosure proceedings, all additional costs, expenses, and reasonable attorneys' fees incurred. The Owner being foreclosed shall be required to pay to the Association all Assessments against such Owner's Property during the period of foreclosure. The Association and any Owner shall have the power to bid on and acquire the Property at foreclosure or other legal sale.

(f) Late Charges and Interest. If (i) any Assessment or other monetary obligation required or provided for by this Agreement remains unpaid for more than thirty (30) days after its due date, or (ii) any Reimbursement Assessment for recovery of amounts of which the defaulting Owner has not previously received written notice of default hereunder has not been paid within five (5) days after notice of such Assessment, the Association or an aggrieved Owner, as applicable, shall be entitled to charge a late fee of One Hundred Dollars ($100.00) on each such payment, and interest shall accrue from the due date at a rate equal to the lesser of (i) two (2) times the Prime Rate in effect from time to time or (ii) the maximum rate then allowed by Law, from the date of such default until such amounts and all interest thereon are paid in full. All such amounts, together with all costs of collection including foreclosure costs, and costs in connection with the filing of any lien, as aforesaid, shall be added to and become part of any amounts owing.

(g) Suspension of Voting Rights. Notwithstanding any provision of this Agreement or the Bylaws to the contrary, if a Gateway Owner is in default of any material obligation under this Agreement and fails to cure such default after notice as provided above (subject to the provisions of Section 22(e) above), and in the case of a Property subject to a First Mortgage after compliance with Subsection 23.5 below, such Owner shall not have the right to vote as a member of the Association or exercise any voting or approval





rights set forth in this Agreement until such Owner is no longer in default, and any trustee or director appointed by such Owner shall not be permitted to vote on matters involving such Owner's default. In such event, votes of the Majority Owners, Majority Owners, or all Owners (as the case may be) shall be deemed to exclude the Gateway Owner so in default, so that the remaining Gateway Owner(s) shall be entitled to make all decisions and approval all actions that the Majority Owners, Majority Owners, or all Owners would be entitled to make or approve under this Agreement or the By-laws.

23.3. Subrogation. If any Owner shall pay on behalf of the Association or any other Owner, or any Mortgagee shall pay on behalf of the Association or any Owner, any obligation or liability that the Association or such Owner is required to pay and shall have failed to timely pay in accordance with this Agreement, then, at the election of such Owner or Mortgagee (as the case may be), such Owner or Mortgagee shall be subrogated to the liens granted under this Agreement to which the Association or any other Owner would be entitled for collection of such amounts. The Association and each Owner to whose lien a party is subrogated under the provisions of this Subsection shall cooperate with the subrogated party in the filing and foreclosure of such lien.

23.4. Enforcement Costs. Subject to the limitation of liability set forth in Section 27, in any case in which the provisions of this Agreement, the By-laws, or the Rules and Regulations shall be enforced through judicial action, including the remedies of specific performance, injunctive relief, other equitable relief and damages, or arbitration as specified above, by the Association or any Owner aggrieved by any violation of the terms and provisions hereof, the prevailing party shall be entitled to an award for all costs and expenses of enforcement of this Agreement, including reasonable attorneys' fees, witness fees, and court costs, in addition to such other relief which it is awarded.

23.5. Notice to First Mortgagees. In the event of a default by any Owner under this Agreement as to which the Association or any Owner shall give any notice of default, the Association or such Owner (as the case may be) shall send, concurrently with any notice of such default to the defaulting Owner, a copy of such notice to each Mortgagee of such defaulting Owner as reflected on the records of the Association. Any such Mortgagee shall have the right (but not the obligation) to cure any such default on behalf of the defaulting Owner, and the Association and each Owner agree to accept from any such Mortgagee cure of such default. If a Property shall be subject to any First Mortgage, the provisions of paragraph 23.2(g) suspending an Owner's voting or approval rights shall not be applicable unless and until (i) a copy of the notice of default shall have been given to the defaulting Owner's First Mortgagee as required immediately above and (ii) such First Mortgagee shall have failed to cure such default within sixty (60) days (or such longer time as may be permitted under the terms of such First Mortgage) following the receipt of such notice by such First Mortgagee. Any suspension of voting or approval rights of an Owner pursuant to paragraph 23.2(g), once it occurs, shall continue until either (A) the applicable default by such Owner is cured or (B) a First Mortgagee or any nominee or successor in interest to the defaulting Owner by foreclosure, deed in lieu of foreclosure, or similar proceeding shall have acquired title to the defaulting Owner's Property.

23.6. Unavoidable Delay. No Owner, nor the Association, shall be deemed in default in the performance of any obligation required by this Agreement, the Bylaws, or the Rules

and Regulations, other than an obligation to pay money, if and so long as the non-performance is directly caused by Casualty, national emergency, federal, state, or local governmental laws or regulations, war, civil commotion, strikes, lockouts, shortage or inability to obtain labor or materials, acts of God, or other similar causes beyond the reasonable control of an Owner ("Unavoidable Delay"). The time for performance shall be extended during any period of Unavoidable Delay, provided that the Owner or the Association unable to perform shall promptly notify the Association and the other Owners of the existence and nature of any Unavoidable Delay, shall periodically keep the Association and the other Owners informed in writing of the status of the Unavoidable Delay and the performance of its obligation, and shall diligently pursue completion of performance.

23.7. Release of Lien. A recorded lien may be released by recording a Release of Lien signed by a director or officer of the Association on behalf of the Association in the case of a lien filed by the Association, or signed by the Owner or its representative filing the lien, in the case of a lien filed by an Owner.

24. Notices. All notices, demands, directions, and other communications provided for or desired to be given hereunder shall be in writing, and shall be (i) sent by certified mail (return receipt requested), (ii) hand delivered against a signed receipt, or (iii) sent by reputable overnight delivery service (such as Federal Express), next business day delivery against a signed receipt, in any case to the appropriate party at its respective address set forth below:

If to Gateway I Association:
One Gateway Center
Condominium Association
c/o The Prudential Insurance
Company of America
8 Campus Drive - 4th Floor
Parsippany, New Jersey 07054
Attention: Asset Manager - Gateway I

with a copy to:
Hilton Gateway Hotel
One Gateway Center
Raymond Boulevard
Newark, New Jersey 07102
Attention: General Manager

and a copy to:
Wyndham International, Inc.
1950 Stemmons Freeway
Suite 6001
Dallas, Texas 75207
Attention: General Counsel

If to Prudential:
The Prudential Insurance
Company of America
8 Campus Drive - 4th Floor
Parsippany, New Jersey 07054
Attention: Vice President - Gateway





If to Third Gateway (as Owner of the Gateway III Property):
Third Newark Gateway Urban
Renewal Association
c/o The Prudential Insurance
Company of America
8 Campus Drive - 4th Floor
Parsippany, New Jersey 07054
Attention: Asset Manager - Gateway III

with a copy to:
The Prudential Insurance Company
of America
Corporate Real Estate Services
Two Gateway Center, 17th Floor
Newark, New Jersey 07102
Attention: Senior Executive Officer

If to Third Gateway (as Owner of the Gateway III Garage):
Third Newark Gateway Urban
Renewal Association
c/o The Prudential Insurance
Company of America
8 Campus Drive - 4th Floor
Parsippany, New Jersey 07054
Attention: Asset Manager - Gateway III

with a copy to:
The Prudential Insurance Company
of America
Corporate Real Estate Services
Two Gateway Center, 17th Floor
Newark, New Jersey 07102
Attention: Vice President, Corporate
Real Estate, Gateway

If to Fourth Gateway:
Gateway Four Urban Renewal, L.P.
c/o The Prudential Insurance
Company of America
8 Campus Drive - 4th Floor
Parsippany, New Jersey 07054
Attention: Asset Manager - Gateway IV

If to Gateway South:

Gateway South Urban
Renewal Association
c/o The Prudential Insurance
Company of America
Corporate Real Estate Services
Two Gateway Center, 17th Floor
Newark, New Jersey 07102
Attention: Asset Manager - Gateway South

Any notice required to be sent to any Owner or Gateway Owner under the provisions of this Agreement shall be deemed to have been properly sent and notice thereby given, when (i) mailed, by United States certified mail, return receipt requested, postage prepaid (effective as of the third business day after deposit in the mails), or (ii) delivered by hand delivery, including commercial messenger delivery service (effective as of the date of delivery), or (iii) delivered by nationally-recognized overnight courier service (effective as of the next business day after deposit thereof with such courier service), in each case addressed to the Owner as set forth above or, if such address shall have been changed, at the last known post office address which appears in the records of the Association at the time of such mailing or delivery. In addition, each Owner shall specify in a written notice to the Association (which the Association shall retain in its records) and to the other Owners facsimile and telephone numbers for such Owner and the name of an individual to whose attention facsimile notices are to be directed, any such notice shall also be deemed properly sent and notice thereby given when sent by facsimile transmission to the facsimile number so specified, to the attention of the individual so specified, with both electronic and telephonic confirmation of receipt, and any such notice shall be effective (x) on the date of such confirmation if confirmation occurs before 5:00 p.m. (local time at the office of the recipient) or (y) on the next business day if confirmation occurs after such time. Notice to Gateway I Association shall constitute notice to each of the Unit Owners within the Gateway I Property, and notice to one (1) of any two or more persons who shall hold common ownership of a Property (other than the Gateway I Property) shall constitute effective notice to such Owner and all such persons for purposes of this Agreement. It shall be the obligation of every Owner to immediately notify the Secretary of the Association and the other Owners in writing of (a) the Owner's address and facsimile and telephone numbers for notice purposes upon such Owner's acquisition of a Property and (b) any change of such Owner's address or facsimile or telephone number. Notices and copies of notices shall also be given to Mortgagees as provided in Section 23.5 above.

25. Indemnification; Waivers of Claims.

25.1. Indemnification by Owners. Except as to matters for which the Association or Gateway South is required to indemnify the other Owners as hereinafter provided, the Gateway I Association (on behalf of the Unit Owners within the Gateway I Property) and each of Third Gateway (as Owner of the Gateway III Property), Third Gateway (as Owner of the Gateway III Garage), and Fourth Gateway (each an "Indemnifying Owner"), covenants to indemnify, defend, and hold harmless the other Owners, the Association, the Gateway I Association, and their respective partners, officers, directors, shareholders, members, managers, employees, and agents (each an "Indemnified Party") from and against any and all Claims asserted by third persons (other than Indemnified Parties), including those for loss of life, personal injury and property damage occurring (a) within the Interior Concourse Area (if any) or any other portion of such Indemnifying





Owner's Property (other than any portions of the Walkways lying within such Property), or (b) as a result of any failure of the Indemnifying Owner to perform any obligation under this Agreement with respect to Concourse or any part thereof, including (i) any failure to repair the same and/or (ii) any failure of the Indemnifying Owner to comply with applicable Laws.

25.2. Indemnification by Association. Except as to matters for which an Owner is required to indemnify the Association as provided immediately above, the Association shall indemnify, defend, and hold harmless the other Owners, the Gateway I Association, and their respective partners, officers, directors, shareholders, members, managers, employees, and agents (each also being an "Indemnified Party" hereunder) from and against any and all Claims asserted by third persons (other than Indemnified Parties), including those for loss of life, personal injury and property damage occurring (a) within the Walkways, or (b) as a result of any failure of the Association to perform any obligation under this Agreement with respect to Concourse or any part thereof, including (i) any failure to maintain or repair the same and/or (ii) any failure of the Association to comply with applicable Laws.

25.3. Indemnification by Gateway South Owner. Gateway South covenants to indemnify, defend, and hold harmless the other Owners, the Association, the Gateway I Association, and their respective partners, officers, directors, shareholders, members, managers, employees, and agents (each also being an "Indemnified Party" hereunder) from and against any and all Claims asserted by third persons (other than Indemnified Parties), including those for loss of life, personal injury and property damage occurring within the Market Street Walkway or any portion of the Gateway South Property, or (b) as a result of any failure of Gateway South to perform any obligation pertaining to the Market Street Walkway under the applicable Underlying Documents or under applicable Laws.

25.4. Notice and Defense of Claims. An Indemnified Party shall provide the Indemnifying Owner or the Association, as applicable (the "Indemnifying Party") with prompt notice of any Claim or other matter for which the Indemnified Party may seek indemnity under this Section; provided, however, the failure to provide such notice shall relieve the Indemnifying Party of its indemnity obligations only to the extent that the Indemnifying Party is damaged or prejudiced by such failure. The Indemnifying Party shall defend the Indemnified Party with respect to any such Claim at the Indemnifying Party's expense, with attorneys selected by the Indemnifying Owner, who may be the attorneys who generally represent the Indemnifying Owner or the Association; provided, that such attorneys shall be reasonably acceptable to the Indemnified Party (and an Indemnified Party shall be deemed reasonable in not finding the Indemnifying Owner's attorneys acceptable if the Indemnifying Party's attorneys would have any material conflict of interest in representing the interests of the Indemnified Party). If the Indemnified Party retains separate attorneys for its defense, it shall do so at its own expense, except where the Indemnifying Party's attorneys are not reasonably acceptable to the Indemnified Parties or are precluded from representing the interests of the Indemnified Party due to a conflict of interest. The Indemnifying Party shall have sole right to conduct such defense (including decisions concerning the forum) and settle any Claim, suit, proceeding, or other matter brought by the third party if (and only if) the Indemnified Parties are released from any liability with respect to such Claim; otherwise, the Indemnifying Party shall consult with the Indemnified Party on all material decisions involved in the litigation; provided, that (A) where only the Indemnifying Party's counsel is permitted to represent the interests of both the Indemnifying Party and the Indemnified Parties hereunder, the

recommendation of such counsel will prevail in any disagreement between such parties, and (B) where the Indemnifying Party's counsel is not permitted to represent the interests of both the Indemnifying Party and one or more Indemnified Parties as provided above, if agreement cannot be reached, each such Indemnified Party shall be entitled to proceed with a separate defense of its own interests. In all cases, the Indemnified Parties shall cooperate with the Indemnifying Party in the defense of any claim, including providing documents and witnesses. In any case in which the Indemnifying Party is the Association, the costs, expenses, and liabilities incurred by the Association in connection with the indemnification and defense of Claims provided for under this Section, to the extent not covered by insurance, shall constitute Common Expenses.

25.5. Waivers of Claims. Each Owner (expressly including the Owners of the McCarter Property and Gateway South Property), the Association, and the Gateway I Association, for itself and its Permittees, successors and assigns, hereby waives, as against one another and their respective Mortgagees, managers, operators, Permittees, and any other person claiming by, through, or under such Owner or Association, and any of their respective directors, officers, constituent partners, members, shareholders, agents, or employees, all Claims arising from any loss, damage, or liability to the extent that (i) such Claims are covered by any insurance policy maintained by the Association or any Owner pursuant to this Agreement and (ii) such waiver either (x) is expressly contemplated by such policy (including any policy providing for a waiver of the insurer's subrogation rights) or (y) does not invalidate the applicable policy or any coverages provided thereby. It is the express intention of this provision that, where possible, the parties desire to allocate the risks of loss or liability to the insurers under the insurance policies provided for herein, and accordingly the foregoing waivers should be liberally construed and applied notwithstanding statutory provisions or judicial principles disfavoring waivers of Claims for future conduct. Each Owner (including the Owners of the McCarter Property and Gateway South Property) agrees to include in each lease, property management agreement, mortgage, hotel management or operating agreement, concession license, or other instrument or agreement by which use of any part of the Concourse is conveyed or granted, a waiver of claims provision consistent with the provisions of this Subsection.

26. Duration and Effect of Agreement. Except as otherwise provided herein, this Agreement shall be perpetual in duration, shall run with and bind the Properties, and shall inure to the benefit of and be enforceable by each of the Owners and their respective successors and assigns in legal title to each of the Properties. The rights, easements, and servitudes created and granted hereunder shall not be severed or severable from the Properties to which they appertain. This Agreement supersedes in its entirely all of the terms and provisions of the Original Grant and Agreement, so that the rights, powers, duties and obligations of the parties hereto with respect to the subject matter of the Original Grant and Agreement shall be determined solely by reference to this Agreement, except that, insofar as the Original Grant and Agreement granted easements upon, through, or over the Gateway II Concourse or created other rights, duties, or obligations with respect to the Gateway II Property or the Gateway II Owner, the same are hereby expressly preserved and shall remain in full force and effect. In addition, as to the rights, powers, duties and obligations as between the parties hereto, this Agreement shall control over any conflicting provisions of the Underlying Documents and shall exclusively govern the rights and obligations of the parties hereto with respect to the subject matter of this Agreement and in particular (but without limiting the foregoing) the obligations of the parties hereto to perform and/or make payments on account of the use, enjoyment, operation, maintenance, repair, improvement, renovation,





restoration, or reconstruction of the Concourse or any part thereof, and as between the parties hereto, any conflicting provisions of the Underlying Documents shall cease to be applicable and are hereby released and terminated; provided, however, that this Agreement shall not amend, modify, control, or otherwise affect the rights, powers, duties, or obligations as between any party hereto and any Other Party under the Underlying Documents. This Agreement shall also constitute a "Concourse Easement Document" under the Master Deed and that certain Declaration of Easements, Covenants, and Restrictions recorded August 21, 1997, in the office of the Register of Essex County, New Jersey, in Book of Deeds 5491, Page 748. The references to the "Properties" in this Section shall include the Gateway South Property.

27. Limitation on Liability. Notwithstanding anything contained in this Agreement, each Owner from time to time shall be liable only for the obligations and liabilities that accrue under this Agreement during the period of such Owner's ownership. A party's rights and obligations under this Agreement shall terminate upon a transfer of such party's interest, except as to acts or omissions occurring prior to such transfer.

28. No Warranties. No Owner is hereby making, and none of them shall be deemed to have made, (i) any warranties of title to its Property or any of the Interior Concourse Areas or Walkways, (ii) any warranties regarding the condition or fitness of any of the improvements or other property located on its Property or any of the Interior Concourse Areas or Walkways, or (iii) any other representations or warranties of any kind.

29. No Merger. In no event shall any unification of title between or among one or more of the Properties (including the McCarter Property and Gateway South Property) be deemed to create or result in a termination of any of the easements, covenants, or restrictions hereunder by reason of the application of the doctrine of merger of title or any similar principle.

30. Adjustment of Dollar Amounts. In every instance where this Agreement refers to a specific dollar amount, such amount shall be increased on every fifth anniversary of the recording of this Agreement, to reflect the increase, if any, in the Index (as hereinafter defined) between (i) the most recent full calendar month immediately preceding the date of recordation of this Agreement (the "Base Month") and (ii) the most recent full month preceding the fifth anniversary of the date of recording of this Agreement and each successive five-year anniversary thereafter. The "Index" shall be the Consumer Price Index – All Items, New York/New Jersey (1982–1984 = 100), as published by the U.S. Department of Labor's Bureau of Labor Statistics ("CPI"); provided, that in any case in which variations of such index are reported, the CPI for purposes of this Agreement shall be the version thereof that is consistent with the index as determined in the base year of 1982-1984; provided further, that in any case in which the CPI shall cease to be determined on a basis comparable to the base year of 1982-1984, the CPI shall be the version or the successor thereto which is most similar to the CPI used in the base year of 1982-1984 (and the index number for the Base Month shall be adjusted to reflect the change in the manner of determining the CPI); and further provided, that if the CPI shall cease to be published, the Index shall be such other comparable measure of inflation as shall then be available and generally in use, as determined by the Association (and the Association shall determine an appropriate index value under such other index for the Base Month). The adjustment shall be made by multiplying each dollar amount by a fraction, the denominator of which is the Index as published for the Base Month, and the numerator of which is the Index as published for the most recent full month prior to each successive fifth

anniversary of such recording (subject to appropriate adjustments for changes in the Index as provided above). The Association shall be responsible for making such adjustments and shall notify all Owners thereof within sixty (60) days after each successive fifth anniversary of the recording of this Agreement.

31. Rules and Regulation. The Association shall have the power to make such Rules and Regulations as may be necessary to carry out the intent of this Agreement or to address matters that, under the provisions of this Agreement, are permitted to be addressed by Rules and Regulations. The Association shall have the right to bring lawsuits to enforce the Rules and Regulations so promulgated. The Association may implement a system for imposing fines on any Owner (including an Owner of the McCarter Property and Gateway South Property) who violates the Rules and Regulations if the Board believes such a system to be appropriate. Any such fine, if imposed, shall be considered as an Assessment levied against the Owner involved, and collection thereof may be enforced in the same manner as herein provided for the enforcement and collection of Assessments.

32. Miscellaneous.

32.1. Interpretation. Whenever used herein, unless the context otherwise provides, the singular number includes the plural, the plural the singular, and the use of any gender includes all genders. Use of terms such as "herein" or "hereof" shall be deemed to refer generally to this Agreement and not to any specific provision hereof, unless the context otherwise expressly requires. Section and subsection titles are for the convenience of reference and are not intended to limit, comment, enlarge, or change the meaning of the contents of the various paragraphs, and all references to any section, subsection, or paragraph by number or letter designation shall be deemed to mean the correspondingly designated section, subsection, or paragraph of this Agreement, unless otherwise expressly provided to the contrary.

32.2. Third Party Beneficiaries. This Agreement is not intended to give or confer any benefits, rights, privileges, claims, actions or remedies to any person or entity, including tenants and other Permittees of the Owners or any Other Party and any tenants or other Permittees of such Other Party, as a third party beneficiary.

32.3. No Implied Waiver. No failure by any Owner or the Association to insist upon the strict compliance or performance with any provision in this Agreement shall constitute a waiver of such provision unless such waiver is made in writing by such Owner. Any waiver of a breach or violation made by an Owner or the Association in writing shall not prevent a subsequent act which constitutes a violation of any provision from having the effect of a violation or prevent such Owner or the Association from exercising all of its rights and remedies hereunder.

32.4. Governing Law; Consent to Jurisdiction and Venue. This Agreement shall be governed by, and construed in accordance with, the internal laws of the State of New Jersey. Each Owner (including an Owner of the McCarter Property and Gateway South Property), solely by virtue of holding an interest in any Property that is the subject of this Agreement, shall be deemed to have consented to the jurisdiction of the courts in the State of New Jersey and shall be deemed to have waived any claim or objection that the courts in the State of New Jersey are not a convenient or proper forum.





32.5. WAIVER OF JURY TRIAL. THE PARTIES TO THIS AGREEMENT (INCLUDING ANY OWNER OF THE MCCARTER PROPERTY AND GATEWAY SOUTH PROPERTY) HEREBY WAIVE, TO THE FULLEST EXTENT PERMITTED BY LAW, THE RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTER-CLAIM FILED BY EITHER PARTY, WHETHER IN CONTRACT, TORT OR OTHERWISE, RELATING DIRECTLY OR INDIRECTLY TO THIS AGREEMENT OR ANY ACTS OR OMISSIONS OF ANY OWNER IN CONNECTION THEREWITH.

32.6. Agreement Binding. This Agreement, together with the Underlying Documents to the extent not modified hereby, set forth the entire understanding between the Owners as to the subject matter of this Agreement. The provisions hereof shall be binding upon and shall inure to the benefit of each Owner (including an Owner of the McCarter Property and Gateway South Property) and its respective successors and assigns.

32.7. Amendments to Agreement. This Agreement may be amended from time to time by written agreement solely among the Gateway Owners, duly recorded and expressly referencing this Agreement; provided, that: (i) this Agreement shall not be amended so as to impose material, additional obligations upon Gateway South or the Owner of the McCarter Property, or to materially diminish the easements and rights granted to Gateway South or the Owner of the McCarter Property under this Agreement, without the written agreement of the affected Owner(s) attached to and recorded with the applicable amendment; and (ii) no amendment shall be binding upon any Mortgagee of record at the time such any amendment is recorded unless the written consent of such Mortgagee is attached to and recorded with the applicable amendment. Notwithstanding the preceding sentence, in any case in which this Agreement authorizes the amendment hereof (or any decision which has the effect of amending this Agreement) upon the approval of the Majority Owners, then this Agreement may be amended by written agreement among the Majority Owners (recorded as provided above and subject to the limitations in clauses (i) and (ii) above), provided that the applicable amendment shall recite, and each executing Owner shall certify under oath in the amending instrument, that the Gateway Owners executing the same constitute the Majority Owners and that such Owners are amending this Agreement pursuant to a particular provision of this Agreement (which shall be specified in such amendment) authorizing them to do so.

32.8. Partial Invalidity; Inconsistencies. In the event that any one or more of the provisions contained in this Agreement shall be held to be invalid, illegal or unenforceable in any respect, the validity, legality or enforceability of the remaining provisions contained herein shall not, in any way, be affected or impaired. In the event of a conflict or inconsistency between the provisions of this Agreement and the provisions of any of the Underlying Documents, the provisions of this Agreement shall govern and prevail to the extent that (i) the parties to this Agreement have the power to amend the Underlying Documents without the consent, approval, or agreement of persons who are not parties to this Agreement and (ii) any resulting modification of the Underlying Documents would not (a) constitute or result in a violation of any of the Underlying Documents or a violation of Law or (b) entitle a person who is not a party to this Agreement to terminate any of the Underlying Documents or to terminate or diminish any of the rights, easements, licenses, or privileges granted thereby.

BK5664PG0718

32.9. Limited Purpose of Execution. Prudential is joining in the execution of this Agreement as Owner to confirm its acceptance of the easements granted to it under Section 2 of this Agreement, to grant the easements under Section 3 of this Agreement, and to subject the McCarter Property to those covenants in this Agreement that expressly apply to the McCarter Property or that by their terms otherwise bind the Owner of the McCarter Property.

32.10. Counterparts. This Agreement may be executed in any number of counterparts, each of which shall be an original, but all of which counterparts shall together constitute one and the same instrument.

32.11. Exhibits and Recitals. All Recitals to this Agreement and all exhibits attached hereto (a listing of which is set forth on Schedule 2 to this Agreement) are incorporated into and made a part of this Agreement.

32.12. No Defaults. Each of the parties executing or joining in this Agreement confirms and agrees that, as of the date of this Agreement, no default by any other of such parties is outstanding under this Agreement, the Original Grant and Agreement, or any of the Underlying Documents, and that neither the Original Grant and Agreement nor any of the Underlying Documents to which it is a party (or a successor to a party) has been modified, amended, or terminated prior to the date hereof, nor, to its knowledge, has any of the Underlying Documents been modified, amended or terminated prior to the date hereof.

[Balance of page intentionally blank]



BK5664PG0719

IN WITNESS WHEREOF, the parties have duly executed and delivered this Agreement as of the day and year first above written.

ONE GATEWAY CENTER CONDOMINIUM ASSOCIATION, INC.

By: Cher Zucker-Maltese
Name: Cher Zucker-Maltese
Title: ~~Vice President~~ Trustee

THIRD NEWARK GATEWAY URBAN RENEWAL ASSOCIATION

By: The Prudential Insurance Company of America, General Partner

By: Cher Zucker-Maltese
Name: Cher Zucker-Maltese
Title: Vice President

GATEWAY FOUR URBAN RENEWAL, L.P., a New Jersey limited partnership

By: The Prudential Insurance Company of America, General Partner

By: Cher Zucker-Maltese
Name: Cher Zucker-Maltese
Title: Vice President

THE PRUDENTIAL INSURANCE COMPANY OF AMERICA, a New Jersey corporation

By: Cher Zucker-Maltese
Name: Cher Zucker-Maltese
Title: Vice President

[Signatures continued on following page]

BK 5664 PG 0720

[Second Signature Page to Amended and Restated Grant and Agreement]

GATEWAY SOUTH URBAN RENEWAL ASSOCIATION, a New Jersey partnership

By: The Prudential Insurance Company of America, General Partner

By: Chee Zucker-Maltese
Name: Chee Zucker-Maltese
Title: Vice President



BK 5664 PG 0721

JOINDERS

Each of First Gateway and H-Gateway are joining in the execution of this Agreement to confirm the authority of the Gateway I Association to enter into this Agreement and to subject the Gateway I Property to the easements, covenants and agreements contained herein.

FIRST NEWARK GATEWAY URBAN RENEWAL ASSOCIATION, a New Jersey partnership

By: The Prudential Insurance Company of America, General Partner

By: Chee Zucker-Maltese
Name: Chee Zucker-Maltese
Title: Vice President

B-GATEWAY, LLC, a Delaware limited liability company

By: Gateway Mezz LLC, its managing member

By: Gateway Manager Corp., its managing member

By: ______________
Name: ______________
Title: ______________

## JOINDERS

Each of First Gateway and H-Gateway are joining in the execution of this Agreement to confirm the authority of the Gateway I Association to enter into this Agreement and to subject the Gateway I Property to the easements, covenants and agreements contained herein.

FIRST NEWARK GATEWAY URBAN RENEWAL ASSOCIATION, a New Jersey partnership

By: The Prudential Insurance Company of America, General Partner

By: ____________________
Name: ____________________
Title: Vice President

B-GATEWAY, LLC, a Delaware limited liability company

By: Gateway Mezz LLC, its managing member

By: Gateway Manager Corp., its managing member

By: [signature]
Name: JOHN R. MORSE
Title: Vice President





### Schedule 1

| Defined Term | Section |
|---|---|
| Adjacent Owner | 19 |
| Adjacent Property | 19 |
| Association | Recital K |
| Concourse | Recital G |
| CPI | 30 |
| Declaration | Recital B |
| Dispute Resolution Plan | 22 |
| Event of Default | 23 |
| Garage Passageway | Recital G |
| Garage Unit | Recital A |
| Gateway I Property | Recital A |
| Gateway I Association | Recital A |
| Gateway I Concourse | Recital F |
| Gateway II Concourse | Recital F |
| Gateway II Property | Recital E |
| Gateway III Garage | Recital C |
| Gateway III Garage Concourse | Recital F |
| Gateway III Lease | Recital C |
| Gateway III Property | Recital C |
| Gateway III/IV Concourse | Recital F |
| Gateway IV Property | Recital D |
| Gateway South Property | Recital G |
| Hotel Unit | Recital A |
| Index | 30 |
| Leasehold Estate | Recital D |
| Market Street Walkway | Recital G |
| McCarter Property | Recital B |
| McCarter Walkway | Recital F |
| Necessary Major Repairs | 11 |
| NEDC | Recital C |
| Notice of Dispute | 22 |
| Office Unit | Recital A |
| Original Grant and Agreement | Recital H |
| Percentage Share | 8 |
| Raymond Plaza Walkway | Recital F |
| Unavoidable Delay | 23.6 |
| Underlying Documents | Recital H |
| Unit Owner | Recital A |
| Walkway III | Recital F |
| Walkway IV | Recital F |
| Walkways | Recital F |